**GAHC4 SONGBIRD SNF PORTFOLIO, LLC**

v.

**MIDWEST HEALTH PROPERTIES, LLC; PETERSEN FARMER CITY, LLC; PETERSEN HEALTH CARE III, LLC; PETERSEN HEALTH CARE VIII, LLC; PETERSEN HEALTH CARE XI, LLC; PETERSEN HEALTH CARE XII, LLC; PETERSEN HEALTH CARE XIII, LLC; PETERSEN HEALTH GROUP, LLC; ROBINGS, LLC; PETERSEN HEALTH CARE II, INC.; MIDWEST HEALTH OPERATIONS, LLC; PETERSEN HEALTH & WELLNESS, LLC; PETERSEN HEALTH BUSINESS, LLC; PETERSEN HEALTH CARE-FARMER CITY, LLC; PETERSEN HEALTH CARE VII, LLC; PETERSEN HEALTH QUALITY, LLC; and MARK B. PETERSEN, as GUARANTOR**

# EXHIBIT A TO COMPLAINT

## PURCHASE AND SALE AGREEMENT

### Project Cardinal/Blue Jay – Petersen Portfolio

**THIS PURCHASE AND SALE AGREEMENT** ("Agreement") is made this 24th day of July, 2018 (the "Effective Date"), by and between (i) GAHC4 Songbird SNF Portfolio, LLC, a Delaware limited liability company ("Buyer"), (ii) the parties listed as "Seller" on Schedule 1 attached hereto (each being referred to as a "Seller", and two or more Seller parties being referred to as "Seller" or "Sellers", as applicable), (iii) the parties listed as "Current Operator" on Schedule 1 attached hereto (each being referred to as a "Current Operator", and two or more Current Operator parties being referred to as "Current Operator" or "Current Operators", as applicable); (iv) POP, LLC, an Illinois limited liability company, an affiliate of Seller and Current Operator ("Tenant"); and (v) Mark B. Petersen, the indirect owner of Sellers, Current Operators and Tenant ("Guarantor"). As used herein, the terms "Seller Party" and "Seller Parties" shall refer to one or more Sellers and Current Operators, as the context requires.

### RECITALS

A.      Each Seller is the owner of the real property listed on Schedule 1 adjacent to the name of that Seller, the legal description of each property stated on Exhibit A, together with the Other Property Rights (defined below) associated therewith and the Improvements (defined below) constructed thereon. For drafting convenience, Schedule 1 establishes for each property a name for that property (e.g. "Sullivan"), which name is intended to refer to all of the Property (defined below) with respect thereto. Each Current Operator is the current licensed operator of the Facility (as defined below) listed on Schedule 1 adjacent to the name of that Current Operator and the owner of the Operating Asset (as defined below) relating to the Facility it operates.

B.      Each Seller desires to sell the Property, and Buyer desires to purchase the same from Seller, on and subject to the terms and conditions set forth in this Agreement. Each Current Operator desires to sell the Operating Assets owned by it, and Buyer desires to purchase the same from Seller, on and subject to the terms and conditions set forth in this Agreement.

E.      Effective as of Closing, each Current Operator intends to transfer to Tenant at Closing the licensed operation of the Facility it operates such that Tenant will be the sole licensed operator of all of the Facilities, and in connection therewith, each Current Operator intends to transfer to Tenant at Closing certain property and rights owned by them and used in connection with the operation of the Facilities (collectively, the "Operations Transfer") pursuant to that certain Operations Transfer Agreement dated as of the Closing Date, by and between each Current Operator and Tenant (the "Operations Transfer Agreement").

D.      Guarantor is an affiliate of Seller, Current Operator and Tenant and will receive substantial benefit from the Closing of the transaction contemplated herein.

### AGREEMENT

FOR AND IN CONSIDERATION OF THE MUTUAL PROMISES SET FORTH HEREIN AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND

SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, THE PARTIES HERETO, INTENDING TO BE LEGALLY BOUND, AGREE AS FOLLOWS:

     **Section 1.**     **Terms and Definitions**: The terms listed below shall have the respective meaning given them as set forth adjacent to each term.

     **(a)**     **"Broker"** shall mean Institutional Property Advisors acting solely as Seller's agent.

     **(b)**     **"Business Day"** means any day except Saturday, Sunday or any other day on which commercial banks located in Illinois are authorized or required by Law to be closed for business (including Holidays (as defined below)).

     **(c)**     **"Closing"** shall mean the consummation of the transaction contemplated herein, which shall occur on the Closing Date (defined below), subject to extension as expressly set forth in this Agreement. The Closing shall be held through the mail and/or electronic mail by delivery of the closing documents and other items required for Closing to the Title Company (defined below) on or prior to the Closing Date, or to such other place or manner as the parties hereto may mutually agree. Title Company shall be permitted to complete Closing based upon receipt of electronic copies of closing documents, provided that the party delivering such electronic copy agrees in writing to provide originals within one (1) Business Day following the Closing Date.

     **(d)**     "**Closing Date**" shall mean the day that is thirty (30) days after expiration of the Due Diligence Period (as defined herein), subject to the satisfaction (or waiver) of the conditions to Closing set forth in <u>Section 13</u> or <u>Section 14</u> or as promptly as possible thereafter once such conditions to Closing have been satisfied or waived.

     **(e)**     **"Deposit"** shall mean Three Million and No/100 Dollars ($3,000,000.00) (together with all interest accrued thereon). Buyer shall deliver the Deposit into escrow with Title Company within three (3) Business Days after the execution and delivery to both parties of this Agreement. The Deposit shall be applied as part payment of the Purchase Price at Closing, or disbursed as agreed upon in accordance with the terms of this Agreement. Upon the expiration of the Due Diligence Period, all monies on deposit shall become nonrefundable, except for the failure of a condition precedent to Buyer's obligation to Closing, or as otherwise set forth herein.

     **(f)**     "**Due Diligence Period**" shall mean the period commencing on the Effective Date of this Agreement and ending on the forty-second (42nd) day following the later of (i) the date on which a fully executed original of this Agreement is delivered to Buyer or (ii) the date on which all of the Primary Diligence Materials (as hereinafter defined) are delivered to Buyer, or uploaded to an internet based data room to which Buyer and its designated representatives have access as of the date of such upload. Promptly following Buyer's receipt of Seller's written request, Buyer will either (i) confirm in writing the receipt (or the uploading to the data room) of all of the Primary Diligence Materials, or (ii) identify in writing the Primary Diligence Materials not received or so uploaded.

(g)     "**Master Lease**" shall mean a Master Lease to be entered into between Buyer (or the affiliated assignees of Buyer formed for the purpose of acquiring title to the Real Property, as permitted by the terms of this Agreement) and Tenant (defined below) on the Closing Date, the agreed-upon form of which is attached hereto as Exhibit F, pursuant to which Tenant will occupy the Real Property and operate the Property for the permitted use stated therein. Certain provisions and Exhibits of said form of Master Lease (including the exhibits attaching the form of Master Lease Guaranty and a form of Management Agreement approved by Landlord) are identified as being subject to further negotiation and agreement by Seller and Buyer acknowledge remain to be finalized (collectively, the "**Open Lease Terms**"), and the parties agree to negotiate agreement regarding these open items promptly and in good faith. If as of the third (3rd) Business Day preceding the last day of the Due Diligence Period Seller and Buyer have not agreed in writing to the resolution of the Open Lease Terms, the Seller shall have the right to terminate this Agreement by delivering written notice to Buyer before the end of the Due Diligence Period, where upon the Deposit shall be immediately returned to Buyer, and upon such return, except as expressly provided herein, this Agreement and all rights and obligations of the respective parties hereunder shall be null and void".

(h)     "**Material Adverse Effect**" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, is a material adverse change in, or a material adverse effect upon, in the aggregate, any of the financial condition, operations, business or properties of Seller Parties or Tenant which is reasonably likely to result in the inability of (A) Seller to perform its obligations under this Agreement, and/or (B) Tenant to execute and/or perform its obligations under the Master Lease; provided, however, that none of the following shall be deemed, in themselves, either alone or in combination, to constitute, and none of the following shall be taken into account determining whether there has been or will be, a Material Adverse Effect, unless the same prevents the completion of Closing or the operation of the Facilities: any adverse event, change or effect attributable to (a) the announcement or pendency of the transactions contemplated by this Agreement (including the impact of any of the foregoing on relationships with customers, suppliers, licensors, employees or regulators) and any event, change or effect to the extent arising from or relating to the identity of Buyer, (b) conditions affecting the industry in which the Seller participates, the U.S. economy as a whole, general regulatory or political conditions in the United States, the capital markets in general (including financial, credit and securities markets) or the markets in which the Seller operates, (c) any change in applicable Law (defined below) or the interpretation thereof, (d) actions required to be taken under applicable Law, (e) any change in accounting requirements or principles, (f) the commencement, continuation or escalation of a war, material armed hostilities or other material international or national calamity or act of terrorism directly or indirectly involving the United States, or any acts of God, natural disasters, earthquakes, tornadoes or hurricanes, and (g) any matter set forth in the Schedules attached hereto as of the date hereof.   Buyer acknowledges that there may be a disruption to the Seller's business as a result of the execution of this Agreement, the announcement by Buyer of its intention to purchase the Property and the Operating Assets or the announcement of Seller of its intention to sell the Property and the Operating Assets, and the

consummation of the transactions set forth in this Agreement, and Buyer agrees that such disruptions do not and shall not constitute a Material Adverse Effect.

       **(i)**      "**Operating Assets**" shall mean all of the following:

       **(i)**      all right, title and interest of Current Operator in and to the Property Diligence Materials owned by Current Operator, if any; and

       **(ii)**      all right, title and interest of Current Operator in and to the following intangible property owned by Current Operator and used in connection with the occupancy and operation of the Facilities to the extent assignable: all certificates of occupancy, permits, licenses and certificates (if any) unrelated to Current Operator's specific status as a licensed operator of the Facilities; all certificates of need, bed rights and other similar entitlements to the extent the same have not merged into a Current Operator's license (collectively, the "Operator Intangible Property").

       **(j)**      "**Other Property Rights**" shall mean all gores, strips, easements, licenses, rights tenements, hereditaments, privileges and appurtenances relating to the Real Property (defined below), and all of Seller's right, title and interest (whether existing now or hereinafter acquired) in and to any adjacent or abutting lands lying in the beds of streets or roads, whether open, proposed or vacated.

       **(k)**      "**Property**" shall mean all of the following:

       **(i)**      each parcel of land described on Exhibit A, together with the Other Property Rights with respect to each (collectively, the "Land");

       **(ii)**      all buildings, facilities and other improvements located on the Land, including, without limitation, all fixtures, fittings and components thereof (such as any and all elevators, partitions, ducts, motors, compressors, and the heating, ventilating, air conditioning, plumbing, sprinkling, drainage, lighting, gas, electrical and all other systems located therein) (collectively, the "Improvements", and together with the Land, the "Real Property");

       **(iii)**      all right, title and interest of Seller, if any, to any unpaid award for (A) any taking or condemnation of the Real Property or any portion thereof, or (B) any damage to the Real Property by reason of a change of grade of any street or highway;

       **(iv)**      all right, title and interest of Seller in and to the Property Diligence Materials owned by Seller;

       **(v)**      all right, title and interest of Seller in and to all certificates of occupancy, certificates of need or similar bed rights (to the extent owned by Seller and assignable, and to the extent the same have not merged into a Current Operator's license), permits, licenses and certificates and other entitlements otherwise required by a landlord for the lease to a tenant of the operation of the business and delivery of healthcare services at the Real

Property; and all warranties, guaranties and other assurances of performance pertaining to the Real Property (collectively, the "Intangible Property"); and

> **(vi)** all right, title and interest of Seller in and to all tangible personal property owned by Seller and used in connection with the Property (the "Tangible Personal Property").  Tangible Property shall not include any diagnostic medical equipment, machinery, vehicles, computer hardware or software, or supplies and inventory owned by Seller or any Operating Asset.

**(l)** "**Purchase Price**" shall mean the sum of Seventy-Eight Million Five Hundred Thousand and 00/100 Dollars ($78,500,000.00).  The Purchase Price shall be allocated among the Properties as set forth on Schedule 1 attached hereto *solely* for the purpose of determining realty transfer tax payable at Closing and certain other Closing costs and expenses agreed upon the Parties applicable to each Property. Seller Parties and Buyer agree to file federal, state and local returns based on each party's own determination of the allocation of the Purchase Price, each bearing its own consequences of any discrepancies.

**(m)** "**Tenant**" shall mean the single, special purpose entity formed to be the tenant under the Master Lease.

**(n)** "**Title Company**" shall mean the Dallas, TX office of Chicago Title Insurance Company, whose notice address shall be as follows, except as may be changed pursuant to the Notice section herein:

> Chicago Title Insurance Company
> 2828 Routh Street, Suite 800
> Dallas, TX  75201
> Attn:  Shannon Bright,
> Commercial Escrow Officer
> Tel. No.:  214-965-1719
> e-mail:  brights@CTT.com

**(o)** "**Seller's Notice Address**", which shall apply for all Seller Parties, Tenant and Guarantor, shall be as follows, except as same may be changed pursuant to the Notice section herein:

> 830 West Trailcreek Drive
> Peoria, Illinois 61614
> Attn.: Marikay L. Snyder, Esq.
> Tel. No.: (309) 689-5880
> Email: msnyder@petersenhealthcare.net

(p)     "**Buyer's Notice Address**" shall be as follows, except as same may be changed pursuant to the Notice section herein:

> Griffin-American Healthcare REIT IV, Inc.
> 18191 Von Karman Avenue, Suite 300
> Irvine, CA 92612
> Attn.: Stefan Oh
> Email:  soh@ahinvestors.com
>
> With a required copy to:
>
> Steven A. Kaye, Esq.
> Arnall Golden Gregory LLP
> 171 17th Street, NW, Suite 2100
> Atlanta, GA  30363
> Fax No.:  404-873-8101
> Email:  steven.kaye@agg.com

**Section 2.     Proration of Expenses and Payment of Costs and Recording Fees**. Seller Parties, Tenant and Buyer agree that all income, revenue and expenses of the Property shall be prorated on a calendar-year basis as of the date of Closing, such that Seller Parties receive the income and revenue from and is responsible for the expenses of the Property up to and including the day preceding the Closing Date, and Buyer receives the income and revenue from and is responsible for the expenses of the Property on and after the Closing Date, including without limitation all utility charges, real estate taxes, assessments, however Buyer's obligation to pay its share of such amounts shall be subject to the obligation of Tenant to pay same pursuant to the terms of the Master Lease, and Buyer shall have no obligation to pay a Seller Party or any other party any amount that is the obligation of Tenant under the Master Lease from and after Closing.  If Closing shall occur before the actual taxes and special assessments payable during such year are known, the apportionment of taxes shall be upon the basis of taxes for the Property payable during the immediately preceding year, provided that, if the taxes and special assessments payable during the year in which Closing occurs are thereafter determined to be more or less than the taxes payable during the preceding year, Seller Parties and Tenant promptly shall adjust the proration of such taxes and special assessments as provided in the Operations Transfer Agreement, and Seller Parties or Tenant, as the case may be, shall pay to the other any amount required as a result of such adjustment and this covenant shall not merge with the deed(s) delivered hereunder but shall survive the Closing.  Seller Parties shall be responsible for the payment of all municipal license taxes payable during the calendar year in which the Closing occurs and corresponding to any period prior to the Closing Date, and the Master Lease shall require that Tenant pay all such amounts from and after the Closing Date.  Seller shall pay all fees (including defeasance fees), charges and expenses imposed or assessed in connection with the payoff or prepayment of all loans secured by a mortgage or deed of trust encumbering the Property.  The premium and related charges for an owner's title insurance policy to be issued to Buyer shall be paid by Seller.  The premium and related charges for a lender's title insurance policy, together with any endorsements to the owner's title insurance policy and lender's title

insurance policy, shall be paid by Buyer. The recording fees necessary to record the deed(s) at the register of deeds office where each Property is located shall be paid by Buyer. The transfer tax, documentary stamp tax, and/or excise tax, if any, payable in connection with the recoding of the deeds shall be paid by Seller. Buyer shall be responsible for the cost of its own surveys (including the cost, if any, of any update to Seller's existing survey requested by Buyer), Phase 1 environmental studies and due diligence investigations. Seller Parties, Tenant, Guarantor and Buyer shall be responsible for their own attorney's fees. Seller and Buyer each shall pay one-half of all escrow and closing fees charged by the Title Company.

**Section 3.** **Sale of Property**. Seller hereby agrees to sell, transfer and convey the Property to Buyer, and Buyer hereby agrees to purchase and accept the Property from Seller, in each case for the Purchase Price and on and subject to the other terms and conditions set forth in this Agreement. Current Operators hereby agree to sell, transfer and convey the Operating Assets to Buyer, and Buyer hereby agrees to purchase and accept the Operating Assets from Current Operator, on and subject to the other terms and conditions set forth in this Agreement.

**Section 4.** **Payment of Purchase Price**. Buyer shall pay the Purchase Price to Seller as consideration for the purchase of the Property and the Operating Assets, subject to the credit for the Deposit, and further subject to the Closing adjustments expressly allocated under the terms of this Agreement, in accordance with all the terms and conditions of this Agreement. Buyer shall pay the Purchase Price by wire transfer of immediately available federal funds to the Title Company on the Closing Date, and Title Company shall disburse all funds it receives from the parties in connection with the Closing.

**Section 5.** **Title**. At Closing, Seller agrees to convey to Buyer fee simple marketable title to the Real Property by special warranty deed free and clear of all liens, defects of title, conditions, easements, restrictions, and encumbrances of record except for (i) liens for taxes for the current year and subsequent years not yet due and payable or taxes being contested in good faith by appropriate procedures (subject to apportionment as provided elsewhere in this Agreement); (ii) existing zoning laws, ordinances and regulations and other laws, ordinances and regulations respecting the use, occupancy and operation of the Property; (iii) liens arising under worker's compensation, unemployment insurance, social security, retirement and similar legislation; and (iv) other conditions, easements, restrictions, and encumbrances of record and exceptions set forth in the Title Report (as defined below) or on a survey of the Property, or as identified by Buyer as an Objection (as defined in Section 6(a)) and which Seller does not agree to cure under Section 6(a) herein and in which Buyer waives as an Objection pursuant to said Section 6(a) (collectively, the "Permitted Exceptions"). At Closing, Current Operators agree to convey to Buyer title to the Operating Assets free and clear of all liens, defects of title, conditions, restrictions, and encumbrances except for Permitted Exceptions; provided, however, with respect to any Permitted Exceptions under (iii) above, Seller agrees to indemnify Buyer for any losses incurred with respect to same, and the same shall become an obligation of Tenant under the Master Lease.

**Section 6.** **Examination of Property**. Seller and Buyer hereby agree as follows:

**(a)** **Title Examination**. Buyer shall order a title report or commitment for title

insurance (the "Title Report") from the Title Company promptly after the Effective Date. Seller shall deliver a copy of its most recent ALTA survey (which shall be certified), within three (3) Business Days after the Effective Date, which Buyer shall have the right to have updated and revised to incorporate Buyer's survey requirements. Before the expiration of the Due Diligence Period, Buyer may furnish to Seller a copy of Buyer's Title Report and survey, together with a statement specifying any defects in condition of title to the Property and Operating Assets required by this Agreement (the "Objections"). Seller Parties shall notify Buyer within ten (10) days after receipt of the Objections whether they will cure the Objections. If Seller Parties do not respond within said ten (10) day period, they shall be deemed to have elected to cure the Objections. If Seller Parties do not agree (or is deemed to not agree) to cure the Objections, Buyer shall have the right, by notice given to Seller Parties and Title Company within ten (10) days after receipt of Seller Parties' notice (or within ten (10) days of the expiration of Seller Parties' ten (10) day response period, if Seller Party does not respond), either to (a) waive the Objections and close title without abatement or reduction of the Purchase Price, or (b) terminate this Agreement and obtain a refund of the Deposit. If Buyer fails to deliver the Objections to Seller Parties within the Due Diligence Period, then Buyer shall be deemed to have elected to waive its right to make Objections. If Buyer elects to terminate this Agreement by notice or is deemed to have terminated this Agreement, the Deposit shall be immediately returned to Buyer, and upon such return, except as expressly provided herein, this Agreement and all rights and obligations of the respective parties hereunder shall be null and void. Notwithstanding the foregoing, Seller shall be solely responsible for the payment or other satisfaction and discharge of record at or before the Closing of all liens and encumbrances against the Property and objected to by Buyer which can be removed by the payment of a fixed and ascertainable sum of money. If Seller fails or refuses to cure monetary liens or encumbrances against the Property, at Buyer's written direction, Title Company shall satisfy such monetary liens or encumbrances by paying same from the Purchase Price received from or on behalf of Buyer.

Notwithstanding any provision of this Agreement to the contrary, following the Effective Date of this Agreement, Seller Party shall not create, place, grant, convey, or otherwise voluntarily cause or otherwise consent to any liens, encumbrances or restrictions affecting the Property or the Operating Assets, or any part thereof, to be created, suffered to be placed or recorded against the title to the Real Property, nor will a Seller Party during said period convey any interest in the Property or the Operating Assets to anyone other than Buyer without Buyer's prior written consent, which consent Buyer may withhold in its absolute discretion. At Closing, Seller Parties will cause the Real Property and the Operating Assets to be released or otherwise discharged from any lien securing the payment of a sum certain which has been voluntarily created by, or with the consent of, Seller or with Buyer's consent will bond over said lien to the reasonable satisfaction of Buyer and Title Company sufficient to cause Title Company to insure over said lien.

Any exceptions to title to the Real Property or Operating Assets that arise between the effective date of the title commitment obtained by Buyer and the Closing are referred to herein as "New Defects." Buyer may notify Seller Parties in writing (the "Gap Notice") of any New Defect (a) raised by the Title Company between the effective date of the Title Commitment and the Closing (the "Gap"), or (b) not otherwise known to Buyer prior to the

effective date of the Title Commitment; provided that Buyer must notify Seller Parties in writing of such objection to title within two (2) Business Days of being made aware of the existence of such exceptions. If Buyer sends a Gap Notice, the parties shall have the same rights and obligations with respect to such notice as exist in <u>Section 6(a)</u> of this Agreement with respect to the Objections.

**(b)** **Examination**. Within three (3) Business Days following execution of this Agreement, Seller Parties shall provide to Buyer copies of the documents and materials pertaining to the Property specified on <u>Exhibit B</u> attached hereto to the extent within their possession or readily obtainable by them (the "<u>Primary Diligence Materials</u>"). Additionally, promptly following execution of this Agreement, Seller Parties shall provide to Buyer all of the following to the extent not duplicative of the Primary Diligence Materials (the "<u>Additional Diligence Materials</u>", together with the Primary Diligence Materials, the "<u>Property Diligence Materials</u>"): and all contracts, subcontracts or agreements affecting the Property (the "<u>Contracts</u>"); title commitment/policy; title exceptions; ALTA survey; site plans and specifications; architectural plans, environmental/hazardous material reports, records, studies, inspections, assessments, investigations, sampling results and analyses; environmental remediation, monitoring and compliance documentation and permits; environmental notices of noncompliance, violation and penalty; environmental corrective action orders and directives, consent orders, settlement agreements, consent agreements and requests for information; public notices and advertisements regarding the presence, release or threat of a release of Hazardous Substances (as such term is defined in <u>Section 11</u> of this Agreement) at, on, under, to, from or about the Property; all correspondence to or from a third party or a governmental agency regarding a query, any claim or demand related to the environmental condition of the Property or the presence, release or threat of a release of any Hazardous Substances at, on, under, to, from or about the Property; structural reports; soils reports; governmental permits/approvals; zoning information; copies of tax bills; condemnation notices; operating expense information and reports; and utility letters and copies of all correspondence related to the existing leases, plans and specification for the Improvements, and any other documents relating to the Property reasonably requested by Buyer. If such items are not available to or in the possession or control of Seller Parties as of the Effective Date, then they shall provide same to Buyer within three (3) Business Days after acquiring same. ***All such due diligence items shall be sent to Buyer at the address set forth in*** <u>***Section 1***</u>***, to the attention of Phil Han, or at the election of Buyer, to an internet-based data room to which Buyer and its representatives have remote access***. Additionally, during the term of this Agreement, Buyer, its employees, contractors, agents and designees, shall have the right to enter the Real Property for the purposes of inspecting and testing the Property, and making surveys, mechanical and structural engineering studies, inspecting construction, and conducting any other interviews, investigations and inspections as Buyer may reasonably require to assess the condition and suitability of the Property; provided, however, that any such investigation or inspection shall be conducted during normal business hours upon reasonable advance notice to Seller, under the supervision of Seller's personnel and in such a manner as not to interfere with the conduct of the Seller's business. Seller agrees to make its personnel reasonably available and to reasonably cooperate with Buyer and the Buyer's representative's efforts to conduct such interviews, investigations and inspections. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to

disclose any information to Buyer if such disclosure would, in Seller's sole discretion: (x) reasonably likely to result in the loss of attorney-client or other legally-recognized privilege; or (y) contravene any applicable Laws, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior written consent of Seller, which consent shall not be unreasonably withheld, conditioned or delayed, Buyer shall have no right to perform invasive or subsurface investigations of the Real Property.

Subject to the policies of insurance Seller Parties and/or any occupant of the Property maintains, Buyer shall indemnify and hold Seller Parties harmless from and against any and all claims or damages to the extent directly resulting from the activities of Buyer on the Property (but not claims or damages arising out of the findings of such activities), and Buyer shall repair any and all damage caused, in whole or in part, by Buyer and return the Property to its condition prior to such damage, which obligation shall survive Closing or any termination of this Agreement. Seller Parties shall reasonably cooperate with the efforts of Buyer and the Buyer's representatives to inspect the Property.

Notwithstanding any provision of this Agreement or any other agreement to the contrary, Buyer shall have the unconditional right, for any reason or no reason, to terminate this Agreement by giving written notice thereof to Seller prior to the expiration of the Due Diligence Period, in which event this Agreement shall become null and void, whereupon Title Company shall refund the Deposit to Buyer (which obligation and right shall survive such termination), whereupon all rights, liabilities and obligations of the parties under this Agreement shall expire, except as otherwise expressly set forth herein. If Buyer does not so terminate this Agreement prior to the expiration of the Due Diligence Period, Buyer conclusively shall be deemed to have waived its right to terminate this Agreement pursuant to this Section 6(b).

**Section 7. Risk of Loss/Condemnation**. Upon an occurrence of a casualty, condemnation or taking affecting the Property which would reasonably be expected to materially or adversely affect the ability to operate the Property as currently operated, Seller shall notify Buyer in writing of same. Until Closing, the risk of loss or damage to the Property shall be borne by Seller. In the event all or a material portion of any Property is damaged in any casualty or condemned or taken, Buyer may elect to terminate this Agreement by providing written notice of such termination to Seller within ten (10) Business Days after Buyer's receipt of notice of such condemnation, taking or damage, upon which termination the Deposit allocated to said Property shall be returned to the Buyer and neither party hereto shall have any further rights, obligations or liabilities under this Agreement, except as otherwise expressly set forth herein. As used in this Section, the term "material portion" shall mean a casualty the cost of which to repair exceeds $1,000,000, as reasonably determined by an independent insurance adjuster or contractor retained by Buyer, or with respect to a taking results in the diminution of the value of a Facility that exceeds $1,000,000, as reasonably determined by an independent MAI appraiser retained by Buyer. With respect to any condemnation or taking (or any notice thereof), if Buyer does not elect to cancel this Agreement as aforesaid, there shall be no abatement of the Purchase Price and Seller Parties shall assign to Buyer at the Closing the rights of Seller Parties to the awards, if any, for the condemnation or taking, and Buyer shall be entitled to receive and keep all such awards. With respect to a casualty, if Buyer does not elect to terminate this Agreement or

does not have the right to terminate this Agreement as aforesaid, there shall be no abatement of the Purchase Price and Seller Parties shall assign to Buyer at the Closing the rights of Seller Parties to the proceeds under Seller Parties' insurance policies covering such Property with respect to such damage or destruction (or pay to Buyer any such proceeds received prior to Closing) and pay to Buyer the amount of any deductible with respect thereto, and Buyer shall be entitled to receive and keep any monies received from such insurance policies. Notwithstanding the foregoing, Tenant shall be fully responsible to repair any damage to the Property caused by a casualty or condemnation occurring prior to Closing, whether or not material for purposes of this Section, and for any claims or obligations regarding the aforesaid as required under the Master Lease, and Buyer shall in no way be required to assume or be deemed to have assumed responsibility for the same, by virtue of the occurrence of the Closing.

     **Section 8.**    **Deposit Disbursement**. The Deposit shall be held by the Title Company, in trust, and disposed of only in accordance with the following provisions:

     **(a)**    Upon receipt of the Deposit, Title Company shall deliver to Seller and Buyer written notice confirming Title Company's receipt of the Deposit, the date on which Title Company received the Deposit and that the Deposit has been deposited as required by this Agreement. The Title Company shall invest the Deposit in a money market account reasonably satisfactory to Buyer, and shall promptly provide Buyer and Seller with confirmation of the investments made.

     **(b)**    If the Closing occurs, the Title Company shall deliver the Deposit to Seller at Closing and the same shall be credited against the Purchase Price. If for any reason the Closing does not occur, the Title Company shall deliver the Deposit to Seller or Buyer only upon receipt of a written demand therefor from such party, except where this paragraph expressly provides for notice only from Buyer. Subject to the last sentence of this clause (b), if for any reason the Closing does not occur and either party makes a written demand (the "Demand") upon the Title Company for payment of the Deposit, the Title Company shall give written notice to the other party of the Demand within one (1) Business Day after receipt of the Demand. If the Title Company does not receive a written objection from the other party to the proposed payment within five (5) Business Days after the giving of such notice by Title Company, the Title Company is hereby authorized to make the payment set forth in the Demand. If the Title Company does receive such written objection within such period, the Title Company shall continue to hold such amount until otherwise directed by written instructions signed by Seller and Buyer or a final judgment of a court of competent jurisdiction in a final judgment in which all parties have had the opportunity to be heard. Notwithstanding the foregoing provisions of this clause (b), if Buyer delivers a notice to Title Company stating that Buyer has terminated this Agreement on or prior to the expiration of the Due Diligence Period, then Title Company shall immediately return the Deposit to Buyer without the necessity of delivering any notice to, or receiving any notice from Seller, and Title Company shall do so notwithstanding any objection by Seller.

     **(c)**    The parties acknowledge that the Title Company is acting solely as a stakeholder at their request and for their convenience, that the Title Company shall not be deemed to be the agent of either of the parties, and that the Title Company shall not be liable to

either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any liabilities (including reasonable attorneys' fees, expenses and disbursements) incurred by Seller or Buyer resulting from the Title Company's mistake of law respecting the Title Company scope or nature of its duties.  Seller and Buyer shall jointly and severally indemnify and hold the Title Company harmless from and against all liabilities (including reasonable attorneys' fees, expenses and disbursements) incurred in connection with the performance of the Title Company's duties hereunder, except with respect to actions or omissions taken or made by the Title Company in bad faith, in disregard of this Agreement or involving negligence on the part of the Title Company.  The Title Company has executed this Agreement in the place indicated on the signature page hereof in order to confirm that the Title Company has received and shall hold the Deposit in escrow, and shall disburse the Deposit pursuant to the provisions of this <u>Section 8</u>.

(d) Buyer and Seller, together, shall have the right to terminate the appointment of Title Company hereunder by giving to it notice of such termination, specifying the date upon which such termination shall take effect and designating a replacement Title Company, who shall sign a counterpart of this Agreement.  Upon demand of such successor Title Company, the Deposit shall be turned over and delivered to such successor Title Company, who shall thereupon be bound by all of the provisions hereof.  Title Company may resign at will and be discharged from its duties or obligations hereunder by giving notice in writing of such resignation specifying a date when such resignation shall take effect; provided, however, that (i) prior to such resignation a substitute escrow agent is approved in writing by Seller and Buyer, which approval shall not be unreasonably withheld or delayed, or (ii) Title Company shall deposit the Deposit with a court of competent jurisdiction.  After such resignation, Title Company shall have no further duties or liability hereunder.

### Section 9.    Default

(a) **Buyer Default**.  If Buyer defaults in the performance of any of its obligations undertaken in this Agreement, and should such default continue for a period of ten (10) Business Days after the date on which Buyer receives Seller Parties' written notice of default, then Seller Parties shall be entitled, as their sole and exclusive remedy, to be exercised only jointly by them, to either:  (i) if Buyer is willing to proceed with Closing, waive such default and proceed to Closing in accordance with the terms and provisions hereof; or (ii) terminate this Agreement, in which event Seller shall be entitled to receive all of the Deposit as liquidated damages as and for Seller Parties' sole and exclusive remedy.  Upon such termination, neither Buyer, Seller Parties nor Tenant shall have any further rights, obligations or liabilities hereunder, except as otherwise expressly provided herein.  Seller Parties and Buyer agree that (a) actual damages due to Buyer's default hereunder would be difficult and inconvenient to ascertain and that such amount is not a penalty and is fair and reasonable in light of all relevant circumstances, (b) the amount specified as liquidated damages is not disproportionate to the damages that would be suffered and the costs that would be incurred by a Seller Party as a result of having withdrawn the Properties from the market, and (c) Buyer desires to limit its liability under this Agreement to the amount of the Deposit paid in the event Buyer fails to complete Closing.  Seller Parties hereby waive any right to recover the balance of the Purchase Price, or

any part thereof, and the right to pursue any other remedy permitted at law or in equity against Buyer. In no event under this Section or otherwise shall Buyer be liable to Seller Parties for any punitive, speculative or consequential damages.

(b) **Seller Default**. If a Seller Party, Tenant or Guarantor defaults in the performance of its obligations hereunder, and should such default continue for a period of ten (10) Business Days after the date on which said party receives Buyer's written notice of default, then Buyer may, either waive such default and proceed to Closing in accordance with the terms and provisions hereof or may in its sole discretion elect to (i) terminate this Agreement, whereupon Title Company shall return the Deposit to Buyer and Seller Parties shall pay to Buyer all of the out-of-pocket costs and expenses incurred by Buyer in connection with this Agreement and the transaction contemplated hereby, including without limitation Buyer's reasonable attorneys' fees and expenses (which obligations shall survive such termination), which return and payment shall operate to terminate this Agreement and release Seller Parties, Tenant, Guarantor and Buyer from any and all liability hereunder, except those which are specifically stated herein to survive any termination hereof, (ii) enforce specific performance of Seller Parties', Tenant's and Guarantor's obligations hereunder, or (iii) by notice to Seller given on or before the Closing Date, extend the Closing Date for a period of up to thirty (30) days to permit Seller Parties, Tenant and Guarantor to remedy any such default, and if such extension is given and the default continues, Buyer shall continue to have all rights and remedies stated herein, at law or in equity. Notwithstanding the foregoing, in the event of a willful or intentional default of Seller Parties, Tenant and/or Guarantor hereunder, Buyer shall, in addition to the foregoing remedies, be permitted to pursue any and all rights and remedies available to Buyer at law or in equity. Buyer may exercise the foregoing remedies with respect to all of the Properties or anyone of the Properties.

**Section 10.    Closing**. The Closing shall consist of the execution and delivery of documents by Seller Parties, Tenant, Guarantor and Buyer, as set forth below, and delivery by Buyer to Seller of the Purchase Price in accordance with the terms of this Agreement. It is expected that the parties will not attend Closing and instead will utilize an escrow with Title Company. Seller shall prepare and deliver to Buyer no later than three (3) Business Days prior to the Closing Date a statement which shall set forth an estimate of all costs payable, and the pro-rations and credits provided for in this Agreement. Any item which cannot be finally prorated because of the unavailability of information shall be tentatively prorated on the basis of the best data then available and adjusted when the information is available in accordance with this Section. If the pro-rations and credits made under the Closing statement shall prove to be incorrect or incomplete for any reason, then either party shall be entitled to an adjustment to correct the same; *provided, however,* that any adjustment shall be made, if at all, within sixty (60) days after the Closing Date or, if later, the close of an applicable real estate tax cycle which determines the amount of real estate taxes applicable to this pro-ration, and if a party fails to request an adjustment to the Closing statement by a written notice delivered to the other party within the applicable period set forth above (such notice to specify in reasonable detail the items within the Closing statement that such party desires to adjust and the reasons for such adjustment), then the pro-rations and credits set forth in the Closing statement shall be binding and conclusive against such party.

(a) **Seller Parties, Tenant and Guarantor Deliverables**: Seller Parties, Tenant and Guarantor (as applicable) shall deliver to Title Company at least two (2) Business Days prior to the Closing Date (or on such other date specified below) the following executed documents, each to be provided separately for each of the Properties being acquired, all in form and substance reasonably satisfactory to Buyer and, as appropriate, executed by Seller Parties, Tenant and Guarantor (as applicable) and acknowledged or notarized:

(1) One (1) original of a special warranty deed conveying each parcel of the Real Property to Buyer, subject only to the Permitted Exceptions. Seller Parties and Buyer agree that the deed for each Property (and/or the valuation certificates filed in connection therewith) may contain a statement noting that the subject Property is part of a multi-state transaction.;

(2) if the legal description of the Land set forth on the survey obtained by Buyer (the "Survey Description") differs from the legal description of the Land set forth on the deed by which Seller acquired title, one (1) original of a quit claim deed conveying the Real Property to Buyer utilizing the Survey Description;

(3) two (2) originals of the Master Lease, together with the letter of credit, security deposit, and other documents or security reasonably required thereby, including, without limitation, the guaranty of the Master Lease executed by Guarantor in the form attached to Master Lease;

(4) two (2) originals of a subordination of any Management Agreement, as such term is defined in the Master Lease;

(5) three (3) originals of an inter-creditor and subordination agreement by and among the applicable Buyer, Tenant and Tenant's lenders (the "Inter-creditor Agreement") as required by the Master Lease, in form and substance acceptable to Buyer, Seller and Seller's lenders;

(6) one (1) original termination of each of the existing leases between Seller and the Current Operators in effect as of the Effective Date, if any;

(7) two (2) originals of the Bill of Sale in the form of Exhibit C attached hereto from Seller Parties to Buyer conveying the Tangible Personal Property and Property Diligence Materials;

(8) two (2) originals of an Assignment of Intangible Property in the form of Exhibit D attached hereto from Seller Parties to Buyer conveying the Tangible Personal Property and the Operator Intangible Property;

(9) two (2) originals of a Security Agreement in the form of Exhibit E attached hereto, executed by Tenant pursuant to which the Tenant grants to Buyer a security interest in all of the Landlord Lien Collateral, as said term is defined by the Master Lease, subject to the terms of the Inter-creditor Agreement;

(10)    UCC-1 financing statements, as required by Buyer, to be filed to perfect the lien rights granted in the Security Agreement referred to above;

(11)    two (2) originals of a settlement statement setting forth the Purchase Price, all prorations and other adjustments to be made pursuant to the terms hereof, and the funds required for Closing as contemplated hereunder;

(12)    all transfer tax statements, declarations and filings as may be necessary, appropriate or required by local practice for purposes of recordation of the deed;

(13)    an original good standing certificate for Seller, Current Operator, Tenant and Guarantor; and an original resolution of Seller authorizing the sale of the Property to Buyer, of Current Operator authorizing the sale of the Operating Assets to Buyer, of Tenant authorizing the execution and delivery of the Master Lease and related documents, and of any Guarantor authorizing the execution and delivery of the Master Lease guaranty and related documents, together with an incumbency certificate for the officers signing this Agreement and such instruments as may be reasonably required by Buyer;

(14)    to the extent not previously delivered to Buyer and if requested in writing by Buyer, but only to the extent within Seller Parties' possession or reasonable control, originals of the Property Diligence Materials and warranties issued in connection with the construction of the Improvements (it being agreed that in the event such warranties are not assignable to Buyer, Seller Parties shall have such warranties re-issued to Buyer or Tenant, as requested by Buyer); copies of all books and records applicable to the Property which are identified by Buyer by written notice to Seller and reasonably necessary for the orderly transition of operation of the Property;

(15)    an original certificate as may be required by the Internal Revenue Service pursuant to Section 1445 of the Internal Revenue Code of 1986, as amended, or the regulations issued pursuant thereto (the "Code"), certifying the non-foreign status of Seller (or, if Seller is a disregarded entity, the non-foreign status of Seller's owner that is not a disregarded entity);

(16)    such original affidavits or other instruments as the Title Company shall require in order to issue policies of title insurance (i) free of any exceptions for unfiled mechanics' or materialmen's liens for work performed prior to Closing, (ii) free from the claim of parties in possession other than the Tenant, and (iii) providing for such other customary matters as Title Company shall request;

(17)    such original documentation from Brokers as may be reasonably required to evidence the satisfaction or waiver, and release, of all liens that Brokers may have in connection with a claim for commissions or other compensation due to the Closing of the transaction contemplated by this Agreement, and in form and substance reasonably acceptable to Title Company and which will permit Title Company to issue its title insurance policy to Buyer without exception for and insuring against such Broker claims;

**(18)** Two (2) original re-certifications by Seller Parties and Tenant of the representations and warranties made by them under this Agreement;

**(19)** An original written waiver of rights from each party having a right or option to purchase the Property (or any portion thereof) from Seller;

**(20)** a certificate of insurance or other evidence reasonably satisfactory to Buyer memorializing and confirming that Tenant is maintaining policies of insurance of the types and in the amounts required by the Master Lease, in the form required by the Master Lease; and

**(21)** a Representation Letter in the form attached hereto as **Schedule "33-A";** and a signed audit letter in the form attached hereto as **Schedule "33-B"**;

**(22)** such other instruments as are reasonably required by Title Company to close the escrow and consummate the purchase of the Property in accordance with the terms hereof.

Seller Party, Tenant, Guarantor and Buyer shall provide the number of duplicate originals of the documents referenced above as the other party may reasonably request.  Additionally, at the request of a party's counsel, in advance of Closing, attorneys for the parties shall exchange electronic copies of executed closing documents (to be held in trust pending Closing) to enable counsel to confirm that all required closing documents have been executed and delivered.

**(b)** **Delivery by Buyer**.  Buyer shall deliver to Title Company on or before the Closing Date the following executed documents and items, each to be provided separately for each of the Properties being acquired, all in form and substance reasonably satisfactory to Seller and, as appropriate, executed by Buyer and acknowledged or notarized:

**(1)** the Purchase Price by wire transfer of immediately available federal funds without offset, setoff or deduction of any kind, subject to any prorations and other adjustments to be made pursuant to the terms hereof, as required by this Agreement;

**(2)** two (2) originals of the Master Lease;

**(3)** two (2) originals of a settlement statement setting forth the Purchase Price, all pro-rations and other adjustments to be made pursuant to the terms hereof, and the funds required for Closing as contemplated hereunder;

**(4)** an original good standing certificate for Buyer; and an original resolution of Buyer authorizing the purchase of the Property, of Buyer authorizing the purchase of the Operating Assets, together with an incumbency certificate for the officers signing this Agreement and such instruments as may be reasonably required by Seller;

**(5)** any documents, instruments, data, records, correspondence, agreements or other items called for under this Agreement which have not previously been delivered by Buyer; and

(6)      such other instruments as are reasonably required by Title Company to close the escrow and consummate the purchase of the Property in accordance with the terms hereof, provided such instrument does not impose an obligation or liability in excess of that otherwise required by this Agreement.

At Closing, Buyer shall instruct the Title Company to deliver the Deposit to Seller which shall be applied to the Purchase Price, and to deliver the balance of the Purchase Price to Seller.

(c)      **Regulatory Approvals**.  In addition to the obligations required to be performed hereunder by the parties at Closing, each of the parties shall perform such other acts, and shall execute, acknowledge and deliver, prior to, at or subsequent to Closing, such other applications, notices, instruments, documents and other materials as the other may reasonably request (as reasonably determined by the requesting party or its counsel) or that may be required in order to effect the consummation of the transactions contemplated hereby, to lawfully vest title to the Property in Buyer and to allow Tenant to lawfully operate the ongoing business at the Property.  The foregoing shall include, without limitation, those actions and items required by all Health Care Regulatory Agencies (defined below) having jurisdiction over the Property, the ownership, operation, maintenance, management, use, regulation, development, expansion or construction thereof, the provision of health care services thereon, the reimbursement of health care costs relating thereto, or which grant, issue or regulate any licenses, permits, provider numbers, approvals, qualifications, certifications, and other authorizations granted by any Health Care Regulatory Agency or other governmental authority or Third Party Payor (defined below) relating to or affecting the Property, the establishment, construction, ownership, operation, maintenance, management, use, regulation, development, expansion or construction thereof, the provision of health care services thereon, and/or the reimbursement of healthcare costs relating thereto (collectively, the foregoing being referred to herein as the "Regulatory Approvals"). Each party shall proceed with diligence and in cooperation with the other party to obtain the Regulatory Approvals at the earliest possible opportunity.  As used in this paragraph, the term (i) "Health Care Regulatory Agency" shall mean all agencies, boards, authorities, bodies and governmental authorities with jurisdiction over the Regulatory Approvals; and (ii) the term "Third Party Payor" shall mean Medicare, Medicaid, Tricare, Veteran's Administration, commercial and private insurers, managed care company, employee assistance programs, HMOs, preferred provider organizations and any other governmental, commercial, or other organization which maintains a healthcare reimbursement program or policy. This paragraph and the obligations of the parties hereunder shall survive the Closing.

**Section 11.      Representations by Seller Parties, Tenant and Guarantor**.  For the purpose of inducing Buyer to enter into this Agreement and to consummate the sale and purchase of the Property in accordance herewith, Seller Parties, Tenant and Guarantor make the following representations and warranties to Buyer as of the Effective Date and as of the Closing Date, which shall survive the Closing for a period of one (1) year.

(a)      Each Seller Party, Guarantor and Tenant is duly organized, validly existing and in good standing under the laws of its state of organization, and (if different than the state of organization) the State in which the Property is located, except where the failure to be so

qualified or in good standing would not have a Material Adverse Effect. Each Seller Party, Guarantor and Tenant is authorized to consummate the transaction set forth herein and fulfill all of its respective obligations hereunder and under all closing documents to be executed by them, and has all necessary limited liability company and/or corporate, as applicable, power, to execute and deliver this Agreement and all closing documents to be executed by them, and to perform all of their obligations hereunder and thereunder. Neither the execution and delivery of this Agreement and all closing documents to be executed by a Seller Party, Guarantor or Tenant, nor the performance of the obligations of a Seller Party, Guarantor or Tenant hereunder or thereunder will result in the violation of any applicable municipal, county, state and federal laws, ordinances, regulations, statutes, administrative rulings or restrictive covenants ("Laws") or any provision of the organizational documents of or will conflict with any order or decree of any court or governmental instrumentality of any nature by which a Seller Party, Tenant and/or Guarantor is bound except where the violation, breach, conflict, default, acceleration or failure to give notice would not have a Material Adverse Effect. The entire direct and indirect ownership of the Seller Parties, Tenant and Guarantor as of the Effective Date is, and as of Closing shall be, as described on Schedule 2 attached hereto;

(b)     Seller, alone, has, and at Closing hereunder will convey and transfer to Buyer, indefeasible, good and marketable legal and equitable fee simple title to the Property as a single contiguous parcel, free and clear of all mortgages, deeds of trust, liens, claims, judgments, encumbrances, ground rents, leases, tenancies, licenses, security interests, covenants, conditions, restrictions, rights of way, easements, encroachments and any other matters affecting title, except the Permitted Exceptions. Current Operator, alone, has, and at Closing hereunder will convey and transfer to Buyer, good and marketable legal and equitable title to the Operating Assets, free and clear of all liens, claims, judgments, encumbrances, security interests, covenants, conditions, restrictions and any other matters affecting title except the Permitted Exceptions.

(c)     No Seller Party or Tenant has received any written notice of any threatened, current or pending litigation, action, proceeding (including municipal, health, administrative, or condemnation proceedings), tax appeals (or other similar proceedings challenging or seeking to reduce the assessed valuation of the Real Property) or environmental investigations relating to the Property or the Operating Assets against Seller Party, Tenant, the Property or in connection with the business operated at the Real Property, which if determined adversely to Seller Party and/or Tenant would result in a Material Adverse Effect. Notwithstanding any provision in this Agreement to the contrary, the disclosure of current or pending litigation relating to the Property or Operating Assets shall in no way release Seller Parties or Tenant from responsibility for any such claims, and Buyer shall in no way be deemed to have assumed responsibility for any such claims, either by virtue of receipt of such notice or the occurrence of the Closing.

(d)     Permanent certificates of occupancy and all other licenses, permits, authorizations, consents, approvals and other grants of authority required by all governmental or quasi-governmental authorities having jurisdiction, including but not limited to Regulatory Approvals by all applicable Health Care Regulatory Agency and Third Party Payor, and the requisite certificates of the local board of fire underwriters (or other body exercising similar

functions), if any, have been, or as of Closing will have been, issued for the Improvements which are a part of the Property, and for the full functioning and operation of the Property and the operation of a skilled nursing facility and assisted living facility, as applicable, thereon, have been paid for in full, and are, and as of Closing will be, in full force and effect, except where the failure to obtain such permits, authorizations, consents, approvals and other grants would not have a Material Adverse Effect. Notwithstanding the foregoing, Tenant shall be fully responsible to obtain and maintain all such permits, authorizations, consents, approvals and other grants as required under the Master Lease, and Buyer shall in no way be deemed to have assumed responsibility for any that are not in effect as of Closing, by virtue of the occurrence of the Closing. Without limiting the generality of the foregoing,

     **(i)** Each facility operated on the Property (a "<u>Facility</u>") is duly licensed as required under applicable laws, except where the failure to obtain such license would not have a Material Adverse Effect. The licensed bed capacity (by type of licensed use) of each Facility is as set forth on <u>Schedule 1</u>. No application has been filed to reduce the number of licensed or certified beds of such Facility, to move or transfer the right to any and all of the licensed or certified beds of such Facility to any other location, or to amend or otherwise change such Facility's authorized bed capacity and/or the number of approved beds, and, to Seller Parties' knowledge, there are no proceedings or actions pending to reduce the number of licensed or certified beds of such Facility.

     **(ii)** Tenant, each Current Operator and the operation of each Facility are, and as of Closing, Tenant, each Current Operator and the operation of each Facility will be, in material compliance with all applicable laws, Health Care Licenses and requirements of Health Care Regulatory Agencies and other governmental authorities having jurisdiction over the operation of such Facility, including, (i) staffing requirements, (ii) health and fire safety codes and standards, including quality and safety standards, (iii) accepted professional standards and principles that apply to professionals providing services in such Facility; (iv) federal, state or local laws, rules, regulations or published interpretations or policies relating to the prevention of fraud and abuse, (v) insurance, reimbursement and cost reporting requirements, (vi) government payment program requirements and disclosure of ownership and related information requirements; (vii) requirements of the applicable state department of health or equivalent and all other federal, state, or focal governmental authorities, including without limitation those relating to such Facility's physical structure and environment, licensing, quality and adequacy of medical care, distribution or pharmaceuticals, rate setting, equipment, personnel, operating policies, additions to facilities and services and fee splitting, and any other applicable laws, regulations or agreements for reimbursement for the type of care or services provided with respect to such Facility, except where the failure to be in compliance would not have a Material Adverse Effect. Notwithstanding the foregoing, Tenant shall be fully responsible to comply with the foregoing as required by the Master Lease, including with respect to any non-compliance as of Closing that does not have a Material Adverse Effect, and Buyer shall in no way be deemed to have assumed responsibility for same by virtue of the occurrence of the Closing.

(iii)    Each Current Operator is, and as of Closing each Current Operator and Tenant will be, in substantial compliance with the requirements for participation in the Medicare and Medicaid Programs with respect to each Facility that currently participates in such programs, including the Medicare and Medicaid Patient and Program Protection Act of 1987, and has a current provider agreement under Title XVIII and/or XIX of the Social Security Act, which is in full force and effect, except where the failure to be in compliance would not have a Material Adverse Effect.  Notwithstanding the foregoing, Tenant shall be fully responsible to comply with the foregoing as required by the Master Lease, including with respect to any non-compliance as of Closing that does not have a Material Adverse Effect, and Buyer shall in no way be deemed to have assumed responsibility for same by virtue of the occurrence of the Closing.   The Facilities did not have any deficiencies at level G or above on its most recent survey (standard or complaint).  Neither the Facilities nor any other health care facility owned or operated by Tenant, a Current Operator or, except has been disclosed in writing to Seller Parties, their respective affiliates has been the subject of a "double G" or "immediate jeopardy" determination for the last three years.

(iv)    The average cumulative census per patient/resident days for all of the Facilities during the six (6) month period preceding Effective Date, calculated in the aggregate based upon a possible total of 660,285 annual patient days (which total is calculated by multiplying (i) the number of 1,809 licensed beds currently in operation by (ii) 365 days) is not less than seventy-four percent (74%) (the "Current Census").

(e)    None of the Contracts will be binding upon Buyer after the Closing unless expressly assumed in writing by Buyer;

(f)    Except for defaults cured on or before the date hereof, neither Seller Party nor Tenant has received any written notice of default under the terms of any of the Contracts expressly assumed in writing by Buyer;

(g)    Except for violations cured or remedied on or before the date hereof, neither Seller Party nor Tenant has received any written notice from (or delivered any notice to) any governmental authority, including, but not limited to, a Health Care Regulatory Agency and Third Party Payor, regarding any material violation of any Laws applicable to the Property and operation of the Property and the operation of a skilled nursing facility or assisted living facility thereon, and Seller Party has no knowledge of any such violations.  Prior to Closing, Seller Party and Tenant shall cure any material violation or notice of which they or Buyer receives written notice from any of the foregoing governmental, quasi-governmental or nongovernmental authorities;

(h)    No written or oral notice has been given to Seller Parties or Tenant by any holder of any mortgage or deed of trust on the Property, by any insurance company which has issued a policy with respect to any of the Property, or by any board of fire underwriters (or other body exercising similar functions), any of which notices claim any defect or deficiency or request the performance of any repairs, alterations or other work to the Property;

(i)     The Tangible Personal Property and Intangible Personal Property are free and clear of liens, security interests and other encumbrances arising by, through or under Seller Parties or Tenant, except for the Permitted Exceptions and those securing (i) a loan that shall be paid in full by Seller Parties at or prior to Closing, or (ii) a loan made to Tenant effective as of Closing that will be subject to the Inter-creditor Agreement;

(j)     To Seller Party' knowledge, there are no material defects in the structural elements of the Improvements and all Improvements (including, without limitation, machinery, equipment, electrical, plumbing, heating and air conditioning systems and equipment) located on the Property are in good mechanical working order, condition and repair, and are structurally safe and sound and have no material defect (reasonable wear and tear excepted), and there is no material leak or material defect in any roof located upon the Property. Notwithstanding the foregoing, Tenant shall in no way be released from responsibility for any claims or obligations regarding the aforesaid as required under the Master Lease, and Buyer shall in no way be deemed to have assumed responsibility for any such claims or obligations, by virtue of the occurrence of the Closing.

(k)     Neither this Agreement nor the consummation of the transactions contemplated hereby is subject to any first right of refusal or other purchase right in favor of any other person or entity; and apart from this Agreement, Seller Parties have not entered into any written agreements for the purchase or sale of the Property or the Operating Assets, or any interest therein which remain in effect.

(l)     To Seller Parties' and Tenant's knowledge, the Property and each facility operated thereon are now and has at all times been in compliance with all Laws, except where the failure to be in compliance would not have a Material Adverse Effect. Seller Parties have not received any written notice that the Property, Seller Parties' or Tenant's use and occupancy or the operation of the facility thereon violates or will violate any Laws, except where such violation would not have a Material Adverse Effect. To Seller Parties' knowledge, the Property contains sufficient parking in compliance with all applicable laws, ordinances, regulations, restrictions, and covenants, except where the failure to be in compliance would not have a Material Adverse Effect. Notwithstanding the foregoing, Tenant shall in no way be released from responsibility for any claims or obligations regarding the aforesaid as required under the Master Lease, and Buyer shall in no way be deemed to have assumed responsibility for any such claims or obligations, by virtue of the occurrence of the Closing.

(m)     Seller Party is not a "foreign person" under the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA") and upon consummation of the transaction contemplated hereby, Buyer will not be required by FIRPTA to withhold from the Purchase Price any withholding tax;

(n)     There are no employees of a Seller Party engaged in the operation or maintenance of the Property, other than those who will continue as employees of Tenant from and after Closing;

(o)     No Seller Party has initiated or participated in, any action for a change or modification in the current subdivision, site plan, zoning or other land use permits for the Property; and

(p)     The Property and Seller Parties are, and at all times have been, in compliance with all Environmental Laws, and Seller Parties have no basis to expect, nor have they received from any person, entity or governmental authority any communication or notice regarding any violation of, or liability under any law, rule, legal requirement or regulation applicable to the Property which regulates or controls matters relating to the environment or public health or safety (collectively, "Environmental Laws"), except to the extent non-compliance would not result in a Material Adverse Effect. To Seller's knowledge, there are no Hazardous Substances at, in or under the Property or at any adjoining property, or incorporated into any structure on the Property. All material permits and other authorizations required for the Property or Seller Party's use thereof have been obtained, and neither the Seller Party nor the Property are or have been in violation thereof, except to the extent such violation would not result in a Material Adverse Effect. Other than as set forth in the Property Diligence Materials, no underground storage tanks are or were present on the Property. Except as would not have a Material Adverse Effect, neither Seller Party nor the Property have incurred any liability under any Environmental Law. Seller has delivered to Purchaser true and complete copies and results of any material documents, reports or tests possessed or initiated by a Seller Party pertaining to (i) Hazardous Substances on, in or under the Property; (ii) compliance by Seller Party and the Property with any Environmental Laws; or (iii) any liability by Seller Party or the Property under any Environmental Law, and there are no material misstatements or omissions in such documents. As used in this Agreement, the term "Hazardous Substances" shall mean any substance or material which is listed, defined or deemed to be a waste, contaminant or pollutant, or substance or material potentially harmful, hazardous or toxic to human health or safety or the environment pursuant to any Environmental Laws, including but without limitation, mold, petroleum, petroleum based product and any petroleum constituent. Notwithstanding the foregoing, the terms of this Section shall not limit the obligations or liabilities of Tenant arising under the Master Lease with respect to the Hazardous Substances and Environmental Laws, and Buyer shall in no way be deemed to have assumed responsibility for any such obligations or liabilities.

(q)     No consent, approval or other action of, or filing on registration with, any governmental agency, commission or office is required on Seller Party's, Tenant's or Guarantor's behalf with respect to the transaction contemplated herein, except where the failure to get such consent, approval or other filing would not have a Material Adverse Effect.

(r)     No litigation or proceeding before any commission, agency or other administrative authority is pending or to Seller Parties' knowledge, threatened against or affecting the Property or the use of the Property or arising out of or by virtue of the ownership or use of the Property. No pending or to Seller Parties' knowledge, threatened judicial, municipal, health or administrative proceeding exists which affects the Property or the use of the Property, or in which Seller Party or Tenant is or may be a party by reason of the ownership or use of all or any part of the Property.

12252756v7

22

(s)    No Seller Party has received any written notices of any outstanding, cited or proposed material deficiencies, sanctions or work orders of any authority related to the Property and the operation of the Property.

(t)    To Seller Party's knowledge, all water, sewer, gas, electric, telephone, and other public utilities and all storm water drainage required by law or necessary for the operation of the Real Property (1) either enter the Real Property through open public streets adjoining the Land, or, if they pass through adjoining private land, do so in accordance with valid public or private easements or rights of way which will inure to the benefit of Buyer, (2) are installed, connected and operating, in good condition, with all installation and connection charges paid in full, including, without limitation, connection and the permanent right to discharge sanitary waste into the collector system of the appropriate sewer authority, and (3) are adequate to service the Real Property for the proper operation of the Facility.

(u)    No work has been performed or is in progress at, and no materials have been furnished to, the Real Property which, though not presently the subject of, might give rise to, mechanics', material suppliers', or other liens against the same or any portion thereof. If any lien for such work is filed before or after Closing hereunder, Seller Parties and Tenant shall promptly discharge the same at its cost.

(v)    All books, records, maintenance and service records, rent rolls, bills, invoices and related documentation furnished or made available (or to be made available) by Seller Parties and Tenant to Buyer are (or when presented, will be) complete, true and correct and fairly present the financial condition, assets and liabilities relating to the Property and the results of operations for such periods, have been prepared in accordance with federal income tax accounting principles consistently maintained since the beginning of the periods covered thereby. There has been no event having a Material Adverse Effect with respect to the operation of the Property since the effective date of the foregoing financial statements.

(w)    Buyer hereby acknowledges that it has an opportunity to inspect the Property as set forth in Section 6 herein, and except as set forth in this Agreement, agrees that the Property will be conveyed at Closing to Buyer in "as-is" condition with no representation or warranties whatsoever, except for those expressly stated in this Agreement or in documents executed and delivered by Seller Parties at Closing. Notwithstanding the foregoing, Seller Parties shall promptly notify Buyer of any material change in any condition with respect to the Property and Operating Assets or of any event or circumstance which makes any representation or warranty of a Seller Party, Tenant or Guarantor to Buyer under this Agreement untrue or misleading, or any covenant of Buyer under this Agreement incapable or less likely of being performed, it being understood that Seller Parties', Tenant's and Guarantor's obligation to provide notice to Buyer under this Section shall in no way relieve them of any liability for a breach by them of any of its representations, warranties or covenants under this Agreement.

(x)    All information given by Seller Parties and Tenant to Buyer in this Agreement or in connection with the transactions contemplated hereunder shall be true, complete and accurate in every material respect as of the Effective Date and, at the Closing, the foregoing representations and warranties of Seller Parties, Tenant and Guarantor shall be remade as of the

Closing Date. Seller Parties, Tenant and Guarantor have no knowledge or information of any facts, circumstances, or conditions that are inconsistent with the representations and warranties contained herein. Seller Parties, Tenant and Guarantor shall promptly inform Buyer in writing if there occurs any (i) change having a Material Adverse Effect with respect to the condition, financial or otherwise, of the Property, or the operation thereof, at any time prior to the Closing Date or (ii) if any information, document, agreement or other material delivered to Buyer is amended, superseded, modified or supplemented.

(y)     There are no commercial tenants leasing or otherwise occupying any portion of the Property.

(z)     This Agreement and all closing documents to be executed by Seller have been (or as of Closing will have been) duly authorized by all requisite corporate or other required action on the part of Seller and to Seller's knowledge, are the valid and legally binding obligation of Seller, enforceable in accordance with their respective terms.

(aa)     There are no actions, suits, claims, investigations or other legal proceedings pending or, to Seller 's knowledge, threatened against or by Seller or any affiliate of Seller that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

(bb)     Except for the representations and warranties contained in this Agreement (including the related portions of any Schedules), neither Seller, Tenant nor Guarantor has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, Tenant and/or Guarantor, including any representation or warranty as to the accuracy or completeness of any information regarding the Seller's business and the Property and Operating Assets furnished or made available to Buyer (including any information, documents or material delivered to Buyer and/or made available to Buyer in the data room, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Seller's business, or any representation or warranty arising from statute or otherwise in law.

Section 12.     Buyer's Representations. For the purpose of inducing Seller to enter into this Agreement and to consummate the sale and purchase of the Property in accordance herewith, Buyer makes the following representations and warranties to Seller Parties as of the Effective Date and as of the Closing Date.

(a)     Buyer is duly organized, validly existing and in good standing under the laws of its state of organization, and (if different than the state of organization) the State in which the Property is located except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. Buyer is authorized to consummate the transaction set forth herein and fulfill all of its respective obligations hereunder and under all closing documents to be executed by them, and has all necessary limited liability company and/or corporate, as applicable, power, to execute and deliver this Agreement and all closing documents to be executed by them, and to perform all of their obligations hereunder and thereunder. Neither the execution and delivery of this Agreement and all closing documents to be executed by Buyer,

nor the performance of the obligations of Buyer hereunder or thereunder will result in the violation of any applicable Laws or any provision of the organizational documents of or will conflict with any order or decree of any court or governmental instrumentality of any nature by which Buyer is bound except where the violation, breach, conflict, default, acceleration or failure to give notice would not have a Material Adverse Effect.

(b)     This Agreement and all closing documents to be executed by Buyer have been (or as of Closing will have been) duly authorized by all requisite corporate or other required action on the part of Buyer and to Buyer's knowledge, are the valid and legally binding obligation of Buyer, enforceable in accordance with their respective terms.

(c)     Buyer has sufficient cash on hand or other sources of available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

(d)     There are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

(e)     Buyer has conducted, or as of Closing, will have had the opportunity to conduct its own independent investigation, review and analysis of the Seller's business and the Property and/or Operating Assets.   Buyer acknowledges and agrees that: (a) in making its decision to consummate the transactions contemplated hereby, Buyer will have relied solely upon its own investigation and the investigation conducted on its behalf and the express representations and warranties of Seller set forth in this Agreement (including related portions of the Schedules); and (b) neither Seller nor any other person has made any representation or warranty as to Seller, the Seller's business, the Property, Operating Assets or this Agreement, except as expressly set forth in this Agreement (including the related portions of the Schedules).

**Section 13.     Conditions to Buyer's Obligations**.  All of Buyer's obligations hereunder (including, without limitation, Buyer's obligation to pay the Purchase Price, to accept title to the Property and Operating Assets and to consummate the Closing) are expressly conditioned on the satisfaction at or before the time of Closing of the following conditions precedent being fully satisfied as of the Closing (any one or more of which may be waived in writing in whole or in part by Buyer, at Buyer's option):

(a)     At Closing, Seller shall deliver possession of the Property to Buyer free and clear of all tenancies and other occupancies, subject to the Permitted Exceptions, except for the the Master Lease and the rights of residents and patients pursuant to admission or residency agreements assigned by Current Operator to Tenant in connection with the Operations Transfer;

(b)     Seller Parties, Tenant and Guarantor shall have timely delivered the items set forth in <u>Section 10</u> above that they are obligated to deliver;

(c)     Buyer shall have received from Title Company or any other Title Company approved by Buyer in its judgment and discretion, a current ALTA owner's form of title insurance policy, or irrevocable and unconditional binder to issue the same, with extended coverage for the Real Property in the amount of the Purchase Price, dated, or updated to, the date of the Closing, insuring, or committing to insure, at its ordinary premium rates, Buyer's good and marketable title in fee simple to the Real Property and otherwise in such form and with such endorsements as provided in the title commitment approved by Buyer pursuant to Section 6 hereof, subject only to the Permitted Exceptions;

(d)     The Real Property shall have a valid, permanent and unconditional certificate of occupancy (or the equivalent thereof) for the use and occupancy of the Property by Tenant (to the extent required by applicable law) which shall not contain any contingencies or require any additional work to be completed, and Buyer shall have received a copy of such certificate;

(e)     Tenant shall be in possession of the premises demised under the Master Lease and open for business to the public;

(f)     Between the date hereof and the Closing Date, there shall have been no event having a Material Adverse Effect with respect to the Property, the business operated thereon or the Operating Assets;

(g)     The municipality in which the Property is located or any other relevant governmental authority issues all certificates, permits and inspection and other approvals that may be required as a condition to the transfer of the Property to Buyer and to continue to operate the Property;

(h)     No later than five (5) Business Days prior to the Closing Date, Seller shall have obtained an estoppel certificate as to each restrictive covenant, declaration and/or reciprocal easement agreement of record, which estoppel certificate shall: (i) be executed by each party entitled to enforce such document; (ii) confirm that such document is in full force and effect, unmodified except as revealed by the Title Report/Commitment received by Buyer; (iii) confirm that there are no defaults by the Seller and/or the Property under such document; (iv) confirm that there are no outstanding sums owed by the Seller and/or the Property; (v) confirm that there are no outstanding construction or similar obligations of Seller and/or the Property; and (vi) be dated no earlier than thirty (30) days prior to Closing;

(i)     The representations and warranties of Seller Parties, Tenant and Guarantor contained in this Agreement shall have been true when made and shall be true at and as of the date of Closing as if such representations and warranties were made at and as of the Closing, and Seller Parties and Tenant shall have performed and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed or complied with by Seller Parties and Tenant prior to or at the Closing;

(j)     All Regulatory Approvals shall have been issued and obtained;

**(k)**    Seller shall have timely delivered the Representation Letter and the Audit Letter required by Section 33, and Buyer is reasonably satisfied with the results of said audit;

**(l)**    [Buyer shall have received evidence reasonably satisfactory to it demonstrating that the average cumulative census per patient/resident days for all of the Facilities during the six (6) month period preceding Closing, calculated in the aggregate based upon a possible total of 660,285 annual patient days (which total is calculated by multiplying (i) the number of 1,809 licensed beds currently in operation by (ii) 365 days) is not less than seventy percent (70%), as compared to the Current Census (defined in Section 11(d)(iv));]

**(m)**    Buyer shall have received evidence reasonably satisfactory to Buyer that the annualized Facility EBITDAR (as said term is defined in the Master Lease attached as an exhibit to this Agreement, and which definition imputes a five percent (5%) management fee, among other assumptions) for all Facilities (computed in the aggregate on a trailing basis for the six (6) month period preceding Closing) is not less than $10,700,000.00;

**(n)**    Buyer shall have received evidence reasonably satisfactory to Buyer that the average cumulative revenue for all Facilities (computed on a trailing basis for the six (6) month period preceding Closing) deriving from Medicaid does not exceed seventy percent (70%);

**(o)**    All documents required to complete the Operations Transfer have been executed and unconditionally delivered (subject only to completion of the Closing), and all actions required to complete the Operations Transfer have been unconditionally performed (subject only to completion of the Closing), including Tenant's receipt of the Regulatory Approvals required for it to operate the Facilities as operated by Current Operators as of the Effective Date; and

**(p)**    Buyer shall have received the clearance certificates required by Section 17 of this Agreement.

If any of the foregoing conditions precedent have not been satisfied as of Closing, Buyer may, in its sole and absolute discretion, either: (i) waive any unsatisfied conditions and proceed to Closing in accordance with the terms and provisions hereof with no deduction from or adjustment of the Purchase Price except for (a) other than the adjustment equal to the amount required to satisfy and discharge of record at or before Closing of any and all liens, judgments or other encumbrances which can be removed by the payment of a fixed and ascertainable amount together with interest and penalties thereon, if any, and together with any additional title insurance costs or premiums imposed by Title Company by reason thereof, and (b) the reasonable cost of curing any failed condition precedent to the extent reducible to a liquidated sum; (ii) suspend the Closing Date on one or more occasions for a period of time as Buyer shall reasonably determine in order to allow for all of the foregoing conditions precedent to be satisfied, during which period Seller, Current Operator and Buyer shall work cooperatively and with reasonable diligence to satisfy all of said conditions, or (iii) terminate this Agreement by delivering written notice thereof to Seller no later than Closing, upon which termination the Deposit shall be refunded to Buyer and, if the termination is the result of the failure of a

condition in Section 13(a), (b), (e), (i), (j), (k), (l), (m), (n), (o) and/or (p), above, Seller shall reimburse Buyer for all reasonable and documented costs and expenses incurred by Buyer in connection with the negotiation and performance of this Agreement and the proposed acquisition of the Property and the Operating Assets, including without limitation Buyer's due diligence investigations of the Property and Operating Assets, title insurance company charges, survey charges, third-party diligence reports, attorneys' fees and other out-of-pocket costs, all obligations, liabilities, and rights of the parties under this Agreement shall terminate.

**Section 14.** **Conditions to Seller Parties' Obligations**. Seller's obligation to deliver title to the Property and Current Operator's obligation to deliver title to the Operating Assets shall be subject to compliance by Buyer with the following conditions precedent on and as of the date of Closing:

(a) Buyer shall deliver to Seller on the Closing Date the remainder of the Purchase Price, subject to adjustment of such amount pursuant to Section 2 hereof;

(b) Buyer shall deliver to Seller and Current Operator (as applicable) on or before the Closing the items set forth in Section 10(b) above that Buyer is obligated to deliver; and

(c) The representations and warranties of Buyer contained in this Agreement shall have been true when made and shall be true in all material respects at and as of the date of Closing as if such representations and warranties were made at and as of the Closing, and Buyer shall have performed and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed or complied with by Buyer prior to or at the Closing.

**Section 15.** **Notices**. Unless otherwise provided herein, all notices and other communications which may be or are required to be given or made by any party to the other in connection herewith shall be in writing and shall be delivered to the addresses set out in Section 1, or at such other addresses as specified by written notice delivered in accordance herewith, only by one of the following means: (i) delivered in person, (ii) deposited in the United States mail, registered or certified, return receipt requested, (iii) deposited with a nationally recognized overnight courier for next Business Day delivery, or (iv) by electronic mail. Notices shall be deemed delivered and received (A) on the date of delivery if delivered in person, (B) upon receipt if deposited by United States mail, registered or certified as provided above, (C) on the date of deposit with a nationally recognized overnight courier as provided above and (D) upon transmission of the electronic mail, provided that a copy of said notice also is sent via one of the means listed in subclauses (i) through (iii) of this Section. Notices may be given on a party's behalf by its attorney.

**Section 16.** **Seller Party Covenants**. Seller Parties agree that, with respect to each of the Properties they: (a) from the date hereof until the Closing, shall continue to operate and manage each Property in a prudent and businesslike manner and in the same manner in which Seller Parties have previously operated and managed the Property, and in doing so, Seller Parties shall not take any action, or fail to take any action which would cause the Property to be

operated, managed and maintained (1) in violation or continued violation of any Laws, except where such violation would not have a Material Adverse Effect, (2) in a manner the result of which would have a Material Adverse Effect on the Property or Buyer's ability to lease to a tenant to continue the operation thereof after the Closing in substantially the same manner as now conducted, or (3) which would cause any of the representations and warranties of Seller Parties contained in this Agreement to be incorrect, incomplete or misleading in any material respect as of the Closing; (b) shall use commercially reasonable efforts to make all necessary repairs and replacements required to keep the Property in good repair and working order and in substantially the same condition as the date hereof; (c) shall maintain in full force and effect all insurance policies in place with respect to the Property as of the Effective Date; (d) shall not, without Buyer's prior written consent:  (i) amend the current leases of the Property in any manner, nor enter into any new lease, license agreement or other occupancy agreement with respect to the Property; (ii) consent to an assignment of the current leases of the Property or a sublease of the premises demised thereunder or a termination or surrender thereof; (iii) terminate the current leases of the Property nor release any guarantor of or security for any of the current leases of the Property; and/or (iv) cause, permit or consent to an alteration of the Real Property (unless such consent is non-discretionary); and (e) shall timely perform all obligations under the current leases of the Property and the Contracts, under all governmental approvals, and under all other agreements relating to the Property; and (f) shall comply with all Laws affecting the Property, except where such noncompliance would not have a Material Adverse Effect, and duly and timely file all material tax reports required to be filed by them and promptly pay when due all federal, state and local taxes and assessments, charges, fees, interest and penalties levied on them or the Property.  Seller Parties shall promptly inform Buyer in writing of any event having a Material Adverse Effect with respect to the ownership, use, occupancy or maintenance of the Property, whether insured or not. Notwithstanding the foregoing, Tenant shall be fully responsible to comply with the foregoing as required by the Master Lease, including with respect to any violation or non-compliance referred to above that exists as of Closing, whether or not such violation or non-compliance has Material Adverse Effect, and Buyer shall in no way be deemed to have assumed responsibility for same by virtue of the occurrence of the Closing.

    **Section 17.**    **Bulk Transfer Tax Clearance**.  The parties acknowledge that the laws of the state in which the Property is located may require that, as a result of the sale of the Property to Purchaser, certain governmental agencies or authorities be notified in advance of the Closing Date, of the proposed assignment and transfer of the Property by Seller to Purchaser, and further may require that Seller (and in certain circumstances, Seller's direct or indirect owners) obtain and/or deliver to Purchaser a clearance certificate evidencing the payment by Seller of certain taxes and assessments.  Seller will timely give such applicable notices (if any) to such governmental agencies or authorities, in advance of Closing, as required under such laws, and shall use its commercially reasonable best efforts to promptly obtain and deliver to Purchaser such applicable clearance certificates, if any, by the Closing Date.  The parties further acknowledge that, as a result of procedures for the administration of applications for such clearance certificate, it may be necessary for a portion of the Purchase Price to be paid to a Department of Revenue of the State in which the Property is located, which Seller hereby agrees to do or, at Purchaser's election, the Title Company will hold or pay same to said Department. Seller also shall promptly request and upon receipt (but at least three (3) Business Days before

the Closing Date) deliver to Purchaser a Tax Lien Certificate, issued by the Department of Revenue of the State in which the Property is located evidencing that no liens or claims for unpaid taxes have been assessed against Seller or the Property, and that all requirements of said office have been satisfied. Seller agrees to act in good faith and with reasonable diligence to apply for, obtain and (upon receipt) deliver to Purchaser (with copies to the Title Company) all statutorily required clearance certificates at or before the Closing Date, and the receipt thereof is a condition precedent to Purchaser's obligation to complete the Closing.

**Section 18.** **Computation of Time; Performance on Business Days**. In computing any period of time pursuant to this Agreement, the day of the act or event from which the designated period of time begins to run will not be included. The last day of the period so computed will be included, unless it is a Saturday, Sunday or a Holiday, in which event the period runs until the end of the next day which is not a Saturday, Sunday or such Holiday. The term "Holiday" shall mean Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Year's Day and any other day in which a majority of federal or national banks are not open for business. All references to a period of days herein shall be deemed to refer to calendar days unless the term "Business Day" is used.

**Section 19.** **Entire Agreement; Modification**. This Agreement constitutes the sole and entire agreement among the parties hereto with respect to the subject matter hereof and no modification of this Agreement shall be binding unless in writing and signed by Seller Party, Tenant, Guarantor and Buyer. No signature of Title Company shall be required to amend this Agreement except for an amendment modifying the terms of Section 8 of this Agreement. No prior agreement or understanding pertaining to the subject matter hereof (including, without limitation, any letter of intent executed prior to this Agreement) shall be valid or of any force or effect from and after the date hereof. Any rule of construction which provides that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement. In the event of any inconsistency between the statements in the body of this Agreement and those in the other transaction documents contemplated hereby, the Exhibits and Schedules (other than an exception expressly set forth as such in the Schedules), the statements in the body of this Agreement will control.

**Section 20.** **Severability**. If any provision of this Agreement, or the application thereof to any person or circumstance, shall be invalid or unenforceable, at any time or to any extent, then the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby. Each provision of this Agreement shall be valid and enforced to the fullest extent permitted by law

**Section 21.** **Applicable Law**. This Agreement shall be construed under the laws of the State of Illinois, without giving effect to any choice or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction). ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF

ILLINOIS IN EACH CASE LOCATED IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 22.** **Broker's Commissions**. Buyer and Seller each hereby represent that, except for the Broker listed herein, there are no other brokers involved or that have a right to proceeds in this transaction. Seller shall be responsible for payment of commissions to the Broker pursuant to a separate written agreement executed by Seller. Seller and Buyer each hereby agree to indemnify and hold the other harmless from all loss, cost, damage or expense (including reasonable attorneys' fees at both trial and appellate levels) incurred by the other as a result of any claim arising out of the acts of the indemnifying party (or others on its behalf) for a commission, finder's fee or similar compensation made by any broker, finder or any party who claims to have dealt with such party (except that Buyer shall have no obligations hereunder with respect to any claim by Broker). The representations, warranties and indemnity obligations contained in this section shall survive the Closing or the earlier termination of this Agreement.

**Section 23.** **Assignment**. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder. If this Agreement relates to more than one Property, Buyer may assign this Agreement in part with respect to individual Properties to facilitate the acquisition of each Property by a separate entity formed and wholly owned by Buyer with respect to each Property.

**Section 24.** **Attorneys' Fees**. In any action between Buyer, Seller Party, Tenant, Guarantor as a result of a party's failure to perform or a default under this Agreement, the prevailing party shall be entitled to recover from the other party, and the other party shall pay to the prevailing party, the prevailing party's attorneys' fees, expenses and court costs incurred in such action.

**Section 25.** **Counterparts**. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each of the parties and delivered to the other party. Signatures on this Agreement which are transmitted electronically shall be legally valid and enforceable for all purposes; provided, however, any party shall deliver an original signature on this Agreement to the other party upon request.

**Section 26.** **Anti-Terrorism; OFAC**. Neither Buyer, Seller Party, Tenant, Guarantor nor any of their affiliates, are in violation of any Anti-Terrorism Law (as hereinafter defined) or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law. "Anti-Terrorism Laws" shall mean any laws relating to terrorism or money laundering, including: Executive Order No. 13224; the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or may hereafter be, renewed, extended, amended or replaced; the applicable laws comprising or implementing the Bank Secrecy Act; and the applicable laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing may from time to time be amended, renewed, extended, or replaced).

**Section 27.** **Buyer's Disclosures**. Seller Party, Tenant and Guarantor acknowledge that Buyer is, and/or may assign this Agreement to one or more subsidiaries of, an entity that is a Real Estate Investment Trust and that, as such, it may be subject to certain filing and reporting requirements in accordance with federal laws and regulations, including but not limited to, regulations promulgated by the Securities and Exchange Commission. Accordingly, and notwithstanding any provision of this Agreement or the provisions of any other existing agreement between the parties hereto to the contrary, Buyer may publicly file, disclose, report or publish any and all information related to this transaction that may be reasonably interpreted as being required by federal law or regulation.

**Section 28.** **No Third Party Beneficiaries**. BUYER, SELLER PARTY, TENANT AND GUARANTOR HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS EXPRESSLY SET FORTH HEREIN TO THE CONTRARY, THERE ARE NO THIRD PARTY BENEFICIARIES TO THIS AGREEMENT, AND, ACCORDINGLY, NO THIRD PARTY (INCLUDING, WITHOUT LIMITATION, ANY BROKER) SHALL HAVE THE RIGHT TO ENFORCE THIS AGREEMENT FOR THE BENEFIT OF SUCH THIRD PARTY OR AGAINST THE INTERESTS OF BUYER, SELLER PARTY OR CURRENT OPERATOR. EITHER OF SELLER OR BUYER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING BROUGHT BY ANY SUCH THIRD PARTY AGAINST SELLER OR BUYER IN CONNECTION WITH THIS AGREEMENT AS CONCLUSIVE EVIDENCE OF THE PARTIES' INTENTIONS.

**Section 29.** **Time of Performance**. Time is of the essence of this Agreement.

**Section 30.** **Further Assurances**. Each party hereto agrees that, from and after the Closing, upon the reasonable request of the other party hereto and without further consideration, such party will execute and deliver to such other party such documents and further assurances and will take such other actions (without cost or liability to such party) as such other party may reasonably request in order to carry out the purpose and intention of this Agreement, including, but not limited, to the effective consummation of the transactions contemplated under the provisions of this Agreement. The provisions of this Section shall survive Closing.

**Section 31.    Consequential Damages.**  Neither Seller Party nor Buyer shall be entitled to recover (and in no event shall either party be responsible for) lost profits or consequential, special or any other indirect damages arising from this Agreement or either party's obligations under this Agreement.

**Section 32.    Jury Waiver**.    THE PARTIES HERETO EACH DO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, OR UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE DOCUMENTS DELIVERED BY THEM AT CLOSING, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ANY ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THIS AGREEMENT OR THE PROPERTY (INCLUDING WITHOUT LIMITATION, ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).    THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO AND ACCEPT THIS AGREEMENT AND SHALL SURVIVE THE CLOSING OF TERMINATION OF THIS AGREEMENT.

**Section 33.    Cooperation with Audit**.  Seller Parties acknowledges that Buyer intends to assign all of its rights, title and interest in and to this Agreement, and that the assignee may be affiliated with a publicly registered company ("Registered Company") promoted by Buyer. Seller Parties acknowledges that it has been advised that if the Buyer is affiliated with a Registered Company, the assignee may be required to make certain filings with the Securities and Exchange Commission (the "SEC Filings") that relate to the most recent pre-acquisition fiscal year (the "Audited Year") and the current fiscal year through the date of acquisition (the "stub period") for the Property.  To assist the assignee in preparing the SEC Filings, the Seller Parties covenant to provide the assignee with the following during the Due Diligence Period and for one (1) year thereafter with respect to Seller Party, each Current Operator and/or (as requested by Buyer) Tenant and any guarantor of the Master Lease: (i) access to bank statements for the Audited Year and stub period; (ii) rent roll as of the end of the Audited Year and stub period; (iii) operating statements for the Audited Year and stub period; (iv) access to the general ledger for the Audited Year and stub period; (v) cash receipts schedule for each month in the Audited Year and stub period; (vi) access to invoices for expenses and capital improvements in the Audited Year and stub period; (vii) accounts payable ledger and accrued expense reconciliations; (viii) check register for the 3-months following the Audited Year and stub period; (ix) all leases and 5-year lease schedules; (x) copies of all insurance documentation for the Audited Year and stub period; (xi) copies of accounts receivable aging as of the end of the Audited Year and stub period along with an explanation for all accounts over thirty (30) days past due as of the end of the Audited Year and stub period; (xii) signed representation letter in the form attached hereto as **Schedule "33-A"** ("Representation Letter"), and (xiii) to the extent necessary, a signed audit letter in the form attached hereto as **Schedule "33-B"**("Audit Letter"); provided, however, that any such investigation or inspection shall be conducted during normal business hours upon reasonable advance notice to Seller, and in such a manner as not to interfere with the conduct of the Seller's business.  Notwithstanding anything to the contrary in this

Agreement, Seller shall not be required to disclose any information to Buyer if such disclosure would, in Seller's sole discretion: (x) be reasonably likely to jeopardize any attorney-client or other legally-recognized privilege; or (y) contravene any applicable Laws, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Seller Party also agrees to deliver a signed Representation Letter and signed Audit Letter to Buyer within five (5) Business Days prior to Closing, and such delivery shall be a condition to Closing. The provisions of this Section shall survive Closing. Seller Party also agrees to reasonably cooperate with Buyer to obtain a comfort letter, as may be reasonably requested by Buyer.

**Section 34. Seller Guarantor**. As an inducement to Buyer to enter into and consummate the transactions contemplated under this Agreement, Guarantor hereby absolutely, unconditionally, and irrevocably guarantees to Buyer, and each of its Affiliates and each of their respective officers, directors, employees and Affiliates (collectively, the "Buyer Indemnified Parties") each and every representation, warranty, covenant, agreement, and obligation of the Seller Parties and the full and timely performance by the Seller Parties, and each of them, of their obligations under this Agreement and the documents executed by each of them in connection herewith (the "Guaranteed Obligations"). This is a guarantee of payment and performance, and not merely of collection, and Guarantor acknowledges and agrees that, except as otherwise set forth herein, this guarantee is full and unconditional, and no release or extinguishments of the Seller Parties' obligations or liabilities (other than in accordance with the terms of this Agreement), whether by decree under bankruptcy law or otherwise, shall affect the continuing validity and enforceability of this guarantee. Guarantor agrees that performance of the Guaranteed Obligations by Guarantor shall be a primary obligation, and shall not be subject to any counterclaim (other than a compulsory counterclaim), set off, abatement, deferment or defense based upon any claim that Guarantor may have against Buyer. Guarantor agrees that performance of the Guaranteed Obligations by Guarantor shall remain in full force and effect without regard to, and shall not be released, discharged or affected in any way by, any circumstance or condition other than those set forth in this Agreement, whether or not Guarantor shall have any knowledge thereof, including, without limitation, (i) any voluntary or involuntary bankruptcy, assignment for the benefit of creditors, receivership, or similar events or proceedings with respect to any Seller Party or Guarantor, as applicable, or (ii) any other occurrence, circumstance, happening, or event, whether similar or dissimilar to the foregoing and whether foreseen or unforeseen, which otherwise might constitute a legal or equitable defense or discharge of the liabilities of Guarantor or which otherwise might limit recourse against Seller or Guarantor, to the fullest extent permitted by law. Guarantor hereby waives, for the benefit of the Buyer Indemnified Parties, any right to require any Seller Party, as a condition of payment or performance by Guarantor, to proceed against Seller or pursue any other remedies whatsoever (other than Buyer's obligation to initially seek recovery against the Escrow Amount pursuant to the terms of Section 17.5). For so long as this guarantee remains in effect, Guarantor shall not transfer, lease, assign, sell or convey substantially all of its assets or cease operating its business in the ordinary course without the prior written consent of Buyer unless Guarantor is replaced with another guarantor to Buyer's satisfaction. Guarantor understands that Buyer is relying on this guarantee in entering into this Agreement. The terms of this Section shall expressly survive the termination of this Agreement and/or the completion of Closing.

**Section 35.    Confidentiality**.  Buyer acknowledges that any confidential information provided to it or to its affiliates prior to the Closing by Seller in connection with the transactions contemplated hereby shall be kept confidential by Buyer, and Buyer shall and shall use commercially reasonable efforts to cause its affiliates and their respective directors, officers, employees and advisors to keep confidential all such confidential or proprietary information provided in connection with the transactions contemplated hereby, except as required by applicable Law or administrative or judicial process and except for information that is available to the public on the date of this Agreement, or thereafter becomes available to the public other than as a result of a breach of this Section.  If this Agreement is, for any reason, terminated prior to the Closing, the provisions of this Section shall nonetheless continue in full force and effect for a period of two (2) years.

**Section 36.    Damages for Breach**.  In no event shall the aggregate amount of any and all damages incurred by Buyer and any successor or permitted assignee for breach of any and all representations and warranties of Seller Parties, Tenant and/or Guarantor, exceed at any time Seven Million Eight Hundred Fifty Thousand and No/100 Dollars ($7,850,000.00); provided further, that Seller shall not be liable to Buyer for such damage or loss unless the aggregate of all such losses exceeds Seven Hundred Eighty-Five Thousand and No/100 Dollars ($785,000.00) at which point Seller will be liable to Buyer for the entire amount of such losses including the initial $785,000.00; provided, however, Seller's liability cap hereunder shall not apply to obligations arising (a) as a result of fraud or intentional misrepresentation or (b) any breach of a representation or warranty contained in Sections 11(a), (b), (i), (p) or  (q) hereof.

**Section 37.    EXHIBITS**.  The following exhibits are attached to this Agreement and are incorporated into this Agreement by this reference and made a part hereof for all purposes:

| | |
|---|---|
| Schedule 1 | List of Seller Parties and Properties |
| Schedule 2 | Depiction of Seller Entities, Guarantor and Tenant Ownership |
| Schedule 33A | Form of Representation Letter |
| Schedule 33B | Form of Audit Letter |
| Exhibit A | Legal Description of Land |
| Exhibit B | Seller Deliverables |
| Exhibit C | Form of Bill of Sale |
| Exhibit D | Form of Assignment of Intangible Property |
| Exhibit E | Form of Security Agreement |
| Exhibit F | Form of Master Lease |

The remainder of this page is intentionally blank.  Signatures follow on the next page.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the day and year first set forth above.

**SELLERS:**

Midwest Health Properties, LLC
Petersen - Farmer City, LLC
Petersen Health Care III, LLC
Petersen Health Care VIII, LLC
Petersen Health Care XI, LLC
Petersen Health Care XIII, LLC
Petersen Health Group, LLC
Petersen Health Care XII, LLC
Robings, LLC

Each an Illinois limited liability company

For each, by: _____

Name: Mark B. Petersen

Title: Manager

Petersen Health Care II, Inc.

By: _____

Name: Mark B. Petersen

Title: President

The remainder of this page is intentionally blank. Signatures follow on the next page.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the day and year first set forth above.

**CURRENT OPERATORS:**

Midwest Health Operations, LLC
Petersen Health & Wellness, LLC
Petersen Health Business, LLC
Petersen Health Care - Farmer City, LLC
Petersen Health Care VII, LLC
Petersen Health Group, LLC
Petersen Health Quality, LLC

Each an Illinois limited liability company

For each, by: _____

Name: Mark B. Petersen

Title: Manager


Petersen Health Care II, Inc.

By: _____

Name: Mark B. Petersen

Title: President


The remainder of this page is intentionally blank. Signatures follow on the next page.

12252756v7

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the day and year first set forth above.

**GUARANTOR:**

Name:  Mark B. Petersen

The remainder of this page is intentionally blank.  Signatures follow on the next page.

12252756v7

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the day and year first set forth above.

**BUYER:**

GAHC4 Songbird SNF Portfolio, LLC**,** a
Delaware limited liability company

By: _____

Name: Jeffrey P. Hanson

Title: Authorized Signatory

The remainder of this page is intentionally blank. Signatures follow on the next page.

12252756v7

THE UNDERSIGNED HEREBY ACKNOWLEDGES AND AGREES TO BE BOUND BY THE TERMS OF THIS AGREEMENT RELATING TO TITLE COMPANY AND THE DEPOSIT.

**TITLE COMPANY:**

Chicago Title Insurance Company

By: _____

Name: _____ **Shannon Bright**

Title: _____ **Escrow Officer**

**SCHEDULE 1**

**Facility Names and Addresses; Seller; Purchaser; Purchase Price Allocation; Licensed Beds**

| | Facility | Address | Seller | Current Operator | Allocation of Purchase Price for Closing Costs | Number, Type of Licensed Beds; Operating Beds |
|---|---|---|---|---|---|---|
| 1. | Sullivan Rehabilitation & Health Center ("Sullivan") | 11 Hawthorne Lane, Sullivan, IL 61951 | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | $1,482,863 | 123 SNF; 95 |
| 2. | Swansea Rehabilitation & Health Center ("Swansea") | 1405 North Second Street, Swansea, IL 62226 | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | $5,921,368 | 94 SNF; 84 |
| 3. | Eastview Terrace ("Eastview") | 100 Eastview Place, Sullivan, IL 61951 | Petersen Health Care XII, LLC | Petersen Health Quality, LLC | $5,136,885 | 63 SNF; 57 |
| 4. | Arcola Health Care ("Arcola") | 422 E. Fourth South St., Arcola, IL 61910 | Petersen Health Care XII, LLC | Petersen Health Quality, LLC | $4,638,731 | 50 SNF and 50 ICF; 95 |
| 5. | Shelbyville Rehabilitation & Health Center ("Shelbyville") | 2116 S. 3rd Street, Shelbyville, IL 62565 | Petersen Health Care III, LLC | Petersen Health & Wellness, LLC | $3,357,456 | 12 SNF and 69 ICF; 60 |
| 6. | Tuscola Health Care Center ("Tuscola") | 1203 Egyptian Trail, Tuscola, IL 61953 | Petersen Health Care XIII, LLC | Petersen Health & Wellness, LLC | $4,911,111 | 73 SNF; 57 |
| 7. | Effingham Rehabilitation & Health Center ("Effingham") | 1610 North Lakewood Drive, Effingham, IL 62401 | Petersen Health Care VIII, LLC | Petersen Health Care VII, LLC | $2,141,706 | 62 SNF; 54 |
| 8. | Aledo Rehabilitation & Health Center ("Aledo") | 304 S. W. 12th Street, Aledo, IL 61231 | Petersen Health Group, LLC | Petersen Health Group, LLC | $1,881,128 | 80 SNF; 72 |
| 9. | Lebanon Care Center ("Lebanon") | 1201 North Alton, Lebanon, IL 62254 | Petersen Health Group, LLC | Petersen Health Group, LLC | $2,833,872 | 90 SNF; 90 |
| 10. | Tarkio Rehabilitation & Health Care ("Tarkio") | 300 Cedar Street, Tarkio, MO 64491 | Midwest Health Properties, LLC | Midwest Health Operations, LLC | $3,482,174 | 95 SNF; 54 |
| 11. | Robings Manor Nursing Home ("Robings") | 502 N. Main St., Brighton, IL 62012 | Robings, LLC | Petersen Health Business, LLC | $3,480,037 | 32 SNF, 43 ICF and 8 IL; 75 |
| 12. | Rosiclare Rehab & Health Care Center | 55 Ferrell Rd., Rosiclare, IL 62982 | Petersen Health Care XI, LLC | Petersen Health Business, LLC | $3,859,866 | 62 SNF; 59 |
| 13. | Courtyard Estates of Sullivan ("Courtyard") | 20 Courtyard Blvd, Sullivan, IL 61951 | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | $4,687,594 | 50 SNF; 50 |

| | Facility | Address | Seller | Current Operator | Allocation of Purchase Price for Closing Costs | Number, Type of Licensed Beds; Operating Beds |
|---|---|---|---|---|---|---|
| 14. | Royal Oaks Care Center ("Royal Oaks") | 605 East Church St, Kewanee, IL 61443 | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | $5,441,634 | 200 SNF; 186 |
| 15. | Twin Lakes Rehab & Health Center ("Twin Lakes") | 310 South Eads Ave, Paris, IL 61944 | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | $1,564,649 | 62 SNF; 52 |
| 16. | Watseka Health Care ("Watseka") | 715 Raymond Rd, Watseka, IL 60970 | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | $3,243,097 | 123 SNF; 95 |
| 17. | Collinsville Rehab & Health Center ("Collinsville") | 614 North Summit Ave, Collinsville, IL 62234 | Petersen Health Care XI, LLC | Petersen Health Business, LLC | $3,619,860 | 98 SNF; 90 |
| 18. | Laharpe Davier Health Care ("Laharpe") | 101 North B St, La Harpe, IL 61450 | Petersen Health Care XI, LLC | Petersen Health Business, LLC | $536,965 | 45 SNF; 45 |
| 19. | Shangri-La Rehab & Living ("Shangri-La") | 930 NE Duncan Rd, Blue Springs, MO 64014 | Petersen Health Care XI, LLC | Petersen Health Business, LLC | $594,969 | 120 SNF; 101 |
| 20. | Westside Health Care ("Westside") | 601 North Columbia St, West Frankfort, IL 62896 | Petersen Health Care XI, LLC | Petersen Health Business, LLC | $763,667 | 96 SNF; 73 |
| 21. | Havana Health Care ("Havana") | 609 North Harpham St, Havana, IL 62644 | Petersen Health Care XII, LLC | Petersen Health Quality, LLC | $4,433,754 | 20 SNF and 78 ICF; 82 |
| 22. | McLeansboro Rehab & Health Care ("McLeansboro") | 405 W Carpenter St, McLeansboro, IL 62859 | Petersen Health Care III, LLC | Petersen Health & Wellness, LLC | $2,712,825 | 43 SNF; 41 |
| 23. | Vandalia Rehab & Health Care ("Vandalia") | 1500 W St Louis Ave, Vandalia, IL 62471 | Petersen Health Care XIII, LLC | Petersen Health & Wellness, LLC | $2,756,089 | 57 SNF and 59 ICF; 89 |
| 24. | Farmer City Rehab & Health Center ("Farmer City") | 404 Brookview Dr, Farmer City, IL 61842 | Petersen - Farmer City, LLC | Petersen Health Care - Farmer City, LLC | $5,017,703 | 56 SNF; 53 |

**SCHEDULE 2**
**OWNERSHIP OF SELLERS, CURRENT OPERATORS, GUARANTOR AND TENANT**

| Facility | Seller | Current Operator | Current Operator Ownership |
|---|---|---|---|
| Aledo | Petersen Health Group, LLC | Petersen Health Group, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Arcola | Petersen Health Care XII, LLC | Petersen Health Quality, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Collinsville | Petersen Health Care XI, LLC | Petersen Health Business, LLC | 99% MBP, 1% MBP, Partner, LLC |
| CYE Sullivan | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | 100% MBP |
| Eastview | Petersen Health Care XII, LLC | Petersen Health Quality, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Effingham | Petersen Health Care VIII, LLC | Petersen Health Care VII, LLC | 100% MBP |
| Farmer | Petersen - Farmer City, LLC | Petersen Health Care - Farmer City, LLC | 100% MBP |
| Havana | Petersen Health Care XII, LLC | Petersen Health Quality, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Laharpe | Petersen Health Care XI, LLC | Petersen Health Business, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Lebanon | Petersen Health Group, LLC | Petersen Health Group, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Mcleansboro | Petersen Health Care III, LLC | Petersen Health & Wellness, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Robings | Robings, LLC | Petersen Health Business, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Rosiclare | Petersen Health Care XI, LLC | Petersen Health Business, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Royal | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | 100% MBP |
| Shangri La | Petersen Health Care XI, LLC | Petersen Health Business, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Shelbyville | Petersen Health Care III, LLC | Petersen Health & Wellness, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Sullivan | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | 100% MBP |
| Swansea | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | 100% MBP |
| Tarkio | Midwest Health Properties, LLC | Midwest Health Operations, LLC | 100% MBP |
| Tuscola | Petersen Health Care XIII, LLC | Petersen Health & Wellness, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Twin | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | 100% MBP |
| Vandalia | Petersen Health Care XIII, LLC | Petersen Health & Wellness, LLC | 99% MBP, 1% MBP, Partner, LLC |
| Watseka | Petersen Health Care II, Inc. | Petersen Health Care II, Inc. | 100% MBP |
| Westside | Petersen Health Care XI, LLC | Petersen Health Business, LLC | 99% MBP, 1% MBP, Partner, LLC |
| KEY: | "MBP" means Mark B. Petersen.  MBP Partner, LLC is an Illinois limited liability company. | | |
| | MBP directly owns 100% of each Seller.  MBP owns 100% of MBP Partner, LLC. | | |
| | Tenant is a newly formed Illinois limited liability company owned 99% by MBP and 1% by MBP Partner, LLC | | |

<u>**SCHEDULE 33A**</u>

**FORM OF REPRESENTATION LETTER**

[*Prepared on Seller's letterhead*]

[*Date*]

KMJ Corbin & Company LLP
555 Anton Blvd. Suite 1000
Costa Mesa, California 92626

This representation letter is provided in connection with your audit of the statement of revenues and certain expenses (the "Statement") of [*Property Name*] (the "Property"), for the purpose of expressing an opinion on whether the Statement presents fairly, in all material respects, the revenues and certain expenses and the related notes to the Statement for the year ended December 31, 20XX [*and your review of the interim statement of revenues and certain expenses for the _____ months ended _____, 20XX*] of the Property in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and Rules and Regulations of the U.S. Securities and Exchange Commission.

The unaudited interim financial information for the [*_____ months ended _____, 20XX*] has been presented and fairly presented in accordance with generally accepted accounting principles applicable to interim financial information. The accounting principles used to prepare the unaudited interim financial information are consistent with those used to prepare the audited statement of revenues and certain expenses.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement.

We confirm that, to the best of our knowledge and belief, having made such inquiries as we considered necessary for the purpose of appropriately informing ourselves during your audit:

**Statement of Revenues and Certain Expenses**

- We are responsible for the preparation and fair presentation of the financial statements in accordance with U.S. GAAP.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of Statement that are free from material misstatement, whether due to fraud or error.
- We acknowledge our responsibility for the design, implementation, and maintenance of internal control to prevent and detect fraud.
- Significant assumptions used by us in making accounting estimates, including those measured at fair value, are reasonable.

12252756v7

- Related party relationships and transactions have been appropriately accounted for and disclosed in accordance with the requirements of U.S. GAAP.
- All events subsequent to the date of the Statement and for which U.S. GAAP requires adjustment or disclosure have been adjusted or disclosed.
- The effects of uncorrected misstatements are immaterial, both individually and in the aggregate, to the Statement as a whole.
- The effects of all known actual or possible litigation and claims have been accounted for and disclosed in accordance with U.S. GAAP.

**Information Provided**

- We have provided you with:
  - Access to all information, of which we are aware that is relevant to the preparation and fair presentation of the Statement, such as records, documentation, and other matters;
  - Additional information that you have requested from us for the purpose of the audit; and
  - Unrestricted access to persons within the entity from whom you determined it necessary to obtain audit evidence.
- We have no knowledge of any fraud or suspected fraud that affects the Property and involves:
  - Management;
  - Employees who have significant roles in internal control; or
  - Others when the fraud could have a material effect on the Statement.
- We have no knowledge of any allegations of fraud, or suspected fraud, affecting the Property's revenues and certain expenses communicated by employees, former employees, analysts, regulators, or others.
- We have disclosed to you all known instances of noncompliance or suspected noncompliance with laws and regulations whose effects should be considered when preparing the statement of revenues and certain expenses.
- We are not aware of any pending or threatened litigation and claims whose effects should be considered when preparing the Statement.
- We have disclosed to you the identity of the Property's related parties and all the related party relationships and transactions of which we are aware.
- No events have occurred subsequent to _____ [*date of issuance*] that require consideration as adjustments to or disclosures in the Statement.
- The responses set forth on the questionnaire attached hereto as Exhibit A and made a part hereof have been provided by management of [*enter name of seller*] (the "Company").

_____

Name

_____

Title

<u>**SCHEDULE 33B**</u>

**FORM OF AUDIT INQUIRY LETTER**

[*Prepared on Seller's letterhead*]

[*Date*]

[*Name of Seller's Attorney*]
[*Address of Seller's Attorney*]

Dear [*insert name of Seller's Attorney*]:

In connection with an audit of our statement of revenues and certain expenses for the year ended December 31, 20XX (the "Financial Statements") that relate to [*enter the address of the property*], please furnish to the independent auditors, KMJ Corbin & Company LLP, located at 555 Anton Blvd. Suite 1000, Costa Mesa, California 92626, the following information concerning certain contingencies involving matters as to which you have devoted substantive attention on behalf of [*enter name of Seller*] (the "Company") (and any of its subsidiaries, if applicable) in the form of legal consultation or representation. These contingencies are regarded by us as material for this purpose if they involve claims amounting to more than [*insert materiality dollar amount*], individually or in the aggregate.

<u>Pending or Threatened Litigation, Asserted Claims, and Assessments</u>

Please furnish to the auditors a description and evaluation of all pending or threatened litigation, asserted claims, and assessments. Your response should include the following:

1. The nature of each matter, including (a) the proceedings, (b) the amount of monetary damages sought, or if no amounts are indicated, a statement to that effect, (c) the extent to which potential damages are covered by insurance, and (d) the objectives sought by the plaintiff other than monetary or other damages.
2. The progress of each matter to date.
3. The way we are responding or intend to respond (e.g., to contest the case vigorously or to seek an out-of-court settlement).
4. An evaluation of the likelihood of an unfavorable outcome and an estimate, if one can be made, of the amount or range of potential loss. If you cannot express an opinion on the outcome of certain litigation, please so state, together with your reasons for that position.

<u>Unasserted Claims and Assessments (considered by us to be probable of assertion, and that, if asserted, would have at least a reasonable possibility of an unfavorable outcome)</u>

The Company's management believes that there are no unasserted claims which are probable of assertion or which, if asserted, would have at least a reasonable possibility of an unfavorable outcome.

We understand that whenever, in the course of performing legal services for us with respect to a matter recognized to involve an unasserted possible claim or assessment that may call for financial statement disclosure, if you have formed a professional conclusion that we should disclose or consider disclosure concerning such possible claim or assessment, as a matter of professional responsibility to us, you will so advise us and will consult with us concerning the question of such disclosure and the applicable requirements of FASB Accounting Standards Codification$^{TM}$ (ASC) 450, *Contingencies*. Please specifically confirm to the auditors that our understanding is correct.

We have represented to and assured the auditors that the unasserted claims and assessments mentioned in this letter include all unasserted claims and assessments that you have advised us are probable of assertion and must be disclosed in accordance with ASC 450.

<u>Response</u>

Your response should include matters that existed as of December 31, 20XX and additional information about those matters or new matters that arose during the period from that date to the effective date of your response.

Please specifically identify the nature of and reasons for any limitation on your response.

We appreciate receiving your reply by [*enter a date that is no later than 5 days prior to the Closing Date*] with a specified effective date no earlier than [*enter a date that is no earlier than 15 days prior to the Closing Date*].

Your response will not be quoted or referred to in the entity's Statement without prior consultation with you.

Please send your response directly to the auditors. The auditors address is:

KMJ Corbin & Company LLP
Attention – Scott Rose, CPA
555 Anton Blvd, Suite 1000
Costa Mesa, California 92626

Thank you for your anticipated timely cooperation with this request.

Respectfully,


_____
(Seller's Authorized Signature and Title)

## EXHIBIT A

### LEGAL DESCRIPTION OF LAND

### (Subject to verification during the Due Diligence Period.)

**SULLIVAN LEGAL DESCRIPTION**

Beginning at a point 307 feet East and 850 feet North of the Southwest corner of the Southwest 1/4 of the Northeast 1/4 of Section One (1), Township Thirteen (13) North, Range Five (5) East of the 3rd P.M., said point also being the Northwest Corner of Lot 1 of Eastview Place as per Plat recorded in Volume 1 of Plats Page 304 of the Records in the Recorder's Office, Moultrie County, Illinois; thence running North 447 feet (recorded) (N 00 degrees 32 minutes 35 seconds W assumed bearing, 447.33 feet measured); thence East 486.68 feet (Rec.) (N 89 degrees 05 minutes 30 seconds E, 486.76 feet meas.); thence South 447 feet (Rec.) (S 00 degrees 36 minutes 28 seconds E, 446.91 feet meas.); thence West 486.68 feet (Rec.) (S 89 degrees 02 minutes 35 seconds W, 487.27 feet meas.) to the place of beginning. Situated in Moultrie County, Illinois.

**SWANSEA LEGAL DESCRIPTION**

Lot Numbered Five (5) of Manas Gardens, a subdivision of part of the North ½ of Section 17, Township 1 North, Range 8 West of the Third Principal Meridian and Lot 11 of Third Addition to Adair Gardens, St. Clair County; reference being had to the plat thereof recorded in the Recorder's Office of St. Clair County, Illinois in Book of Plats "51" on Page 74.

**EASTVIEW LEGAL DESCRIPTION**

```
Beginning at a point 307 feet East and 850 feet North of the
Southwest corner of the Southwest 1/4 of the Northwest 1/4 of
Section One (1), Township Thirteen (13) North, Range Five (5)
East of the 3rd P.M., said point also being the Northwest
Corner of Lot 1 of Eastview Place as per Plat recorded in
Volume 1 of Plats Page 304 of the Records in the Recorder's
Office, Moultrie County, Illinois; thence running North 447
feet (recorded) (N 00 degrees 32 minutes 35 seconds W assumed
bearing, 447.33 feet measured); thence East 486.68 feet (Rec.)
(N 89 degrees 05 minutes 30 seconds E, 486.76 feet meas.);
thence South 447 feet (Rec.) (S 00 degrees 36 minutes 28
seconds E, 446.91 feet meas.); thence West 486.68 feet (Rec.)
(S 89 degrees 02 minutes 35 seconds W, 487.27 feet meas.) to
the place of beginning. Situated in Moultrie County, Illinois.
```

**ARCOLA LEGAL DESCRIPTION**

Beginning at the Northeast Corner of the South Half of the Northeast Quarter of Section 9, running thence South 400 feet; thence West 400 feet; thence North 400 feet; thence East 400 feet to the place of beginning all in Township 14 North, Range 8 East of the Third Principal Meridian, situate in Douglas County, Illinois.

## SHELBYVILLE LEGAL DESCRIPTION

```
Beginning  at an iron pipe set on the North-South center section line
644.2 feet north of a stone at the SE corner of the NE¼ of the NW¼ of
Section  13,  Township  11 North, Range 3 East of the Third Principal
Meridian,  thence  Westward  on  a line parallel to the North line of
said  Section  13, 430 feet to an iron pipe for a point of beginning,
thence  continuing  on  the  same Westward line parallel to the North
line of said Section 13, 420 feet, thence South on a line parallel to
the  North-South  center  section line 250 feet, thence Eastward on a
line  parallel  to the North line of said Section 13, 420 feet more or
less  to  the  West  edge  of  the  property owned by the Shelbyville
Housing  Authority,  thence Northward on said West boundary line, 250
feet,  more  or  less,  to  the  point  of  beginning, also known as the
North 220 feet of Lot 4 of E.I. Johnston and Son Addition to the City
of Shelbyville, Shelby County, Illinois.
```

## TUSCOLA LEGAL DESCRIPTION

For APN/Parcel ID(s): 09-08-02-100-027 and 09-08-02-100-029

The North 30 feet of the West 297 feet of Lot 3 of TURN-KEY SUBDIVISION, as per plat recorded in Plat Book 2, page 113 of the records in the Recorder's Office of Douglas County, Illinois being a part of the Northwest Quarter of Section 2, Township 15 North, Rnage 8 East of the Third Principal Meridian, Douglas County, Illinois.

AND

Lot 1 of TURN-KEY SUBDIVISION of the South 30 acres of the West Half of Government Lot 3 of the Northwest Quarter of Section 2, Township 15 North, Range 8 East of the Third Principal Meridian, situated in Douglas County, Illinois, AND, the North 15 feet of Lot 2 of said TURN-KEY SUBDIVISION.

## EFFINGHAM LEGAL DESCRIPTION

For APN/Parcel ID(s): 03-11-01-025

Part of the Southeast Quarter of Section 19, Township 8 North, Range 6 East of the Third Principal Meridian, more particularly described as follows: Beginning at the Northwest corner of the Southeast Quarter of the Southeast Quarter of Section 19, Township 8 North, Range 6 East of the Third PrincipalMeridian, thence South 74 degrees 45 minutes East 90 feet; thence North 15 degrees 17 minutes East 858 feet; thence North 75 degrees 25 minutes West 323 feet to the right of way of Interstate Route 70; thence with said right of way line of Interstate 70, South 31 degrees 50 minutes West 444 feet and South 13 degrees 57 minutes West 429 feet; thence South 74 degrees 45 minutes East a distance of 352 feet to the point of beginning. Situated in the City of Effingham, Illinois.

Except any interest in the coal, oil, gas and other minerals underlying the land which have been heretofore conveyed or reserved in prior conveyances, and all rights and easements in favor of the estate of said coal, oil, gas and other minerals, if any.

Situated in EFFINGHAM COUNTY, ILLINOIS.

## ALEDO LEGAL DESCRIPTION

**For APN/Parcel ID(s):  10-10-20-302-002**

Lots 1, 2, 3, 9, 10 and the East 360 feet of Lot 6, all in the Resubdivision of Lot "C", being the South Half of the East Half of the North Half of the Northeast Quarter of the Southwest Quarter of Section 20, Township 14 North, Range 3 West of the Fourth Principal Meridian, said property being, and situated in the City of Aledo, County of Mercer, and State of Illinois, as shown by the Plat recorded in Plat Book "E", page 249.

## LEBANON LEGAL DESCRIPTION

Parcel 1:

A part of Lot B in the Southwest Quarter of Section 18, Township 2 North, Range 6 West of the Third Principal Meridian, St. Clair County, Illinois; reference being had to the plat thereof recorded in Plat Book "C" Page 195, described as follows:

Beginning at the Northwest corner of the Third Addition to Sunny Hill Place Subdivision (Plat Book 62 Page 24); thence Northerly 184.90 feet, along the West right of way line of Alton Street; thence Easterly 102.30 feet; thence Northerly, parallel to the West right of way line of Alton Street extended, 123.00 feet to the North line of Lot "B"; thence Westerly, along the North line of Lot "B", 627.30 feet; thence Southerly 314.88 feet; thence Easterly 525.00 feet to the point of beginning;

Except that part conveyed to Bohannon Nursing Home, Inc. by Warranty deed recorded November 21, 1985 in Book 2620 Page 681, described as follows: Commencing at the Northwest corner of Third Addition of Sunny Hill Place Subdivision (Plat 62 Page 24); thence Westerly, along the Westerly prolongation of the North line of said subdivision, 214.92 feet to the point of beginning of the tract herein excepted; thence continuing Westerly, on said prolongation, 310.08 feet; thence Northerly 314.88 feet to the North line of said Lot "B"; thence Easterly, along said North line of Lot B, 310.63 feet; thence Southerly 310.63 feet more or less, to the point of beginning of said exception;

Also excepting therefrom that part conveyed to Kenneth Bohannon by deed recorded September 19, 2007 as Document No. A02067624, described as follows: Beginning at an iron pin marking the Southwest corner of Lot 84 of Sunny Hill Place Fourth Addition (Plat Book 66 Page 96); thence Westerly, along the North line of Ursula Drive as shown on said Fourth Addition plat, having an assumed bearing of North 88 degrees 11 seconds West, 66.34 feet to a point on the East edge of an existing concrete drive; thence North 00 degrees 03 minutes 39 seconds East, along said East edge 122.49 feet to an iron pin and cap on the South line of Century Oaks Subdivision (Plat Book 95 Page 33; thence South 88 degrees 53 minutes 11 seconds East, along said South line, 67.36 feet to an iron pin marking the Northwest corner of said Lot 84; thence South 00 degrees 32 minutes 12 seconds West, along the West line of said Lot 84, a distance of 122.98 feet to the point of beginning of said exception;

Also excepting all coal and other minerals and all rights and easements in favor of the estate of said coal and other minerals. Situated in St. Clair County, Illinois.

Parcel 2:

A part of Lot "B" in the Southwest Quarter of Section 18, Township 2 North, Range 6 West of the Third Principal Meridian, St. Clair County, Illinois; reference being had to the plat thereof recorded in Plat Book "C" Page 195, being more particularly described as follows:

Commencing at the Northwest corner of Third Addition of Sunny Hill Place Subdivision (Plat Book 62 Page 24); thence Westerly, along the Westerly-prolongation of the North line of said subdivision, 214.92 feet to the point of beginning of the tract herein described; thence continuing Westerly, on said prolongation, 310.08 feet; thence Northerly 314.88 feet to the North line of said Lot "B"; thence Easterly,

along said North line of Lot "B", 310.63 feet; thence Southerly 310.63 feet more or less, to the point of beginning;

Except coal and other minerals underlying and all rights and easements in favor of the estate of said coal and other minerals.

Situated in St. Clair County, Illinois.

## TARKIO LEGAL DESCRIPTION

TRACT 1:
All of a tract of land commencing sixty-four (64) feet North of the Northeast corner of the Southeast Quarter of the Northwest Quarter of Section Fourteen (14), Township Sixty-Five (65) North, Range Forty (40) West, Atchison County, Missouri; thence running West twenty-four (24) rods; thence North thirty-six (36) rods; thence East twenty-four (24) rods; thence South thirty-six (36) rods to the point of beginning, except the North two hundred forty (240) feet thereof.

TRACT 2:
A strip of land 64 feet wide running East and West immediately South of and abutting on a tract of land described as:
Commencing 64 feet North of the Northeast corner of the Southeast fourth of the Northwest Quarter of Section Fourteen (14), Township Sixty-Five (65) North, Range Forty (40) West, Atchison County, Missouri; thence running West 24 rods; thence North 36 rods; thence East 24 rods; thence South 36 rods.

TRACT 3:
The South 97.5 feet of the North 240 feet of a tract of land; Commencing 64 feet North of the Northeast corner of the Southeast Fourth of the Northwest Quarter of Section Fourteen (14), Township Sixty-Five (65) North, Range Forty (40) West, Atchison County, Missouri; thence running West 24 rods; thence North 36 rods; thence East 24 rods; thence South 36 rods, all within the city limits of Tarkio, Missouri, said three tracts respectively being more particularly bounded and described as follows:

Tract 1:
Commencing at the East Quarter corner of the Northwest Quarter of Section 14, Township 65 North, Range 40 West, Atchison County, Missouri; thence along Quarter Section line North 00 degrees 08 minutes 27 seconds East 64.00 feet to the point of beginning; thence North 89 degrees 30 minutes 23 seconds West 393.74 feet (396.0 record) to the East line of Northview Addition; thence along the East line of said Addition North 00 degrees 20 minutes 29 seconds West 354.04 feet; thence South 89 degrees 30 minutes 18 seconds East 396.72 feet (396 record) to Quarter Section line; thence along said line South 00 degrees 08 minutes 27 seconds West 354.00 feet to the point of beginning.

Tract 2:
Beginning at the East Quarter corner of the Northwest Quarter of Section 14, Township 65 North, Range Forty (40) West, Atchison County, Missouri; thence North 89 degrees 30 minutes 22 seconds West 393.20 feet (396.0 record) to the East line of Northview Addition; thence along said line North 00 degrees 20 minutes 29 seconds West 64.00 feet; thence South 89 degrees 30 minutes 23 seconds East 393.74 (396.0 record) to Quarter Section line; thence along said line South 00 degrees 08 minutes 27 seconds West 64.0 feet to the point of beginning.

Tract 3:
Commencing at the East Quarter corner of the Northwest Quarter of Section 14, Township 65 North, Range 40 West, Atchison County, Missouri; thence along Quarter Section line North 00 degrees 08 minutes 27 seconds East 418.00 feet to the point of beginning; thence North 89 degrees 30 minutes 18 seconds West 396.72 feet (396.0 record) to the East line of Northview Addition; thence along the East line of said Addition North 00 degrees 20 minutes 29 seconds West 97.50 feet; thence South 89 degrees 30 minutes 25 seconds East 397.54 feet (396 record) to Quarter Section line; thence along said line South 00 degrees 08 minutes 27 seconds West 97.50 feet to the point of beginning.

**ROBINGS LEGAL DESCRIPTION**

For APN/Parcel ID(s): 21-001-047-00, 21-001-048-00 and 21-001-049-00

TRACT 1:

LOT TWELVE (12) OF THE SUBDIVISION OF THE SOUTH HALF OF SECTION EIGHTEEN (18) IN THE VILLAGE OF BRIGHTON, SITUATED IN TOWNSHIP SEVEN (7) NORTH, RANGE NINE (9) WEST AS SURVEYED BY I. ALBRO AND JAMES PALMER AND RECORDED IN LAND PLATS "A" AT PAGE 1, AND FURTHER DESCRIBED AS: BEGINNING AT A POINT 2 RODS WEST OF THE CENTER OF THE PUBLIC ROAD LEADING NORTH AND SOUTH THROUGH AND KNOWN AS MAIN STREET IN THE TOWN OF BRIGHTON, SAID POINT BEING 4 CHAINS AND 83 LINKS NORTH OF THE SOUTH LINE OF SECTION EIGHTEEN (18), TOWNSHIP SEVEN (7) NORTH, RANGE NINE (9) WEST OF THE THIRD PRINCIPAL MERIDIAN, AND RUNNING THENCE WEST PARALLEL WITH THE SOUTH LINE OF SAID SECTION EIGHTEEN (18), NINE (9) RODS; THENCE NORTH NINE (9) RODS; THENCE EAST NINE (9) RODS TO A POINT TWO (2) RODS WEST OF THE CENTER OF SAID ROAD; AND THENCE SOUTH NINE (9) RODS TO THE· . PLACE OF BEGINNING. THE SAME ALSO DESCRIBED AS LOT TWELVE (12) IN THE JAMES PALMER, I. ALBRO AND OTHERS SUBDIVISION OF THE SOUTH HALF OF SECTION EIGHTEEN (18), IN TOWNSHIP AND RANGE AFORESAID, SITUATED IN THE VILLAGE OF BRIGHTON, MACOUPIN COUNTY, LESS AND EXCEPTING THAT PORTION THAT WAS DEEDED TO THE HIGHWAY DEPARTMENT AND NOW USED FOR ROAD PURPOSES WHICH IS RECORDED AND OF RECORD. SUBJECT TO EASEMENTS, RESTRICTIONS AND COVENANTS OF RECORD.

PROPERTY TAX NO. 21 001 047 00

TRACT 2:

THE NORTH PART OF LOT THIRTEEN (13) IN PALMER, ALBRO AND OTHERS SUBDIVISION OF A PART OF THE SOUTH HALF (S 1/2) OF SECTION EIGHTEEN (18), TOWNSHIP SEVEN (7) NORTH, RANGE NINE (9) WEST OF THE THIRD PRINCIPAL MERIDIAN, IN THE COUNTY OF MACOUPIN AND THE STATE OF ILLINOIS; DESCRIBED AS: COMMENCING AT A POINT 2 CHAINS 28 LINKS NORTH OF THE SOUTHEAST CORNER OF THE WEST HALF OF THE SOUTHWEST QUARTER IN SECTION EIGHTEEN (18), TOWNSHIP SEVEN (7) NORTH, RANGE NINE (9) WEST~ RUNNING THENCE WEST SEVEN (7) CHAINS, EIGHT (8) LINKS, THENCE NORTH FOUR (4) CHAINS. EIGHTY (80) LINKS TO A STONE; THENCE EAST FOUR (4) CHAINS, EIGHTY-THREE (83) LINKS, THENCE SOUTH TWO (2) CHAINS, TWENTY-FIVE (25) LINKS; THENCE SOUTH TWO (2) CHAINS, FIFTY-FIVE (55) LINKS TO THE PLACE .OF BEGINNING, EXCEPT A STRIP OF LAND FORTY (40) FEET WIDE OFF OF THE SOUTH SIDE OF SAID TRACT .. DEEDED BY AMBROSE ROBINGS TO H.W. HUPP ON SEPTEMBER 11, 1896, AND FURTHER EXCEPT THAT PART OF LOT THIRTEEN (13) CONVEYED TO THE VILLAGE OF BRIGHTON IN BOOK 722 AT PAGE 37, SITUATED IN THE TOWN OF BRIGHTON, MACOUPIN COUNTY, ILLINOIS. SUBJECT TO EASEMENTS, RESTRICTIONS AND COVENANTS OF RECORD.

PROPERTY TAX NO. 21 001 048 00

TRACT 3:

A PART OF LOT NUMBER THIRTEEN (13) IN I. ALBRO'S, JAMES PALMER AND OTHERS SUBDIVISION OF THE SOUTH HALF OF SECTION EIGHTEEN (18) IN TOWNSHIP SEVEN (7) NORTH, RANGE NINE (9) WEST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS

COMMENCING ON THE EAST BOUNDARY LINE OF SAID LOT AT A POINT TWO (2) CHAINS AND THIRTY (30) LINKS NORTH OF THE SOUTHEAST CORNER OF SAID LOT AND RUNNING THENCE WEST SEVEN (7) CHAINS AND TWELVE (12) LINKS TO THE WEST BOUNDARY OF SAID LOT; THENCE NORTH ON SAID WEST BOUNDARY FORTY (40) FEET; THENCE EAST SEVEN (7) CHAINS AND TWELVE (12) LINKS TO THE EAST LINE OF SAID LOT; AND THENCE SOUTH FORTY (40) FEET TO THE PLACE OF BEGINNING, ALL BEING IN THE VILLAGE OF BRIGHTON,· MACOUPIN COUNTY, ILLINOIS. SUBJECT TO EASEMENTS, RESTRICTIONS AND COVENANTS OF RECORD.

PROPERTY TAX NO. 21 001 049 00

## ROSICLARE LEGAL DESCRIPTION

For APN/Parcel ID(s): 06-82-001-02-000

Tract 1:

A part of the Southwest Quarter of Section 5, Township 13 South, Range 8 East of the Third Principal Meridian, Hardin County, Illinois, more particularly described as follows: Commencing at the Northwest corner of Section 5, Township 13 South, Range 8 East of the Third Principal Meridian; thence in a Southeasterly direction with a bearing of South 16°21'06" East, a distance of 3,349.84 feet to the Point of Beginning of this description; thence in a Westerly direction with a bearing of North 89°45'20" West, a distance of 734.10 feet to a point on the South Right of Way Line of Fairview Road; thence in a Northeasterly direction with a bearing of North 58°16'19" East, a distance of 162.90 feet to a concrete R.O.W. marker on the South R.O.W. Line of Fairview Road; thence in a Northwesterly direction with a bearing of North 26°53'14" West, a distance of 19.15 feet to a concrete R.O.W. marker on the South R.O.W. line of Fairview Road; thence in a Northeasterly direction with a bearing of North 62°33'24" East, a distance of 201.50 feet to a concrete R.O.W. marker on the South Line of Fairview Road; thence in a Northeasterly direction with a bearing of North 63°10'00" East, a distance of 40.70 feet to a point on the South R.O.W. Line of Fairview Road; thence in a Northwesterly direction with a bearing of North 26°50'00" West, a distance of 20.0 feet to a point on the South R.O.W. Line of Fairview Road; thence in a Northeasterly direction with a bearing of North 63°10'00" East, a distance of 439.00 feet to a point of intersection of the South R.O.W. Line of Fairview Road and the West Line of Ferry Road; thence in a Southeasterly direction with a bearing of South 17°05'00" East, a distance of 103.00 feet to a point on the West Line of Ferry Road; thence along a curve to the right having a radius of 201.15 feet and an arc length of 79.00 feet, being subtended by a chord of South 05°50'00" East, a distance of 78.45 feet to a point on the West Line of Ferry Road; thence in a Southwesterly direction with a bearing of South 05°25'00" West, a distance of 44.0 feet to a point on the West Line of Ferry Road; thence along a curve to the left having a radius of 1592.00 feet and an arc length of 212.56 feet, being subtended by a chord of South 02°45'50" West, a distance of 212.40 feet to a point on the West Line of Ferry Road; thence in a Southwesterly direction with a bearing of South 87°56'55" West, a distance of 17.50 feet to the Point of Beginning of this description.

Tract 2:

A part of the West One-Half of Section 5, Township 13 South, Range 8 East of the Third Principal Meridian, Hardin County, Illinois, more particularly described as follows: Commencing at the Northwest Corner of Section 5, Township 13 South, Range 8 East of the Third Principal Meridian; thence in a Southeasterly direction with a bearing of South 14°20'14" East, a distance of 2934.10 feet to a point on the North R.O.W. line of Fairview Road, said point being the point of beginning of this description; thence in a Southwesterly direction with a bearing of South 63°10'00" West, a distance of 163.70 feet to a point on the North R.O.W. line of Fairview Road; thence in a Northwesterly direction with a bearing of North 24°43'32" West, a distance of 90.93 feet to a point; thence in a Northeasterly direction with a bearing of North 66°10'34" East, a distance of 161.61 feet to a point; thence in a Southeasterly direction with a bearing of South 26°06'50" East, a distance of 82.39 feet to the point of beginning of this description.

Tract 3:

A part of the West One-Half of Section 5, Township 13 South, Range 8 East of the Third Principal Meridian, Hardin County, Illinois, more particularly described as follows: Commencing at the Northwest corner of Section 5, Township 13 South, Range 8 East of the Third Principal Meridian; thence in a Southerly direction along and with the West line of the aforementioned Section 5 with a bearing of South 00°33'34" West, a distance of 2,900.51 feet to the point of intersection with the South R.O.W. line of the former Illinois Central Railroad, said point being the point of beginning of this description; thence in a Northeasterly direction along and with the aforementioned Railroad R.O.W. line along a curve that is concave to the Northwest having a radius of 1646.97 feet and an arc length of 671.09 feet, being subtended by a chord of North 63°10 00" East, a distance of 666.46 feet to a point; thence in a Northeasterly direction along and with the aforementioned Railroad R.O.W. line with a bearing of North 34°53'00" East, a distance of 76.37 feet to a point; thence in a Southeasterly direction with a bearing of South 26°50'00" East, a distance of 45.86 feet to a point; thence in a Southeasterly direction with a bearing of South 25°53'53" East, a distance of 128.91 feet to a point; thence in a Southeasterly direction with a bearing of South 26°23'20" East, a distance of 135.60 feet to a point; thence in a Southeasterly direction with a bearing of South 26°06'50" East, a distance of 124.98 feet to a point; thence in a Southwesterly direction with a bearing of South 66°10'34" West, a distance of 161.61 feet to a point; thence in a Southeasterly direction with a bearing of South 24°43'32" East, a distance of 90.93 feet to a point on the North R.O.W. line of Fairview Road; thence in a Southwesterly direction along and with the North R.O.W. line of Fairview Road with a bearing of South 63°10'00" West, a distance of 60.00 feet to a point; thence in a Northwesterly direction along and with the North R.O.W. line of Fairview Road with bearing of North 26°50'00" West, a distance of 20.00 feet to a point; thence in a Southwesterly direction along and with the North R.O.W. line of Fairview Road with a bearing of South 63°10'00" West, a distance of 40.80 feet to a point; thence in a Southwesterly direction along and with the North R.O.W. line of Fairview Road with a bearing of South 60°20'00" West, a distance of 81.26 feet to the point of intersection with the North R.O.W. line of the former Spardale Road; thence in a Westerly direction along and with the North R.O.W. line of the former Spardale Road with a bearing of North 89°05'00" West, a distance of 157.50 feet to a point; thence in a Westerly direction along and with the North R.O.W. line of the former Spardale Road along and with a curve that is concave to the South having a radius of 2900.00 feet and an arc length of 282.90 feet, being subtended by a chord of South 88°07'17" West, a distance of 282.79 feet to a point on the West line of the aforementioned Section 5; thence in a Northerly direction along and with the West line of Section 5 with a bearing of North 00°33'34" East, a distance of 90.87 feet to the point of beginning of this description.

Tract 4:

A part of the West One-Half of Section 5, Township 13 South, Range 8 East of the Third Principal Meridian, Hardin County, Illinois, more particularly described as follows: Commencing at the Northwest corner of Section 5, Township 13 South, Range 8 East of the Third Principal Meridian; thence in a Southerly direction along and with the West line of the aforementioned Section 5 with a bearing of South 00°33'34" West, a distance of 3031.58 feet to a point on the South R.O.W. line of the former Spardale Road, said point being the point of beginning of this description; thence in a Northeasterly direction along and with the South R.O.W. line of the former Spardale Road, along and with a curve that is concave to the South having a radius of

2860.00 feet and an arc length of 202.67 feet, being subtended by a chord of North 88°04'43" East, a distance of 282.55 feet to a point; thence in an Easterly direction along and with the South R.O.W. line of the former Spardale Road with a bearing of South 89°05'00" East, a distance of 89.82 feet to the point of intersection with the North R.O.W. line of Fairview Road; thence in a Southwesterly direction along and with the North R.O.W. line of Fairview Road with a bearing of South 60°20'00" West, a distance of 190.13 feet to a point; thence in a Northwesterly direction along and with the North R.O.W. line of Fairview Road with a bearing of North 29°40'00" West, a distance of 15.00 feet to a point; thence in a Southwesterly direction along and with the North R.O.W. line of Fairview Road with a bearing of South 60°20'00" West, a distance of 21.65 feet to a point; thence in a Southwesterly direction along and with the North R.O.W. line of Fairview Road with a bearing of South 57°52'00" West, a distance of 178.61 feet to a point; thence in a Southwesterly direction along and with the North R.O.W. line of Fairview Road with a bearing of South 57°04'00" West, a distance of 9.55 feet to a point; thence in a Westerly direction with a bearing of South 88°16'11" West, a distance of 23.31 feet to a point on the West line of the aforementioned Section 5; thence in a Northerly direction along and with the West line of Section 5 with a bearing of North 00°33'34" East, a distance of 184.65 feet to the point of beginning of this description.

## COURTYARD LEGAL DESCRIPTION

Lot 3 in Hawthorne Second Addition according to the plat thereof recorded May 2, 2007 as document no. 282433, in the City of Sullivan, Moultrie County, Illinois.

## ROYAL OAKS LEGAL DESCRIPTIONu

Lots 1 and 2 in Briarcliffs 3rd addition being a Re-Subdivision of Lot 1 of Briarcliff 1st addition to the City of Kewanee, Henry County, Illinois.

## TWIN LAKES LEGAL DESCRIPTION

***PART OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 6, IN TOWNSHIP 13 NORTH, RANGE 11 WEST OF THE SECOND PRINCIPAL MERIDIAN, DESCRIBED AS BEGINNING AT AN IRON PIPE AT THE SOUTHWEST CORNER THEREOF; THENCE EASTERLY ALONG THE SOUTH LINE THEREOF 360.66 FEET TO AN IRON PIPE; THENCE DEFLECTING 90 DEGREES 00 MINUTES TO THE LEFT 276.12 FEET TO AN IRON PIPE; THENCE DEFLECTING 90 DEGREES 00 MINUTES TO THE LEFT 210.00 FEET TO AN IRON PIPE; THENCE DEFLECTING 90 DEGREES 00 MINUTES TO THE LEFT 60.00 FEET TO AN IRON PIPE; THENCE DEFLECTING 90 DEGREES 00 MINUTES TO THE RIGHT 152.74 FEET TO A RAILROAD SPIKE IN THE WEST LINE THEREOF; THENCE SOUTHERLY ALONG SAID WEST LINE 215.21 FEET TO THE PLACE OF BEGINNING, SITUATED IN EDGAR COUNTY, ILLINOIS.***

## WATSEKA LEGAL DESCRIPTION

Tract I:
The East Half of that part of the Southwest Quarter of the Northwest Quarter of Section 33, Township 27 North, Range 12 West of the 2nd Principal Meridian lying East of Blocks 2, 3 and 6 of Stanley's 2nd Addition to Watseka, except 10 rods in width off the West side of the South Half thereof and also except the South 430 feet thereof and also except the North 150 feet of the East 200 feet thereof, and also except the East 30 feet of the following described tract: The Southwest Quarter of the Northwest Quarter of said Section 33, except the South 430 feet and except the North 150 feet of the East 200 feet thereof.

Tract II:
The North 230 feet of a tract of land 10 rods in width off the West side of the South Half of the East Half of that part of the Southwest Quarter of the Northwest Quarter of Section 33, Township 27 North, Range 12 West of the 2nd Principal Meridian, lying East of Blocks 2, 3 and 6 of Stanley's 2nd Addition to Watseka, Iroquois County, Illinois.

## COLLINSVILLE LEGAL DESCRIPTION

For APN/Parcel ID(s): 13-2-21-28-18-303-001

Lots 10, 11, 12, 13, 14, 15, and 16 in Block 4 in Johnson's Addition to Collinsville, as the same appears from plat thereof recorded in Plat Book 5 Page 75 in the Recorder's Office of Madison County, Illinois; Except any interest in the coal, oil, gas and other minerals underlying the land which have been heretofore conveyed or reserved in prior conveyances, and all rights and easements in favor of the estate of said coal, oil, gas and other minerals, if any.

Situated in Madison County, Illinois

## LAHARPE LEGAL DESCRIPTION

For APN/Parcel ID(s): 06-21-405-010

All of Lots One (1), Two (2), Seven (7), and Eight (8); and the West Half of Lots Three (3) and Six (6); all in Block One (1) of the City of La Harpe, Hancock County, Illinois

## SHANGRI-LA LEGAL DESCRIPTION

All that part of the Northeast Quarter of the Northwest Quarter of Section 29, Township 49, Range 30, In Blue Springs, Jackson County, Missouri described as follows: Beginning at a point on the South line of Duncan Road as now established which is 35.01 feet South and 404.17 feet East of the Northwest corner of said Quarter Section; thence South and parallel to Adams Dairy Road as now established 376.7 feet to a point on the North line of Lot 10, Platted Vienna Woods, a subdivision in Blue Springs; thence South 88 degrees 43 minutes East along the North lines of Lots 10, 11, 12, 13, 14, and 15, said Vienna Woods and Parallel to said Duncan Road 348.86 feet to the Northeast corner of said Lot 15 and the West line of 9th Street Northeast as now established thence North and parallel to said Adams Dairy Road, 30.0 feet; thence South 88 degrees 43 minutes East and parallel to said Duncan Road, 25.0 feet; thence North and parallel to said Adams Dairy Road, 346.7 feet to the South line of said Duncan Road; thence North 88 degrees 43 minutes West along said South line, 373.86 feet to the point of beginning.

## WESTSIDE LEGAL DESCRIPTION

For APN/Parcel ID(s): 11-24-105-002

Lots One (1) through Fourteen (14) in Block Seventeen (17) and Lots One (1) through Fourteen in Block Eighteen (18) in Stotlar and Jones Second Addition to West Frankfort, EXCEPTING the coal, oil, gas and other minerals underlying the same and all rights and easements in favor of the owner of the mineral estate or of any party claiming by, through or under said estate, situated in FRANKLIN COUNTY, ILLINOIS.

## HAVANA LEGAL DESCRIPTION

For APN/Parcel ID(s): 05-31-300-006 and 05-31-304-013

Parcel 1:

A tract of land described as follows: Commencing at a stone marking the Southeast corner of the Southwest Quarter of the Southwest Quarter of Section 31, Township 22 North, Range 8 West of the Third Principal Meridian, and running thence North along the East side of said 1/16th Section, 526.5 feet, to the actual place of beginning; thence West and parallel with the South line of said Section 31, 574.6 feet to the center line of Harpham Street as extended; thence North said center line and parallel with the East line of said 1/16th Section, 300 feet; thence East parallel with the South line of said Section 31, 574.6 feet to the East line of said 1/16th Section; thence South on the East line of said 1/16th Section, 300 feet to the Place of beginning, situated in the City of Havana, in the county of Mason and State of Illinois.

Parcel 2:

A tract of land in the Southwest Quarter of the Southwest Quarter of Section 31, Township 22 North, Range 8 West of the Third Principal Meridian, more particularly described as follows: Commencing at a stone marking the Southeast corner of the Southwest Quarter of the Southwest Quarter of Section 31, Township 22 North, Range 8 West of the Third Principal Meridian, and running North along the East side of said 1/16th Section, 826.5 feet to the actual place of beginning; thence West parallel with the South line of said Section 31, 574.6 feet to the center line of Harpham Street, extended; thence North on said center line 402.51 feet to the South lien of Mound Street, extended; thence North 89 degrees 38 minutes 30 seconds East 573.18 feet to the East side of said 1/16th Section; thence south on the East side of said 1/16th Section 403.99 feet to the actual Place of Beginning; situated in the County of Mason and State of Illinois.

Parcel 3:

A tract of land described as follows: Commencing at the Southeast corner of the Southwest Quarter of the Southwest Quarter of section 31, Township 22 North, Range 8 West of the Third Principal Meridian; thence North 31.5 feet; thence West parallel with the South side of said Section, 264 feet; thence North 495 feet to the actual Place of Beginning; thence West 343.6 feet; thence South 3.5 feet; thence East 66 feet; thence South 15 feet; thence East 277.6 feet; thence North 18.5 feet to the actual Place of Beginning; situated in the County of Mason and State of Illinois.

**MCLEANSBORO LEGAL DESCRIPTION**

    **Tract 1: Lots 5, 6, 7, 8, 9 (except the East 10 feet of Lot 9) and Lot 10 in Sharpe's Addition to the City of McLeansboro, Hamilton County, Illinois.**

    **Tract 2: Also all that part of a vacated alley more particularly described as beginning at the Southeast Corner of said Lot 9, thence Westerly along the South lines of Lots 9, 8, 7, 6 and 5 to the Southwest Corner of Lot 5, thence Southerly along a line parallel with the West line of Lot 5 extended, 7 feet to the centerline of the vacated alley, thence Westerly along the centerline of said vacated alley to the intersection of said centerline with the East right of way line of Harris Place, thence South along the East right of way of Harris Place to the Northwest Corner of Lot 10, thence Easterly along the North line of Lot 10 to the Northeast Corner of Lot 10, thence North 14 feet to the point of beginning, situated in Hamilton County, Illinois.**

**VANDALIA LEGAL DESCRIPTION**

    For APN/Parcel ID(s): 18-14-17-453-012

Beginning at a point 294 feet North of the Southwest corner of Outlot 19 of 6 Acre Outlots in the City of Vandalia, in Fayette County, Illinois, running thence North to the Northwest corner of said Outlot, thence East to the Northeast corner of said Outlot, thence South to a point 294 feet North of the Southeast corner of said Outlot, thence West to the Place of Beginning, EXCEPT the undivided 1/2 interest in a strip of land 16 feet off the East side thereof,. An undivided 1/2 interest in an easement for ingress and egress over and upon the East 16 feet of Outlot 19 aforesaid, as created by Quit Claim Deed dated July 23, 1901 and recorded July 26, 1901, Book 145, page 173, from John W. Walton, etux to Joseph W. Walton and Charles A. Walton, situated in Fayette County, Illinois.

**FARMER CITY LEGAL DESCRIPTION**

    LOT 26 (EXCEPT 25 FEET OFF OF THE FULL SOUTH SIDE THEREOF), ALL OF LOTS 27, 28, 29, 30, AND 31 IN THE FIRST ADDITION TO JACKSON HEIGHTS ADDITION TO THE CITY OF FARMER CITY, SITUATED IN THE COUNTY OF DEWITT, IN THE STATE OF ILLINOIS.

## EXHIBIT B

### SELLER DELIVERABLES

1.  All title insurance commitments, reports and policies relating to each Property and all title documents referenced therein.

2.  A copy of each surveys and site plan of each Property, including, without limitation, any as-built surveys obtained or delivered to tenants of each Property in connection with its construction.

3.  Census, Operating Data and Property-Level Operating Statements, including records of payor-mix for patients/residents at the Property.

4.  Corporate-level financial statements for each Seller, Lessee and Guarantor for the thirty-six (36) month period immediately preceding the Agreement effective date

5.  Individual property-level operating statements and operating statistics for the thirty-six (36) month period immediately preceding the Agreement effective date

6.  A written inventory of all items of personal property to be conveyed to Buyer, if any.

7.  Service Contracts which affect each Property

8.  Property real estate tax bills for the current and prior two (2) tax years.

9.  Environmental report and site assessments, including Phase I and Phase II Environmental Reports, and those items referenced in Section 6(b).

10. Engineering/Property condition reports

11. Summary of all capital expenditures for the thirty-six (36) month period immediately preceding the Agreement effective date.

12. A copy of all site plans, floor plans, building plans, architectural plans and specifications and construction drawings for improvements located on each Property.

13. Seismic reports (if applicable)

14. Certificate of Occupancy (shell and all suites)

15. Original Property Photos

16. Property insurance certificates and policies

17. Professional liability/general liability insurance certificates, policies and information on captive (if applicable)

18. Schedule of pending litigation

19. Roof/Parking Information

20. All building permits and warranties relating to the improvements constructed on the Property, including without limitation any structural slab or roof warranties.

21. Zoning reports

22. Easements, parking agreements and REA (Declarations), if any

23. Life safety/ADA compliance reports; a copy of all regulatory correspondence relating to any physical plant or life safety code deficiencies for the Property; a copy of any documents relating to a waiver of life safety code or physical plant requirements for the Property.

24. Complete Tenant leases (including all amendments, exhibits and correspondence) and documents executed and delivered in connection therewith, including guaranties and letters of credit

25. All primary and secondary state licenses or regulatory permits for the Property.

26. A copy of any third-party accreditation (i.e. Joint Commission) which affect each Property, if any.

27. A copy of all Medicare and Medicaid provider agreements and provider numbers for each Property.

28. A copy of any certificate of need documentation for each Property, if any.

29. All correspondence with licensing and regulatory agencies, including those relating to enforcement actions imposed or threatened for the past five (5) years.

30. A copy of any consent order imposed on the Property.

31. All legal agreements among seller, lessees and guarantors.

32. Average occupancy and rental rates for the previous five (5) years

33. Organizational chart of the Tenant's parent entity and any affiliated entities.

## EXHIBIT C

## FORM OF
## BILL OF SALE

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, _____, a _____, having an address at _____ ("Seller"), hereby bargains, sells, conveys and transfers to _____, a _____ ("Buyer"), all of Seller's right, title and interest in and to [**DRAFTING NOTE:** *delete (i) if no tangible personal property is being conveyed, and modify rest accordingly*] (i) the tangible personal property owned by Seller and used in connection with the Property (the "Tangible Personal Property") and (ii) the documents, surveys and reports located at or held in connection with the physical attributes of the property legally described on Schedule A attached hereto and made a part hereof (including any warranty made by third parties in connection with the same and the right to sue on any claim for relief under such warranties) (the "Property Diligence Materials" , and collectively with the Tangible Personal Property, the "Personal Property").

Seller has not made and does not make any express or implied warranty or representation of any kind whatsoever with respect to the Personal Property, Diligence Materials, including, without limitation, with respect to title, merchantability of the Personal Property or its fitness for any particular purpose, the design or condition of the Personal Property; the quality or capacity of the Personal Property; workmanship or compliance of the Personal Property with the requirements of any law, rule, specification or contract pertaining thereto; patent infringement or latent defects. Buyer accepts the Personal Property on an "as is, where is" basis.

**IN WITNESS WHEREOF**, Seller has caused this instrument to be executed and delivered as of this ___ day of _____, 2012.

SELLER:

_____

By:
Name:
Title:

Exhibit C - Page 1

**SCHEDULE A**
**TO BILL OF SALE**

(Add legal description of Land]

## EXHIBIT D

## FORM OF
## ASSIGNMENT OF INTANGIBLE PROPERTY

**THIS ASSIGNMENT**, made as of the ___ day of _____, 201_, by _____, a _____ ("Assignor"), to _____, a _____ ("Assignee").

## W I T N E S S E T H:

**WHEREAS**, by Purchase and Sale Agreement (the "Purchase Agreement") dated as of _____, 2012, between Assignor and Assignee, Assignee has agreed to purchase from Assignor as of the date hereof, and Assignor has agreed to sell to Assignee, that certain property located at _____ (the "Property"); and

**WHEREAS**, Assignor desires to assign to Assignee as of the date hereof all of Assignor's right, title and interest in all right, title and interest of Assignor in and to the intangible property used in connection with the foregoing, including, without limitation, any and all certificates of occupancy and other permits, licenses and certificates, certificates of need and bed rights to the extent assignable and owned or held by Assignor or otherwise required by a landlord for the lease to a tenant of the operation of the business at the Real Property, and, to the extent assignable, all warranties, guaranties and other assurances of performance pertaining to the Real Property, all surveys, drawings, plans, specifications, diagrams, reports, environmental assessments  and other architectural or engineering work product, including without limitation the Plans and Specifications (collectively, the "Intangible Property"). **[DRAFTING NOTE: *do not include the following in the initial draft*]** Intangible Property shall exclude Seller's intellectual property, such as trade names, logos and the like.

**NOW THEREFORE**, in consideration of the premises and the mutual covenants herein contained, the Assignor hereby assigns, sets over and transfers unto Assignee to have and to hold from and after the date hereof all of the right, title and interest of Assignor in, to and under the Intangible Property.  Assignor agrees without additional consideration to execute and deliver to Assignee any and all additional forms of assignment and other instruments and documents that may be reasonably necessary or desirable to transfer or evidence the transfer to Assignee of any of Assignor's right, title and interest to any of the Intangible Property.

This Assignment shall be governed by the laws of the State of _____, applicable to agreements made and to be performed entirely within said State.

**IN WITNESS WHEREOF**, Assignor has duly executed this Assignment as of the date first above written.

ASSIGNOR:

_____

a _____

By:_____
Name:_____
Title: _____

**EXHIBIT E**

**FORM OF SECURITY AGREEMENT**

City: _____

**SECURITY AGREEMENT**

**[_____ (*insert property name*)]**

This Security Agreement ("Security Agreement"), is made this ____ day of _____, 201_ by and between _____ (hereinafter referred to as the "Debtor") and _____ ("Secured Party").

**RECITALS**

WHEREAS, _____, as "Tenant" (the "Tenant"), Secured Party and certain other Persons signatory thereto, collectively as "Landlord", have entered into that certain Master Lease, dated of even date herewith (the "Master Lease");

WHEREAS, simultaneously with the execution and delivery of the Master Lease, Tenant and Debtor entered into that certain Sublease Agreement dated of even date herewith (the "Sublease") pursuant to which Debtor has subleased certain real property and improvements located thereon in the City of ____, _____known as "_____" and having a street address of _____ (the "Facility");

WHEREAS, Debtor executed that certain Lease Guaranty dated on or about the date hereof in favor of Landlord (the "Guaranty"), pursuant to which Debtor guaranties certain obligations to Landlord under the Master Lease;

WHEREAS, Debtor operates the Facility as a _____ participating in and receiving reimbursement or payment from some or all of the following: Medicare, Medicaid, Tricare, Veteran's Administration, commercial and private insurers, managed care companies, employee assistance programs, HMOs, preferred provider organizations and other governmental, commercial, or other organizations which maintain a healthcare reimbursement program or policy ("Third Party Payor"); and

WHEREAS, Debtor and Secured Party desire to enter into this Security Agreement in connection with the Guaranty and the Sublease, as governed by the Master Lease.

NOW, THEREFORE, for and in consideration of the premises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Secured Party and Debtor agree as follows:

**I.     DEFINITIONS.**  Capitalized terms used and not defined herein shall have the meanings assigned to them in the Master Lease.  In addition, the following terms shall have the following meanings in this Agreement:

     **1.1     Collateral.**  Any and all of the following of Debtor:

     (i)     all Accounts Receivables;

     (ii)     all cash and Cash Equivalents;

     (iii)     all Chattel Paper;

     (iv)     all Commercial Tort Claims;

     (v)     all Contracts;

     (vi)     all Deposit Accounts;

     (vii)     all Documents;

     (viii)     all Equipment (other than title documents with respect to Vehicles)

     (ix)     all General Intangibles;

     (x)     all Goods;

     (xi)     all Fixtures;

     (xii)     all Instruments;

     (xiii)     all Intellectual Property;

     (xiv)     all Inventory;

     (xv)     all Investment Property;

     (xvi)     all Letters of Credit and Letter-of-Credit Rights;

     (xvii)     all Permits;

     (xviii)     all Receivables;

     (xix)     upon the making of a request by Secured Party pursuant to Section 3.3(iv) hereof, all Vehicles and title documents with respect to Vehicles;

     (xx)     all Supporting Obligations;

     (xxi)     all other property not otherwise described above, including, without limitation, all of Debtor's right, title and interest in and to the Imposition

Reserve Fund (as defined in the Sublease), the Insurance Premium Reserve Fund (as defined in the Sublease), and the CapEx Reserve Funds (as defined in the Sublease);

(xxii)   all books and records pertaining to the Collateral; and

(xxiii)  all Proceeds and products of any and all of the foregoing, all substitutions and replacements for and all rents and profits of, each of the foregoing, all General Intangibles and indemnities relating to each of the foregoing, and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided however, that the Collateral shall not include the Excluded Property.

1.2     **Excluded Property.** (a) Any permit or license issued by a Governmental Authority to Debtor or any agreement, contract or lease to which Debtor is a party (A) that prohibits or requires the consent of any Person (other than any of Debtor's affiliates) which has not been obtained as a condition to the creation by Debtor of a lien on any right, title or interest in such permit, lease, license, agreement or contract, (B) to the extent that any requirement of law applicable thereto prohibits the creation of a lien thereon, or (C) to the extent that a lien thereon would give another Person party thereto a legally enforceable right to terminate such permit, lease, license, agreement or contract (which right to terminate has not been waived by such other Person), but only, with respect to the prohibition in (A), (B), and (C), to the extent, and for as long as, such prohibition or right to terminate is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other applicable requirement of law (including the Title 11 of the United States Code or any statute of similar purpose or nature the "Bankruptcy Code") or principles of equity; (b) any deposits, escrows or accounts solely maintained by Debtor in accordance with applicable state or local laws or regulations to the extent such state or local laws prohibit Debtor from pledging assigning or encumbering such deposit, escrow or account, and (c) any equity interests in any other Person owned by Debtor; provided, however, that (x) Excluded Property shall not include any Proceeds of any property described in clauses (a) or (c), and (y) any such property that at any time ceases to satisfy the criteria for Excluded Property (whether as a result of Debtor obtaining any necessary consent, any change in law, or otherwise), shall no longer be Excluded Property.

1.3     **Obligations.**  All of the following:

(i)     all of Debtor's obligations under the Guaranty and this Security Agreement;

(ii)    all of Debtor's present and future obligations to Secured Party;

(iii)   all of Debtor's present and future obligations under the Sublease, as may be governed by the Master Lease, as each may be amended, modified, extended, renewed or changed;

(iv) the repayment of (a) any reasonable, out-of-pocket costs and expenses that Secured Party may advance or spend for the maintenance or preservation of the Collateral as provided herein, and (b) any other expenditures that Secured Party may make under the provisions of this Security Agreement;

(v) all amounts owed under any modifications, additional advances, renewals, extensions or substitutions of any of the foregoing obligations;

(vi) all Default Costs, as defined in Paragraph VIII of this Security Agreement; and

(vii) any of the foregoing that may arise after the filing of a petition by or against Debtor under the Bankruptcy Code, even if the obligations do not accrue because of the automatic stay under Bankruptcy Code § 362 or otherwise.

## II.    GRANT OF SECURITY INTEREST.

Debtor grants a security interest in the Collateral to Secured Party to secure the payment and performance of the Obligations.

## III.    PERFECTION OF SECURITY INTERESTS.

### 3.1    Filing of Security Interests.

(i) Debtor authorizes Secured Party to file any financing statement (the "Financing Statement") describing the Collateral in any location deemed necessary and appropriate by Secured Party.

(ii) Debtor authorizes Secured Party to file a Financing Statement describing any other statutory liens held by Secured Party.

### 3.2    Possession.

(i) Debtor shall have possession of the Collateral, except where expressly otherwise provided in this Security Agreement or where Secured Party chooses to perfect its security interest by possession in addition to the filing of a Financing Statement.

(ii) Where Collateral is in the possession of a third party, Debtor will join with Secured Party in notifying the third party of        Secured    Party's    security interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Secured Party.

### 3.3    Other Collateral.

(i) Debtor shall promptly notify Secured Party in writing if Debtor obtains any interest in any Collateral consisting of Deposit Accounts (other than payroll, employee benefits, security deposits, withholding, escrow, trust accounts, tax

withholding accounts and other similar fiduciary accounts) or intellectual property, and, upon Secured Party's request, shall promptly execute such documents and take such actions as Secured Party deems appropriate to effect Secured Party's valid and enforceable security interest upon such Collateral, including obtaining any appropriate possession, access or control agreement.

(ii) If any Collateral is in the possession of a third party, Debtor shall use commercially reasonably efforts to obtain an acknowledgment that such third party holds the Collateral for the benefit of Secured Party.

(iii) Debtor shall promptly notify Secured Party in writing if Debtor has any Commercial Tort Claims, and, upon Secured Party's request, shall promptly execute such documents and take such actions as Secured Party deems appropriate to confer upon Secured Party a valid and enforceable lien upon and security interest in such claim.

(iv) Within thirty (30) days after the request of Secured Party, all applications for certificates of title/ownership indicating Secured Party's security interest in each Vehicle owned or acquired by Debtor covered by such certificate, and any other necessary documentation, shall be filed in each office in each jurisdiction which Secured Party shall deem advisable to perfect its security interests in the Vehicles.

## IV. POST-CLOSING COVENANTS AND RIGHTS CONCERNING THE COLLATERAL.

**4.1 Inspection.** The parties to this Security Agreement may inspect any Collateral in the other party's possession, at any time upon reasonable notice.

**4.2 Personal Property.** Except for items specifically identified by Debtor and Secured Party as fixtures, Health Care Licenses and Provider Agreements, the Collateral shall remain personal property at all times, and Debtor shall not affix any of the Collateral to any real property in any manner which would change its nature from that of personal property to real property or to a fixture.

**4.3 Intentionally deleted**.

**4.4 Limitations on Obligations Concerning Maintenance of Collateral.**

(i) **Risk of Loss**. Debtor has the risk of loss of the Collateral.

(ii) **No Collection Obligation**. Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral.

**4.5 No Disposition of Collateral**. Except in the ordinary course of Debtor's business (but in such event, subject to the terms of the Sublease), Secured Party does not authorize, and Debtor agrees not to:

8844440v2

     (i)   make any sales or leases of any of the Collateral, except in the ordinary course of business;

    (ii)   license any of the Collateral; or

   (iii)   grant any other security interest in any of the Collateral other than as may be approved in writing by Secured Party or permitted pursuant to each of the Sublease or Master Lease.

**4.6**    **Insurance**.  Debtor shall obtain and keep in force such insurance on the Collateral as is required by the Master Lease and the Sublease.

## V.    DEBTOR'S REPRESENTATIONS AND WARRANTIES.

Debtor represents and warrants to Secured Party:

**5.1**    **Title to and transfer of Collateral**. Except as expressly provided above with respect to the transferability of the Health Care Licenses and Provider Agreements, Debtor has rights in or the power to transfer the Collateral and its title to the Collateral is free of all adverse claims, liens, security interests and restrictions on transfer or pledge except (i) as created by this Security Agreement [*OPTIONAL, if applicable:*] and (ii) the security interest granted to _____ Bank as of the date hereof (the "_____ Lien"), but subject to the terms and conditions of that certain Intercreditor and Subordination Agreement by and among _____ Bank, Debtor, Secured Party and certain other Persons signatory thereto (the "**Intercreditor Agreement**").

**5.2**    **Location of Collateral**.  All collateral consisting of Goods is located solely in the following state(s) of _____.

**5.3**    **Location, State of Incorporation and Name of Debtor**.  Debtor's:

    (i)   chief executive office (if Debtor has more than one place of business), place of business (if Debtor has one place of business), is located in the following City and State: _____ (the "Place of Business");

    (ii)   state of incorporation or organization is _____ (the "Debtor State"); and

   (iii)   exact legal name is as set forth in the first paragraph of this Security Agreement, and Debtor has not changed its name or used any other name or any trade name within the five (5) year period immediately preceding the date of this Security Agreement.

**5.4**    **Business Purpose**.  None of the Obligations is a Consumer Transaction, as defined in the UCC, and none of the Collateral has been or will be purchased or held primarily for personal, family or household purposes.

## VI.    DEBTOR'S COVENANTS.

Until the Obligations are paid in full, Debtor agrees that it will:

**6.1**    preserve its legal existence and not, in one transaction or a series of related transactions, merge into or consolidate with any other entity, or sell all or substantially all of its assets;

**6.2**    not change Debtor State of its registered organization;

**6.3**    not change its registered name without providing Secured Party with 30 days' prior written notice; and

**6.4**    not change the state of its Place of Business.

## VII.    EVENTS OF DEFAULT.

The occurrence of any of the following shall, at the option of Secured Party, be an Event of Default:

**7.1**    Any default by Master Tenant under the Master Lease or by Debtor under the Guaranty and/or the Sublease where such default continues beyond the expiration of the applicable notice and cure periods stated in said agreements;

**7.2**    Debtor's failure to comply with any of the provisions of, or the incorrectness of any representation or warranty contained in, this Security Agreement;

**7.3**    Transfer or disposition of any of the Collateral in violation of the terms and conditions of this Security Agreement, the Master Lease or the Sublease; or

**7.4**    Secured Party shall receive at any time following the closing a UCC filing report indicating that Secured Party's security interest is not prior to all other security interests or other interests reflected in the report, other than the _____ Lien, unless otherwise approved in writing by Secured Party.

## VIII.    DEFAULT COSTS.

**8.1**    Should an Event of Default occur, Debtor will pay to Secured Party all costs incurred by Secured Party for the purpose of enforcing its rights hereunder, including:

(i)    costs of foreclosure;

(ii)    costs of obtaining money damages; and

(iii)    a reasonable fee for the service of attorneys employed by Secured Party for any purpose related to this Security Agreement or the Obligations, including without limitation consultation, drafting documents, sending notices or instituting, prosecuting or defending litigation or arbitration.

8844440v2

## IX.    REMEDIES UPON DEFAULT.

**9.1    General**.  Upon any Event of Default, Secured Party may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce or satisfy any Obligations then owing.

**9.2    Concurrent Remedies**.  Upon any Event of Default, Secured Party shall have the right to pursue any of the following remedies separately, successively or concurrently, in each case to the extent available pursuant to applicable law:

(i)    File suit and obtain judgment and, in conjunction with any action, Secured Party may seek any ancillary remedies provided by law or at equity, including levy of attachment and garnishment.

(ii)    Take possession of any Collateral if not already in its possession without demand and without legal process.  Upon Secured Party's demand, Debtor will assemble and make the Collateral available to Secured Party as it directs, subject to applicable law and approval by all applicable Health Care Regulatory Agencies, Governmental Authorities and Third Party Payors, as applicable.  Debtor grants to Secured Party the right, for this purpose, to enter into or on any premises where Collateral may be located.

(iii)    Without taking possession, sell, lease or otherwise dispose of the Collateral at public or private sale in accordance with the UCC, and in the case of the Health Care Licenses and the Provider Agreements, subject to applicable law and approval by all applicable Health Care Regulatory Agencies, Governmental Authorities and Third Party Payors, as applicable.

**9.3    Debtor Cooperation.**  In connection with an Event of Default that is existing, to the extent assignable under applicable law and approved by all applicable Health Care Regulatory Agencies, Governmental Authorities and Third Party Payors, as applicable, Debtor shall cause the Health Care Licenses and the Provider Agreements to be reissued in the name of Tenant or Secured Party or their designees, as directed by Secured Party, as of the date of such Event of Default or as soon thereafter as practicable.

## X.    FORECLOSURE PROCEDURES.

**10.1    No Waiver**.  No delay or omission by Secured Party to exercise any right or remedy accruing upon any Event of Default shall (a) impair any right or remedy, (b) waive any default or operate as an acquiescence to the Event of Default, or (c) affect any subsequent default of the same or of a different nature.

**10.2    Notices**.  Secured Party shall give Debtor such notice of any private or public sale as may be required by the UCC.

**10.3    Condition of Collateral**.  Secured Party has no obligation to repair, clean up or otherwise prepare the Collateral for sale.

10.4 **No Obligation to Pursue Others**. Secured Party has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor. Debtor waives any right they may have to require Secured Party to pursue any third person for any of the Obligations.

10.5 **Compliance with Other Laws**. Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

10.6 **Warranties**. Secured Party may sell the Collateral without giving any warranties as to the Collateral and may specifically disclaim any warranties of title or the like. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

10.7 **Sales on Credit**. If Secured Party sells any of the Collateral upon credit, Debtor will be credited only with payments actually made by the purchaser and received by Secured Party. In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Debtor shall be credited with the proceeds of the sale as and when received, less expenses.

10.8 **Purchases by Secured Party**. In the event Secured Party purchases any of the Collateral being sold, Secured Party may pay for the Collateral by crediting some or all of the Obligations of Debtor.

10.9 **No Marshalling**. Secured Party has no obligation to marshal any assets in favor of Debtor, or against or in payment of any of the Obligations or any other obligation owed to Secured Party or any other person.

XI. **MISCELLANEOUS.**

11.1 **Assignment**.

(i) **Binds Assignees**. This Security Agreement shall bind and shall inure to the benefit of the successors and assigns of Secured Party, and shall bind all heirs, personal representatives, executors, administrators, successors and permitted assigns of Debtor.

(ii) **No Assignments by Debtor**. Secured Party does not consent to any assignment by Debtor except as expressly provided in this Security Agreement, the Master Lease and the Sublease.

(iii) **Secured Party Assignments**. Secured Party may assign its rights and interests under this Security Agreement. If an assignment is made, Debtor shall render performance under this Security Agreement to the assignee. Debtors waive and will not assert against any assignee any claims, defenses or

8844440v2

set-offs which Debtor could assert against Secured Party except defenses which cannot be waived.

**11.2    Severability**.  Should any provision of this Security Agreement be found to be void, invalid or unenforceable by a court or panel of arbitrators of competent jurisdiction, that finding shall only affect the provisions found to be void, invalid or unenforceable and shall not affect the remaining provisions of this Security Agreement.

**11.3    Notices**.  Notice whenever provided for herein shall be in writing and shall be given either by personal delivery, overnight express mail or by certified or registered mail, return receipt requested, to Secured Party at the address set forth for Secured Party in the Master Lease, and to Debtor at the address set forth for Debtor in the Sublease, or at such other addresses as may be designated from time to time by written notice from either party to the other. Notices shall be deemed given (a) when delivered personally if delivered on a Business Day (as defined in the Master Lease) (or if the same is not a Business Day, then the next Business Day after delivery), (b) three (3) Business Days after being deposited in the United States mail, registered or certified mail, postage prepaid, return receipt requested or (c) if delivery is made by Federal Express or a similar, nationally recognized overnight courier service for 9:00 am. delivery, then on the date of delivery (or if the same is not a Business Day, then the next Business Day after delivery), if properly sent and addressed in accordance with the terms of this Section 11.3.

**11.4    Headings**.  Section headings used in this Security Agreement are for convenience only.  They are not a part of this Security Agreement and shall not be used in construing it.

**11.5    Governing Law**.  This Security Agreement is being executed and delivered and is intended to be performed in the State in which the Property is located and shall be construed and enforced in accordance with the laws of said state, except to the extent that the UCC provides for the application of the law of Debtor State.  Time is of the essence of this Security Agreement.

**11.6    Rules of Construction**.

   (i)    No reference to "proceeds" in this Security Agreement authorizes any sale, transfer, or other disposition of the Collateral by Debtor except in the ordinary course of business.

   (ii)    "Includes" and "including" are not limiting.

   (iii)    "Or" is not exclusive.

   (iv)    "All" includes "any" and "any" includes "all."

**11.7    Integration and Modifications**.

    (i)    This Security Agreement is the entire agreement of Debtor and Secured Party concerning its subject matter.

    (ii)    Any modification to this Security Agreement must be made in writing and signed by the party adversely affected.

**11.8    Waiver**.    Any party to this Security Agreement may waive the enforcement of any provision to the extent the provision is for its benefit.

**11.9    Further Assurances**.    Debtor agrees to execute any further documents, and to take any further actions, reasonably requested by Secured Party to evidence or perfect the security interest granted herein or to effectuate the rights granted to Secured Party herein.

**11.10    Collateral Assignment**.    Debtor hereby acknowledges that Secured Party may collaterally assign its security interest in the Collateral to a mortgagee of Secured Party and/or to a landlord superior to Secured Party to secure the obligations of Secured Party to such mortgagee or such superior landlord.    Upon Secured Party's request, or at the request of such mortgagee, Debtor shall confirm in writing the grant of such security interests to such mortgagee and/or such superior landlord.

The remainder of this page is intentionally blank.  Signatures follow on the next page.

8844440v2

The parties have signed this Security Agreement as of the day and year first above written.

**DEBTOR:**

_____

By: _____

Name: _____

Title: _____

**SECURED PARTY:**

_____

By: _____

Name: _____

Title: Authorized Signatory

**EXHIBIT F**

**FORM OF MASTER LEASE**

**LEASE**

**BETWEEN**

**CERTAIN AFFILIATES OF**
**GRIFFIN-AMERICAN HEALTHCARE REIT IV, INC.**

**as Landlord**

**AND**

**POP, LLC**

**as Tenant**

**Dated: as of _____, 2018**

12277199v9

## TABLE OF CONTENTS

ARTICLE A  CERTAIN LEASE PROVISIONS ........................................................... 1

ARTICLE B  CERTAIN DEFINITIONS...................................................................... 3

ARTICLE C  LANDLORD'S AGENT .......................................................................... 3

ARTICLE 1  PREMISES AND TERM; SERIES OF LEASES ............................... 3

ARTICLE 2  BASE RENT; SUPPLEMENTARY RENT ....................................... 4

ARTICLE 3  IMPOSITIONS ..................................................................................... 6

ARTICLE 4  USE AND OPERATION OF PREMISES......................................... 10

ARTICLE 5  CONDITION OF PREMISES; ALTERATIONS AND REPAIRS ............. 11

ARTICLE 6  INSURANCE ...................................................................................... 17

ARTICLE 7  DAMAGE OR DESTRUCTION ...................................................... 23

ARTICLE 8  CONDEMNATION ............................................................................ 26

ARTICLE 9  ASSIGNMENT AND SUBLETTING ............................................... 29

ARTICLE 10 SUBORDINATION ............................................................................ 36

ARTICLE 11 OBLIGATIONS OF TENANT ......................................................... 41

ARTICLE 12 DEFAULT BY TENANT; REMEDIES............................................ 47

ARTICLE 13 NO WAIVER...................................................................................... 58

ARTICLE 14 ESTOPPEL CERTIFICATE; CONSENT ....................................... 58

ARTICLE 15 QUIET ENJOYMENT ...................................................................... 59

ARTICLE 16 SURRENDER .................................................................................... 60

ARTICLE 17 ACCESS............................................................................................. 63

ARTICLE 18 ENVIRONMENTAL MATTERS .................................................... 64

ARTICLE 19 FINANCIAL AND REGULATORY REPORTING COVENANTS ........... 69

ARTICLE 20 LICENSED FACILITY OPERATION; ACCESS TO BOOKS AND
RECORDS   ........................................................................................ 75

ARTICLE 21 MISCELLANEOUS PROVISIONS................................................. 83

ARTICLE 22 RESERVED ....................................................................................... 90

ARTICLE 23 RESERVED ....................................................................................... 90

ARTICLE 24 RENEWAL........................................................................................ 90

ARTICLE 25 LETTER OF CREDIT ...................................................................... 92

ARTICLE 26 CAPITAL EXPENDITURE REQUIREMENT .............................. 94

**SCHEDULE 1**          **PREMISES**

**SCHEDULE 2**          **DEPICTION OF TENANT OWNERSHIP**

**SCHEDULE B**          **RENT SCHEDULE**

**SCHEDULE C**          **FORM OF LETTER OF CREDIT**

**SCHEDULE D**          **DEFINITIONS**

**SCHEDULE E**          **FORM OF OPERATIONS TRANSFER AGREEMENT**

**SCHEDULE F**          **FORM OF GUARANTY**

**SCHEDULE G**          **ENVIRONMENTAL REPORTS**

**SCHEDULE H**          **FORM OF APPROVED MANAGEMENT AGREEMENT**

**SCHEDULE 19.3-A**     **FORM OF REPRESENTATION LETTER**

**SCHEDULE 19.3-B**     **FORM OF AUDIT LETTER**

## LEASE

THIS LEASE (the "**Lease**") is made as of the ___ day of _____, 2018, (the "**Effective Date**") between the entities listed as Landlord on the signature pages attached hereto (individually and collectively, "**Landlord**"), and POP, LLC, an Illinois limited liability company ("**Tenant**").

## RECITALS

A.     Each Landlord is the owner of the land described on <u>Schedule A-1</u> through <u>Schedule A-24</u> (collectively, the "**Land**") together with the Other Property Rights associated therewith and the Improvements constructed thereon.

B.     Tenant desires to lease each property comprising the Premises from the applicable Landlord that is the owner thereof, and each such Landlord agrees to so lease the same to Tenant upon the terms and conditions set forth in this Lease.  The entire direct and indirect ownership of Tenant as of the Effective Date is depicted on <u>Schedule 2</u> attached to this Lease.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant, for themselves, and their administrators, legal representatives, successors and permitted assigns, hereby covenant as follows:

## ARTICLE A
## CERTAIN LEASE PROVISIONS

| | | |
|---|---|---|
| 1. | **Address for the Premises**: | As set forth on <u>Schedule A-1</u> through <u>Schedule A-24</u>. |
| 2. | **(a) "Term":** | Fifteen (15) Lease Years, beginning on the Commencement Date (as defined below) and ending on the Expiration Date (as defined below). |
| | **(b) "Commencement Date"** | The Effective Date of this Lease |
| | **(c) "Expiration Date"** | The last day of the fifteenth (15th) Lease Year, as such date may be extended for an Extended Term pursuant to Article 24 hereof, or unless sooner terminated pursuant to this Lease. |
| 3. | **"Base Rent"** for the Premises | For the first Lease Year (as defined below), Base Rent per annum shall be the amount listed on <u>Schedule B</u> and shall be paid in advance in equal   consecutive monthly installments in the amount listed on <u>Schedule B</u> on or before the first day of each month ("**Initial Base Rent**").  On the first day of the |

|   |   |   |
|---|---|---|
|   |   | second Lease Year and on the first day of each Lease Year thereafter, the Base Rent payable under this Lease shall increase by two and a half percent (2.5%) above the Base Rent payable for the prior Lease Year, which increase in Base Rent is reflected in the Base Rent amounts listed in <u>Schedule B</u>. |
| **4.** | **Permitted Use of Premises**: | The operation of each Facility for its current licensed use as a skilled nursing facility or assisted living facility, as applicable, and for other lawful uses ancillary and incident thereto (the "**Permitted Use**"). |
| 5. | **"Extended Term":** | Two (2) options to extend the Term, each for an additional period of ten (10) years, at the rental as determined pursuant to the provisions of <u>Article 24</u>. |

**Address for Notice:**

|   |   |
|---|---|
| **For Landlord:** | c/o Griffin-American Healthcare REIT IV, Inc. 18191 Von Karman Avenue, Suite 300 Irvine, CA 92612 Attention: President and COO |
| **For Tenant:** | 830 West Trailcreek Drive Peoria, Illinois 61614 Attention: Marikay L. Snyder, Esq. |
|   | With a copy of notices of Default also sent to: |
|   | Duane Morris LLP 190 S. LaSalle Street, Suite 3700 Chicago, IL 60603 Attention: Michael A. Witt, Esq. |
| **Address for Rent Payment:** | c/o American Healthcare Investors, LLC 4650 E Cotton Center Blvd., Suite 140 Phoenix, AZ 85040 Attention: Accounting |
|   | Or, at the direction of Landlord, by wire transfer of electronic funds pursuant to the written instruction provided by Landlord from time to time |

12277199v9

## ARTICLE B
## CERTAIN DEFINITIONS

This Lease utilizes capitalized terms that have specific meaning. Many of these terms and their definition (or references to the Section containing their definition) are set forth on Schedule D attached to this Lease.

## ARTICLE C
## LANDLORD'S AGENT

Each Landlord hereby appoints GAHC4 Songbird SNF Portfolio, LLC (the "**Landlord's Representative**") as the agent and lawful attorney-in-fact of such Landlord to act for such Landlord for all purposes and actions of Landlord under this Lease and Tenant shall be entitled to conclusively rely on any action taken or notice given by Landlord's Representative as being by or from Landlord in respect of this Lease. All notices, approvals, consents, waivers and all other documents and instruments executed by Landlord's Representative pursuant to the Lease from time to time and all other actions of Landlord's Representative on behalf of Landlord under the Lease shall be binding upon every entity comprising Landlord. All notices or communications from Tenant to the Landlord's Representative shall be conclusively deemed to have been communicated or delivered to Landlord in accordance with the terms of this Lease. Landlord may designate a different party to serve as Landlord's Representative, provided that no such designation shall be effective as to Tenant unless and until Landlord delivers written notice thereof to Tenant.

## ARTICLE 1
## PREMISES AND TERM; PERMITTED EXCEPTIONS

**Section 1.1** <u>Premises</u>. During the Term, Landlord, in consideration of the Rents herein reserved and of the terms, provisions, covenants and agreements on the part of Tenant to be kept, observed and performed, does hereby lease and demise the Premises unto Tenant, and Tenant does hereby hire and take the Premises from Landlord, subject to the Permitted Exceptions.

**Section 1.2** <u>Term</u>. Tenant shall lease the Premises for the Term, unless extended for an Extended Term pursuant to Article 24 hereof, or unless sooner terminated as hereinafter provided.

**Section 1.3** <u>Permitted Exceptions</u>. Title to the Premises shall be subject to each and every matter affecting title to the Premises, including, without limitation, all of the following which are in effect as of the Commencement Date and recorded against or affecting the Premises: all easements, rights of way, covenants, conditions and restrictions, liens, encumbrances, encroachments, licenses, notices of pendency, charges, zoning laws, ordinances, regulations, building codes, Requirements and other Applicable Laws, and other exceptions to Landlord's title, whether or not the same are of public record, including, without limitation, those exceptions listed as "**Permitted Exceptions**" on Schedule A or in any deed by which title to the Premises is conveyed to Landlord, and Tenant agrees that its use and occupancy of the Premises

-3-

shall be subject to the terms and conditions of said Permitted Exceptions. Accordingly, Tenant shall comply with (and not violate any of) the terms, conditions, obligations and restrictions set forth in the Permitted Exceptions. Landlord shall not create or suffer or permit any additional Permitted Exceptions to be recorded against or affect the Premises during the Term of the Lease that materially impairs the operation of any Facility, or that materially increases the costs of operating any Facility, without the consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed.

**ARTICLE 2**
**BASE RENT; SUPPLEMENTARY RENT**

**Section 2.1**     (a)     <u>Base Rent</u>.  Tenant shall pay to Landlord as Base Rent for the Premises during the Term the amounts stated in <u>Article A</u>, <u>Section 3</u>, as shown on Schedule B attached hereto ("**Base Rent**"). Base Rent shall be payable in equal monthly installments in advance on the first (1st) day of each and every month during the Term, without previous demand, notice or presentment therefor and without abatement, offset or deduction of any kind whatsoever.  Notwithstanding the foregoing, Tenant shall pay the partial month's installment of Base Rent (with respect to the remaining days of the month in which the Commencement Date occurs) upon the Commencement Date of this Lease.

(b)     <u>Lease Year</u>.  As used herein the term "**Lease Year**" means a period of twelve (12) calendar months commencing on the Commencement Date and ending on the day immediately preceding the first (1st) anniversary of the Commencement Date (if the Commencement Date occurs on the first (1st) day of a month) or the last day of the month during which the first (1st) anniversary of the Commencement Date occurs (if the Commencement Date occurs on a day other than the first (1st) day of a month), and each successive twelve (12) month period thereafter during the Term until the Expiration Date.

**Section 2.2**   <u>Supplementary Rent</u>.   Tenant shall also pay and discharge as supplementary rent (the "**Supplementary Rent**") all other amounts, liabilities and obligations of whatsoever nature relating to the Premises, including, without limitation, all Impositions, those amounts, liabilities and obligations arising under this Lease, any Applicable Laws or Requirements, easements, restrictions, or other similar agreements affecting the Premises, and all interest and penalties that may accrue thereon in the event of Tenant's failure to pay such amounts when due and payable, and all actual damages, costs and expenses which Landlord may incur by reason of any Default of Tenant or failure on Tenant's part to comply with the terms of this Lease, in each case which is not cured after notice and the expiration of applicable cure periods, all of which Tenant hereby agrees to pay within ten (10) days after written demand therefor or as is otherwise provided herein. Upon any failure by Tenant to pay any of the Supplementary Rent, such unpaid Supplementary Rent shall accrue interest at the Default Rate and Landlord shall have all legal, equitable and contractual rights, powers and remedies provided either in this Lease or by statute, at law, in equity or otherwise in the case of nonpayment of the Base Rent. The term Supplementary Rent shall be deemed rent for all purposes hereunder other than with respect to Tenant's internal accounting procedures.

**Section 2.3**　　Rent Defined.  All Base Rent and Supplementary Rent payable hereunder (collectively, "**Rent**") shall be made payable to Landlord and sent to Landlord's address set forth in Article A or to such other person or persons or at such other place as may be designated by written notice from Landlord to Tenant, from time to time, at least thirty (30) days in advance, and shall be made in United States currency which shall be legal tender for all debts, public and private. Landlord may opt to receive all Rent payable hereunder when due by wire transfer of immediately available funds to the bank and an account designated from time to time by Landlord; such option shall become effective five (5) Business Days after Landlord's written request. Notwithstanding the foregoing, Impositions shall be payable to the parties to whom they are due, except as otherwise provided herein. The terms and conditions of this Section are subject to the terms and conditions of Section 2.5 until Mortgagee otherwise notifies Tenant in writing.

**Section 2.4**　　Absolute Net Lease.  This Lease shall be deemed and construed to be a so-called "bond lease", absolutely net to Landlord, and Tenant shall pay to Landlord, absolutely net throughout the Term, the Rent, free of any charges, assessments, impositions or deductions of any kind and without abatement, deduction or set-off whatsoever except as expressly set forth otherwise in this Lease.  Under no circumstances or conditions, whether now existing or hereafter arising, or whether beyond the present contemplation of the parties, shall Landlord be expected or required to make any payment of any kind whatsoever or be under any other express or implied obligation or liability hereunder, except as herein otherwise expressly set forth in Section 3.5 or otherwise in this Lease and Tenant hereby waives all Applicable Laws and Requirements to the contrary. Tenant shall pay all costs, expenses and charges of every kind and nature relating to the Premises from and after the Commencement Date, including, without limitation, all taxes, costs of improvements, maintenance, repairs, alterations, additions, replacements, and insurance and other Impositions, except debt service on any Mortgage or any other indebtedness of Landlord or any rent or other charges under any Superior Lease, which may arise or become due or payable prior to, during or after (but attributable to a period falling within) the Term.  Unless otherwise expressly provided in this Lease, the obligations of Tenant hereunder shall not be affected by reason of: any damage to or destruction of the Premises or any part thereof, any Taking of the Premises or any part thereof or interest therein by condemnation or otherwise, any prohibition, interruption, limitation, restriction or prevention of Tenant's use, occupancy or enjoyment of the Premises or any part thereof, or any interference with such use, occupancy or enjoyment by any person or for any reason, any matter affecting title to the Premises, any eviction by paramount title or otherwise, any default by Landlord hereunder, the impossibility, impracticability or illegality of performance by Landlord, Tenant or both, any action of any Governmental Authority, Tenant's acquisition of ownership of all or part of the Premises (unless this Lease shall be terminated by a writing signed by all Persons, including any Mortgagee, having an interest in the Premises), any breach of warranty or misrepresentation, or any other cause whether similar or dissimilar to the foregoing and whether or not Tenant shall have notice or knowledge thereof and whether or not such cause shall now be foreseeable.  The parties intend that the obligations of Tenant under this Lease shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations have been modified or terminated pursuant to an express provision of this Lease.

**Section 2.5**    Payment of Rent Upon Assignment of Lease.  Tenant acknowledges that all of the interest of Landlord in and to this Lease may be assigned to a present or future Mortgagee pursuant to a Mortgage and other loan documents in connection therewith, and that under the terms thereof, all Rent under this Lease may be required to be paid directly to Mortgagee or its designee in accordance with the provisions contained therein. Tenant hereby agrees, after written notice from Landlord or Mortgagee, to so pay all such Rent directly to Mortgagee or its designee as and when same are due and payable under this Lease by wire transfer pursuant to the wire transfer instructions set forth in such notice.  Landlord consents to Tenant's compliance with any such notice directing it to pay rent directly to Mortgagee and acknowledges that any such payment of the appropriate amounts to Mortgagee shall satisfy Tenant's Rent payment obligations under this Lease.

**Section 2.6**    Federal Income Tax Treatment.   Tenant and Landlord agree and acknowledge that the parties intend the Lease to be classified as a "true lease" for Federal income tax and all other purposes and that this Lease does not represent a financing agreement. Each party shall reflect the transaction represented hereby in all applicable books, records and reports (including income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

**Section 2.7**    Rents from Real Property.  If the aggregate fair market value of the personal property (for purposes of Section 856(d)(1)(c) of the Code) leased to Tenant under this Lease equals an amount which, as determined in the sole discretion of Landlord, (a) would cause any Rent otherwise payable to Landlord under this Lease to be treated as other than "rents from real property" for purposes of Section 856(c)(2) and (c)(3) of the Code, and/or (b) would subject Landlord to a material risk of failing to satisfy the requirements of Section 856(c)(4) of the Code, Tenant and Landlord agree to use their respective best efforts to effect the assignment of such personal property to an Affiliate of Landlord or a third party and the subsequent lease by Tenant of such personal property from such Affiliate or third party; provided, however, the aggregate rent payable by Tenant under this Lease and such lease of personal property shall not exceed the rent which Tenant would have paid under this Lease absent the assignment of such personal property to an Affiliate of Landlord or a third party.

**ARTICLE 3**
**IMPOSITIONS**

**Section 3.1**    "Impositions" Defined.   Subject to the terms of Section 3.5, from and after the Commencement Date and throughout the Term, Tenant shall pay and discharge not later than thirty (30) days before any fine, penalty, interest or cost may be added thereto for the non-payment thereof, all taxes, assessments, water rents, storm and sewer rents and charges, duties, impositions, license and permit fees, regulatory application fees, assessments payable to any owner's association or similar entity, governmental levies and charges, charges for public utilities of any kind, , including, without limitation, all bed tax and assessments or similar provider taxes or fees, together with any interest or penalties imposed upon the late payment thereof (except for interest and penalties resulting from Landlord's failure to timely perform its obligations under Section 3.5), which, pursuant to past, present or future Applicable Law, during,

prior to or after (but attributable to a period falling within) the Term, shall have been or shall be levied, charged, assessed, imposed upon or grow or become due and payable out of or for or have become a lien on the Premises or any part thereof, any Buildings or personal property (including, without limitation, the Tenant's Personal Property) in or on the Premises, the Rents and income payable by Tenant or on account of any use of the Premises and such franchises as may be appurtenant to the use and occupation of the Premises as well as any sales, use, excise, commercial rent, tangible personal property and similar taxes imposed by any Governmental Authority or improvement district in connection with the use or operation by Tenant of the Premises, the Facilities, and the Tenant's Personal Property, and any interest and penalties assessed in connection therewith as a result of late payment or non-payment of any of the foregoing or late filing or non-filing of any tax returns or reports due in connection therewith (each of the foregoing being an **"Imposition"** and collectively **"Impositions"**); provided, however, Tenant's obligation to pay directly to the applicable Governmental Authority all regularly assessed ad valorem real estate taxes and assessments ("**Real Estate Taxes**") shall be suspended at Landlord's election, and in such event Tenant shall comply with the terms and provisions of Section 3.5 hereof (in which case Landlord or Mortgagee shall make such payments on or before the date when due). Except as provided in Section 3.5, Tenant, upon request from Landlord, shall submit to Landlord the proper and sufficient receipts or other evidence of payment and discharge of the same; provided, however, Tenant shall not be required to furnish such receipts or other evidence of payment with respect to Real Estate Taxes or with respect to Impositions that are being contested in accordance with Section 3.2. The certificate, advice, or bill of non-payment of any Imposition from the appropriate official designated by Applicable Law to make or issue the same or to receive payment of any Imposition shall be prima facie evidence that such Imposition is due and unpaid at the time of the making or issuance of such certificate, advice, or bill of non-payment. If any Impositions are not paid when due under this Lease, Landlord shall have the right, but shall not be obligated, to pay the same following written notice to Tenant of such payment, provided Tenant is not contesting the same pursuant to a right to do so herein. If Landlord shall make such payment, Landlord shall thereupon be entitled to repayment by Tenant on demand as Supplementary Rent hereunder. Landlord shall promptly forward to Tenant any invoices for Impositions that Landlord receives so as to allow Tenant to make payment for the Impositions in a timely manner.

     **Section 3.2**   <u>Tax Protest</u>. Tenant shall have the right to protest and contest any Impositions imposed against the Premises or any part thereof. If Tenant so elects to contest, Tenant shall use commercially reasonable efforts to notify Landlord in writing of its decision to pursue such contest promptly following the commencement or filing thereof and, to the extent procedurally required, or to prevent jeopardizing any license, permit or certification, including, without limitation, any Health Care License or Medicare and Medicaid certifications under Titles XVIII and XIX of the Social Security Act of 1935, as amended, because of nonpayment thereof, Tenant shall pay the amount in question prior to initiating the contest, which amount may be paid under protest or under reservation of rights. Tenant's right to contest is conditioned upon the following: (i) such contest is done at Tenant's sole cost and expense, (ii) nonpayment will not subject the Premises or any part thereof to sale or other liability by reason of such nonpayment, (iii) such contest shall not subject Landlord or any Mortgagee to the risk of any criminal or civil liability, and (iv) Tenant shall provide such security as may reasonably be required by Landlord or any Mortgagee or under the terms of any Mortgage or any loan documents in connection

-7-

therewith to ensure payment of such contested Impositions. Upon request, Tenant shall keep Landlord advised as to the status of such contest. Subject to the provisions of clauses (i) through (iv) above, Landlord agrees to execute and deliver to Tenant any and all documents reasonably acceptable to Landlord and otherwise required for such purpose and to cooperate with Tenant in every reasonable respect in such contest, but without any cost or expense to Landlord. If Landlord should actually receive proceeds of any such contest to the extent Tenant had paid in advance the amount in question, and to the extent that the same relate to the period of the Term, then Landlord shall remit the same to Tenant. If Landlord owns the fee interest in the Premises, then at the request of Landlord, Tenant shall (or at Tenant's own initiative subject to the provisions of clauses (i) through (iv) above, Tenant may) elect to take commercially reasonable steps to file and enforce tax certiorari proceedings to reduce tax affecting the Premises, all at Tenant's own expense; *provided, however*, that if Tenant shall decline to take such steps after a request by Landlord, Landlord may take such steps at Landlord's own expense and, in the event Landlord is successful in reducing the tax affecting the Premises, Tenant shall reimburse Landlord such expenses to Landlord to the extent of the amount of the reduction in taxes for the first year in which the lower amount of taxes are paid, within 30 days of Landlord's demand therefor.

**Section 3.3**    Installment Payments.  To the extent permitted by Applicable Law, Tenant shall have the right to apply for the conversion of any Impositions to make the same payable in annual installments over a period of years. Tenant shall pay all such deferred installments prior to the expiration or sooner termination of the Term, notwithstanding that such installments shall not then be due and payable; *provided, however*, that any Impositions (other than one converted by Tenant so as to be payable in annual installments as aforesaid) relating to a fiscal period of the taxing authority, a part of which is included in a period of time after the Expiration Date, shall (whether or not such Impositions shall be assessed, levied, confirmed, imposed or become payable, during the Term) be prorated between Landlord and Tenant as of the Expiration Date, so that Landlord shall pay at its own expense (and not from the Imposition Reserve Fund) that portion of such Impositions which relate to that part of such fiscal period included in the period of time after the Expiration Date, and Tenant shall pay the remainder thereof (which amount Landlord shall be entitled to withdraw from the Imposition Reserve Fund to the extent funds are available thereof).

**Section 3.4**    Excluded Taxes.  Tenant shall not be obligated to pay (and Landlord or Mortgagee shall not pay from the Imposition Reserve Fund) any franchise, excise, corporate, estate, inheritance, succession or capital levy or tax of Landlord or any income, profits or revenue tax upon the income of Landlord.

**Section 3.5**    Tax Escrow.  Notwithstanding any provision of this Lease to the contrary, Tenant shall: (i) pay to Landlord or, if directed by Landlord, Mortgagee on the Commencement Date and on the first day of each month thereafter until thirty (30) days prior to the date when the next installment of all Real Estate Taxes is due to the authority or other Person to whom the same is paid, an amount equal to said next installment of Real Estate Taxes divided by the number of months over which such payments are to be made; and (ii) thereafter during the Term pay to Landlord or Mortgagee an amount each month reasonably estimated by Landlord or Mortgagee to be adequate to create a fund ("**Imposition Reserve Fund**") which, as each

succeeding installment of Real Estate Taxes becomes due, will be sufficient, prior to such due date, to pay such installment in full. All such payments shall be deemed to be Supplementary Rent and Rent hereunder.  Landlord or Mortgagee shall use reasonable efforts to cause the monthly payments to be equal in amount, but neither of them shall be liable in the event that such required payments are unequal.   Landlord and Tenant will collaborate to establish a schedule for the Tenant's payments into the Imposition Reserve Fund based upon the payment due dates established by applicable law. If at any time the amount of Real Estate Taxes is increased, said monthly payments shall be increased within ten (10) Business Days after written demand by Landlord or Mortgagee so that, at lease thirty (30) days prior to the due date for each installment of Real Estate Taxes, there will be payments on hand with Landlord or Mortgagee sufficient to pay such installments in full.  Landlord or Mortgagee shall apply amounts of the Imposition Reserve Fund as necessary to payments of Real Estate Taxes on or before the date when due required to be made by Tenant pursuant to this Article and shall provide evidence of such payments to Tenant.  In making any payment relating to the Imposition Reserve Fund, Landlord or Mortgagee may do so according to any bill, statement or estimate procured from the applicable Governmental Authority or provided by Tenant without inquiry into the accuracy of such bill, statement or estimate or into the validity of any Real Estate Taxes.  Landlord or Mortgagee shall not be required to deposit any such amounts in an interest bearing account.  For the purpose of determining whether Landlord or Mortgagee has on hand sufficient moneys in the Imposition Reserve Fund to pay any particular Real Estate Taxes prior to the due date therefor, payments for each category of Real Estate Taxes shall be treated separately, it being the intention that Landlord shall not be obligated to use moneys paid for the payment of an item not yet due and payable to the payment of an item that is due and payable.  Notwithstanding the foregoing, it is understood and agreed that (a) to the extent permitted by Applicable Law, payments provided for hereunder may be held by Landlord or its Affiliate or Mortgagee in a single bank account and commingled with other funds of Landlord or Mortgagee, and (b) Landlord or Mortgagee, may, if Tenant fails to make any payments required hereunder, use payments made for any one item for the payment of the same or any other item of Rent.  If this Lease shall be terminated by reason of any Event of Default, all payments then held by Landlord shall be applied by Landlord on account of any and all sums due under this Lease; if there is a resulting deficiency, Tenant shall pay the same, and if there is a surplus, Tenant shall be entitled to a refund of the surplus once all taxes attributable to any period prior to termination have been paid. Tenant acknowledges and agrees that no deficiency or lack of funds in the Imposition Reserve Fund shall relieve Tenant of its obligation to pay all Real Estate Taxes as required under this Lease.

(a)     Security Interest.  Although it is the intent of Landlord and Tenant that Tenant's payments to Landlord for the Imposition Reserve Fund are Supplementary Rent and Rent under this Lease, if a court determines that, by operation of Applicable Law, such sums are not Supplementary Rent or Rent but instead are the property of Tenant, then to further protect Landlord's interest in said amounts, Tenant hereby grants to Landlord a first-priority security interest in the Imposition Reserve Fund and any and all monies now or hereinafter paid therein as additional security for payment of Rent.  Until expended or applied in accordance with the terms of this Lease, the Imposition Reserve Fund shall serve as additional security for Tenant's obligations hereunder.  During the continuance of an Event of Default, Landlord may, in addition to all other remedies under this Lease, apply any or all of the Imposition Reserve Fund for the

-9-

payment of Rent or other sums owing to Landlord under this Lease in its sole discretion.  The Imposition Reserve Fund shall not constitute trust funds.

(b)     General.  Tenant shall not pledge, assign or grant a security interest in the Imposition Reserve Fund, or permit any lien or encumbrance to attach thereto or any levy to be made thereon by a party claiming through Tenant, except those naming Landlord as the secured party.  Should Landlord elect to hold the Imposition Reserve Fund in an interest bearing account, all interest earned shall be added to the Imposition Reserve Fund and Tenant shall pay all taxes due in connection therewith.

**Section 3.6**     Transfer of Payments on Sale of Property.  If Landlord ceases to have any interest in the Premises, Landlord shall transfer to the Person who owns or acquires such interest in the Premises from Landlord and is the transferee of this Lease, the payments made pursuant to Section 3.5 hereof relating to the Premises covered by this Lease, subject, however, to the provisions thereof. Upon such transfer of the Premises and the payments, and assumption of this Lease by the transferee in writing, the transferor and its Affiliates shall be deemed to be released from all liability with respect thereto and Tenant agrees to look to the transferee solely with respect thereto, and the provisions hereof shall apply to each such successive transfer of the said payments.

**Section 3.7**     Survival.  The provisions of this Article 3 shall survive the expiration or earlier termination of this Lease.

**ARTICLE 4**
**USE AND OPERATION OF PREMISES**

**Section 4.1**     Use.  The Premises may be used and occupied only for the Permitted Use set forth in Article A, Section 4.  If the Health Care Licenses permit operations of more or other than for the Permitted Use designated for a Facility, as applicable, Tenant shall not be permitted to modify the use of any Facility to such other use without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, and it shall be reasonable for Landlord to condition its consent on Tenant executing and delivering an amendment to this Lease addressing the regulatory and other issues associated with such different use, as reasonably determined by Landlord.  Tenant shall not create or suffer or permit to exist any public or private nuisance, hazardous or illegal condition or waste on or with respect to the Premises. For purposes of this Article 4, "**waste**" as used herein, includes, but is not limited to, loss of: (i) any certification for participation in the Medicaid Program, the Medicare Program and/or any other program of any Governmental Authority by more than one of the Facilities, (ii) any Health Care License of Tenant relating to more than one of the Facilities, (iii) any certificate of need rights relating to more than one of the Facilities, (iv) any governmental certification or license resulting in the closure of more than one of the Facilities, or (vi) full participation in a Third Party Payor program by more than one of the Facilities.  This Article 4 shall survive the expiration or earlier termination of this Lease.

**Section 4.2**     Non-Competition and Non-Solicitation.

-10-

12277199v9

(a)     Tenant acknowledges that a fair return to Landlord on its investment in the Premises is dependent, in part, on the concentration of the Premises during the Term of the licensed skilled nursing and/or assisted living facility, as applicable, business of Tenant, Guarantor and their respective Affiliates in the geographical area of the Premises. Tenant further acknowledges that the diversion of residents and/or patient care activities from the Premises to other facilities owned or operated by Tenant, Guarantor or their respective Affiliates during the Term at or near the end of the Term may have a material adverse impact on the value and utility of the Premises.

(b)     Therefore, except for (i) existing facilities currently owned by Tenant or an Affiliate of Tenant or Guarantor as of the Effective Date located in Havana, Illinois, Sullivan, Illinois and Kewanee, Illinois, (ii) facilities under construction currently owned by Tenant or an Affiliate of Tenant or Guarantor as of the Effective Date, and (iii) facilities which may be constructed on vacant land currently owned by Tenant or an Affiliate of Tenant or Guarantor, Tenant agrees that during the Term, neither Tenant, Guarantor nor any of their respective Affiliates shall, without the prior written consent of Landlord, operate, own, manage, participate in or otherwise receive revenues from any other facility or institution providing services similar to those provided on or in connection with any Facility and the permitted use thereof as contemplated under this Lease, within a three (3) mile radius of any Facility.

(c)     Except as required for medically appropriate reasons, or for other reasons which, in Tenant's reasonable judgment are in the best interests of a Facility or a resident or patient, during the Term, neither Tenant, Guarantor nor their respective Affiliates will solicit the removal or transfer of any resident or patient from any Facility to any other nursing or health care facility, or to any senior housing or retirement housing facility, located within a three (3) mile radius of any Facility.

(d)     *Intentionally omitted*.

(e)     Notwithstanding the foregoing, Tenant may request that Landlord waive some or all of the foregoing provisions with respect to another facility that will benefit one of the Facilities.  Landlord shall have no obligation to approve such waiver and may approve or disapprove such request in its reasonable discretion.

(f)     This <u>Section 4.2</u> will survive the expiration or termination of the Lease.

## ARTICLE 5
## CONDITION OF PREMISES; ALTERATIONS AND REPAIRS

**Section 5.1**     <u>Condition of Premises</u>.  *Tenant acknowledges that, immediately prior to the execution and delivery of this Lease, Tenant or its Affiliate was the owner of the Premises, was (and, as of the date hereof, is currently) in possession of the Premises, and therefor has examined the Premises, is familiar with the physical condition, expenses, operation and maintenance, zoning, Requirements, status of title and use that may be made of the Premises*

-11-

*and every other matter or thing affecting or related to the Premises, and is leasing the same in its "As Is" condition.* Landlord has not made and does not make any representations or warranties whatsoever with respect to the Premises or otherwise with respect to this Lease, express or implied, including any warranty regarding the merchantability or warranty regarding the suitability of the Premises for their intended commercial purposes. Tenant assumes all risks resulting from any defects (patent or latent) in the Premises or from any failure of the same to comply with any Requirement, Applicable Law or the uses or purposes for which the same may be occupied and assumes all responsibility for repair of any defect (patent or latent) in the Premises. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING OR ANY OTHER PROVISION OF THIS LEASE, TENANT AGREES THAT IT IS TAKING AND ACCEPTING POSSESSION OF THE PREMISES ON THE COMMENCEMENT DATE AND THEREAFTER ON AN "AS IS", "WHERE IS", AND "WITH ALL FAULTS" BASIS.

**Section 5.2**    Tenant Repairs. At Tenant's sole cost and expense, whether or not Tenant is in occupancy of all of the Buildings, Tenant shall maintain and keep all of the Buildings on the Premises and the adjoining sidewalks, curbs and common areas and any alterations or improvements thereto, if any, clean and in good condition and repair, normal wear and tear excepted, free of accumulations of dirt, rubbish, snow and ice. Tenant shall make all repairs and replacements, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, and shall perform all maintenance, necessary to (a) maintain the Premises and any sidewalks, curbs and common areas in good condition and repair, and (b) cause the Premises to comply with all Requirements and Applicable Laws. When used in this Section 5.2, the term "**repairs**" shall include all necessary additions, alterations, improvements, replacements, renewals and substitutions. All repairs made by or at the direction of Tenant shall be equal in quality and class to the original work and shall be made in compliance with all Requirements and Applicable Laws. Landlord shall not be required to furnish any services or facilities or to maintain or make any repairs or alterations to the Premises, and Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Premises and all costs and expenses incidental thereto. Tenant shall have the roof inspected with at least annually by an appropriate consultant reasonably acceptable to Landlord, at Tenant's expense, and Tenant will deliver to Landlord a copy of each written inspection report Tenant obtains within ten (10) Business Days after receiving same. Tenant shall, at its sole cost and expense, repair, replace and maintain the roof in at least the same level of condition and repair as on the Commencement Date. Notwithstanding the foregoing standard of maintaining the Premises in at least the same level of condition and repair as on the Commencement Date, if the Requirements or any Applicable Law mandate a higher standard, then Tenant shall, at Tenant's expense, be obligated to cause the Premises to comply with such higher standard.

**Section 5.3**    Landlord Non-Responsibility. Landlord shall not be responsible for the cost of any alterations or replacements of or maintenance or repairs to, or Restoration of the Premises of any nature whatsoever, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen, whether or not now in the contemplation of the parties. To the extent not prohibited by Applicable Law, Tenant hereby waives and releases all rights now or hereinafter conferred by any Applicable Laws, Requirements or otherwise which would have the effect of limiting or modifying any of the provisions of this Article 5.

**Section 5.4** <u>Tenant Alterations</u>. Tenant shall have the right at any time and from time to time during the Term to make, at its sole cost and expense, changes, alterations, additions or improvements (collectively, "**Alterations**") in or to the Premises, subject, however, in each case to all of the following:

(a)     No Alteration shall be undertaken except after prior written notice to Landlord and Landlord's approval thereof, which approval shall not be unreasonably withheld, conditioned, delayed or denied, *provided that* no such notice or approval shall be required with respect to (i) any nonstructural Alteration involving an estimated cost of less than or equal to the Threshold Amount individually or in the aggregate for any Lease Year with respect to a Facility (as reasonably estimated by a licensed third party architect or contractor reasonably selected by Tenant and reasonably approved by Landlord), provided, Tenant shall notify Landlord of the anticipated scheduled commencement date and of the actual commencement of such Alteration (which notice may be given by electronic mail using an email address identified by Landlord from time to time), (ii) any Alteration made by Tenant on an emergency basis (e.g., to protect health or welfare of persons or imminent loss or damage to the Premises or any part thereof) in which case Tenant shall notify Landlord in writing of such emergency Alteration as soon as practicable, or (iii) Alterations required by the Requirements or Applicable Law.  As used herein, the term "nonstructural Alteration" means an alteration that does not affect the roof, foundation, load-bearing walls or the systems (e.g. electric, water, HVAC, etc.) serving any Facility.

(b)     Other than an Alteration to comply with Applicable Laws, no material structural Alteration, and no other Alteration (individually or in the aggregate with respect to a Facility in any Lease Year) involving an estimated cost of more than the Threshold Amount (as reasonably estimated by a licensed third party architect or contractor reasonably selected by Tenant and reasonably approved by Landlord), shall be made without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, delayed or denied by Landlord.

(c)     Any Alteration shall, when completed, be of such a character as not to be expected to reduce the value of the Premises below its value immediately before such Alteration as determined by Landlord in its reasonable discretion.

(d)     Notwithstanding the provisions of Section 5.4(a)(i) and (ii) and Section 5.4(b), if, under the provisions of any Mortgage or any loan documents in connection therewith, any Alteration requiring Landlord's consent hereunder also requires the consent of the Mortgagee, the written consent of such Mortgagee must be obtained before the commencement of any such Work and Landlord agrees to use commercially reasonable efforts to assist Tenant in obtaining such consent of Mortgagee.

(e)     Notwithstanding the provisions of <u>Section 5.4(a)</u> and <u>Section 5.4(b)</u>, no Alteration shall be made by Tenant without Landlord's reasonable consent if the same would reduce the number of licensed beds or the square footage of the Building being altered, or weaken, temporarily or permanently, the structure of the Building being altered or any part thereof, or enable Tenant to conduct activity inconsistent with the limitations upon its use as stated in <u>Article 4</u>.

-13-

(f)     The reasonable actual, out-of-pocket cost and expense of Landlord's and Mortgagee's review of any plans and specifications for Alterations required to be furnished to Landlord and Mortgagee pursuant to Section 5.5 hereof, including reasonable third party costs and expenses actually incurred by Landlord and Mortgagee, shall be paid by Tenant to Landlord within ten (10) business days after written demand as Supplementary Rent.

(g)     The provisions and conditions of Section 5.5 shall apply to any work performed by Tenant under this Section 5.4.

(h)     For purposes of Sections 5.4 and 5.5, the **"Threshold Amount"** shall mean, for each applicable project in a Building, an amount equal to $100,000.00 per Lease Year.

(i)     For purposes of Sections 5.4 and 5.5, notice of whether Landlord's consent has been given or withheld shall be delivered to Tenant within ten (10) Business Days following receipt of Tenant's written request (as such time period shall be extended for a reasonable period in the event Landlord determines, in its reasonable discretion, that it is prudent to engage a third party to review the plans and specifications, if any, pertaining to such contemplated Alteration).

**Section 5.5**     Tenant Work.  Tenant agrees that all Alterations, repairs, Restoration and other work which Tenant shall be required or permitted to do under the provisions of this Lease (each hereinafter called the "**Work**") shall be at Tenant's sole cost and expense, and (i) performed in a good, workmanlike manner, and in accordance with this Lease and all Requirements and Applicable Laws, as well as any plans and specifications therefor which shall have been approved by Landlord (if such approval is required hereunder), (ii) commenced and completed promptly and (iii) done in all cases upon, in compliance with and subject to the terms of any Non-Disturbance Agreement and, to the extent not inconsistent with any term thereof, all of the following terms and conditions:

(a)     If the Work shall (i) involve any material structural Work, or (ii) cost more than the Threshold Amount individually or in the aggregate with respect to a Facility in any Lease Year (as reasonably estimated in writing by a licensed third patty architect or contractor reasonably selected by Tenant), then the Work shall not be commenced until detailed plans and specifications (including layout, architectural, mechanics and structural drawings), prepared by a licensed architect selected by Tenant and reasonably approved by Landlord, together with a proposed construction budget shall have been submitted to and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

(b)     No material structural Work or Work costing more than the Threshold Amount (individually or in the aggregate with respect to a Facility in any Lease Year) shall be undertaken except under the supervision of a licensed third party architect or other appropriate design professional reasonably satisfactory to Landlord.

(c)     All Work shall be commenced only after all required permits, authorizations and approvals shall have been obtained by Tenant from the applicable

-14-

Governmental Authorities, at its own cost and expense, and copies thereof delivered to Landlord. Landlord will, on Tenant's written request, execute any documents necessary to be signed by Landlord to obtain any such permits, authorizations and approvals, *provided that* no such documents shall cause Landlord to incur any liability other than monetary liability associated with fees or costs charged in connection with such permits, authorizations and approvals, and Tenant shall pay and discharge any such expense or liability of Landlord in connection therewith.

(d)     If the Work will cost more than the Threshold Amount (as reasonably estimated in writing by a licensed third party architect or contractor reasonably selected by Tenant), it shall not be commenced until Tenant shall have obtained and delivered to Landlord, either (i) a performance bond and a labor and materials payment bond (issued by a corporate surety licensed to do business in the State in which the Premises are located and satisfactory to Landlord in its reasonable discretion), each in an amount equal to the estimated cost of such Work and in form otherwise satisfactory to Landlord in its reasonable discretion, or (ii) such other security or evidence of ability to pay the estimated cost of such Work as shall be satisfactory to Landlord in its reasonable discretion.

(e)     The cost of all Work shall be paid promptly, in cash, so that the Premises and Tenant's leasehold estate therein shall at all times be free from (i) liens for labor or materials supplied or claimed to have been supplied to the Premises or Tenant, and (ii) chattel mortgages, conditional sales contracts, title retention agreements, security interests and agreements, and financing agreements and statements. Tenant shall, upon Landlord's request, provide Landlord evidence of such payment satisfactory to Landlord in Landlord's reasonable discretion, which evidence may include partial and final lien releases and waivers from any and all appropriate parties.

(f)     At all times when any Work is in progress, Tenant shall maintain or cause to be maintained with such companies and for such periods as Landlord may reasonably require (i) workers' compensation insurance covering all persons employed in connection with the Work, in an amount at least equal to the minimum amount of such insurance required by Applicable Law (with a waiver of subrogation satisfactory to Landlord in its sole and absolute discretion); and (ii) for the mutual protection of Landlord, Tenant and any Mortgagee, (1) builder's risk insurance, completed value form, covering all physical loss, in an amount satisfactory to Landlord in its reasonable discretion, and (2) commercial general liability insurance against all hazards, with limits for bodily injury or death to any one person, for bodily injury or death to any number of persons in respect of any one accident or occurrence, and for property damage in respect of one accident or occurrence in such amounts as Landlord in its reasonable discretion may require. Such commercial general liability insurance may be satisfied by the insurance required under Section 6.1(a), but may be effected by an endorsement, if obtainable, upon the insurance policy referred to in said Section. The provisions and conditions of Article 6 hereof shall apply to any insurance which Tenant shall be required to maintain or cause to be maintained under this subsection. All contractors, subcontractors, vendors, materialmen and others performing any Work on the Premises or providing any supplies or materials in connection with Work on the Premises must be licensed and qualified to perform such services and/or provide such supplies and shall be required to maintain insurance of each of

-15-

the types set forth above in such amounts as Landlord in its reasonable discretion requires, naming Landlord, and all Mortgagees as additional named insureds and Tenant shall obtain and supply to Landlord evidence of such required insurance.

(g)     Upon completion of any Work, Tenant, at Tenant's expense, shall obtain certificates of final approval of such Work required by any Governmental Authority and shall furnish Landlord with copies thereof, together with (i) "as-built" plans and specifications for such Work (if the cost of such Work exceeds the Threshold Amount), and (ii) final lien waivers and releases from any and all appropriate parties.

(h)     The conditions of Section 5.4 shall have been complied with, to the extent applicable to the Work.

**Section 5.6**     <u>Landlord Inspection Right</u>.  Following the delivery of prior reasonable notice, any Work shall be subject to inspection at reasonable times during normal business hours and without disruption to the business of Tenant by Landlord, its architect and Mortgagee, or their duly authorized representatives, and if Landlord's architect or Mortgagee upon any such inspection shall be of the reasonable opinion that the Work is not being performed substantially in accordance with the provisions of this Article 5 or with the plans and specifications, or that any of the materials or workmanship are not of good quality or are unsound or improper, Tenant shall correct any such failure and shall immediately replace any unsound or improper materials or workmanship, and Tenant shall, within five (5) Business Days after demand therefor, reimburse Landlord for its reasonable expenses actually incurred in connection with such inspection.

**Section 5.7**     <u>Fixtures and Tenant's Personal Property</u>.  All fixtures, structures and other improvements (other than Tenant's Personal Property) shall become the property of Landlord and shall remain upon and be surrendered with the Premises. All Tenant's Personal Property required to be removed by Tenant at the end of the Term remaining in the Premises thereafter shall be deemed abandoned and may, at the election of Landlord, either be retained as Landlord's property or may be removed from the Premises by Landlord at Tenant's expense. Tenant shall be responsible for, and shall reimburse Landlord within ten (10) days after written demand therefor, any damage to the Premises caused in whole or in part by the removal or demolition of Tenant's Personal Property (unless Landlord purchases the owned Tenant's Personal Property or takes an assignment of the leased Tenant's Personal Property pursuant to Section 16.5 below, in which event, Tenant shall not be obligated to remove same), structures or other improvements which Tenant is required to remove pursuant to this Section 5.7 or which Tenant is entitled to and elects under the provisions of this Lease to remove.  The provisions of this Section 5.7 shall survive the expiration or earlier termination of the Term.

**Section 5.8**     <u>Compliance with Health Care Requirements</u>.  Notwithstanding any other provision of this Lease, Tenant shall be exclusively responsible at its own expense for determination and assurance that, and shall cause, the condition of the Premises and each Facility and all repairs, Alterations, Restoration and Work are in material compliance with all Requirements of Health Care Licenses and Governmental Authorities and for obtaining any

-16-

approvals or consents of Governmental Authorities in connection with any repairs, Alterations, Restoration or Work.

# ARTICLE 6
## INSURANCE

**Section 6.1**    <u>Policies to Maintain</u>.  Throughout the Term, Tenant shall, at its own cost and expense, provide and keep in force for the benefit of Landlord, Tenant and any Mortgagee for the Facilities:

(a)    commercial general liability insurance and professional liability insurance (including owner's protective liability coverage on operations of Tenant and its independent contractors engaged in construction, personal injury, and blanket contractual liability insurance), with a limit for each occurrence not less than $1,000,000 and to have general aggregate limits of not less than $3,000,000 for each policy year, protecting and indemnifying Landlord, Tenant, and any Mortgagee against all claims for damages to person or property or for loss of life or of property occurring upon, in, or about the Premises, written on a claims made or occurrence basis. Such coverage shall contain endorsements: (i) deleting any liquor liability exclusion (if alcohol is sold on the Premises); (ii) including cross-liability; and (iii) waiving the insurer's rights of subrogation against Landlord for events of which Landlord is not, but Tenant is, covered; provided however, that with regard to the requirements of waiver of subrogation against Landlord, Tenant shall utilize its reasonable efforts to obtain such waiver in any insurance policy procured by Tenant, and if it cannot do so, Landlord shall have the right to procure, at Tenant's expense, an insurance policy containing such waiver if it can do so at the same or better price and on substantially the same terms and conditions.  Tenant shall increase the limits stated above within thirty (30) days following receipt of written notice from Landlord to limits not exceeding $3,000,000/occurrence and $5,000,000/aggregate as reasonably requested by Landlord if such increases are required by a Mortgagee or in connection with any merger of, or a sale of the assets or equity interest of, a parent of Landlord;

(b)    property insurance on the Premises and all installations, additions and improvements which may now or hereafter be erected thereon against "ALL RISK" of loss or damage in an amount sufficient to prevent Landlord, Tenant, and any Mortgagee from becoming co-insurers and in any event, including loss or damage from sprinkler leakage, earthquakes and windstorm, in an amount not less than one hundred percent (100%) of the actual replacement value thereof (i.e., including the cost of debris removal) as agreed by Landlord and Tenant from time to time (or as otherwise required by Mortgagee) and subject to all applicable policy sub-limits. Such coverage shall contain an agreed amount endorsement reasonably acceptable to Landlord.  Landlord agrees that Tenant, in satisfaction of this paragraph, may maintain such property coverage pursuant to a blanket policy that covers the Premises as well as properties other than the Premises (i) with a sublimit of $159,740,985 for all-risk loss or damage with respect to all properties, including the Premises, covered by such blanket policy, and (ii) a sublimit of $159,740,985 for loss or damage from earthquakes and windstorm with respect to all properties, including the Premises, covered by such blanket policy;

-17-

(c)     business interruption insurance covering risk of loss due to the occurrence of any of the hazards covered by the insurance to be maintained by Tenant described in <u>Section 6.1(b)</u> with coverage in a face amount of not less than the aggregate amount, for a period of twelve (12) months following the insured-against peril, of 100% of all Rent (which includes all Impositions and other amounts specified in the definition of Rent) to be paid by Tenant under this Lease; such coverage shall contain an agreed amount endorsement acceptable to Landlord;

(d)     workers' compensation insurance (including employers' liability insurance), with a waiver of subrogation satisfactory to Landlord in its reasonable discretion, covering all persons employed at the Premises to the extent required by the Applicable Laws and Requirements of the state in which the Premises are located, including, without limitation, during the course of work to the Premises; provided, however, that with regard to the requirements of waiver of subrogation against Landlord, Tenant shall utilize its reasonable efforts to obtain such waiver in any insurance policy procured by Tenant;

(e)     mechanical breakdown insurance, if applicable, in an amount not less than one hundred percent (100%) of the actual replacement value thereof and of any improvements in which any such boiler is located (including the cost of debris removal but excluding foundations and excavations) as determined by Landlord in its reasonable discretion from time to time;

(f)     *intentionally omitted*;

(g)     equipment coverage and elevator liability coverage, if applicable, in amounts approved by Landlord in its reasonable discretion;

(h)     flood insurance (if the Premises are located in whole or in part within a special flood hazard area as designated by any department or agency of the United States Government having jurisdiction);

(i)     any additional insurance as required by any Health Care Regulatory Agency;

(j)     motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000) (if applicable); and

(k)     if during the Term, Tenant, or any Facility are covered by general liability, professional liability, patient healthcare professional malpractice or other liability insurance on a "claims made" basis, Tenant shall procure and maintain, at Tenant's sole cost and expense, "tail" insurance coverage, with such coverage limits and such deductible amounts as shall be reasonably acceptable to Landlord for general liability, professional liability, patient healthcare professional malpractice or other liability claims reported after the termination of this Lease or expiration of the claims made policy, but concerning services provided during the Term of this Lease. Tenant shall provide Landlord with a certificate evidencing that such insurance coverage is in effect for a period of no less than one (1) year subsequent to the termination of this Lease no later than ninety (90) days prior to the termination of this Lease.

-18-

**Section 6.2** Policies to Name Landlord, Mortgagees. Whenever under the terms of this Lease Tenant is required to maintain insurance for the benefit of Landlord, (i) Landlord, any agent identified by Landlord and any Mortgagee shall be an additional insured in all such liability insurance policies, and (ii) either Landlord or Mortgagee, as specified in Section 6.3, shall be named as loss payee in all such casualty insurance policies. In the event that the Premises shall be subject to a Mortgage, the commercial general liability insurance shall name the Mortgagee (together with any trustee or servicer therefor) as an additional insured and all other insurance provided hereunder shall name the Mortgagee as an additional insured or, as provided in Section 6.3, loss payee under a standard "non-contributory mortgagee" endorsement or its equivalent. All policies of insurance shall provide that such coverage shall be primary and that any insurance maintained separately by Landlord, or the Mortgagee shall be excess insurance only. The original certificates (on Acord Form 27 or its equivalent in the case of casualty and on insurance company letterhead in the case of liability) and certified true copies of the original policies (or binders thereof if the policies have not yet been prepared) shall be delivered to Landlord and any Mortgagee.

**Section 6.3** Adjustment. The loss under all insurance policies insuring against property damage to the Buildings shall be payable to Mortgagee or, if there is none, to Landlord, subject to Section 7.2. All property insurance policies required by this Lease shall provide that all adjustments for claims with the insurers in excess of One Hundred Thousand Dollars ($100,000.00) (exclusive of any deductible) shall be made with Landlord, Tenant and any Mortgagee. Subject to the terms of any Mortgage, any adjustments for claims with the insurers involving sums of One Hundred Thousand Dollars ($100,000.00) (exclusive of any deductible) or less shall be made by Tenant.

**Section 6.4** Insurance Company Requirements. All of the above-mentioned insurance policies and/or certificates shall be obtained by Tenant and delivered to Landlord on or prior to the date hereof, and thereafter as provided for herein, and shall be written by insurance companies: (i) rated "A:VIII" or better in "Best's Insurance Guide" (or any substitute guide acceptable to Landlord) and at least "A" by Standard & Poor's Ratings Group; (ii) authorized to do business in the state where the Premises are located; and (iii) of recognized responsibility and which are reasonably satisfactory to Landlord and any Mortgagee. Any deductible amounts under any property insurance policy for earthquake, flood and wind damage hereunder shall not exceed $150,000 per occurrence and any deductible amounts hereunder for any general liability policy under Section 6.1(a) and any policy under Section 6.1(b) liability insurance policy hereunder shall not exceed $100,000 per occurrence.

**Section 6.5** Evidence of Insurance, Renewal. At least five (5) days prior to the expiration of any policy or policies of such insurance, Tenant shall renew such insurance, and deliver to Landlord and any Mortgagee, within the said period of time insurance binders evidencing the coverage described in this Article 6 and as promptly as practicable thereafter, certified true copies of the policies (if such copies are requested by Landlord) and certificates of insurance, endorsed in accordance with Section 6.2 hereof and to deliver original certificates of insurance five (5) days prior to the expiration of any policy of insurance and, upon request by Landlord, certified true copies of the original policies within sixty (60) days after the expiration

-19-

of any policy of insurance. All coverage described in this Article 6 shall be endorsed to provide Landlord, and Mortgagee with thirty (30) days' notice of cancellation or change in terms.

Section 6.6    No Violation of Policies.  Tenant shall not violate in any material respect, any of the conditions of any of the said policies of insurance.

Section 6.7    Prohibited Insurance.    Tenant shall not carry separate or additional insurance affecting the coverage described in this Article 6 concurrent in form and contributing in the event of any loss or damage to the Premises with any insurance required to be obtained by Tenant under this Lease, unless such separate or additional insurance shall comply with and conform to all of the provisions and conditions of this Article 6. Tenant shall promptly give notice to Landlord of such separate or additional insurance.

Section 6.8    Blanket/Umbrella Insurance.  The insurance required by this Lease, at the option of Tenant, may be effected by blanket and/or umbrella policies issued to Tenant covering the Premises, provided that the policies otherwise comply with the provisions of this Lease and allocate to the different properties comprising the Premises the specified coverage, without possibility of reduction or coinsurance by reason of, or damage to, any other premises named therein, and if the insurance required by this Lease shall be effected by any such blanket or umbrella policies, Tenant shall furnish to Landlord or Mortgagee certified true copies of such policies, with schedules showing the amount of insurance afforded by such policies applicable each of the properties comprising the Premises.

Section 6.9    Landlord's Right to Place Policy.  In the event that Tenant fails to maintain the insurance required to be maintained by Tenant under this Lease following at least two (2) Business Days written notice thereof from Landlord, Landlord may thereafter, in its sole discretion, designate that with respect to property, fire and related building insurance coverages as described in Sections 6.1(b), 6.1(e), 6.1(f) and 6.1(g) of this Lease, or in the absence of such failure, upon the agreement of Landlord or Tenant, Landlord or Landlord's Affiliates may obtain some or all of such insurance coverages otherwise required to be obtained by Tenant under this Lease at the expense of Tenant, and in such event, Tenant shall pay to Landlord, as Supplementary Rent, the premiums and all other costs of such insurance, on a timely basis when and as required to be paid by Landlord, including payment in advance of the date such costs become due and payable, whether by payment of a single installment or in equal monthly installments. Such insurance which is obtained by Landlord or Landlord's Affiliates shall be at costs and on terms no less favorable than prevailing market terms for similar insurance available to Tenant, and shall offer customer service which is at least at the level otherwise available to Tenant on the date of this Lease. Landlord may cause such insurance which it obtains to be provided by or through an insurance carrier or insurance agency which is an Affiliate of Landlord.

Section 6.10   Greater Insurance Amounts. Additionally, Tenant shall obtain and maintain such other insurance or such greater policy amounts for the insurance specified above as Landlord may reasonably require from time to time, provided that any such other insurance or such greater policy amounts are consistent with such other insurance or such greater policy

amounts being required for similar Facilities in similar geographic areas as where the Facilities are located.

      **Section 6.11** <u>Premium Escrow</u>.  Notwithstanding any provision in this Lease to the contrary, Tenant shall: (i) pay to Landlord or, if directed by Landlord, Mortgagee on the first (1st) day of each month until thirty (30) days prior to the date when the next installment of the premiums for the policies of insurance that Tenant is required by the terms of this Lease to maintain (the "**Insurance Premiums**") is due an amount equal to said next installment of Insurance Premiums divided by the number of months over which such payments are to be made; and (ii) thereafter during the Term pay Landlord or Mortgagee an amount each month reasonably estimated by Landlord or Mortgagee to be adequate to create a fund ("**Insurance Premium Reserve Fund**") which, as each succeeding installment of Insurance Premiums becomes due, will be sufficient, thirty (30) days prior to such due date, to pay such installment in full.  Landlord or Mortgagee shall use reasonable efforts to cause the monthly payments to be equal in amount, but neither of them shall be liable in the event that such required payments are unequal.  All such payments shall be deemed to be Supplementary Rent and Rent hereunder.  If at any time the amount of any Insurance Premium is increased, said monthly payments shall be increased within ten (10) Business Days after written demand by Landlord or Mortgagee so that thirty (30) days prior to the due date for each installment of Insurance Premiums, there will be payments on hand with Landlord or Mortgagee sufficient to pay such installments in full. Landlord or Mortgagee shall apply the full amount of the Insurance Premium Reserve Fund (as defined herein) to payments of Insurance Premiums on or before the date when due required to be made by Tenant pursuant to this Article 6, and shall provide evidence of such payments to Tenant.  In making any payment relating to the Insurance Premium Reserve Fund, Landlord or Mortgagee may do so according to any bill, statement or estimate procured from the applicable insurance company or provided by Tenant without inquiry into the accuracy of such bill, statement or estimate or into the validity of any Insurance Premium.  If the Insurance Premiums are paid pursuant to a master policy covering properties other than the Facilities and Premises, then Tenant shall be permitted to deposit into the Insurance Premium Reserve Fund an amount equal to the proportionate portion of such premiums attributable to the Premises calculated based upon the ratio of (i) the number of licensed beds within the Facilities to (ii) the number of licensed beds insured under such master policies.  Landlord or Mortgagee shall not be required to deposit any such amounts in an interest bearing account.  For the purpose of determining whether Landlord or Mortgagee has on hand sufficient moneys in the Insurance Premium Reserve Fund to pay any particular Insurance Premium thirty (30) days prior to the due date therefor, payments for each category of insurance shall be treated separately, it being the intention that Landlord shall not be obligated to use moneys paid for the payment of an item not yet due and payable to the payment of an item that is due and payable. Notwithstanding the foregoing, it is understood and agreed that (a) to the extent permitted by Applicable Law, payments provided for hereunder may be held by Landlord or its Affiliate or Mortgagee in a single bank account and commingled with other funds of Landlord or Mortgagee, and (b) Landlord or Mortgagee, may, if Tenant fails to make any payments required hereunder, use payments made for any one item for the payment of the same or any other item of Rent.  If this Lease shall be terminated by reason of any Event of Default, all payments then held by Landlord shall be applied by Landlord on account of any and all sums due under this Lease; if there is a resulting deficiency, Tenant shall pay the same, and if there is a surplus, Tenant shall be entitled to a refund of the surplus. Tenant acknowledges

and agrees that no deficiency or lack of funds in the Insurance Premium Reserve Fund, shall relieve Tenant of its obligation to pay all Insurance Premiums as required under this Lease.

(a)     Security Interest.  Although it is the intent of Landlord and Tenant that Tenant's payments to Landlord for the Insurance Premium Reserve Fund are Supplementary Rent and Rent under this Lease, if a court determines that, by operation of Applicable Law, such sums are not Supplemental Rent or Rent but instead are the property of Tenant, then to further protect Landlord's interest in said amounts, Tenant hereby grants to Landlord a first-priority security interest in the Insurance Premium Reserve Fund and any and all monies now or hereinafter deposited therein as additional security for payment of Rent.  Until expended or applied in accordance with the terms of this Lease, the Insurance Premium Reserve Fund shall serve as additional security for Tenant's obligations hereunder.  Upon the occurrence of an Event of Default and during the continuance thereof, Landlord may, in addition to all other remedies under this Lease, apply any or all of the Insurance Premium Reserve Fund for the payment of Rent or other sums owing to Landlord under this Lease in its sole discretion.  The Insurance Premium Reserve Fund shall not constitute trust funds.

(b)     General.  Tenant shall not pledge, assign or grant a security interest in the Insurance Premium Reserve Fund, or permit any lien or encumbrance to attach thereto or any levy to be made thereon by a party claiming through Tenant, except those naming Landlord as the secured party.  Should Landlord elect to hold the Insurance Premium Reserve Fund in an interest bearing account, all interest earned shall be added to the Insurance Premium Reserve Fund and Tenant shall pay all taxes due in connection therewith.

**Section 6.12**  Waiver of Subrogation.  Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income, or losses under worker's compensation laws and benefits, even though such loss or damage might have been occasioned by the fault or negligence of such party, its agents or employees if, and to the extent, that any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Section.  The provisions of this Section shall prevail over any conflicting provision in the Lease, it being the intention of Landlord and Tenant that wherever applicable the waiver of subrogation contained in this Section shall take precedence over any other provision providing for the liability of one party to the other.

**Section 6.13**  Loss Run Reports.  Within ten (10) Business Days following the end of each calendar quarter, Tenant shall deliver to Landlord a report of the following: (i) all written claims asserted against Tenant which are or which may be covered by Tenant's liability insurance policies, (ii) a list of said claims that Tenant has tendered to its insurance company and the status of each, together with an update to the status of claims identified on prior reports, and (iii) a list of said claims that have been paid and settled by Tenant and/or its insurance company, identifying the payments made by each of Tenant and its insurance in connection therewith (the "**Loss Run Report**").  The Loss Run Report shall be in form reasonably acceptable to Landlord, and if the Loss Run Report fails to include information reasonably requested by Landlord, Tenant shall promptly (and in any event within ten (10) Business Days) provide such information

-22-

as Landlord requests in writing. If the liability insurance Tenant maintains pursuant to Section 6.1(a) has policy limits of less than $3,000,000 per occurrence and $5,000,000 general aggregate limits for each policy year (being the annual period of coverage afforded by the liability policy for which recovery limits apply), and if the Loss Run Report discloses for any policy year that the amount of claims paid during said annual period exceeds the actual per occurrence or aggregate limits of such policy (said excess being referred to as a "**Coverage Shortfall**"), then effective as of the thirtieth (30th) day following Landlord's written notice to Tenant, then (i) the LC Amount otherwise required by **Article 25** shall increase by fifty percent (50%) of the Coverage Shortfall, and (ii) the Minimum Tangible Net Worth Requirement also shall increase by fifty percent (50%) of the Coverage Shortfall. These increases to the LC Amount and the Minimum Tangible Net Worth Requirement shall remain in effect for the balance of said annual policy year in which the Coverage Shortfall occurs (to the extent the same has not yet ended) and also for the entirety of the next subsequent policy year (the "**Deficiency Coverage Period**"; and said increases to the LC Amount and the Tangible Net Worth Requirement shall end, and the LC Amount and Minimum Tangible Net Worth Requirement otherwise required by this Lease shall apply so long as no subsequent Coverage Shortfall occurs during the Deficiency Coverage Period.

## ARTICLE 7
## DAMAGE OR DESTRUCTION

**Section 7.1** <u>Restoration</u>. If the Premises or any Building or any part thereof shall be damaged or destroyed by fire or other casualty (including any casualty for which insurance was not obtained or obtainable) of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, (a) Landlord shall pay over to Tenant, upon the terms set forth in Section 7.2 and Section 7.3, any moneys which may be recovered by Landlord from property insurance procured by Tenant as required by this Lease, (b) this Lease shall be unaffected thereby and shall continue in full force and effect, and (c) Tenant shall, at Tenant's sole cost and expense, expeditiously and in a good and workmanlike manner, cause such damage or destruction to be remedied or repaired (the **"Restoration"**) by restoring the Premises to substantially the same condition and configuration immediately prior to such damage or destruction. All Restoration work shall be performed in accordance with the provisions of this Lease, including, without limitation, the provisions of Section 5.4 and 5.5 hereof. Tenant hereby waives the provisions of any Applicable Law to the contrary and agrees that the provisions of this Article 7 shall govern and control in lieu thereof. If Tenant shall fail or neglect to restore the Premises with reasonable diligence, or having so commenced such Restoration, shall fail to complete the same with reasonable diligence, subject to events of Force Majeure, or if prior to the completion of any such Restoration by Tenant, this Lease shall expire or be terminated for any reason, Landlord shall have the right, but not the obligation, to complete such Restoration at Tenant's cost and expense and the cost thereof shall be payable within thirty (30) days after written demand as Supplementary Rent, together with interest thereon from the date of demand until paid at the Default Rate. The obligations of Tenant under this Section 7.1 shall survive the expiration or earlier termination of this Lease.

**Section 7.2** <u>Disbursing of Proceeds</u>. Landlord shall pay over to Tenant from time to time, upon the following terms, any moneys which may be received by Landlord from property

insurance provided by Tenant but, in no event, to any extent or in any sum exceeding the amount actually collected by Landlord upon the loss; *provided, however,* that Landlord, before paying such moneys over to Tenant, shall be entitled to reimburse or pay itself therefrom to the extent, if any, of (i) the reasonable expenses actually paid or incurred by Landlord necessary for the collection of such moneys, and (ii) any other amounts then outstanding and due and owing to Landlord under this Lease. Landlord shall pay to Tenant, as herein provided, the aforesaid insurance proceeds which may be received by Landlord for the purpose of Restoration to be made by Tenant. Prior to making any Restoration, Tenant shall furnish Landlord with an estimate of the cost of such Restoration, prepared by a licensed third party architect or contractor selected by Tenant and reasonably approved by Landlord. Such insurance moneys shall be paid to Tenant (or, at Landlord's option, directly to the party to whom such payment is due) from time to time thereafter in installments as the Restoration progresses, within ten (l0) Business Days after application to be submitted by Tenant to Landlord showing the cost of labor and material incorporated in the Restoration, or incorporated therein since the last previous application (assuming such proceeds are available from the insurer). If any vendor's, mechanic's, laborer's, or materialman's lien is filed against the Premises or any part thereof, or if any public improvement lien is created or permitted to be created by Tenant and is filed against Landlord, or any assets of, or funds appropriated to, Landlord, Tenant shall not be entitled to receive any further installment until such lien is satisfied or otherwise discharged, unless such lien is contested by Tenant in good faith and Tenant has obtained and delivered a bond issued by a surety, or such other security in an amount and in form otherwise satisfactory to Landlord in its reasonable discretion. The amount of any installment to be paid to Tenant shall be such proportion of the total insurance moneys received by Landlord as the cost of labor and materials theretofore incorporated by Tenant in the Restoration bears to the total estimated cost of the Restoration by Tenant, less (a) all payments theretofore made to Tenant out of said insurance proceeds and (b) ten percent (10%) of the amount so determined, decreasing to five percent (5%) of the amount so determined upon fifty percent (50%) completion of such Restoration, (the "**Retainage**", as applicable). Notwithstanding the foregoing, Landlord shall not withhold the Retainage from any installment provided (i) such installment constitutes the final payment due a contractor or materialman, or (ii) the contractor is bonded and Tenant furnishes to Landlord payment and performance bonds and labor and material bonds of Tenant's contractor complying with the Requirements, Applicable Laws and otherwise satisfactory to Landlord in its reasonable discretion, naming Landlord as co-obligee, in which event Landlord shall withhold from such installment the same percentage withheld by Tenant pursuant to the construction contract. Upon completion of and payment for the Restoration, including payment of the Retainage or other amount, as applicable, the balance of any and all insurance proceeds held by Landlord shall be paid to Tenant so long as no Event of Default has occurred and is continuing hereunder. In the event that the insurance proceeds are insufficient for the purpose of paying for the Restoration, Tenant shall nevertheless be required to make the Restoration and pay any additional sums required for the Restoration in accordance with the provisions of Section 7.4 hereof. Notwithstanding the foregoing, if an Event of Default by Tenant has occurred and is continuing hereunder, subject to the provisions of this Article 7, Landlord, the insurance carrier, or any Mortgagee may elect in their discretion to perform the Restoration (being under no obligation to do so), then Landlord or Mortgagee shall use any amounts held by Landlord to pay for the cost of such Restoration, and in which case, Tenant shall pay over to Landlord or Mortgagee any proceeds of property insurance Tenant receives for the purpose of Restoration.

-24-

**Section 7.3**    Payment Conditions.  The following shall be conditions precedent to each payment made to Tenant (or to any other party) as provided in Section 7.2 above:

(a)    Tenant shall provide to Landlord the certificate of the aforesaid architect or contractor stating (i) that the sum then requested to be withdrawn either has been paid by Tenant and/or is justly due to contractors, subcontractors, materialmen, engineers, architects or other persons (whose names and addresses shall be stated) who have rendered or furnished certain services or materials for the work and giving a brief description of such services and materials and the principal subdivisions or categories thereof and the several amounts so paid or due to each of such persons in respect thereof, and stating in reasonable detail the progress of the work up to the date of said certificate, (ii) that no part of such expenditures (A) has been or is being made the basis, in any previous or then pending request, for the withdrawal of insurance money or (B) has been made out of the proceeds of insurance received by Tenant, and (iii) that the balance of any insurance proceeds held by Landlord, together with such other sums, if any, which Tenant has made or will (for which evidence of Tenant's intention and ability shall be to Landlord's satisfaction in its reasonable discretion) make available for the Restoration in accordance with Section 7.4 hereof and to Landlord's satisfaction (in its reasonable discretion) will be sufficient upon completion of the Restoration to pay for the same in full, and stating in reasonable detail an estimate of the cost of such completion;

(b)    there shall be furnished to Landlord an official search, or a certificate of a title insurance company satisfactory to Landlord in its sole and absolute discretion, or other evidence satisfactory to Landlord in its sole and absolute discretion, showing that there has not been filed any vendor's, mechanic's, laborer's or materialmen's statutory or other similar lien affecting the Premises or any part thereof, or any public improvement lien created or permitted to be created by Tenant affecting Landlord, or the assets of, or funds appropriated to, Landlord, which has not been discharged of record, except such as will be discharged upon payment of the amount then requested to be withdrawn, or unless any such lien is contested by Tenant in good faith and Tenant has obtained and delivered a bond issued by a surety, or such other security in an amount and in form otherwise satisfactory to Landlord in its reasonable discretion;

(c)    at the time of making such payment, no Event of Default shall have occurred and be continuing;

(d)    Tenant shall have deposited the items required to be deposited under Section 7.4; and

(e)    if the amount due to any such Person to be paid from such payment exceeds $25,000 and the failure to pay for the applicable underlying work or material could result in a Lien, such payment request shall be accompanied by conditional lien waivers or other evidence of payment from such Person reasonably satisfactory to Landlord.

**Section 7.4**    Payment of Excess Costs.  If the estimated cost of any Restoration determined as provided in Section 7.2 hereof exceeds the net insurance proceeds, then, prior to the commencement of any Restoration, Tenant hereby covenants to deposit with Landlord, a

-25-

bond, cash or other security satisfactory to Landlord (in its reasonable discretion) in the amount of such excess, to be held and applied by Landlord in accordance with the provisions of Section 7.2 hereof.

**Section 7.5**    No Termination of Lease. As material consideration to Landlord for its agreement to enter into this Lease, the parties agree that this Lease shall not terminate or be forfeited or be affected in any manner, and there shall be no reduction or abatement of the Rent payable hereunder, by reason of damage to or total, substantial or partial destruction of the Premises or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any damage or destruction of the Premises from any cause whatsoever, and, notwithstanding any Applicable Law, present or future, Tenant waives any and all rights to quit or surrender the Premises or any part thereof on account of any damage or destruction of the Premises. Tenant expressly agrees that its obligations hereunder, including the payment of Rent payable by Tenant hereunder, shall continue as though the Premises had not been damaged or destroyed and without abatement, suspension, diminution or reduction of any kind.

**Section 7.6**    Applicability of Mortgage.  All provisions contained in the Mortgage or any other document in connection therewith Landlord provides to Tenant which concern or pertain to the Restoration of the Premises and the application of insurance proceeds following a casualty, shall take precedence over and be in lieu of any contrary provision provided for in this Lease, subject to the terms of the Non-Disturbance Agreement executed by Tenant and the Mortgagee.

**ARTICLE 8**
**CONDEMNATION**

**Section 8.1**    Generally.  Tenant, promptly upon obtaining knowledge of the institution of any proceeding for a Taking, shall notify Landlord and Mortgagee thereof and Landlord and Mortgagee shall be entitled to participate in any Taking proceeding. Subject to the provisions of this Article 8, Tenant hereby irrevocably assigns to Mortgagee or to Landlord, in that order, any award or payment to which Tenant is or may be entitled by reason of any Taking, whether the same shall be paid or payable for Tenant's leasehold interest hereunder or otherwise.

**Section 8.2**    Limited Termination Right.  (a) If the whole of the Premises shall be permanently taken by condemnation or other eminent domain proceedings pursuant to any Applicable Law, general or special, or by conveyance made in response to the threat of the exercise of such a right (a "**Taking**"), or if a substantial and material portion of the Premises is taken such that Tenant is not able to operate the Facilities in substantially the same manner as it was operated prior to the Taking, then on the earlier of the date of the vesting of title to the Premises or the date of taking of possession of the Premises (the **"Ending Date"**): (i) this Lease shall terminate, (ii) all Rent required to be paid by Tenant under this Lease shall be pro-rated up to such date, (iii) Landlord shall be entitled to any and all awards in connection with such condemnation on account of Landlord's fee simple interest in the Land and the Buildings, with such proceeds going first to pay any outstanding amounts owed to Mortgagee, and (iv) Tenant shall be entitled to receive any and all awards on account of Tenant's Personal Property, moving

-26-

expenses and interruption of or damage to Tenant's business, with such proceeds going first to pay any outstanding amounts owed to Mortgagee. Upon such termination, this Lease shall be of no further force and effect, except that any obligation or liability of either party, actual or contingent, under this Lease which has accrued on or prior to the Ending Date shall survive and any prepayment of Rent shall be prorated between the parties. In the event of a partial Taking that results in the reduction of the number of licensed beds at a Facility, the terms and conditions of this Lease that are determined based upon the number of licensed beds shall be adjusted downward to account for the number of licensed beds at such Facility that are the subject of the Taking, and such reduction shall be the basis for a proportionate reduction in Base Rent, but shall not be the basis for an Event of Default.

(b)     If there shall be a Taking of the entire Premises for a particular Facility or of a substantial and material portion of the Premises for a particular Facility such that Tenant is not able to operate such Facility in substantially the same manner as it was operated prior to the Taking, then on the Ending Date for such particular Facility; (i) the Premises for such Facility shall no longer be leased by Landlord to Tenant under this Lease and shall be removed and thereafter not be a part of the Premises, (ii) Landlord shall be entitled to any and all awards in connection with such condemnation on account of Landlord's fee simple interest in the Land and the Buildings associated with such Facility, with such proceeds going first to pay any outstanding amounts owed to Mortgagee, and (iii) as between Landlord and Tenant, Tenant shall be entitled to receive any and all awards on account of Tenant's Personal Property used in connection with such Facility, moving expenses and interruption of or damage to Tenant's business associated with such Facility, with such proceeds going first to pay any outstanding amounts owed to Mortgagee. Upon such removal of the Premises for such Facility from this Lease, (1) this Lease shall be of no further force and affect with respect to such Premises, except that any obligation or liability of either party, actual or contingent, under this Lease with respect to such Premises which has accrued on or prior to such Ending Date, for such particular Facility shall survive, (2) any prepayment of Rent on account of such condemned Facility shall be prorated between the parties, and (3) the Base Rent and Supplementary Rent for the Premises shall be equitably adjusted to take into account the removal of the Premises for such Facility from this Lease.

**Section 8.3**     <u>Partial Taking</u>.  In the event of a permanent partial Taking of one or more of the Building(s), in which the portion of the Premises taken is such that Tenant may continue to operate the Facility in substantially the same manner as it was operated prior to the Taking in Tenant's reasonable discretion, this Lease shall be unaffected by such Taking, and Tenant shall, continue to pay the Base Rent and Supplementary Rent pursuant to <u>Article 2</u> and the following shall apply:

(i)  Landlord shall be entitled to receive the entire award in any proceeding with respect to such Taking without deduction therefrom for any estate vested in Tenant by this Lease and Tenant shall receive no part of such award;

(ii)     Notwithstanding the foregoing, in the event this <u>Section 8.3</u> is applicable, Landlord shall pay over to Tenant from time to time any moneys which may be received by Landlord on account of the exercise of the power of eminent domain with respect to

the Premises, which (x) are necessary for Tenant to repair and restore such Building(s) such that the remaining portion of the Facility may continue to be operated and (y) represent an award for the loss of Tenant's Personal Property, moving expenses and interruption of or damage to Tenant's business; *provided, however,* that Landlord, before paying such moneys over to Tenant, shall be entitled to reimburse or pay itself therefrom to the extent, if any, of (i) the reasonable expenses actually paid or incurred by Landlord necessary for the collection of such moneys, and (ii) any other amounts then outstanding and due and owing to Landlord under this Lease. Such moneys shall be paid over to Tenant on the terms and subject to the conditions set forth in Article 7 as if, for this purpose, such moneys were insurance proceeds resulting from casualty to the Premises. Tenant agrees to undertake such Restoration on such terms and subject to such conditions to the extent of the availability of such proceeds and such additional funds as are necessary to complete the Restoration at Tenant's own cost and expense.

**Section 8.4**    Taking Unimproved Land. If only unimproved land shall be the subject of a Taking and Sections 8.2 and 8.3 do not apply, this Lease shall be unaffected by such Taking, and Tenant shall continue to pay the Base Rent and Supplementary Rent pursuant to Article 2 and Landlord shall be entitled to receive the entire award in any proceeding with respect to such Taking without deduction therefrom for any estate vested in Tenant by this Lease and Tenant shall receive no part of such award.

**Section 8.5**    Temporary Taking.  If the use or occupancy of all or any part of the Premises shall be the subject of a temporary Taking during the Term of this Lease, Tenant shall be entitled, except as hereinafter set forth, to receive that portion of the award for such temporary Taking which represents compensation for the use and occupancy of the Premises and, if so awarded, for the temporary Taking of Tenant's Personal Property and for moving expenses, and that portion which represents reimbursement for the cost of Restoration of the Premises. This Lease shall be and remain unaffected by such temporary Taking and Tenant shall be responsible for all obligations hereunder not affected by such temporary Taking and shall continue to pay in full when due the Base Rent and Supplementary Rent and all other sums required to be paid by Tenant pursuant to the provisions of this Lease.  If the period of temporary use or occupancy shall extend beyond the Expiration Date, that part of the award which represents compensation for the use or occupancy of the Premises (or a part thereof) shall be divided between Landlord and Tenant so that Tenant shall receive so much thereof as represents the period to and including the Expiration Date and Landlord shall receive so much as represents the period subsequent to the Expiration Date and Landlord shall be entitled to receive that portion which represents reimbursement for the cost of Restoration of the Premises.

**Section 8.6**    Cooperation.  Each party agrees to execute and deliver to each other and to applicable Governmental Authorities all documents and instruments that may be required to effectuate the provisions of this Article 8.

# ARTICLE 9
## ASSIGNMENT AND SUBLETTING

**Section 9.1**    General Restriction. Except as expressly permitted by this Lease, Tenant shall not directly or indirectly (i) sell, assign, mortgage, convey, alienate, sublease or otherwise transfer, directly or indirectly, by operation of law or otherwise, this Lease, all or any portion of Tenant's estate or interest in this Lease or the Premises, (ii) permit any assignment of this Lease or any estate or interest therein by operation of law, (iii) grant any Sublease, license, concession, or other right of occupancy of all or any portion of the Premises, other than in the ordinary course of business to the operators of ancillary services offered to residents of the Facility, such as beauticians, medical specialists and physical therapists, (iv) permit the use of the Premises or any part thereof by any parties other than Tenant, (v) mortgage, encumber, pledge, grant a security interest in, collaterally assign or conditionally transfer this Lease or any Subleases or any of the rents, issues and profits from a sublease operator or any other commercial sublessee or Tenant's estate or interest in the Premises, (vi) sell, convey or transfer, directly or indirectly, by operation of law or otherwise, any capital stock, membership interests, partnership interests, trust units, or any other equity interest in Tenant, Guarantor (if Guarantor is not a natural person), or in any direct or indirect constituent owner of Tenant or Guarantor (if Guarantor is not a natural person), (vii) consummate, or permit any direct or indirect constituent owner of Tenant to consummate, any transaction resulting in, or otherwise in any way implement or permit any direct or indirect constituent owner of Tenant to implement, a change of control (as the term "**control**" and "**change of control**" are defined below), (viii) permit Guarantor or any direct or indirect constituent owner of Guarantor to consummate, any transaction resulting in, or otherwise in any way implement or permit any direct or indirect constituent owner of a Guarantor (if Guarantor is not a natural person) to implement, a change of control (as defined below), or (ix) permit any Subtenant to directly or indirectly do any of the foregoing (each of the foregoing, a "**Transfer**"), without Landlord's prior written consent, which consent may be granted or withheld in Landlord's sole and absolute discretion. For purposes of this Article 9, the terms: (i) "**control**" or "**controls**" shall mean (a) ownership directly or indirectly of fifty percent (50%) or more of all capital stock, membership interests, partnership interests, trust units, or any other equity interest in an entity, or (b) possession, direct or indirect, of the power to direct or to cause the direction of, the management and policies of any person or entity, whether through the ownership of voting securities, or partnership, membership or other equity interests, by contract or otherwise; and (ii) "**change of control**" shall mean (a) a change of the direct or indirect power to direct or to cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, or partnership, membership or other equity interests, by contract or otherwise, (b) the pledge, hypothecation, encumbrance or transfer of any interest in an entity, or (c) the merger or consolidation of an entity by, with or into another entity. Any attempted Transfer in violation of the terms and covenants of this Section 9.1 shall be void.   If Landlord consents in writing to a Transfer, then (1) Tenant shall nevertheless at all times remain fully responsible and liable for payment of the Rent and for compliance with all of Tenant's other duties, obligations and covenants under this Lease, (2) the transferee shall be required to execute and deliver an assumption of all obligations of Tenant hereunder that are applicable to such Transfer, pursuant to an instrument satisfactory to Landlord, and (3) the Transfer shall be

-29-

conditioned upon obtaining and securing (A) all necessary Health Care Licenses and other approvals and consents of Governmental Authorities at no expense to the Landlord and (B) the consent of any Mortgagee, which consent may be withheld in Mortgagee's sole discretion. Occupancy of individual rooms or beds by bona fide patients of a Facility in the ordinary course of business shall not be considered a "Sublease" for purposes of this Article 9. Notwithstanding any provision of this Lease to the contrary, there shall be no assignment of this Lease with respect to less than the entire Premises. Nothing in this Section 9.1 shall limit or restrict Guarantor from transferring or disposing of assets owned by Guarantor, so long as Tenant and Guarantor shall at all times during the Term continue to satisfy the financial covenants set forth in Section 21.24(b).

[Notwithstanding the foregoing, Guarantor may, with the prior written consent of Landlord, which consent Landlord may withhold in its reasonable discretion, to Transfer the liabilities and obligations created under the Guaranty to a trust created for the benefit of Guarantor and controlled solely by Guarantor ("**Trust**") or to a corporation, partnership or limited liability company owned or controlled (with the term "control" having the meaning given to such term in this Section 9.1) solely by Guarantor ("**Corporate Guarantor**"), provided that such Trust or Corporate Guarantor satisfies the financial covenants set forth in Section 21.24(b) below.] [**DRAFTING NOTE:** *this section remains open and subject to further negotiation and agreement by the parties.*]

**Section 9.2**    Request for Consent. If Tenant requests Landlord's or any Mortgagee's consent to a Transfer, Landlord and such Mortgagee shall be given not less than fifteen (15) business days' advance written notice of the proposed Transfer, which notice shall be delivered to Landlord and such Mortgagee together with (i) a true and complete copy of the proposed instrument(s) of the Transfer, and (ii) such other information and documents as Landlord or such Mortgagee may request in its reasonable discretion. Tenant shall pay, on demand, Landlord's and such Mortgagee's reasonable costs and expenses in connection with their consideration of whether to grant any such consent to a Transfer. No Transfer may be proposed or consummated during the continuance of a Default or an Event of Default.

**Section 9.3**    Nature of Consent. Any consent by Landlord under this Article 9 shall apply only to the specific transaction thereby authorized and shall not relieve Tenant from the requirement of obtaining the prior written consent of Landlord to any further Transfer of this Lease. No Transfer of all or a portion of this Lease shall release or relieve the original named Tenant (or any previously approved transferee) from any obligations of Tenant hereunder, and the original named Tenant (or any previously approved transferee) shall remain liable for the performance of all obligations of Tenant hereunder.

**Section 9.4**    Subtenant Compliance. If Landlord consents in writing to a Transfer involving a Sublease, license or occupancy agreement with respect to the Premises or any part thereof, Tenant shall cause each permitted subtenant, licensee and occupant (each a "**Subtenant**" and collectively, the "**Subtenants**") to comply with its obligations under its respective Sublease, license or occupancy agreement, and Tenant shall diligently enforce all of its rights thereunder in accordance with the terms of such Sublease, license or occupancy agreement and this Lease.

-30-

**Section 9.5**    Subtenant Breach.  The fact that a violation or breach of any of the terms, provisions or conditions of this Lease results from or is caused by an act or omission by any of the Subtenants shall not relieve Tenant of Tenant's obligation to cure the same. Tenant shall take all necessary steps to prevent any such violation or breach.

**Section 9.6**    Certain Landlord Rights Following Event of Default.  If this Lease is assigned, or if the Premises or any part thereof is subleased, licensed or occupied by anybody other than Tenant, Landlord may, after an Event of Default by Tenant, and in addition to any other remedies herein provided or provided by Applicable Law, collect all rent becoming due to Tenant directly from the Subtenants, and apply the net amount collected to the Rent herein reserved and all other sums due to Landlord by Tenant hereunder, but no such assignment, sublease, license, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the Subtenant as tenant, or a release of Tenant from the further performance by Tenant of the terms, covenants, and conditions on the part of Tenant to be observed or performed hereunder. Tenant hereby authorizes and directs any such Subtenant to make such payments of rent directly to Landlord, or into any cash management system required by any Mortgagee upon receipt of notice from Landlord, and each Sublease will contain this provision. In the event that amounts payable under such assignment, sublease, license or occupancy agreement exceed the sums due to Landlord by Tenant hereunder, Landlord shall be entitled to receive all of such excess proceeds and Tenant hereby agrees to immediately pay over to Landlord all such excess upon Tenant's receipt of same. No direct collection by Landlord from any such Subtenant shall be construed to constitute a novation or a release of Tenant from the further performance of its obligations hereunder. After any assignment, subletting, license or occupancy, Tenant's liability hereunder shall continue notwithstanding any subsequent modification or amendment hereof or the release of any subsequent tenant hereunder from any liability, to all of which Tenant hereby consents in advance. The consent by Landlord to any Transfer shall not in any way be construed to relieve Tenant from obtaining the express written consent of Landlord to any further Transfer.

**Section 9.7**    Collateral Assignment. To secure the prompt and full payment by Tenant of the Rent and the faithful performance by Tenant of all the other terms and conditions herein contained on its part to be kept and performed, Tenant hereby collaterally assigns, transfers and sets over unto Landlord, subject to the conditions hereinafter set forth, all of Tenant's right, title and interest in and to all permitted subleases, assignments, licenses and occupancy agreements (each a "**Sublease**" and collectively, the "**Subleases**") and hereby confers upon Landlord, its agents and representatives, a right of entry (after prior written notice) in, and sufficient possession of, the Premises to permit and insure the collection by Landlord of the rentals and other sums payable under the Subleases, and further agrees that the exercise of said right of entry and qualified possession by Landlord shall not constitute an eviction of Tenant from the Premises or any portion thereof and that should said right of entry and possession be denied Landlord, its agent or representative, Landlord, in the exercise of said right, may use all requisite force to gain and enjoy the same without responsibility or liability to Tenant, its servants, employees, guests or invitees, or any Person whomsoever; *provided*, *however,* that such assignment shall become operative and effective only if (a) an Event of Default shall have occurred and be continuing or (b) this Lease and the Term shall be cancelled or terminated pursuant to the terms, covenants and conditions hereof or (c) there occurs repossession under a dispossess warrant or other re-entry or repossession by Landlord under the provisions hereof or

-31-

(d) a receiver for the Premises is appointed, and then only as to such of the subleases that Landlord may elect to take over and assume. At any time and from time to time within ten (10) days after Landlord's written demand, Tenant promptly shall deliver to Landlord a schedule of all Subleases, setting forth the names of all Subtenants, with a true, correct and complete copy of each of the Subleases. Upon reasonable request of Landlord, Tenant shall permit Landlord and its agents and representatives to inspect all Subleases affecting the Premises. Tenant covenants that each Sublease shall provide that the Subtenant thereunder shall be required from time to time, upon request of Landlord or Tenant, to execute, acknowledge and deliver, to and for the benefit of Landlord, an estoppel certificate confirming with respect to such Sublease the information set forth in Section 14.1 hereof.

Section 9.8    Required Sublease Terms. Tenant covenants and agrees that all Subleases hereafter entered into affecting the Premises shall provide that (a) they are subject to this Lease and that the principals of the Subtenant acknowledge that they have read this Lease and accept the terms hereof, (b) the term thereof shall not end less than one (1) day prior to the Expiration Date hereof, unless Landlord shall consent otherwise, which consent may be withheld in Landlord's sole and absolute discretion, (c) the Subtenants will not do, authorize or execute any act, deed or thing whatsoever or fail to take any such action which will or may cause Tenant to be in violation of any of its obligations under this Lease, (d) the Subtenants will not pay rent or other sums under the Subleases with Tenant for more than one (1) month in advance, (e) the Subtenants shall give to Landlord at the address and otherwise in the manner specified in Section 21.8 hereof a copy of any notice of default by Tenant as the landlord under the Subleases at the same time as, and whenever, any such notice of default shall be given by the Subtenants to Tenant, (f) the Subtenants shall grant to the landlords under the Subleases a security interest in all of their right, title and interest in the Health Care Licenses and the Provider Agreements, such grant to be pursuant to a provision that is substantially similar to Section 12.15 hereof, and (g) in the event of the termination or expiration of this Lease prior to the Expiration Date hereof, any such Subtenant, at Landlord's election, shall be obligated to attorn to and recognize Landlord as the lessor under such Sublease, in which event such Sublease shall continue in full force and effect as a direct lease between Landlord and the Subtenant upon all the terms and conditions of such Sublease, except as hereinafter provided. Any attornment required by Landlord of such Subtenant shall be affective and self-operative as of the date of any such termination or expiration of this Lease without the execution of any further instrument; *provided, however,* that such Subtenant shall agree, upon the request of Landlord, to execute and deliver any such instruments in recordable form and otherwise in form and substance satisfactory to Landlord in its sole and absolute discretion to evidence such attornment. With respect to any attornment required by Landlord of any Subtenant hereunder, (i) at the option of Landlord, Landlord shall recognize all rights and obligations of Tenant as the lessor under such sublease and the Subtenant thereunder shall be obligated to Landlord to perform all of the obligations of the Subtenant under such Sublease and (ii) Landlord shall have no liability, prior to its becoming lessor under such Sublease, to such Subtenant nor shall the performance by such Subtenant of its obligations under the Sublease, whether prior to or after any such attornment, be subject to any defense, counterclaim or setoff by reason of any default by Tenant in the performance of any obligation to be performed by Tenant as lessor under such Sublease, nor shall Landlord be bound by any prepayment of more than one (i) month's rent unless such prepayment shall have been expressly

approved in writing by Landlord. The provisions of this Section shall survive the expiration or earlier termination of the Term.

**Section 9.9** Bankruptcy.  If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of Title 11 of the United States Code or any statute of similar purpose or nature (the **"Bankruptcy Code"**) to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment shall be given to Landlord by Tenant no later than fifteen (15) days after receipt of such offer by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall file any application or motion with a court of competent jurisdiction for authority and approval to enter into such assumption and assignment. Such notice shall set forth (a) the name and address of the assignee, (b) all of the terms and conditions of such offer, and (c) the proposal for providing adequate assurance of future performance by such person under the Lease, including, without limitation, the assurance referred to in Section 365 of the Bankruptcy Code. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease from and after the date of such assignment. Any such assignee shall execute and deliver to Landlord upon demand an instrument confirming such assumption.

**Section 9.10** Adequate Assurance.  The term **"adequate assurance of future performance"** as used in this Lease shall mean (in addition to the assurances called for in Bankruptcy Code Section 365(1)) that any proposed assignee shall, among other things, (a) deposit with Landlord on the assumption of this Lease an amount deemed by the Bankruptcy Court to be reasonably necessary for the adequate protection of Landlord under the circumstances, as security for the faithful performance and observance by such assignee of the terms and obligations of this Lease, (b) furnish Landlord with financial statements of such assignee, which financial statements shall show a net worth at least equal to the amount of the deposit referenced in (a) above, (c) if determined by the Bankruptcy Court to be appropriate under the circumstances, grant to Landlord a security interest in such property of the proposed assignee as Landlord shall deem necessary to secure such assignee future performance under this Lease, and (d) provide such other information or take such action as Landlord, in its reasonable judgment, shall determine is necessary to provide adequate assurance of the performance by such assignee of its obligations under the Lease.

**Section 9.11** Lease Rejection.  If, at any time after Tenant may have assigned Tenant's interest in this Lease in a proceeding of the type described in Section 12.1(h) or (i) of this Lease shall be disaffirmed or rejected in any proceeding of the types described in Section 12.1(h) or (i) hereof, or in any similar proceeding, or in the event of termination of this Lease by reason of any such proceeding or by reason of lapse of time following notice of termination given pursuant to Article 12 based upon any of the events of default set forth in said Section 12.l(h) or (i), Tenant, upon request of Landlord given within thirty (30) days next following any such disaffirmance rejection or termination (and actual notice thereof to Landlord in the event of a disaffirmance or rejection or in the event of termination other than by act of Landlord), shall (a) pay to Landlord all Base Rent and Supplementary Rent due and owing by the assignee to Landlord under this Lease to and including the date of such disaffirmance, rejection or termination, and (b) as

-33-

"tenant", enter into a new lease with Landlord for a term commencing on the effective date of such disaffirmation, rejection or termination and ending on the expiration date of the Term, unless sooner terminated as in such lease provided, at the same Base Rent and Supplementary Rent upon the then executory terms, covenants and conditions as are contained in this Lease, except that (i) Tenant's rights under the new lease shall be subject to the possessory rights, if any, of the assignee under this Lease and the possessory rights of any person claiming through or under such assignee or by virtue of any Applicable Law, (ii) such new lease shall require all defaults existing under this Lease to be cured by Tenant with due diligence, and (iii) such new lease shall require Tenant to pay all Base Rent and Supplementary Rent reserved in this Lease which, had this Lease not been so disaffirmed, rejected or terminated, would have accrued under the provisions of this Lease after the date of such disaffirmation, rejection or termination with respect to any period prior thereto.  If Tenant shall default in its obligation to enter into said new lease for a period of ten (10) days next following Landlord's request therefor, then in addition to all other rights and remedies by reason of such default, either at law or in equity, Landlord shall have the same rights and remedies against Tenant as if Tenant had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reason of Tenant's default thereunder.

**Section 9.12** <u>Healthcare Issues</u>.

(a)     Upon Landlord's written demand following the expiration of the term of this Lease or upon the termination of this Lease after an Event of Default, to the extent permitted by Applicable Law and approved by all applicable Governmental Authorities, Tenant shall assign to Landlord (i) all assignable Health Care Licenses, certificates or permits, and (ii) the names associated with the Facilities as then known to the general public (but excluding any names that are Tenant's Personal Property), along with the responsibilities and obligations for the management and operation of the Premises.  To the extent that assignment of the Health Care Licenses, certificates or permits is not permitted by Applicable Law and approved by all applicable Governmental Authorities, then Tenant or Manager shall continue to manage and operate the Facilities for a period not to exceed six (6) month (unless extended by agreement of the parties) pursuant to an agreement mutually acceptable to Landlord and Tenant (which shall include an obligation of Landlord to reimburse Tenant for the reasonable and customary costs and expenses of operating the Facilities, excluding any profit if such services are performed after a termination of the Lease following an Event of Default) during such period of time that such replacement tenant and licensed operator of such Facility applies for the issuance of same to said parties. Tenant agrees to use commercially reasonable efforts to cooperate with Landlord and any new tenant and licensed operator to accomplish the transfer of management and operation without interrupting the operation of the Premises and the parties shall enter into an Operations Transfer Agreement substantially in the form attached hereto as <u>Schedule E</u>.  For purposes of all regulatory filings, this provision shall be deemed explicit authorization and consent by Tenant to the transfer of all operations of the Facility to the successor operator identified by Landlord.

(b)     The present number of licensed beds in the Premises shall not be reduced, taken out of service or removed from any Third Party Payor program or otherwise transferred by Tenant to others or to other locations or among the Premises for the respective Facilities unless approved in advance by Landlord in writing, which approval may be withheld in Landlord's

-34-

reasonable discretion, provided Tenant shall not be deemed in default of the foregoing if the reduction of licensed beds is the result of an action taken by a Governmental Authority (which action is not the result of a default by Tenant of an obligation hereunder, or of a default by an Operating Subtenant of an obligation under an Operating Sublease). With respect to reductions in licensed beds due to an Alteration or Restoration, Landlord's consent shall not be unreasonably withheld, conditioned or delayed.

(c)     Tenant shall not and shall not allow a Subtenant or any Person to abandon or surrender any licenses, permits, certificates or authorizations required for or which relate to the operation of the Premises for the Permitted Use, as applicable and as indicated on Schedule 1, without prior notice to, and receipt of written approval from, Landlord. Tenant shall not and shall not allow any Person to act or fail to act in any manner which will cause any licenses, permits or certificates to be revoked or not renewed by any Governmental Authority having jurisdiction thereof.

(d)     Tenant shall not file bankruptcy, become insolvent, permit itself to become subject to any action seeking the appointment of a trustee, receiver, liquidator, custodian or similar official of Tenant or a substantial part of its assets, permit itself to become subject to any action of involuntary receivership, fail to pay its debts as they become due, or take any corporate action to authorize any of the foregoing without the prior written consent of Landlord.

**Section 9.13**   Survival.  The provisions of Sections 9.7, 9.8, 9.9, 9.12 and 9.13 hereof shall survive the expiration or earlier termination of this Lease.

**Section 9.14**   Special Purpose Entity. Notwithstanding any of the foregoing, any assignee of Tenant's interest in this Lease must at all times be a Special Purpose Entity.

**Section 9.15**   Sublease Rent Limitation. Anything contained in this Lease to the contrary notwithstanding, without the prior specific written consent of the Landlord, which consent Landlord may withhold in its sole discretion, Tenant shall not enter into (or permit any Manager to enter into on its behalf) any sublease with respect to the Premises or any part or portion thereof on any basis such that the rental to be paid by Tenant would be based (or considered to be based), in whole or in part, on either (a) the income or profits derived by the business activities of the sublessee or any other person, or (b) any other formula such that any portion of the rent payable hereunder would or could fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provisions thereto.  Any such sublease automatically shall be void.

**Section 9.16**   Sublease Tenant, Limitation. Anything contained in this Lease to the contrary notwithstanding, without the prior specific written consent of the Landlord, which consent Landlord may withhold in its sole discretion, Tenant shall not sublease (or permit any Manager to sublease on its behalf), the Premises or any part or portion thereof to any person or entity in which Landlord or any Affiliate of Landlord owns, directly or indirectly, a ten percent (10%) or greater interest, within the meaning of Section 856(d)(2)(B) of the Code, or any similar or successor provisions thereto. Any such sublease automatically shall be void.  Tenant shall take

reasonable precautions in connection with each sublease to ensure that such sublease will not result in a violation of this <u>Section 9.16</u>.

      **Section 9.17**   <u>Assignee Rent Limitation</u>. Anything contained in this Lease to the contrary notwithstanding, without the prior specific written consent of the Landlord, Tenant shall not assign this Lease such that the rental to be paid by the assignee thereunder would be based (or considered to be based), in whole or in part, on either (a) the income or profits derived by the business activities of the assignee or any other person, or (b) any other formula such that any portion of the rent payable hereunder would or could fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provisions thereto. Any such assignment automatically shall be void.

      **Section 9.18**   <u>Assignee Tenant Limitation</u>. Anything contained in this Lease to the contrary notwithstanding, without the prior specific written consent of the Landlord, Tenant shall not assign the Lease to any person or entity in which Landlord or any Affiliate of Landlord owns, directly or indirectly, a ten percent (10%) or greater interest, within the meaning of Section 856(d)(2)(B) of the Code, or any similar or successor provisions thereto. Tenant shall take reasonable precautions in connection with each assignment to ensure that such assignment will not result in a violation of this <u>Section 9.18</u>. Any such assignment automatically shall be void.

**ARTICLE 10**
**SUBORDINATION**

      **Section 10.1**   <u>Subordination Generally</u>. This Lease shall be subject and subordinate to all Mortgages and each Superior Lease hereinafter in effect and to all renewals, modifications, consolidations, replacements, restatements, increases and extensions of any such Mortgages and/or Superior Lease; *provided, however,* that the Mortgagee of such Mortgage and/or the Superior Landlord of such Superior Lease shall execute and deliver to Tenant an agreement (on a form reasonably acceptable to Mortgagee, Landlord and Tenant) to the effect that, if (x) there shall be a foreclosure of its Mortgage, such Mortgagee will not make Tenant a party defendant to such foreclosure, unless necessary under Applicable Law for the Mortgagee to foreclose, or if there shall be a foreclosure of such Mortgage, such Mortgagee shall not evict Tenant, or disturb or interfere with Tenant's use and enjoyment of the Premises or disturb Tenant's leasehold estate or rights hereunder, or (y) such Superior Landlord shall exercise any of its rights and remedies under such Superior Lease or at law or in equity to terminate such Superior Lease or evict the tenant thereunder, such Superior Landlord shall not evict Tenant, or disturb Tenant's leasehold estate or rights hereunder, *provided that,* in all events, no Event of Default then exists (any such agreement, or any agreement of similar import, from a Mortgagee or any Superior Landlord being hereinafter called a "**Non-Disturbance Agreement**"), and Tenant shall attorn to the Mortgagee or any Superior Landlord, or any successor-in-interest to Landlord, the Mortgagee or any Superior Landlord including without limitation, any such party which takes title by foreclosure, power of sale, deed in lieu of foreclosure, pursuant to a proceeding in bankruptcy or alternative procedure, or any right or remedy under a Superior Lease or at law or in equity. The transfer of the title to the Premises, any part thereof or any underlying lease to any Mortgagee or any Superior Landlord, or any successor in interest to Landlord, Mortgagee or any Superior

-36-

Landlord by foreclosure, power of sale, deed in lieu of foreclosure, pursuant to a proceeding in bankruptcy or any alternative procedure, or any right or remedy under a Superior Lease or at law or in equity shall <u>not</u> be considered a default or breach by Landlord of this Lease so long as such transfer is subject in all respects to the terms and provisions of this Lease. This <u>Section 10.1</u> shall be self-operative and no further instrument of subordination shall be required to make the interest of any Mortgagee or Superior Landlord, as the case may be, superior to the interest of Tenant hereunder. Notwithstanding the previous sentence, however, Tenant shall, together with the Mortgagee or any Superior Landlord, as the case may be, execute and deliver promptly any certificate or agreement that Landlord and any Mortgagee or Superior Landlord, as the case may be, may reasonably request in confirmation of such subordination. Any Non-Disturbance Agreement may be made on the condition that neither the Mortgagee nor any Superior Landlord or anyone claiming by, through or under such Mortgagee or Superior Landlord shall be:

(a)      liable for any act or omission of any prior Landlord (including, without limitation, the then defaulting Landlord);

(b)      subject to any defense or offsets which Tenant may have against any prior Landlord (including, without limitation, the then defaulting Landlord) which arise prior to the date such Mortgagee (or someone acquiring at a foreclosure sale related to the Mortgagee's Mortgage) or Superior Landlord acquires title to the Premises or any part thereof or interest therein;

(c)      bound by any payment of Rent which Tenant might have paid for more than the current month to any prior Landlord (including, without limitation, the then defaulting Landlord);

(d)      except as provided in Sections 3.5, 6.11, 7.2 and 8.3, bound by any obligation to make any payment to Tenant which was required to be made prior to the time such Landlord succeeded to any prior Landlord's interest;

(e)      bound by any obligation to perform any work or to make improvements to the Premises;

(f)      bound by any modification, amendment or supplement to this Lease made without the prior written consent of the Mortgagee and/or each Superior Landlord; or

(g)      bound by any security deposit for Tenant's obligations under this Lease unless such deposit is actually received by Mortgagee and/or a Superior Landlord.

If required by any Mortgagee or Superior Landlord, Tenant promptly shall join in any Non-Disturbance Agreement consistent with the terms hereof to indicate its concurrence with the provisions thereof and its agreement, in the event of (x) a foreclosure of any Mortgage, or (y) such Superior Landlord's exercise any of its rights and remedies under such Superior Lease or at law or in equity to terminate such Superior Lease or evict the tenant thereunder, to attorn to such Mortgagee or Superior Landlord, as the case may be, as Tenant's landlord hereunder, pursuant to and in accordance with the terms of this Lease. Tenant shall

promptly so accept, execute and deliver any Non-Disturbance Agreement proposed by any Mortgagee or Superior Landlord which conforms with the provisions of this Section 10.1. Any Non-Disturbance Agreement may also contain other terms and conditions as may otherwise be reasonably required by any Mortgagee or Superior Landlord which do not increase Tenant's monetary obligations or materially and adversely affect the rights or obligations of Tenant under this Lease.

      **Section 10.2**  Notice; Mortgagee Performance. (a) Tenant hereby agrees to give to any Mortgagee and Superior Landlord copies of all notices given by Tenant of default by Landlord under this Lease at the same time and in the same manner as, and whenever, Tenant shall give any such notice of default to Landlord. Such Mortgagee and Superior Landlord shall have the right to remedy any default under this Lease, or to cause any default of Landlord under this Lease to be remedied, and for such purpose Tenant hereby grants such Mortgagee and Superior Landlord such period of time as may be reasonable to enable such Mortgagee or Superior Landlord to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default which is a default. Tenant shall accept performance by such Mortgagee or the Superior Landlord of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. Except for a default by Landlord of its obligations under Section 3.5, Section 6.11, Section 7.2, or any other default by Landlord which could reasonably be expected to materially and adversely affect Tenant's management and operation of the Premises, no default under the Lease shall exist or shall be deemed to exist (i) as long as such Mortgagee or Superior Landlord, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, subject to Force Majeure, or (ii) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by such Mortgagee or Superior Landlord, as long as such Mortgagee or Superior Landlord, in good faith, shall have notified Tenant that such Mortgagee or Superior Landlord intends to institute proceedings under the Mortgage or the Superior Lease, as applicable, and, thereafter, as long as such proceedings shall have been instituted and shall prosecute the same with reasonable diligence and, after having obtained possession, prosecutes the cure to completion with reasonable diligence. This Lease shall not be terminated by Tenant without such Mortgagee's and each Superior Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed. In the event of the termination of this Lease by reason of any default thereunder or for any other reason whatsoever except the expiration thereof, upon such Mortgagee's or Superior Landlord's written request, given within fifteen (15) days after any such termination, Tenant, within fifteen (15) days after receipt of such request, shall execute and deliver to such Mortgagee or Superior Landlord or its designee or nominee a new lease of the Premises for the remainder of the Term of the Lease upon all of the same terms, covenants and conditions of this Lease. Neither such Mortgagee nor Superior Landlord or its designee or nominee shall become liable under this Lease unless and until such Mortgagee, Superior Landlord or its designee or nominee becomes, the fee owner of the Premises or the owner of the leasehold interest of Landlord under this Lease. Such Mortgagee and Superior Landlord shall have the right, without Tenant's consent, to, as the case may be, foreclose the Mortgage or to accept a deed in lieu of foreclosure of such Mortgage, or exercise its rights and remedies under such Superior Lease or at law or in equity to terminate such Superior Lease or evict the tenant thereunder, so long as such Mortgagee and Superior Landlord honors and

-38-

recognizes the terms, covenants and conditions of this Lease arising thereafter or provides to Tenant a new lease of the Premises for the remainder of the Term of the Lease upon all of the same terms, covenants and conditions of this Lease.

(b)     In the event of any act or omission of Landlord which would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right (i) until it has given written notice of such act or omission to each Mortgagee and Superior Landlord, and (ii) unless such act or omission shall be one which is not capable of being remedied by Landlord or such Mortgagee or Superior Landlord within a reasonable period of time, until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such Mortgagee or Superior Landlord shall have become entitled under the Mortgage or any other loan documents in connection therewith or Superior Lease, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under this Lease or otherwise, after similar notice, to effect such remedy).

**Section 10.3**    Inability to Obtain Non-Disturbance Agreement. After a written request by Tenant, Landlord shall use its commercially reasonable efforts to obtain from the Mortgagee of the Mortgage and each Superior Landlord under a Superior Lease the Non-Disturbance Agreement referred to in Section 10.1 above, but Landlord does not assure that such Non-Disturbance Agreement can be obtained. Notwithstanding the inability to obtain such Non-Disturbance Agreement, this Lease shall continue in full force and affect, *provided, however,* that in such event, subject to the Mortgagee's and each Superior Landlord's written consent, Landlord and Landlord's Affiliates shall permit Tenant and Tenant's Affiliates to cure any defaults by Landlord and Landlord's Affiliates under such Mortgages (without any obligation on the part of Tenant and Tenant's Affiliates to do so) by the payment of debt service thereunder and under such Superior Lease by the payment of rent thereunder. Landlord and Landlord's Affiliates, and Tenant and Tenant's Affiliates, shall implement a lock box arrangement whereby Base Rent and Impositions payable monthly under this Lease shall be paid into the lock box as required by the Mortgagee.

**Section 10.4**    Limitation of Tenant Termination Right.   If (x) a Superior Lease or Mortgage exists, and (y) Landlord gives Tenant notice thereof, then Tenant shall not seek to terminate this Lease by reason of Landlord's default hereunder until Tenant has given written notice of such default to the Superior Landlords and the Mortgagees in either case at the addresses that have been furnished to Tenant. If any such Superior Landlord or Mortgagee notifies Tenant, within ten (10) Business Days after the date that such Superior Landlord or Mortgagee receives such notice from Tenant, that such Superior Landlord or Mortgagee intends to remedy such act or omission of Landlord and thereafter within a reasonable period of time, commences to remedy such act or omission of Landlord with reasonable diligence, then Tenant shall not have the right to so terminate this Lease unless such Superior Landlord or Mortgagee fails to remedy such act or omission of Landlord within a reasonable period of time after the date that such Superior Landlord or Mortgagee gives such notice to Tenant (it being understood that such Superior Landlord or Mortgagee shall not have any liability to Tenant for the failure of such

-39-

Superior Landlord or Mortgagee to so remedy such act or omission of Landlord during such period).

**Section 10.5** <u>Cooperation With Respect to Financing</u>. Without the consent of Tenant, Landlord will have the right from time to time, directly or indirectly, to create or grant the Facilities a Mortgage or any other type of lien or encumbrance on the Premises, or any portion thereof or interest therein (including this Lease), to secure any borrowing or other financing or refinancing. Tenant shall use reasonable efforts to cooperate with Landlord in connection with Landlord's efforts to obtain any such financing, including, without limitation, borrowing or financing insured by the U.S. Department of Housing and Urban Development Federal Housing Administration ("**HUD**") under the provisions of Section 232 of the National Housing Act, and the regulations promulgated thereunder, or any other similar program (a "**HUD Financing**"), and financing with Fannie Mae or Freddie Mac ("**FM Financing**"). If required by Landlord, Mortgagee, HUD and/or Fannie Mae or Freddie Mac, Tenant shall (i) execute such customary documentation required by the Facility Mortgagee, HUD, Fannie Mae or Freddie Mac in connection with the financing, including without limitation control account agreements, deposit account instructions service agreements, required regulatory agreements, cross-default agreements and subordination, non-disturbance and attornment agreements; (ii) cause its lender to execute such other documentation required by Facility Mortgagee, HUD, Fannie Mae or Freddie Mac in connection with the financing, including without limitation inter-creditor agreements and collateral lien subordination agreements, (iii) execute a modification to the operating agreement or partnership agreement of Tenant to comply with the then-applicable and customary HUD, Fannie Mae or Freddie Mac requirements for a special purpose entity, (iv) obtain and maintain policies of insurance required of Tenant provided that the coverages and liability limits of such policies are not materially different than the insurance coverages and liability limits required by the terms of this Lease, (v) provide for the escrow of ad valorem real estate taxes, insurance premiums and reserves, and (vi) comply with HUD, Fannie Mae or Freddie Mac reasonable requirements relating to Accounts Receivable financing and other financing secured by the Landlord Lien Collateral. Reserves paid or required to be paid by Tenant hereunder shall be used to satisfy the reserve requirements of HUD, Fannie Mae or Freddie Mac or any Mortgagee, and any reserve requirements of HUD, Fannie Mae or Freddie Mac or any Mortgagee in excess of reserves that Tenant is required to pay pursuant to this Lease shall be funded by Tenant, **_provided, however_** any such reserves Tenant pays in excess of what Tenant is required to pay pursuant to this Lease shall belong to Tenant and refunded to Tenant at the expiration of the Term. Except as otherwise provided in this Section, if any of the HUD, Fannie Mae, Freddie Mac or Mortgagee, or other mortgagee requirements set forth in this paragraph or otherwise in this Lease call for the completion of certain so-called "critical" repairs or improvements to the Premises in connection with the funding of the applicable loan, then Tenant shall construct the same (to the extent of available CapEx Reserve Funds) and the cost thereof shall be paid for from the CapEx Reserve Funds in accordance with the terms of this Lease. Tenant will name Landlord's Lender(s) as an additional insured promptly upon the request of Landlord. If Landlord or any successor owner of the Premises conveys the Leased Properties other than as security debt, including without limitation, the Facility Mortgage, Landlord or such successor owner, as the case may be, shall be released from all future liabilities and obligations of Landlord under this Lease arising or accruing from and after the date of such conveyance or other transfer, and all such future liabilities and obligations shall be binding upon

-40-

the new owner; provided, however, that such successor Landlord executes an assignment of lease or other such document, reasonably agreeable to Tenant, assuming all of Landlord's executory liabilities and obligations under this Lease. Tenant shall perform the requirements of this Section at Tenant's sole cost and expense.

## ARTICLE 11
## OBLIGATIONS OF TENANT

**Section 11.1**    Compliance with Requirements. Whether or not Tenant is in occupancy of all of the Buildings, Tenant shall promptly comply with all Applicable Laws with respect to the Premises (or any part thereof) and/or the use and occupation thereof, whether any of the same relate to or require (i) structural changes to or in and about the Premises, or (ii) changes or requirements incident to or as the result of any use or occupation thereof or otherwise (collectively, the **"Requirements"),** and subject to Article 7, Tenant shall so perform and comply, whether or not such Applicable Laws or Requirements shall now exist or shall hereafter be enacted or promulgated and whether or not the same may be said to be within the present contemplation of the parties hereto. The foregoing shall include, without limitation, present and future compliance with the provisions of the Americans with Disabilities Act. In addition, Tenant will comply with the applicable provisions of ERISA and of the regulations and published interpretations thereunder and shall furnish to Landlord promptly after any officer of Tenant either knows, or has a reasonable basis to know, notice that any violation or other reportable event (including the events set forth in Section 4043(b) of ERISA) has occurred.

**Section 11.2**    Notices to Landlord. Tenant agrees to give Landlord notice of any written notice, assessment, claim, demand, communication, violation, summons, complaint, investigation, sanction, termination, suspension, or revocation made, issued or adopted by any of the governmental departments or agencies or authorities hereinbefore mentioned affecting (i) the Premises, (ii) the use thereof or (iii) the financial condition of Tenant a copy of which is served upon or received by Tenant, or a copy of which is posted on, or fastened or attached to the Premises, or otherwise brought to the actual knowledge of Tenant in writing, by mailing within five (5) Business Days after such service, receipt, posting, fastening or attaching or after the same otherwise comes to the attention of Tenant in writing, a copy of each and every one thereof to Landlord. At the same time, Tenant will inform Landlord as to the Work or corrective measure which Tenant proposes to do or take) in order to comply therewith. Notwithstanding the foregoing, however, if such Work or corrective measure would require any Alterations which would, in Landlord's opinion, reduce the value of the Premises or change the general character, design or use of any of the Buildings or other improvements thereon, and if Tenant does not desire to contest the same, Tenant shall, if Landlord so requests, defer compliance therewith in order that Landlord may, if Landlord wishes, contest or seek modification of or other relief with respect to such Requirements, so long as Tenant is not put in violation of any Applicable Law, but nothing herein shall relieve Tenant of the duty and obligation, at Tenant's expense, to comply with such Requirements, or such Requirements as modified, whenever Landlord shall so direct.

**Section 11.3**   Indemnity.  Except for matters arising solely out of the gross negligence or willful misconduct of Landlord, Tenant shall defend, protect, indemnify and save harmless Landlord, Mortgagee, each Superior Landlord, each of their respective Affiliates, any shareholders, partners, members or managers thereof, any shareholders, partners, members or managers of any such shareholders, partners, members or managers, and any partners, members, managers, officers, stock-holders, trustees, directors or employees of any of the foregoing and any successors and/or assigns of any of the foregoing (each an **"Indemnified Party"** and collectively, **"Indemnified Parties"),** from and against and shall reimburse such parties for (a) any and all liabilities, obligations, losses, penalties, costs, charges, sanctions, judgments, claims, causes of actions, suits, damages and expenses (collectively, **"Claims"**) (1) arising from the use, occupancy and operations of, in or about the Premises under this Lease during the Term of this Lease, (2) arising from the ownership, operation, maintenance, management, use, regulation, development, expansion or construction of the Facilities and/or provision of health services from or at the Facilities during the Term of this Lease, (3) arising from working capital or other operating liabilities relating to the Facilities covered by this Lease on the date hereof, including without limitation, Claims of Governmental Authorities and Third Party Payors, accounts payable Claims, Recoupment Claims and similar retroactive adjustments, Claims by or through patients, residents, customers of such Facilities or services, employee obligations Claims, payroll and payroll overhead Claims, benefit program Claims, and other Claims relating to the liabilities of the Facilities, or (4) arising from a breach of this Lease by Tenant or (5) which may be imposed upon or incurred or paid by or asserted against the Indemnified Parties by reason of or in connection with (i) any accident, injury, death or damage to any person or property occurring in, on or about the Premises or any portion thereof or any adjacent street, alley, sidewalk, curb, or passageway; (ii) any changes, alterations, repairs and anything done in, on or about the Premises or any part thereof in connection with such changes, alterations and repairs; (iii) the use, non-use, occupation, condition, operation, maintenance or management of the Premises or any part thereof, or any adjacent street, alley, sidewalk, curb, or passageway; (iv) any negligent act on the part of Tenant or any of its agents, contractors, servants, employees, space tenants, licensees, assignees or Subtenants; (v) the performance of any labor or services or the furnishing of any materials or other property in respect of the Premises or any part thereof; (vi) any violation by Tenant (or by any agent, contractor, or licensee then upon or using the Premises) of any provision of this Lease (beyond the expiration of all applicable notice and cure periods), including, but not limited to, Article VII hereof, or any breach of any Applicable Law by Tenant or its agents, concessionaires, contractors, servants, vendors, materialmen or suppliers; or (vii) the condition of the Premises, or of any buildings or other structures now or hereafter situated thereon, or the fixtures or personal property thereon or therein, to the extent such events described in the foregoing clauses (i) through (vii) occur during the Term; and (b) all costs, expenses and liabilities incurred, including actual, customary and reasonable attorney's fees and disbursements through and including appellate proceedings, in or in connection with any of such Claims. If any action or proceeding shall be brought against any of the Indemnified Parties by reason of any such Claims, Tenant, upon notice from any of the Indemnified Parties, shall resist and defend such action or proceeding, at its sole cost and expense by counsel to be selected by Tenant but otherwise satisfactory to such Indemnified Party in its reasonable discretion. Tenant or its counsel shall keep each Indemnified Party fully apprised at all times of the status of such defense. If Tenant shall fail to defend such action or proceeding, such an Indemnified Party may retain its own attorneys to defend or assist in defending any such claim, action or proceeding,

and Tenant shall pay the actual, customary and reasonable fees and disbursements of such attorneys. The terms and provisions of this Section 11.3 shall not in any way be affected by the absence of insurance covering such occurrence or claim or by the failure or refusal of any insurance company to perform any obligation on its part. The provisions of this Section 11.3 shall survive the expiration or earlier termination of this Lease. Tenant shall not enter into any settlement of a Claim which would impose a monetary liability on Landlord, without the written consent of Landlord. Any insurance proceeds actually received by an Indemnified Party shall be credited against the indemnification otherwise to be provided herein. An Indemnified Party shall give prompt written notice to Tenant of any Claim for which it seeks indemnification hereunder, but delay in providing such notice shall not relieve Tenant of its indemnification obligations, except to the extent such delay materially prejudiced Tenant's ability to defend such Claim. Nothing contained herein shall be construed to create a benefit for a third party.

**Section 11.4**   Mechanics' Liens.   If at any time prior to or during the Term (or within the statutory period thereafter if attributable to Tenant), any mechanic's or other lien or order for payment of money, which shall have been either created by, caused (directly or indirectly) by, or suffered against Tenant or Subtenant, shall be filed against the Premises or any part thereof, Tenant, at its sole cost and expense, shall cause the same to be discharged by payment, bonding or otherwise, within thirty (30) days after Tenant receives notice of the filing thereof unless such lien or order is contested by Tenant in good faith and Tenant provides sufficient security or evidence of financial ability, in each case to the satisfaction of Landlord (in its sole and absolute discretion), to pay the amount of such lien or order. Tenant shall, upon notice and request in writing by Landlord, defend for Landlord, at Tenant's sole cost and expense, any action or proceeding which may be brought on or for the enforcement of any such lien or order for payment of money, and will pay any damages and satisfy and discharge any judgment entered in such action or proceeding and save harmless Landlord from any liability, claim or damage resulting therefrom. In default of Tenant's procuring the discharge of any such lien as aforesaid Landlord may, without notice, and without prejudice to its other remedies hereunder, procure the discharge thereof by bonding or payment or otherwise, and all cost and expense which Landlord shall incur shall be paid by Tenant to Landlord as Supplementary Rent forthwith.

**Section 11.5**   Non-Liability of Landlord; Liens.    Landlord shall not under any circumstances be liable to pay for any work, labor or services rendered or materials furnished to or for the account of Tenant upon or in connection with the Premises, and no mechanic's or other lien for such work, labor or services or material furnished shall, under any circumstances, attach to or affect the reversionary interest of Landlord in and to the Premises or any alterations, repairs, or improvements to be erected or made thereon. Nothing contained in this Lease shall be deemed or construed in any way as constituting the request or consent of Landlord, either express or implied, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises.

**Section 11.6**   Non-Liability of Landlord.   Except for matters arising solely out of the gross negligence or willful misconduct of Landlord, neither Landlord nor its agents shall be

-43-

liable for any loss of or damage to the property of Tenant or others by reason of casualty, theft or otherwise, or due to any interruption or failure of any services or use or the operation or management of the Premises, or due to any building on the Premises being defective or improperly constructed, or being or becoming out of repair, or for any injury or damage to persons or property resulting from any cause of whatsoever nature.

**Section 11.7** <u>No Services Furnished</u>. Landlord shall not be required to furnish to Tenant any facilities or services of any kind whatsoever, including, but not limited to, water, steam, heat, gas, oil, hot water, and/or electricity, all of which Tenant represents and warrants that Tenant has obtained from the public utility supplying the same, at Tenant's sole cost and expense. Upon Tenant's written request, however, Landlord agrees to cooperate with Tenant (at no cost to Landlord) with respect to such services.

**Section 11.8** <u>Special Purpose Entity</u>. Tenant from its formation has been, and at all times during the Term shall be, a Special Purpose Entity.

**Section 11.9** <u>Leased Personal Property</u>.

(a) <u>No Representation or Warranty</u>. Tenant acknowledges that: Landlord is not the manufacturer of Leased Personal Property nor the manufacturer's or supplier's agent; Tenant is satisfied that the Leased Personal Property is suitable and fit for its purposes; and TENANT ACKNOWLEDGES THAT LANDLORD HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF LEASED PERSONAL PROPERTY, ITS FITNESS FOR ANY PARTICULAR PURPOSE, THE QUALITY OR CAPACITY OF THE MATERIALS IN LEASED PERSONAL PROPERTY OR WORKMANSHIP IN LEASED PERSONAL PROPERTY, LANDLORD'S TITLE TO LEASED PERSONAL PROPERTY, NOR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER; Landlord shall not be liable to Tenant for any loss, damage or expense of any kind or nature caused, directly or indirectly, by Leased Personal Property or the use or maintenance thereof or the failure or operation thereof, or the repair, service or adjustment thereof, or by any delay or failure to provide any such maintenance, repairs, service or adjustment, or by any interruption of service or loss of use thereof or for any loss of business however caused. Landlord shall not be liable for any consequential damages as that term is used in the Uniform Commercial Code. No defect or unfitness of Leased Personal Property shall relieve Tenant of the obligation to pay any installment of Rent or any other obligation under this Lease.

(b) <u>Title</u>. Title to the Leased Personal Property shall at all times be vested in Landlord. Tenant authorizes Landlord, at Tenant's expense, to cause a statement or other instrument in respect of this Lease showing the interest of Landlord in the Leased Personal Property, including Uniform Commercial Code Financing Statements, to be filed or recorded. Tenant agrees to execute or procure for Landlord such estoppel certificates, landlord's or mortgagee's waivers or other documents as Landlord may reasonably request to confirm or perfect Landlord's right in the Leased Personal Property. Tenant agrees to pay or reimburse Landlord for any filing, recording or stamp fees or taxes arising from the filing or recording of

-44-

any such instrument or statement. Tenant shall, at its expense, protect and defend Landlord's title against all persons claiming against or through Tenant, keep the Leased Personal Property free from legal process or encumbrance, give Landlord immediate notice thereof and shall indemnify Landlord from any loss caused thereby. So long as an Event of Default by Tenant has not occurred and be continuing hereunder, Tenant shall quietly use and enjoy the Leased Personal Property, subject to the terms hereof.

(c)     Maintenance, Repair, Etc.   Tenant shall: maintain the Leased Personal Property in good operating condition, repair and appearance, and protect it from deterioration other than normal wear and tear; use the Leased Personal Property in the regular course of its business, within its normal operating capacity, without abuse; comply with all laws, ordinances, regulations, requirements and rules with respect to the use, maintenance and operation of the Leased Personal Property; use the Leased Personal Property solely for the operation of the Facilities; not make any modification, alteration or addition to the Leased Personal Property without the written consent of Landlord, other than repairs and replacements in the ordinary course of Tenant's business, not affix the Leased Personal Property (which shall remain personal property at all times regardless of how attached or installed) to realty so as to change its nature to real property or a fixture; and keep the Leased Personal Property at the Facilities, and not remove Leased Personal Property (except in the ordinary course of Tenant's business, but then only if returned to the Premises or replaced with an item of equal or greater value and functionality) without the written consent of Landlord.   Tenant, at its sole expense, shall enter into and maintain in force, for the Term of this Lease, any maintenance contracts required by the manufacturer of the Leased Personal Property, and shall provide to Landlord a copy of such contract and all supplements thereto.

(d)     Net Obligation.   Tenant therefore covenants and agrees to pay and discharge on a timely basis, as additional rental hereunder, all costs, expenses, and obligations of every kind and nature whatsoever relating to the Leased Personal Property which may arise or become due during the Term, including, without limitation, all Taxes and all interest or penalties related thereto.   Tenant will furnish to Landlord, promptly upon receipt of Landlord's written request, proof of payment of such amounts.   If any such assessment may legally be paid in installments, Tenant may pay such assessment in installments; in such event, Tenant shall be liable only for installments which become due and payable with respect to any tax period occurring in whole or in part during the Term hereof.

(e)     Indemnity.   Tenant shall indemnify and hold Landlord harmless from and against all claims, losses, liabilities (including negligence, tort and strict liability), damages, judgments, suits and all legal proceedings, and any and all costs and expenses in connection therewith (including attorneys' fees) arising out of or in any manner connected with the possession, use, storage, operation, maintenance, repair, and disposition of the Leased Personal Property, including, without limitation, (a) claims for injury to or death of persons and for damage to property, and (b) claims relating to latent or other defects in the Leased Personal Property whether or not discoverable by Landlord.

(f)     Risk of Loss.   All risks of loss, theft, damage or destruction of the Leased Personal Property from any cause shall be borne by Tenant.   The occurrence of such loss or

-45-

damage shall not relieve Tenant of any obligations hereunder. In the event of loss or damage, Tenant, at Tenant's option, shall: (a) place the damaged Leased Personal Property in good repair, condition and working order, or (b) replace lost or damaged Leased Personal Property with new equipment of the same type and model, or functionally equivalent new equipment. All replacements of the Leased Personal Property shall constitute Tenant's Personal Property and be subject to the rights, security interests and liens granted to Landlord in this Lease.

(g) <u>No Assignment</u>. Tenant shall not assign, transfer, convey or grant a security interest in the Leased Personal Property or any interest therein without the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion.

(h) <u>Insurance</u>. Tenant shall, at Tenant's sole cost and expense, keep the Leased Personal Property insured against all risks of loss or damage from every cause whatsoever for not less than the full replacement cost thereof. Tenant shall also obtain and maintain in effect throughout the term, public liability insurance, covering both personal injury and property damage arising out of or in connection with the use or operation of the Leased Personal Property. All insurance shall be in such form and for such amounts, and issued by such companies, as shall be reasonably acceptable to Landlord and shall name Landlord and Landlord's assignee or secured party as loss payees with respect to the casualty coverage and as additional insured with respect to public liability coverage and shall provide for the notice requirements described in Section 6.5 hereof. Tenant shall, upon Landlord's request, deliver to Landlord satisfactory evidence of the required insurance coverage.

(i) <u>Collateral</u>. In order to secure the prompt payment of the Rent and all of the other amounts from time to time outstanding hereunder, and the performance and observance by Tenant of all of the provisions hereof, Tenant hereby collaterally assigns, grants, and conveys to Landlord, a security interest in and lien on all of Tenant's right, title and interest in and to all of the following, ***if any*** (whether now existing or hereafter created, the "**Collateral**"), subject to the terms of any Inter-Creditor Agreement: (1) (if contrary to the parties' intentions a court determines that this Lease is not a true "lease" under any applicable Uniform Commercial Code) the Leased Personal Property (including all fixtures or other property comprising the Leased Personal Property),; and (2) any and all insurance and/or other proceeds of the property described in clauses (1) and (2) of this Section 11.9(i) in and against which a security interest is granted hereunder. The collateral assignment, security interest and lien granted herein shall survive the termination, cancellation or expiration of the Lease until such time as Tenant's obligations hereunder are fully discharged. Tenant agrees that: (a) with respect to the Leased Personal Property, in addition to all of the other rights and remedies available to Landlord hereunder during the continuance of an Event of Default, Landlord shall have all of the rights and remedies of a secured party under any applicable Uniform Commercial Code and all other applicable law; and (b) any obligation to pay Rent or any other payment, to the extent constituting the payment of interest, shall be at an interest rate that is equal to the lesser of the maximum lawful rate permitted by applicable law or the effective interest rate used by Landlord in calculating such amounts pursuant to this Lease

-46-

## ARTICLE 12
## DEFAULT BY TENANT; REMEDIES

**Section 12.1**   Events of Default Defined.   Each of the following shall be deemed an event of default (an "**Event of Default**") and a breach of this Lease by Tenant:

(a)   The failure of Tenant to pay when due, any portion of any installment of Base Rent, Supplementary Rent or any other monetary charge due from Tenant under this Lease where such failure continues for a period of five (5) Business Days after Tenant's receipt of Landlord's written notice of such failure, except that Landlord shall not be required to deliver such notice more than twice in any twelve (12) month period.

(b)   The failure of Tenant to comply with or observe any of the other provisions, agreements, conditions, covenants or terms contained in Sections 4.1, 6.1, 10.1, 12.15, 14.1, 14.2, 16.1, 16.4, 25.4 of this Lease, and such failure continues for twenty (20) Business Days after written notice thereof to Tenant.

(c)   The failure of Tenant to comply with or observe any of the other provisions, agreements, conditions, covenants or terms contained in this Lease not addressed in the preceding two paragraphs of this Section, and such failure continues for thirty (30) days after written notice thereof to Tenant (or if such default is of such a nature that it cannot be completely remedied within said thirty (30) day period, then if Tenant does not agree in writing within such thirty (30) day period to cure the same, commence and thereafter diligently prosecute the cure and complete the cure within ninety (90) days after such original written notice of default by Landlord to Tenant, unless the nature of such cure requires additional time and Landlord approves same in the plan of correction approved by Landlord).

(d)   If Tenant shall Transfer all or any of its interest in the Premises or this Lease without strict compliance with Article 9 of this Lease.

(e)   The (i) initiation of any proceeding whereupon the estate or interest of Tenant in the Premises, or any portion thereof, or in this Lease is levied upon or attached, or (ii) taking of Tenant's leasehold estate by execution or other process of law other than as provided in Article 8, which proceeding or taking, as the case may be, is not vacated, discharged, dismissed or otherwise reversed within ninety (90) days thereafter.

(f)   An Event of Default under and as defined in any of the Subleases or the Guaranty.

(g)   Tenant shall desert, vacate or fail, or fail to cause a Subtenant, to physically occupy any portion of the Premises for a period of thirty (30) consecutive days, excluding a permitted closure permitted under this Lease and destruction of the Premises or the Premises for a particular Facility prior to completion of the Restoration, and condemnation of the Premises or the Premises for a particular Facility, to the extent that Tenant must wholly or partially vacate the Premises to effect a Restoration.

-47-

(h)     If (i) Tenant or Guarantor shall commence any case, proceeding or other action (A) under any existing or future Applicable Law relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to Tenant, or seeking to adjudicate Tenant a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution, composition or other relief with respect to Tenant or Tenant's debts, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for Tenant or for all or any substantial part of Tenant's property; or (ii) Tenant or Guarantor shall become insolvent or make a general assignment for the benefit of Tenant's creditors or shall make a transfer in fraud of creditors; or (iii) there shall be commenced against Tenant or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above (including involuntary bankruptcy) or seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of Tenant's property, which case, proceeding or other action (A) results in the entry of an order for relief or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (iv) Tenant or Guarantor shall take any action consenting to or approving of any of the acts set forth in clause (i) or (ii) above; or (v) Tenant or Guarantor shall generally not, or shall be unable to, pay its debts as they become due or shall admit in writing its inability to pay its debts.

(i)     Tenant is a corporation (or partnership or limited liability company) and shall cease to exist as a corporation (or partnership or limited liability company) in good standing in the state of its incorporation (or formation) (unless Tenant simultaneously becomes incorporated (or formed) and in good standing in another state) or if Tenant is a partnership or limited liability company or other entity and Tenant shall be dissolved or otherwise liquidated, then, in any such case, if Tenant does not completely remedy such default within the ninety (90) day period following its receipt of written notice of such default.

(j)     Tenant fails or refuses to execute any certificate or agreement that Landlord or Mortgagee may reasonably request confirming the subordination required pursuant to Article 10 or estoppel certificate required pursuant to Article 14 within five (5) Business Days after Landlord's written notice to Tenant of such failure or refusal.

(k)     **[DRAFTING NOTE:** *section remains open and subject to further negotiation and agreement by the parties.***]**  Any revocation, termination, suspension, decertification or other loss of any Health Care License or Provider Agreement relating to any of the Facilities or health care services provided at or from any of the Facilities or the taking of any action by a Governmental Authority requiring the suspension, closure or inability to operate any Facility in accordance with the Permitted Use.  Notwithstanding the foregoing, in the case of any action referenced above in this paragraph which (i) is temporary and not irrevocable, and (ii) does not require closure of or cessation of operation at a Facility, if Tenant promptly notifies Landlord and commences and thereafter diligently pursues commercially reasonable and good faith efforts to cure the applicable violations, then such event shall not constitute an Event of Default if Tenant shall, within one hundred eighty (180) days after the action was initially taken, fully cure the applicable violations and restore full use of the Health Care License within one hundred eighty (180) days after the action was initially taken or, if shorter, the time for cure set by the Governmental Authority.

-48-

(l)     [**DRAFTING NOTE: *this section remains open and subject to further negotiation and agreement by the parties***] Any debarment or disqualification of Tenant from being a health care provider, government contractor, holder of any Health Care License or recipient of reimbursement from any Third Party Payor.  Notwithstanding the foregoing, in the case of any action referenced above in this paragraph which (i) is temporary and not irrevocable, and (ii) does not require closure of or cessation of operation at a Facility, if Tenant promptly notifies Landlord and commences and thereafter diligently pursues commercially reasonable and good faith efforts to cure the applicable violations, then such event shall not constitute an Event of Default if Tenant shall, within one hundred eighty (180) days after the action was initially taken, fully cure the applicable violations and restore full use of the Health Care License within one hundred eighty (180) days after the action was initially taken or, if shorter, the time for cure set by the Governmental Authority.

(m)     If at any time during the Term or any extension or renewal thereof, on or after the (4th) fourth Test Date occurring after the Effective Date, the Rent Coverage Ratio is 1.25:1.00 or less for any Test Period, it being the intent of the parties that such event shall constitute an automatic Event of Default without an obligation on the part of Landlord to provide written notice thereof to Tenant.  Notwithstanding the foregoing, such Default shall not constitute an Event of Default if (i) within ten (10) Business Days after said Test Date Tenant receives an equity contribution of cash from Guarantor or an Affiliate equal to the amount which, if added to Facility EBITDAR, would result in the Rent Coverage Ratio for that Test Period being greater than 1.25:1.00 and (ii) in the quarter that immediately follows said Test Date, the Rent Coverage Ratio is greater than 1.25:1.00 for such Test Period; provided that Tenant shall be permitted to cure such Default as provided in this Sentence only once during each Lease Year, but no more than five (5) times during the Term. To qualify as an equity contribution of cash satisfying the requirements of this Section, the entire equity so contributed must appear on the financial statements of Tenant as "contributed capital" (or paid in capital or similar term) within the stockholder's equity portion of the balance sheet (it being the intent that there is no corresponding liability reflecting an obligation to repay said amount to the contributor or any third party), and thus be accretive to the solvency of Tenant in accordance with GAAP.

(n)     A default, beyond notice and applicable cure periods, under the Working Capital Loan or any document in connection therewith by a party other than Working Capital Lender.

(o)     A default exists under any other agreement between Tenant or an Affiliate of Tenant and Landlord or an Affiliate of Landlord and such default remains uncured as of the end of the notice and cure period stated in said agreement.

(p)     (i) during any period in which the Guaranty remains in effect, the aggregate of (A) Tangible Net Worth of Tenant plus (B) the Tangible Net Worth of Guarantor is less than the then-applicable Minimum Tangible Net Worth Requirement; or (ii) after the expiration of the Guaranty by its terms, the Tangible Net Worth of Tenant is less than the then-applicable Minimum Tangible Net Worth Requirement.  Notwithstanding the foregoing, the occurrence of the foregoing shall not constitute an Event of Default if, in the calendar quarter immediately following said Default, the Tangible Net Worth of Tenant plus (if applicable) the

-49-

Tangible Net Worth of Guarantor exceeds the Minimum Tangible Net Worth Requirement, provided that Tenant shall be permitted to cure such Default only once during each [successive five (5) Lease Years during the Term and any extension or renewal thereof.] **[DRAFTING NOTE:** *the bracketed language at the end of this section remains open and subject to further negotiation and agreement by the parties*]

**Section 12.2**   Remedies.  Upon the occurrence of an Event of Default, Landlord may, at any time thereafter, without limiting Landlord in the exercise of any right or remedy at law or in equity that Landlord may have by reason of such Event of Default, at its option pursue any one or more of the following remedies without any further notice or demand whatsoever:

(a)     Terminate this Lease and all of the Subleases by issuing written notice of termination to Tenant, in which event Tenant shall immediately surrender the Premises to Landlord, but if Tenant shall fail to do so, Landlord may without notice and without prejudice to any other remedy Landlord may have, peaceably enter upon and take possession of the Premises and expel or remove Tenant and its effects without being liable to prosecution or any claim for damages therefor, and upon any such termination, subject to Section 12.2(b) below, Tenant agrees that in addition to its liability for the payment of arrearages of Base Rent, Supplementary Rent and other sums due and owing by Tenant to Landlord under this Lease upon such termination, Tenant shall be liable to Landlord for damages. Tenant shall pay to Landlord as damages on the same days as Base Rent and other payments which are expressed to be due under the provisions of this Lease, the total amount of such Base Rent and other payments plus a reimbursement for all unamortized tenant allowances and concessions, less such part, if any, of such payments that Landlord shall have been able to collect from a new tenant upon reletting; *provided, however,* that Landlord shall have no obligation to this Tenant to relet the Premises so as to mitigate the amount for which Tenant is liable, except solely as follows: **following** an Event of Default, Landlord shall use commercially reasonable efforts to mitigate its damages, provided, however, that the foregoing shall not be a condition precedent to an action by Landlord against the Guarantor pursuant to the Guaranty.  Landlord's duty to mitigate by leasing the Premises to another tenant (a "Replacement Tenant") is subject to the following:

(i)     Landlord shall have no obligation to solicit or entertain negotiations with any prospective Replacement Tenants until Landlord obtains the final and unappealable legal right to relet the Premises free of any claim of Tenant;

(ii)     Landlord shall not be obligated to lease the Premises to a Replacement Tenant whose use would, in Landlord's reasonable opinion, (a) violate any restriction, covenant or requirement contained in this Lease or document of another tenant or occupant of the Building; (b) violate the Health Care Requirements or Health Care Licenses; or (c) be incompatible with the operation of the Building;

(iii)     Landlord shall not be obligated to lease the Premises to any proposed Replacement Tenant that does not have, in Landlord's sole discretion,

-50-

sufficient financial resources or operating experience to operate the Premises for the use required by this Lease; and

(iv)     Landlord shall not be required to expend any amount of money to alter, remodel or otherwise make the Premises suitable for use by a proposed Replacement Tenant.

(b)     In addition to the other remedies reserved to Landlord herein, and to the extent not prohibited by law, if Landlord elects to terminate this Lease following an Event of Default, Landlord shall be entitled to recover from Tenant the aggregate of: (i) the amount of unpaid Rent earned as of the date of the termination hereof; (ii) the worth at the time of award of the amount by which the unpaid Rent which would have been earned after the date of termination hereof until the time of award exceeds the amount of such Rental loss that Tenant proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such Rental loss that Tenant proves could have been reasonably avoided; (iv) any other amount necessary to compensate Landlord for the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of things, would be likely to result therefrom; and (v) any other amount which Landlord may hereafter be permitted under Applicable Law to recover from Tenant to compensate Landlord for the detriment caused by Tenant's default.  For the purposes hereof,  "Rent" shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, the "time of award" shall mean the date upon which the judgment in any action brought by Landlord against Tenant by reason of such Event of Default is entered or such earlier date as the court may determine; the "worth at the time of award" of the amounts referred to in subclauses (i) and (ii) of this paragraph shall be computed by allowing interest on such amounts at the Default Rate; and the "worth at the time of award" of the amount referred to in subclause (iii) of this paragraph shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of New York at the time of award plus one percent (1%) per annum (the "**Discount Rate**").

(c)     Enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and any Subtenant and their effects therefrom without being liable to prosecution or any claim for damages therefor, and Landlord may relet the Premises for the account of Tenant. Tenant shall pay to Landlord all arrearages of Base Rent, Supplementary Rent and other sums due and owing by Tenant to Landlord, and Tenant shall also pay to Landlord during each month of the unexpired Term the installments of Base Rent and other sums due hereunder, less such part, if any, that Landlord shall have, been able to collect from a new tenant upon reletting. In the event Landlord exercises the rights and remedies afforded to it under this Section 12.2(c) and then subsequently elects to terminate this Lease, Tenant shall be liable to Landlord for damages as set forth in Section 12.2(a) above and Landlord shall have the right at any time to demand final settlement as provided therein.

(d)     Cause the transfer of Health Care Licenses relating to the Facilities and the operation and management of the Facilities and leasing of the Premises to any replacement operator, manager or tenant of the applicable Facility identified by Landlord, to the extent permitted by Applicable Law, and seek the approval of Governmental Authorities in connection

therewith, in which event Tenant shall cooperate with Landlord to transfer all books and records relating to the Facilities and transition services to the replacement operator tenant in accordance with the provisions of Section 16.1 so as to provide continuation of patient care and minimize disruption. Tenant shall cooperate with Landlord to complete the relevant application or transfer process as expeditiously as possible. All fees and other expenses shall be the obligation of Tenant.

(e)     Enforce, by all legal suits and other means, its rights hereunder, including the collection of Rent and other sums payable by Tenant hereunder, without re-entering or resuming possession of the Premises and without terminating this Lease.

(f)     Landlord may do whatever Tenant is obligated to do by the provisions of this Lease, may peaceably enter the Premises in order to accomplish this purpose and may make any expenditure or incur any obligation for the payment of money in connection therewith, including, without limitation, reasonable attorneys' fees and expenses. Tenant agrees to reimburse Landlord immediately upon demand for any expenses which Landlord may incur in its actions pursuant to this Section 12.2(f), with interest thereon at the Default Rate from the date of demand until paid and such amount shall be deemed to be Supplementary Rent hereunder. Tenant further agrees that Landlord shall not be liable for damages resulting to Tenant from such action.

(g)     To the extent permitted by Applicable Law and in compliance with the requirements of Health Care Licenses and Governmental Authorities, and in coordination with a transition to a replacement facility operator or manager, Landlord may peaceably enter upon the Premises and change, alter, or modify the door locks on all entry doors of the Premises, and permanently or temporarily exclude Tenant, and its agents, employees, representatives and invitees, from the Premises. In the event that Landlord either permanently excludes Tenant from the Premises or terminates this Lease on account of Tenant's Default, Landlord shall not be obligated thereafter to provide Tenant with a key to the Premises at any time, regardless of any amounts subsequently paid by Tenant. If Landlord elects to exclude Tenant from the Premises temporarily without permanently repossessing the Premises or terminating this Lease, then Landlord shall not be obligated to provide Tenant with a key to renter the Premises until such time as all delinquent rent and other amounts due under this Lease have been paid in full and all other defaults, if any, have been cured and Tenant shall have given Landlord evidence reasonably satisfactory to Landlord that Tenant has the ability to comply with its remaining obligations under this Lease; and if Landlord temporarily excludes Tenant from the Premises, Landlord shall have the right thereafter to permanently exclude Tenant from the Premises or terminate this Lease at any time before Tenant pays all delinquent rent, cures all other defaults and furnishes such evidence to Landlord. A key to the Premises will be furnished to Tenant only during Landlord's normal business hours. Landlord's exclusion of Tenant from the Premises shall not constitute a permanent exclusion of Tenant from the Premises or a termination of this Lease unless Landlord so notifies Tenant in writing. Landlord shall not be obligated to place a written notice on the Premises on the front door thereof explaining Landlord's action or stating the name, address or telephone number of any individual or company from which a new key may be obtained. In the event Landlord permanently or temporarily excludes Tenant from the Premises or terminates this Lease, and Tenant owns property that has been left in the Premises

-52-

but which is not subject to any statutory or contractual lien or security interest held by Landlord as security for Tenant's obligations, Tenant shall have the right to promptly so notify Landlord in writing, specifying the items of property not covered by any such lien or security interest and which Tenant desires to retrieve from the Premises. Landlord shall have the right to either (i) escort Tenant to the Premises to allow Tenant to retrieve Tenant's property not covered by any such lien or security interest, or (ii) remove such property itself and make it available to Tenant at a time and place designated by Landlord. In the event Landlord elects to remove such property itself as provided in the immediately preceding clause (ii), Landlord shall not be obligated to remove such property or deliver it to Tenant unless Tenant shall pay to Landlord, in advance, an amount of cash equal to the amount that Landlord estimates Landlord will be required to expend in order to remove such property and to repair any damage caused by such removal and to make such property available to Tenant, including all moving or storage charges theretofore or thereafter incurred by Landlord with respect to such property. If Tenant pays such estimated amount to Landlord and the actual amount incurred by Landlord differs from the estimated amount, Tenant shall pay any additional amounts to Landlord on demand or Landlord shall refund any excess amounts paid by Tenant to Tenant on demand.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or equity. Exercise of such remedies shall be in compliance with the requirements of Health Care Licenses and Governmental Authorities, and in coordination with a transition to a replacement facility operator or manager. Any entry by Landlord upon the Premises may be by use of a master or duplicate key or electronic pass card or any locksmith's entry procedure or other means. Any reletting by Landlord shall be without notice to Tenant, and if Landlord has not terminated this Lease, the reletting may be in the name of Tenant or Landlord, as Landlord shall elect. Any reletting shall be for such term or terms (which may be greater or less than the period which, in the absence of a termination of this Lease, would otherwise constitute the balance of the Term) and on such terms and conditions (which may include free rent, rental concessions or tenant inducements of any nature) as Landlord in its sole and absolute discretion may determine, and Landlord may collect and receive any rents payable by reason of such reletting. In the event of any reletting, Tenant shall pay to Landlord on demand the cost of renovating, repairing and altering the Premises for a new tenant or tenants, and the cost of advertisements, brokerage fees, reasonable attorney's fees and other costs and expenses incurred by Landlord in connection with such reletting. In the event any rentals actually collected by Landlord upon any such reletting for any calendar month are in excess of the amount of rental payable by Tenant under this Lease for the same calendar month, the amount of such excess shall belong solely to Landlord and Tenant shall have no right with respect thereto. In the event it is necessary for Landlord to institute suit against Tenant in order to collect the rental due hereunder or any deficiency between the rental provided for by this Lease for a calendar month and the rental actually collected by Landlord for such calendar month, Landlord shall have the right to allow such deficiency to accumulate and to bring an action upon several or all of such rental deficiencies at one time. No suit shall prejudice in any way the right of Landlord to bring a similar action for any subsequent rental deficiency or deficiencies.

**Section 12.3**   <u>Additional Rights</u>. Subject to the terms of <u>Section 12.2</u> above and Applicable Law, upon the exercise by Landlord of any of the remedies contained in this Lease, at law or in equity:

(a)   Tenant shall pay to Landlord all Rent payable under this Lease by Tenant to Landlord to the date upon which this Lease or Tenant's right to possess the Premises shall have been terminated or to the date of re-entry upon the Premises by Landlord, as the case may be. Additionally, Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in (i) obtaining possession of the Premises, (ii) removing and storing Tenant's or any other occupant's property, (iii) repairing any damage to the Premises, and (iv) performing any of Tenant's unperformed obligations.

(b)   No re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless written notice of such intention be given to Tenant by Landlord.  Notwithstanding any such reletting or re-entry to take possession, Landlord may at any time thereafter elect to terminate this Lease for a previous then continuing uncured Default. No act or thing done by Landlord or its agents during the term hereby granted shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless the same be made in writing by Landlord.

**Section 12.4**   <u>Continuing Tenant Liability</u>. Absent termination of this Lease and subject to Applicable Law, no taking of possession of and/or reletting the Premises, or any part thereof, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such repossession or reletting.

**Section 12.5**   <u>Waiver</u>. To the extent not prohibited by Applicable Law, Tenant hereby waives and releases all rights now or hereafter conferred by statute or otherwise which would have the effect of limiting or modifying any of the provisions of this <u>Article 12</u>.  Tenant shall execute, acknowledge and deliver any instruments which Landlord may request, whether before or after the occurrence of an Event of Default evidencing such waiver or release.

**Section 12.6**   <u>Rent and Costs as a Lien</u>. The Rent payable by Tenant hereunder and each and every installment thereof, and all costs, actual, customary and reasonable attorneys' fees and disbursements and other expenses which may be incurred by Landlord in enforcing the provisions of this Lease on account of any delinquency of Tenant in carrying out the provisions of this Lease shall be and they hereby are declared to constitute a valid lien upon the interest of Tenant in this Lease and in the Premises.

**Section 12.7**   <u>No Delay in Recovery</u>. Suit or suits for the recovery of damages, or for a sum equal to any installment or installments of Rent due and payable hereunder or any deficiencies or other sums due and payable by Tenant to Landlord pursuant to this <u>Article 12</u>, may be brought by Landlord from time to time at Landlord's election during the continuance of an Event of Default, and nothing herein contained shall be deemed to require Landlord to await the date whereon this Lease or the Term would have expired by limitation had there been no Event of Default by Tenant and termination of this Lease.

**Section 12.8**   Damages.  Nothing contained in this Article 12 shall limit or prejudice the right of Landlord to prove and obtain as damages in any bankruptcy, insolvency, receivership, reorganization or dissolution proceeding an amount equal to the maximum allowed by Applicable Law governing such proceeding and in effect at the time when such damages are to be proved, whether or not such amount shall be greater than, equal to or less than the amount of the damages referred to in any of the preceding Sections of this Article 12.

**Section 12.9**   Tenant Waiver of Notice and Redemption. Except as otherwise expressly provided herein or as prohibited by Applicable Law, Tenant hereby expressly waives the service of any notice of intention to re-enter provided for in any statute, or of the institution of legal proceedings to that end, and Tenant, for and on behalf of itself and all persons claiming through or under Tenant, also waives any and all right of redemption provided by any Applicable Law or statute now in force or hereafter enacted or otherwise, or re-entry or repossession or to restore the operation of this Lease in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or in case of any expiration or termination of this Lease.

**Section 12.10**  Strict Performance Not a Condition. No failure by Landlord to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, or receipt or acceptance of Rent with knowledge of or during the continuance of any such breach, shall constitute a waiver or relinquishment of any such breach or of such covenant, agreement, term or condition. No covenant, agreement, term or condition of this Lease to be performed or complied with by Tenant, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Landlord. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

**Section 12.11**  Specific Performance. In the event of any breach by Tenant of any of the covenants, agreements, terms or conditions contained in this Lease, Landlord shall be entitled to a decree compelling performance of any of the provisions hereof and the restraint by injunction of the violation of any of the terms, covenants and conditions of this Lease, and shall have the right to invoke any rights and remedies allowed at law or in equity or by statute or otherwise as though re-entry, summary proceedings, and other remedies were not provided for in this Lease. The rights granted to Landlord in this Lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law, in equity or otherwise, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

**Section 12.12**  Enforcement Costs.  Tenant shall pay to Landlord all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Landlord in any action or proceeding to which Landlord may be made a party by reason of any act or omission of Tenant. Tenant also shall pay to Landlord all reasonable costs and expenses, including, without limitation, actual, customary and reasonable attorneys' fees and disbursements, incurred by Landlord in enforcing any of the covenants and provisions of this

-55-

Lease and incurred in any action brought by Landlord against Tenant on account of the provisions hereof, and all such costs, expenses and attorneys' fees and disbursements may be included in and form a part of any judgment entered in any proceeding brought by Landlord against Tenant on or under this Lease. All of the sums paid or obligations incurred by Landlord as aforesaid, with interest and costs, shall be paid by Tenant to Landlord on demand.

**Section 12.13** <u>Interest on Late Payment</u>.  If Tenant fails to pay any installment of Base Rent or Supplementary Rent within five (5) business days following the date such payment is due hereunder, then upon the second (2nd) such failure in any twelve (12) month period, Tenant shall pay to Landlord, in addition to such installment of Base Rent or Supplementary Rent, interest on such installment at the Default Rate, computed from the date such payment was due to and including the date of payment, and a late charge equal to five percent (5%) of the amount of such installment.

**Section 12.14** <u>Attorneys' Fees</u>.  To the extent that any provision of this Lease entitles Landlord to recover its fees, costs, expenses or attorneys' fees from Tenant, such fees, costs, expenses or attorneys' fees shall include Landlord's reasonable allocable costs of in-house counsel, and in-house fees and expenses only to the extent that Landlord's right to recover such fees, costs, expenses or attorneys' fees arises out of an Event of Default by Tenant.

**Section 12.15** <u>Landlord's Lien</u>.

(a)  Subject to this <u>Section 12.15</u>, as security for the payment and performance of all of Tenant's obligations and Landlord's rights under this Lease, Tenant hereby assigns, grants, delivers, sets over and transfers to Landlord and grants to Landlord, and shall assign, grant, deliver, set over and transfer to the applicable Landlord and grant to such Landlord, its successors and assigns pursuant to those certain Security Agreements dated of even date herewith (collectively, the "**Security Agreements**"), a continuing security interest in all of its right, title and interest, whether now owned or hereafter acquired, now existing or hereafter arising, wherever located, in and to (i) the Tenant's Personal Property, (ii) all Permits, including without limitation, the Health Care Licenses and the Provider Agreements and (iii) Accounts Receivables (collectively with the Tenant's Personal Property and the Permits, the "**Landlord Lien Collateral**") in each case to the extent owned or leased by Tenant, as applicable, but with respect to leased property, only to the extent that the granting of such security interest does not violate the terms of the applicable lease. The aforementioned grants of a security interest in the Tenant's Personal Property, Permits, Health Care Licenses and Provider Agreements shall, in each instance, create a first priority lien; and the aforementioned grants of a security interest in the Accounts Receivable shall, in each instance, create a priority lien subject only to the lien Tenant grants to its Working Capital Lender, subject to the terms of the Inter-Creditor Agreement (defined below). Tenant shall sign and deliver to Landlord or the applicable Landlord, as the case may be, or if Tenant's signatures are not required, Tenant hereby authorizes Landlord to file in all necessary governmental offices, one or more financing statements to perfect the security interest granted by Tenant to Landlord hereunder. Tenant shall promptly notify Landlord in writing if Tenant obtains any interest in any Collateral consisting of Deposit Accounts (other than payroll, employee benefits, security deposits, withholding, escrow, trust accounts, tax withholding accounts and other similar fiduciary accounts) or intellectual

-56-

property, and, upon Landlord's request, shall promptly execute such documents and take such actions as Landlord deems appropriate to effect Landlord's valid and enforceable security interest upon such Collateral, including obtaining any appropriate possession, access or control agreement. If any Collateral is in the possession of a third party, Tenant shall use commercially reasonably efforts to obtain an acknowledgment that such third party holds the Landlord Lien Collateral for the benefit of Landlord. Landlord shall have all rights and remedies available to a secured party under the Uniform Commercial Code, as amended from time to time. Tenant acknowledges that Landlord may collaterally assign its security interest in the Landlord Lien Collateral to Mortgagee and/or to a Superior Landlord to secure Landlord's obligations to Mortgagee or such Superior Landlord. Upon Landlord's request, or at the request of Mortgagee, Tenant shall confirm in writing the grant of such security interests to Mortgagee and/or Superior Landlord. These provisions of this Lease shall be deemed to be a security agreement for purposes of the Uniform Commercial Code. To the extent permitted by Applicable Law, in connection with the expiration or earlier termination of this Lease, Tenant shall cooperate with Landlord, in causing the Health Care Licenses and the Provider Agreements to be reissued in the name of Landlord or the applicable Landlord, as the case may be, or its designee as of such date or as soon thereafter as is practicable, and such Landlord shall be entitled to apply in its own name, its designee's name for the transfer of the Health Care Licenses and the Provider Agreements to Landlord or the applicable Landlord, as the case may be, or its designee, and Tenant's obligation to cooperate shall survive the expiration or earlier termination of this Lease. Any grant of security interest in, or pledge or collateral assignment of, the Landlord Lien Collateral Tenant to any financial institution making a loan to Tenant shall be expressly subject to the terms of this Lease, including, without limitation, the foregoing rights of Landlord and security interest therein. Tenant shall provide to Landlord copies of the documents evidencing the Working Capital Loan within five (5) Business Days following receipt of Landlord's written request.

(b)       Tenant shall not grant a security interest in, or pledge or collateral assignment of, the Landlord Lien Collateral without first complying with the terms and conditions of Section 12.15.

(c)       Notwithstanding any provision in this Lease to the contrary, Tenant is expressly permitted, from time to time, directly or indirectly, to grant to a Working Capital Lender a security interest or create or otherwise cause to exist a lien, encumbrance or pledge, in, to or upon any and all of Tenant's right, title and interest in, to and under the Landlord Lien Collateral, subject to the terms of this Section 12.15, and provided that before granting same to the Working Capital Lender, the Working Capital Lender executes an inter-creditor agreement with Landlord, in form and substance acceptable to Landlord in its reasonable discretion (an "**Inter-Creditor Agreement**"), simultaneously with the occurrence of the foregoing. Any Inter-Creditor Agreement will include a provision that, following an event of default under such Working Capital Loan or this Lease (beyond any applicable notice and cure periods), the Working Capital Lender will release its lien against the Tenant's Personal Property, Permits, Health Care Licenses and Provider Agreements upon receipt of the sum of $1.00.

Nothing contained in this Section 12.15 shall be deemed to permit Tenant to grant a security interest or create or otherwise cause to exist a lien, encumbrance or pledge in any of Tenant's right, title and interest in, to or under any Rents paid or payable to Tenant under any Sublease of

-57-

all or any portion of the Premises, it being understood and agreed that in no event shall Tenant be permitted to so encumber such Rents. Tenant shall pay all of Landlord's costs and expenses (including reasonable attorneys' fees and expenses) incurred in connection with the negotiation and execution of an Inter-Creditor Agreement. With respect to a Working Capital Loan in effect as of the Effective Date, simultaneously with the execution of this Lease, Landlord, Tenant, any Superior Landlord or Mortgagee (if designated by Landlord) and the Working Capital Lender shall execute an Inter-Creditor Agreement with respect to security interest granted in the Landlord Lien Collateral. The occurrence of a default by Tenant under a Working Capital Loan shall, upon the expiration of the notice and cure periods expressly stated in the Working Capital Loan, be an automatic Event of Default hereunder.

## ARTICLE 13
## NO WAIVER

**Section 13.1** <u>Generally</u>. No receipt of moneys by Landlord from Tenant after the termination or cancellation of this Lease or termination of Tenant's right to possess the Premises (or after the giving of any notice of the termination of this Lease or Tenant's right to possess the Premises) shall reinstate, continue or extend the Term, or affect any notice theretofore given to Tenant, or affect or otherwise operate as a waiver of the right of Landlord to enforce the payment of Base Rent or Supplementary Rent then due, or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Premises by proper suit, action, proceeding or remedy; it being agreed that, after the service of notice to terminate or cancel this Lease or Tenant's right to possess the Premises, or the commencement of suit, action or summary proceedings, or any other remedy, or after a final order or judgment for the possession of the Premises, Landlord may demand, receive and collect any moneys due, or thereafter falling due, without, in any manner whatsoever, affecting such notice, proceeding, suit, action, order or judgment; and any and all such moneys collected shall be deemed to be payments on account of the use and occupation of the Premises or, at the election of Landlord, on account of Tenant's liability hereunder. The acceptance of any check or payment bearing or accompanied by any endorsement, legend or statements shall not, of itself, constitute any change in or termination of this Lease.

**Section 13.2** <u>Continuing Landlord Rights</u>. The failure of Landlord to enforce any agreement, condition, covenant or term, by reason of its breach by Tenant shall not be deemed to void, waive or affect the right of Landlord to enforce the same agreement, condition, covenant or term on the occasion of a subsequent default or breach. No surrender of the Premises by Tenant (prior to any termination of this Lease) shall be valid unless consented to in writing by Landlord.

## ARTICLE 14
## ESTOPPEL CERTIFICATE; CONSENT

**Section 14.1** <u>Tenant Certificate</u>. Tenant agrees that it shall, at any time and from time to time upon not less than ten (10) Business Days' prior notice by Landlord, execute, acknowledge and deliver to Landlord a statement in writing certifying that this Lease is

-58-

unmodified and in full force and effect (or if there have been any modifications, that the Lease is in full force and effect as modified and stating the modifications), the Base Rent and Supplementary Rent payable and the dates to which the Base Rent and Supplementary Rent have been paid, that the address for notices to be sent to Tenant is as set forth in this Lease, stating whether or not Landlord is in default in keeping, observing or performing any term, covenant, agreement, provision, condition or limitation contained in this Lease and, if in default, specifying each such default, the Commencement Date and Expiration Date for the current Term, that Tenant is in possession of the Premises, and any other matters reasonably requested by Landlord, any Mortgagee, or any Superior Landlord; it being intended that any such statement delivered pursuant to this Article 14 may be relied upon by Landlord or any Superior Landlord or any prospective purchaser of the Premises or any Mortgagee thereof or any assignee of any Mortgage upon the Premises. Tenant shall also use reasonable efforts to cause any Subtenant to deliver a statement as to the foregoing matters with respect to, the applicable Sublease, and the same parties shall be entitled to rely on such estoppel certificate.

**Section 14.2** Lender Certificate. Landlord may secure financing of its interest in the Premises by, among other things, assigning Landlord's interest in this Lease and the sums payable hereunder to Mortgagee. Tenant agrees, upon not less than ten (10) Business Days' prior notice by Landlord, to execute, acknowledge and deliver to Landlord such certificates and other documents as may be requested by Mortgagee which are reasonably acceptable to Tenant.

**Section 14.3** Landlord Certificate. Landlord agrees that it shall, at any time and from time to time upon not less than ten (10) days' prior notice by Tenant, execute, acknowledge and deliver to Tenant a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been any modifications, that the Lease is in full force and effect as modified and stating the modifications), the Base Rent and Supplementary Rent payable and the dates to which the Base Rent and Supplementary Rent have been paid, that the address for notices to be sent to Landlord is as set forth in this Lease, stating whether or not to the knowledge of Landlord an Event of Default has occurred and is continuing under this Lease and, if so, specifying each such default, the Commencement Date and Expiration Date for the current Term, that Tenant is in possession of the Premises, and any other matters requested by Tenant; it being intended that any such statement delivered pursuant to this Article 14 may be relied upon by Tenant or any prospective purchaser of Tenant's business.

## ARTICLE 15
## QUIET ENJOYMENT

**Section 15.1** Tenant, upon payment of the Rents herein reserved and upon the due performance and observance of all the covenants, conditions and agreements herein contained on Tenant's part to be performed and observed, including without limitation, the maintenance by Tenant of all necessary Health Care Licenses for the Facilities in good standing and the compliance by Tenant with all Requirements of Governmental Authorities, shall and may at all times during the Term peaceably and quietly have, hold and enjoy the Premises without any manner of suit, trouble or hindrance of and from any person claiming by, through or under Landlord, subject, nevertheless, to the terms and provisions of this Lease.

-59-

# ARTICLE 16
## SURRENDER

**Section 16.1** <u>Generally</u>.  (a) Tenant shall, on the last day of the Term, or upon the sooner termination of the Term, quit and surrender to Landlord the Premises vacant, free of all Tenant's Personal Property (subject to Landlord's right to purchase the owned Tenant's Personal Property or take an assignment of the leased Tenant's Personal Property pursuant to <u>Section 16.5</u> hereof), and in the same level of condition and repair as on the Commencement Date, reasonable wear and tear, and damage from condemnation and from Tenant's election not to restore after casualty excepted, and Tenant shall remove or demolish all of the fixtures, structures and other improvements which Landlord shall have elected to cause Tenant to remove pursuant to and in accordance with <u>Section 5.7</u> hereof; *provided, however,* that at the termination of the Lease, if Landlord exercises its right set forth in <u>Section 16.5</u> to purchase such Tenant's Personal Property, Tenant shall allow Landlord or its successor tenant to use Tenant's Personal Property, and such use shall be at no charge until the earlier of (i) ninety (90) days following such termination or (ii) until Landlord or the successor tenant (as applicable) and Tenant complete the sale of the Tenant's Personal Property at a mutually agreed upon price. If Landlord or the successor tenant (s applicable) and Tenant are unable to mutually agree upon a price for the sale of Tenant's Personal Property within ninety (90) days following the termination of the Lease, and provided no Event of Default exists, Tenant shall permit Landlord or its successor tenant (as applicable) to use Tenant's Personal Property following said 90th day upon payment of the reasonable rental value for such use.  Upon the expiration or earlier termination of this Lease, Landlord may, to the extent permitted by Applicable Law and approved by all applicable Health Care Regulatory Agencies, and with Tenant's approval, cause the transfer of Health Care Licenses relating to the Facilities and the operation and management of the Facilities and leasing of the Premises to any replacement operator, manager or tenant of the Facilities designated by Landlord. In connection with such transfer, Tenant shall cooperate with Landlord at no cost, expense or liability to Tenant (including, if required by Landlord, the execution and delivery of a transfer agreement and the parties shall enter into an Operations Transfer Agreement reasonably acceptable to Landlord and Tenant and provide for, at Landlord's expense: (i) the transfer to the successor tenant of (A) all federal, state or municipal licenses, certifications, certificates, approvals, permits, variances, waivers, provider agreements and other authorizations certificates that are related to the operation of the Facilities to the extent same are transferable under Applicable Law and the transfer is approved by all applicable Health Care Regulatory Agencies and (B) all names associated with the Facilities as then known to the general public (but excluding any names that are Tenant's Personal Property), (ii) indemnification obligations mutually acceptable to the parties; (iii) the preparation and filing of all notices reasonably required by Applicable Law in connection with such termination and transfer of operations, (iv) the delivery to the successor tenant of all patient and resident charts records along with appropriate patient and resident consents, if necessary, subject to Applicable Laws, (v) the delivery to the successor tenant of such inventories and supplies at commercially reasonable operating levels, and (vi) the delivery of copies of all of Tenant's books and records relating to the Facilities and their operations that are necessary to transition the Facilities to the successor tenant, to Landlord or the successor tenant, within a reasonable time so as to provide

continuation of patient or resident care and minimize disruption. Tenant's obligation to observe and perform this covenant shall survive the expiration or earlier termination of the Term. In the event that Tenant fails to surrender the Premises as aforesaid, in addition to the rights of Landlord under Section 16.3, Landlord shall have the right to exercise the applicable remedies upon the occurrence of an Event of Default. Tenant shall have the right, as long as no Event of Default has occurred and is continuing under this Lease, upon the expiration of the Term (but subject to (a) the temporary use by the successor tenant referred to above and (b) Landlord's right to purchase the owned Tenant's Personal Property or takes any assignment of the leased Tenant's Personal Property, in each case, pursuant to Section 16.5 hereof), to remove from the Premises all of Tenant's Personal Property, whether or not the same be attached to the real estate, *provided that* Tenant shall at its own cost and expense reasonably restore and repair any damage to the Premises caused by the removal of Tenant's Personal Property. Such removal shall be done upon reasonable advance notice, at a mutually convenient time approved by Landlord and without disruption of the successor tenant's business operations.

**Section 16.2**  Rent Apportionment.  Upon the expiration of the Term, all Base Rent and Supplementary Rent and other items payable by Tenant under this Lease shall be apportioned to the date of termination.

**Section 16.3**  Holding Over.  Tenant acknowledges that possession of the Premises must be surrendered to Landlord at the expiration or sooner termination of the term of this Lease. The parties recognize and agree that the damage to Landlord resulting from any failure by Tenant to timely surrender possession of the Premises as aforesaid will be extremely substantial, will exceed the amount of the Base Rent and Supplementary Rent theretofore payable hereunder, and will be impossible to accurately measure. Tenant therefore agrees that, subject to Section 16.4, if possession of the Premises is not surrendered to Landlord upon the expiration or sooner termination of the term of this Lease, then, in addition to any other rights or remedies available to Landlord under this Lease, Tenant shall pay to Landlord, as liquidated damages for each month and for each portion of any month during which Tenant holds over in the Premises after the expiration or sooner termination of the term of this Lease, a sum equal to the higher of the then fair market rental value of the Premises as reasonably determined by Landlord, taking into account the effect of all material factors reasonably relevant to such determination, or one and one-half (1.5) times the Base Rent and one hundred percent (100%) of the Supplementary Rent which was payable under this Lease with respect to the last month of the term hereof.  Nothing herein contained shall be deemed to permit Tenant to retain possession of the Premises after the expiration or sooner termination of the term of this Lease; and in the event of any unauthorized holding over, Tenant shall indemnify each of the Indemnified Parties against all claims for actual damages by any other lessee or prospective lessee to whom Landlord may have leased all or any part of the Premises effective before or after the expiration or termination of the Term of this Lease. If Tenant holds over in possession after the expiration or termination of the term of the Lease, such holding over shall not be deemed to extend the term or renew this Lease, but the tenancy thereafter shall continue as a tenancy from month to month upon the terms and conditions of this Lease at the Base Rent and Supplementary Rent as herein increased. Tenant hereby waives the benefit of any Applicable Law which would contravene or limit the provisions set forth in this Section 16.3. This provision shall survive the expiration or earlier termination of this Lease.

**Section 16.4**   Duty to Continue Operations. Notwithstanding anything to the contrary contained in this Lease, if pursuant to Applicable Law, Tenant is required to continue to operate the Facilities after the Expiration Date, Tenant shall do so pursuant to Applicable Law, and Tenant shall continue to pay Landlord Base Rent and Supplementary Rent at the rates then in effect under this Lease. Landlord further agrees that if Tenant is required to continue the operation of the Facilities pursuant to this Section 16.4, then at Tenant's option, Tenant may continue to operate the balance of the Facilities until such time as Tenant is permitted to cease operations of all of the Facilities. The period of time pursuant to which Tenant continues to operate the Facility or Facility pursuant to this Section 16.4 shall be referred to as the "**Extended Operation Period**".

**Section 16.5**   Landlord Acquisition of Tenant's Personal Property. At the expiration or earlier termination of the Lease, Landlord shall have the right to (i) for no consideration, take an assignment of the lessee's interest in all of the Leased Personal Property free and clear of all liens and encumbrances (other than said lease) and (ii) acquire all of Tenant's Personal Property free and clear of all liens and encumbrances. The acquisition of the Tenant's Personal Property shall be for a total consideration of (a) $100 if acquired following an Event of Default or (b) with payment of said property's fair market value if acquired upon the expiration or earlier termination of the Term (where such early termination is not the result of an Event of Default). For purposes of determining the fair market value of the owned Tenant's Personal Property (**"Personal Property Fair Market Value"**)*,* the following procedure shall apply:

(a)   If Landlord has timely delivered the aforementioned notice, Tenant shall within fifteen (15) days deliver to Landlord a written notice of Tenant's determination of the Personal Property Fair Market Value (the "**Value Notice**").

(b)   Within fifteen (15) days after Landlord's receipt of the Value Notice, Landlord shall give Tenant a notice (**"Landlord's Value Response Notice"**) electing either (i) to accept the Personal Property Fair Market Value set forth in the Value Notice, in which case the Personal Property Fair Market Value shall be as set forth in the Value Notice, or (ii) not to accept Tenant's determination of the Personal Property Fair Market Value set forth in the Value Notice in which case Landlord's Value Response Notice shall include Landlord's determination of the Personal Property Fair Market Value, whereupon Landlord and Tenant shall endeavor to agree upon the Personal Property Fair Market Value on or before the date that is thirty (30) days after Tenant's receipt of Landlord's Value Response Notice. If Landlord and Tenant are unable to agree upon the Personal Property Fair Market Value within such 30-day period, then the Personal Property Fair Market Value shall be determined in accordance with Section 16.5(c) below. If Landlord fails to deliver Landlord's Value Response Notice within the 15-day period following its receipt of Tenant's Value Notice, Landlord shall be conclusively deemed to have rejected Tenant's determination of the Personal Property Fair Market Value.

(c)   If Landlord and Tenant shall fail to agree upon the Personal Property Fair Market Value within thirty (30) days of the date of Tenant's receipt of Landlord's Value Response Notice, then, within ten (10) Business Days thereafter, Landlord and Tenant each shall give notice to the other setting forth the name and address of an independent appraiser or

-62-

consultant having at least ten (10) years' experience in the business of appraising or determining the value of personal property comparable to Tenant's Personal Property in the general location of the Premises. If either party shall fail to give notice of such designation within such ten (10) Business Day period, then the appraiser chosen shall make the determination alone. If two appraisers have been designated, such two appraisers may consult with each other and shall, not later than the sixtieth (60th) day after Tenant's receipt of Landlord's Value Response Notice choose either Landlord's or Tenant's determination of the Personal Property Fair Market Value by simultaneously giving written notice thereof to each of Landlord and Tenant, in which case the determination so chosen shall be final and binding upon Landlord and Tenant and their respective Affiliates. If such two appraisers shall fail to concur within such thirty (30) day period, then such two appraisers shall, within the next ten (10) days, designate a third appraiser meeting the above requirements. The third appraiser shall within thirty (30) days after its designation, choose either Landlord's or Tenant's determination (and no other) by simultaneously delivering to Landlord and Tenant signed and acknowledged original counterparts of his or her determination within seven (7) days thereof, which determination shall be final and binding upon Landlord and Tenant and their respective Affiliates. The determination of the appraisers pursuant to this Section 16.5(c) shall be deemed to be binding arbitration which may be confirmed by court order at the request of either Landlord or Tenant. The parties shall execute and deliver any instruments of conveyance required to transfer Tenant's Personal Property pursuant to such appraisers' determination; however, if the appraisal determination is not complete as of the effective expiration date of the Lease, at Landlord's request Tenant shall execute and deliver any such instruments of conveyance on and effective as of said expiration date, and Landlord's obligation to pay the consideration as determined by said appraisal process shall survive said lease expiration and conveyance.

(d)     The fees, costs and expenses of each party's appraiser shall be paid by such party. The fees, costs and expenses of the third appraiser shall be shared equally by Landlord and Tenant. If a decision is rendered by a single appraiser due to the other party's failure to designate an appraiser, then the fees, costs and expenses of the appraiser so rendering the decision shall be shared equally by Landlord and Tenant.

(e)     Landlord and/or its designee (including any successor operator of the Facilities) shall have the unconditional right to utilize the Tenant's Personal Property after the expiration of the Term and following Tenant's return of possession of the Premises to Landlord during the period of time that the Personal Property Fair Market Value is being determined.

**ARTICLE 17**
**ACCESS**

**Section 17.1**   Inspection. Landlord shall at all times during the Term, after reasonable advance written notice to Tenant (except in cases of emergency, in which event Landlord shall give Tenant such notice, if any, as may be practical under the circumstances), have the right and privilege to enter the Premises for the purpose of inspecting the same or for the purpose of showing the same to prospective purchasers or Mortgagees thereof.  Landlord shall also have the right and privilege at all times during the Term to post notices of non-responsibility for work performed by or on behalf of Tenant or a Subtenant and, during the last one (1) year of the Term,

-63-

Landlord shall have the right and privilege, to enter the Premises at reasonable times during business hours for the purpose of exhibiting the same to prospective new tenants. Notwithstanding the foregoing, Landlord will not access patient or medical information which is protected from such access by Federal or State privacy laws, including the Health Insurance Portability and Accountability Act ("**HIPAA**") and the Health Information Technology for Economic and Clinical Health Act ("**HITECH Act**") and the regulations promulgated thereunder, as amended, and Landlord will respect patient's rights to privacy of their own rooms and possessions. Tenant shall have the right to have a representative present during all entries by Landlord.

Section 17.2    Repairs.  Landlord shall at all times during the Term, after reasonable advance written notice to Tenant (except in cases of emergency, in which event Landlord shall give Tenant such notice, if any, as may be practical under the circumstances), have the right to enter the Premises or any part thereof for the purpose of making such repairs or Alterations therein as Landlord deems reasonably necessary or advisable following the failure of Tenant to make any such repairs or Alterations required by this Lease beyond any applicable notice and cure period which required repairs or Alterations must be supported by an engineering report from an engineer reasonably acceptable to Landlord and Tenant, and reasonably agreed to by both Landlord and Tenant, but such right of access shall not be construed as obligating Landlord to make any repairs to or replacements to the Premises or as obligating Landlord to make any inspection or examination of the Buildings. Tenant shall pay to Landlord, on demand, as Supplementary Rent hereunder, all amounts expended by Landlord pursuant to this Section 17.2 which amounts shall bear interest at the Default Rate until paid, if Tenant shall have failed to make said repairs within fifteen (15) days of the receipt of said report.

# ARTICLE 18
# ENVIRONMENTAL MATTERS

Section 18.1    Generally. Tenant will not use, generate, manufacture, produce, store, release, discharge or dispose of in, on, under, from or about the Premises or transport to or from the Premises any Hazardous Substance and will not allow or suffer any other person or entity to do so (except for non-material quantities of Hazardous Substances that are customarily used in the ordinary operation of the Facilities for the Permitted Use for which Tenant has obtained any necessary permits or Governmental approvals, collectively, **"Immaterial Use"**).

Section 18.2    Compliance With Environmental Laws. Tenant shall keep and maintain the Premises in compliance with, and shall not cause, permit or suffer the Premises to be in violation of any Environmental Law. Tenant shall, at its sole cost and expense, cause any Repairs or Alterations to the Premises to be conducted and performed by qualified contractors and in compliance with all Environmental Laws.  The obligations of Tenant pursuant to this Section shall apply also to conditions that existed prior to the Effective Date of this Lease.

Section 18.3    Notices. Tenant shall give prompt written notice to Landlord of:

(i)     any use, generation, manufacture, production, storage, release, discharge or disposal of any Hazardous Substance in, on, under, from or about the Premises or the migration thereof to or from other property, in each case, prior to and/or during the Term (other than Immaterial Use);

(ii)     the commencement, institution or threat of any proceeding, inquiry or action by or written notice from any local, state or federal governmental authority with respect to the use or presence of any Hazardous Substance in, on, under, from or about the Premises or the migration thereof from or to other property, in each case, prior to and/or during the Term;

(iii)     all claims or demands made or threatened by any third party against Tenant, or the Premises relating to any damage, contribution, cost recovery, compensation, loss or injury resulting from any Hazardous Substance, in each case, prior to and/or during the Term;

(iv)     any circumstances, occurrence or condition on, in, under, to or from the Premises, in each case, prior to and/or during the Term, that reasonably could (A) cause the Premises or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use under any Environmental Law, (B) give rise to a proceeding, inquiry, notice of violation, penalty or fine  by any local, state or federal governmental authority against Landlord or Tenant, or (C) give rise to a claim or demand by any third party against Landlord or Tenant for damages, contribution, cost recovery, compensation, loss or injury; and

(v)     any claims for the incurrence of expense by any governmental authority or others in connection with the assessment, containment, remediation or removal of any Hazardous Substance located on, under, from or about the Premises, in each case, prior to and/or during the Term.

Landlord shall give prompt written notice to Tenant of any of the facts, events or circumstances set forth in (i) and (v) above, including all claims under Environmental Laws commenced or threatened against Landlord with respect to the Premises during the Term.

**Section 18.4**   Landlord Rights. Landlord shall have the right, but not the obligation, to join and participate in, as a party if it so elects, any legal or administrative proceedings or actions initiated with respect to the Premises in connection with any Environmental Law. In the event that Tenant refuses or fails to defend any such legal proceedings or actions concerning matters for which Tenant has primary responsibility under this Article 18, Landlord shall have the right, but not the obligation, to defend proceedings or actions using counsel chosen by Landlord, and Tenant shall reimburse Landlord for its actual, customary and reasonable attorney's fees incurred in connection with such defense.

**Section 18.5**   Remedial Action.   Without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, Tenant shall not take any remedial action in response to the presence of any Hazardous Substance in, on, under, from or

about the Premises, nor enter into any settlement, consent or compromise which might, in Landlord's reasonable judgment, impair the value of Landlord's interest in the Premises under this Lease; *provided, however,* that Landlord's prior consent shall not be necessary if the presence of Hazardous Substance in, on, under, from or about the Premises either poses an immediate threat to the health, safety or welfare of any individual or is of such a nature that an immediate remedial response is necessary and it is not reasonably practical or possible to obtain Landlord's consent before taking such action. In such event Tenant shall notify Landlord as soon as practicable of any action so taken. Landlord agrees not to withhold its consent, where such consent is required hereunder, if a particular remedial action is ordered by a court or any agency of competent jurisdiction.

**Section 18.6**     Indemnity. (a)Tenant shall protect, indemnify and hold harmless each of the Indemnified Parties from and against any and all claim, loss, damage, cost, expense, liability, fines, penalties, charges, administrative and judicial proceedings and orders, judgments, remedial action requirements, enforcement actions of any kind (including, without limitation, attorneys' fees and costs) directly or indirectly arising out of or attributable to, in whole or in part, any of the following: (i) the breach of any of the covenants, representations and warranties of this Article 18 by Tenant, or (ii) the use, generation, manufacture, production, storage, release, threatened release, discharge or disposal of a Hazardous Substance in, on, under, from or about the Premises or (iii) any violation or liability under any Environmental Law arising from any other activity carried on or undertaken on the Premises prior to and/or during the Term by Landlord's predecessor in title and said predecessor's tenants, Tenant or any employees, agents, contractors or subcontractors of Tenant or any third persons occupying or present on the Premises prior to and/or during the Term, including, without limitation: (i) all consequential damages; (ii) the costs of any required or necessary response, repair, cleanup or detoxification of the Premises and the preparation and implementation of any closure, remedial or other required plans including, without limitation: (A) the costs of response, removal or remedial action incurred by any Governmental Authority, or response costs incurred by any other Person, or damages from injury to, destruction of, or loss of natural resources, including the costs of assessing such injury, destruction or loss, incurred pursuant to any Environmental Law; (B) the clean-up costs, fines, damages or penalties incurred pursuant to the provisions of Applicable Law; and (C) the cost and expenses of abatement, correction or clean-up, fines, damages, response costs or penalties which arise from the provisions of any other Applicable Law; and (iii) liability for damage, including damages assessed for the maintenance of the public or private nuisance, response costs or for the carrying on of an abnormally dangerous activity. The obligations arising under this Section 18.6 shall apply regardless of when the violation, liability, loss, harm, damage or injury is discovered, so long as it occurred prior to and/or during the Term.

As used in this Lease, the term "Petroleum" shall mean any petroleum, petroleum product, petroleum by-product, and any constituent derivative or by-product thereof, including methyl tertiary butyl ether (MTBE).

This indemnity is intended to be operable under 42 U.S.C. Section 9607(e)(1), and any successor section thereof and shall survive expiration or earlier termination of this Lease and any transfer of all or a portion of the Premises by Tenant.

(b)     The foregoing indemnity shall in no manner be construed to limit or adversely affect Landlord's rights under this Article 18 including, without limitation, Landlord's rights to approve any Remedial Work or the contractors and consulting engineers retained in connection therewith.

Section 18.7   Other Requirements. (a) In the event that any reporting, assessment, investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (the "**Remedial Work**") is required by any Applicable Law, or by any Governmental Authority or reasonably by other Person because of, or in connection with, any Hazardous Substance threatened to be released, released, discharged, or disposed of prior to and/or during the Term, Tenant shall within thirty (30) days after written demand for performance thereof by Landlord (or such shorter period of time as may be required under any Applicable Law or agreement), commence to perform, or cause to be commenced, and thereafter diligently prosecute to completion within such period of time as may be required under any Applicable Law or agreement (or as otherwise required by Landlord), all such Remedial Work at Tenant's sole expense in accordance with the requirements of any applicable Governmental Authority or Environmental Law. All such Remedial Work shall be completed in accordance with Applicable Law and performed by qualified contractors, and for an amount in excess of $50,000 shall be performed by one or more qualified contractors, approved in advance in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, and under the supervision of a consulting engineer approved in advance in writing by Landlord. The scope of work and schedule for any Remedial Work shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld, conditioned or delayed.  All reports, data, correspondence or any other submittals to a Governmental Authority in connection with any Remedial Work shall be provided in draft form to Landlord prior to submittal to the Governmental Authority, and shall be subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.  All costs and expenses of such Remedial Work shall be paid by Tenant, including, without limitation, the charges of such contractor(s) and/or the consulting engineer, and Landlord's actual, customary and reasonable attorneys' fees and costs incurred in connection with monitoring or review of such Remedial Work. In the event Tenant shall fail to timely commence, or cause to be commenced, or fail to complete such Remedial Work within the time required above, Landlord may, but shall not be required to, cause such Remedial Work to be performed and all reasonable costs and expenses thereof, or incurred in connection therewith shall become part of the Supplemental Rent payable hereunder.  The obligations under this Section 18.7 shall survive expiration or earlier termination of this Lease, and any transfer of all or any portion of the Premises by Tenant or Landlord.

(b)     O&M Plan.  Tenant shall maintain and comply with an Operation and Maintenance Plan reasonably satisfactory to Landlord for the Facilities containing asbestos containing materials.

Section 18.8   Other Landlord Rights. In the event that Landlord reasonably believes that there may be a violation or threatened violation by Tenant of any Environmental Law or a violation or threatened violation by Tenant of any covenant under this Article 18, Landlord is authorized, but not obligated, by itself, its agents, employees or workmen to enter at any

-67-

reasonable time following reasonable advance notice to Tenant, so long as such entry does not unduly interfere with Tenant's normal conduct of business, upon any part of the Premises for the purposes of inspecting the same for Hazardous Substances and Tenant's compliance with this Article 18, and such inspections may include, without limitation, soil borings; *provided, however*, if Landlord reasonably believes that the violation or threatened violation either poses an immediate threat to the health, safety or welfare of any individual or is of such a nature that an immediate response may be necessary, Landlord may enter the Premises at any time and Tenant's prior consent shall not be necessary. In such event, Landlord shall notify Tenant as soon as practicable of any action so taken. If such inspection reveals any violation of Environmental Law or violation by Tenant of any covenant under this Article 18 or the existence of any Hazardous Substance released, discharged, or disposed of during the Term (other than an immaterial technical violation or liability), Tenant agrees to pay to Landlord, within ten (10) days after Landlord's written demand, all actual, customary and reasonable expenses, costs or other amounts incurred by Landlord in performing any inspection for the purposes set forth in this Section 18.8.

**Section 18.9**   Costs. All costs and expenses incurred by Landlord under this Article 18 shall be immediately due and payable as Supplementary Rent within ten (10) days after written demand and shall bear interest at the Default Rate from the date of notice of such payment by Landlord and the expiration of any grace period provided herein until repaid.

**Section 18.10** Environmental Law Defined. "**Environmental Law**" and "**Environmental Laws**" shall mean respectively any one or more Applicable Law pertaining to health, industrial hygiene, hazardous waste or the environmental conditions in, on, under, from or about the Premises or any part thereof, including, without limitation, the laws listed in the definition of Hazardous Substances below, and the rules and regulations promulgated thereunder; in each case as the same may have been and hereafter may be supplemented, modified, amended, restated or replaced from time to time.

**Section 18.11** Hazardous Substance Defined. "**Hazardous Substance**" and "**Hazardous Substances**" shall mean, respectively, any one or more element, compound, chemical mixture, contaminant, pollutant, material, waste or other substance (a) which poses a threat to the public health, safety or welfare or to the environment if released, or (b) which is defined, determined or identified as a "hazardous substance", "hazardous waste" or "hazardous material", or is otherwise regulated under any Applicable Law, including, without limitation, the following: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. § 9601 et seq.); (ii) the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et. seq.); (iii) the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et. seq.); (vi) the Toxic Substances Control Act (15 U.S.C. § 2601, et seq.); (v) the Clean Air Act (33 U.S.C. § 1251 et seq..); (vi) the Clean Air Act (42 U.S.C. § 7401, et seq..); (vii) the Safe Drinking Water Act (21 U.S.C. § 349; 42 (U.S.C. § 201 and § 300f et. seq.); (viii) the National Environmental Policy Act of 1969 (42 U.S.C. § 3421); (ix) the Superfund Amendment and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C.); and (x) Title III of the Superfund Amendment and Reauthorization Act (40 U.S.C. § 1101 et seq.).

**Section 18.12** Responsibility for Pre-Commencement Date Conditions. Landlord neither makes nor provides any representation, warranty or indemnity with regard to the presence or existence of Hazardous Substances located or present in, on, under, about or emanating from the Premises, or the compliance of the Premises with Environmental Laws, or other environmental condition of the Premises, on or prior to the Commencement Date. Tenant shall be responsible for the costs and expenses of Remedial Work in connection with any Hazardous Substance released, discharged, or disposed of in, on, under, from or about the Premises prior to and/or during the Term. Landlord and Tenant shall cooperate in the initiation of claims and the enforcement of remedies against third parties which may be responsible for environmental conditions at the Premises.

**Section 18.13** Medical Waste and Drug Compliance. Tenant shall be responsible for safe and secure storage, transport and off-site disposal of medical waste materials, including without limitation, biological or infectious waste and radioactive materials, shall ensure the compliance with all Applicable Laws pertaining to such storage, transport and disposal, and shall cause the promulgation and compliance by the Facilities and all personnel with protocols for storage and disposal of such waste and compliance with Requirements relating thereto. Tenant shall be responsible for the safe and secure storage, dispensation and disposal of pharmaceuticals, drugs and controlled substances at the Facilities and shall cause the promulgation and compliance by the Facilities and all personnel with protocols for storage, dispensation and disposal of such pharmaceuticals, drugs and controlled substances and compliance with Requirements relating thereto.

**Section 18.14** Survival. All representations, warranties, covenants and indemnities of Tenant in this Article 18 shall continue to be binding upon Tenant, and its successors and assigns, after the expiration or earlier termination of this Lease.

**Section 18.15** Existing Conditions. Tenant acknowledges and agrees that (i) it has reviewed and is aware of all environmental conditions at, in, on, under, from or potentially affecting the Premises (the "**Environmental Conditions**"), referenced in the documents and reports listed on Schedule G attached hereto (the "**Environmental Reports**"), (ii) it takes possession of the premises with full knowledge of the Environmental Conditions, and (iii) the "As Is" condition referenced in Section 20.16 shall include the Environmental Conditions. Tenant acknowledges and agrees that it hereby waives any claim or remedies against Landlord arising out of or in connection with any of the Environmental Conditions, arising in law or equity, whether by statute, regulation, common law or by agreement other than as specifically provided by this Lease, including but without limitation, for contribution, cost recovery, interference with quiet enjoyment of the Premises, reduction or abatement of Rent, or other damages. The provisions contained in this Section 18.15 shall survive expiration or earlier termination of this Lease, and any transfer of all or a portion of the premises by Tenant or Landlord.

### ARTICLE 19
### FINANCIAL AND REGULATORY REPORTING COVENANTS

**Section 19.1** Reporting, Requirements. Tenant will furnish to Landlord:

-69-

(a)     Audited Annual Financial Statements.  As soon as available, and in any event within ninety (90) days after the end of each applicable fiscal year, beginning with the fiscal year ending December 31 of the calendar year in which this Lease is executed, (i) copies of the annual audited reports for Tenant containing balance sheets and statements of income, retained earnings, and cash flow as at the end of such fiscal year and for the fiscal year then ended, setting forth in comparative form the figures for the preceding fiscal year, all in reasonable detail and audited and certified on an unqualified basis by a "big four" accounting firm, or any other an independent accounting firm which is reasonably acceptable to Landlord (it being agreed that Gianoli & Company, Inc. initially is approved by Landlord as Tenant's accounting firm, subject to Landlord's right, in its reasonable determination, to subsequently rescind such approval and require an alternate firm), to the effect that such report has been prepared in accordance with GAAP; (ii) copies of the annual personal financial statement for Guarantor, in reasonable detail and containing the review report by an independent accounting firm which is reasonably acceptable to Landlord; and (iii) individual operating statements for each Facility at the Premises. The foregoing shall be complete in all respects and shall include all footnotes, if any.

(b)     Unaudited Quarterly Financial Statements.  As soon as available, and in any event within forty-five (45) days after the end of each fiscal quarter, (i) copies of unaudited financial reports for Tenant as of the end of such period and for the portion of the fiscal year then ended containing balance sheets and statements of income, retained earnings, and cash flow, setting forth in comparative form the figures for the corresponding period of the preceding fiscal year, in reasonable detail certified by the chief executive officer, chief financial officer or chief accounting officer of Tenant to have been prepared in accordance with GAAP and to fairly present the financial condition and results of operations of Tenant at the date and for the periods indicated therein, subject to year-end audit adjustments, (ii) copies of unaudited financial reports for Guarantor as of the end of such period and for the portion of the fiscal year then ended, setting forth in comparative form the figures for the corresponding period of the preceding fiscal year, in reasonable detail certified by the Guarantor to fairly present the financial condition of the Guarantor at the date and for the periods indicated therein, (iii) individual operating statements and detailed trial balance in Excel format for each Facility at the Premises, also subject to year-end adjustments, and (iii) a report of monthly Rent Coverage Ratio for each month in the quarter just ended.  The foregoing shall be complete in all respects, shall be created using software (e.g., Microsoft Excel) reasonably acceptable to Landlord and shall include all footnotes, if any.

(c)     Unaudited Monthly Financial Statement.  As soon as available, and in any event within thirty (30) days after the end of each month of the Term, (i) copies of unaudited financial reports for Tenant as of the end of such period and for the portion of the fiscal year then ended containing balance sheets and statements of income, retained earnings, and cash flow, setting forth in comparative form the figures for the corresponding period of the preceding fiscal year, in reasonable detail certified by the chief executive officer, chief financial officer or chief accounting officer of Tenant, respectively to have been prepared in accordance with GAAP and to fairly present the financial condition and results of operations of Tenant at the date and for the periods indicated therein, subject to year-end audit adjustments and (ii) individual operating statements and detailed trial balance in Excel format for each Facility at the Premises, also

-70-

subject to year-end adjustments.  The foregoing shall be complete in all respects, shall be created using software (e.g., Microsoft Excel) reasonably acceptable to Landlord and shall include all footnotes, if any.

(d)     <u>Notice of Litigation</u>.  Promptly after receipt by Tenant of written notice of the commencement thereof, notice of all actions, suits, and proceedings before any Governmental Authority or arbitrator materially adversely affecting Tenant's ability to perform its obligations under this Lease.

(e)     <u>Notice of Regulatory Actions</u>.  Promptly after receipt by Tenant of the written notice of commencement thereof, and in any event within five (5) Business Days, notice of (i) any audit, investigation, claim (excluding immaterial adjustments, complaints, and corrective activity in the ordinary course of business) (including without limitation, Recoupment Claims), proceeding, settlement, judgment, consent order or agreement, certificate of compliance agreement or corporate integrity agreement by or imposed by any Health Care Regulatory Agency materially adversely affecting any Facility, (ii) any actual or threatened suspension, debarment or disqualification of Tenant, or any of its Affiliates from being a health care provider, government contractor, holder of any Health Care License or recipient of reimbursement from any Third Party Payor, (iii) any actual or threatened suspension, termination, or revocation of any Health Care License of Tenant, or any of its Affiliates or (iv) any self or voluntary disclosure of any material overpayment to a Third Party Payor by Tenant, or any of its respective Affiliates.

(f)     <u>Notice of Settlement Negotiations</u>.  Tenant shall provide Landlord with reasonable notice of any and all settlement discussions and/or negotiations materially adversely affecting Tenant (excluding immaterial adjustments, complaints, and corrective activity in the ordinary course of business) between representatives of Tenant and any Governmental Authority, including without limitation negotiations with respect to any Claim (including without limitation, Recoupment Claims), settlement agreement, consent order or agreement, certificate of compliance agreement or corporate integrity agreement between Tenant and its Affiliates and any Governmental Authority (**"Settlement Discussions"**).  In connection with Settlement Discussions, (i) Tenant shall timely provide Landlord with copies of any and all documents that Tenant intends to submit, or that Tenant receives, in connection with any Settlement Discussions, and (ii) Tenant shall advise Landlord as to the status of the Settlement Discussions.

(g)     [Intentionally omitted].

(h)     No receipts of any such notice under Subsection (d), (e) and (f) shall impose any obligation on Landlord to take any action or to enforce its rights hereunder or otherwise remedy the circumstances leading to such notice.

(i)     Tenant will keep and maintain or will cause to be kept and maintained on a fiscal year basis, in accordance with GAAP, proper and accurate books, records and accounts reflecting all of the financial affairs of Tenant and all items of income and expense in connection with the operation on an individual basis of the Premises. Landlord or Landlord's designee shall have the right from time to time (but not more than once in any calendar quarter unless Tenant

-71-

shall be in Default under this Lease), at all times during normal business hours upon reasonable advance notice to examine such books, records and accounts at the office of Tenant or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Landlord shall desire.

        (j)     Tenant will furnish Landlord within thirty (30) days after the end of each calendar month a true, complete and correct Occupancy Report for the Facility.

        (k)     Tenant shall furnish Landlord, within five (5) days of the receipt by Tenant, any and all notices (regardless of form) or charges issued relating to non-compliance from any Health Care Regulatory Agency and/or any Third Party Payor that Tenant's license, Medicare or Medicaid certification, as applicable, or accreditation by any Health Care Regulatory Agency or Third Party Payor is being, or could be, revoked, suspended or limited, that action is pending, being considered or being, or could be, taken to downgrade, revoke, suspend or limit Tenant's license, certification or accreditation or to fine, sanction, penalize or impose remedies upon Tenant, or that action is pending, being considered, or being, or could be, taken, to discontinue, suspend, deny, decrease or recoup any payments or reimbursements due, made or coming due to Tenant or related to the operation of the Facilities.

        (l)     Tenant shall file all required Third Party Payor cost reports on or prior to the date such reports are due and shall furnish Landlord, within thirty (30) days of the date of filing, a complete and accurate copy of the annual Medicare or Medicaid cost report and other annual Third Party Payor cost reports for Tenant, and promptly furnish Landlord any amendments filed with respect to such reports and all notices, responses, audit reports or inquiries with aspect to such reports.

        (m)     Tenant shall furnish Landlord, within thirty (30) days of the receipt by, all annual reimbursement rate sheets from all Third Party Payors, and promptly after receipt thereof by Tenant, any new, revised or amended reimbursement rate sheets and other annual reimbursement rate sheets from all Third Party Payors for Tenant which may be issued subsequent to the annual reimbursement rate sheets.

        (n)     With respect to any deficiency cited, Tenant shall furnish Landlord, within ten (10) days of receipt, a copy of any Third Party Payor or other licensing or accreditation or ranking agency or entity survey, report, warning letter, or notice, and any statement of deficiencies, and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Landlord a copy of the plan of correction generated from such survey, report, warning letter, or notice for Tenant and by subsequent correspondence related thereto, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure or of full participation in any Third Party Payor program by the date required for cure by such agency or entity (plus extensions granted by such agency or entity).

        (o)     Any reports, statements or other information required to be delivered under this Lease shall be delivered (i) in paper form, (ii) in electronic format as directed by Landlord, and (iii) if requested by Landlord and within the capabilities of Tenant's data systems

12277199v9

without change or modification thereto, in electronic form. Tenant agrees that Mortgagee may disclose information regarding the Facilities as provided to Mortgagee pursuant to this Section in connection with the securitization of the Mortgage Loan to such parties requesting such information in connection with such securitization.

(p)     Tenant shall cause all residency agreements of the Facilities to substantially comply with any applicable Health Care Requirements.

(q)     If Tenant fails to deliver to Landlord any report, statement or information required under this Section within five (5) days of the date due hereunder, and such failure continues for five (5) Business Days after Tenant's receipt of written notice from Landlord, Tenant shall pay to Landlord a late fee of (a) $5,000 per failure for each such late delivery, plus an additional late fee equal to $250 per day per report, statement or information per failure for each day that such failure continues beyond the initial ten days with respect to those reports listed in Sections 19.1(a)-(c); and (b) $2,000 per failure for each such late delivery, plus an additional late fee equal to $150 per day for each day that such failure continues beyond the initial ten days with respect to those reports listed in Sections 19.1(d)-(n). Any failure by Tenant to pay such late fee after delivery of such report, statement or information giving rise to the late fee shall be deemed to be waived by Landlord unless demand for payment is made by Landlord within ninety (90) days after the date of such delivery.

(r)     Landlord shall keep and maintain all reports, statements and information received from Tenant under this Section 19 in confidence and not disclose to any other parties, except as permitted under Section 19.4 hereof.

**Section 19.2**   Compliance with Anti-Terrorism Laws. Tenant represents and warrants to Landlord that it is not, and, after making a commercially reasonable inquiry, that no person who directly owns a controlling interest in or otherwise directly controls Tenant is, (i) listed on the Specially Designated Nationals and Blocked persons List (the "SDN List") maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or on any other similar list ("Other Lists" and, collectively with the SDN List, the "Lists") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation (collectively, "OFAC Laws and Regulations"); or (ii) a person (a "Designated Person") designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or similarly designated under any related enabling legislation or any other similar Executive Orders (collectively, the "Executive Orders"). The OFAC Laws and Regulations and the Executive Orders are collectively referred to in this Agreement as the "Anti-Terrorism Laws". This Section shall not apply to any person to the extent that such person's interest in the Tenant is through a U.S. Publicly-Traded Entity. As used in this Lease, "U.S. Publicly-Traded Entity" means a person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a person.

**Section 19.3**   REIT Audit. Tenant acknowledges that Landlord may be, or may be affiliated with, a publicly registered company ("Registered Company"). Tenant acknowledges that it has been advised that if the Landlord is or becomes, or is or becomes affiliated with a

-73-

Registered Company, that the Landlord or said affiliate may be required to make certain filings with the Securities and Exchange Commission (the "SEC Filings") that relate to the three (3) fiscal years prior to the fiscal year in which this Lease is dated (the "Audited Years") through the first anniversary of the date of this Lease (the "stub period") for the Premises (calculated on a per Property basis). To assist Landlord and its affiliate in preparing the SEC Filings, Tenant covenants and agrees that it shall cause Guarantor to provide Landlord with the following: (i) copies of bank statements for the Audited Years and stub period; (ii) intentionally deleted; (iii) operating statements for the Audited Years and stub period; (iv) copies of the general ledger for the Audited Years and stub period; (v) cash receipts schedule for each month in the Audited Years and stub period; (vi) copies of invoices for expenses and capital improvements in the Audited Years and stub period; (vii) accounts payable ledger and accrued expense reconciliations; (viii) check register for the Audited Years and stub period; (ix) intentionally deleted; (x) copies of all insurance documentation for the Audited Years and stub period; (xi) copies of Accounts Receivable aging as of the end of the Audited Years and stub period along with an explanation for all accounts over 30 days past due as of the end of the Audited Years and stub period; (xii) a signed representation letter in the form attached hereto as Schedule "19.3-A", and (xiii) to the extent necessary, the information set forth in the letter set forth in the form attached hereto as Schedule "19.3-B". The foregoing shall be subject to compliance with all Applicable Laws and will be performed at Tenant's cost to the extent prepared in the ordinary course of business, and otherwise at Landlord's cost.

**Section 19.4**   Publication.

(a)    Landlord shall be permitted to rely upon the accuracy and completeness of the items furnished pursuant to this Article and to disclose and publish the same as required by Applicable Laws. Without limiting the generality of the foregoing, Tenant acknowledges that Landlord is a subsidiary of a Real Estate Investment Trust and that, as such, it is subject to certain filing and reporting requirements in accordance with federal laws and regulations, including but not limited to, regulations promulgated by the Securities and Exchange Commission. Accordingly, and notwithstanding any provision of this Lease or the provisions of any other existing agreement between the parties hereto to the contrary, Landlord may publicly file, disclose, report or publish any and all information related to this Lease (including the information provided to Landlord pursuant to this Article) that may be reasonably interpreted as being required by federal or state law or regulation after Closing.

(b)    Except as provided below, and except for disclosures of information permitted by Section 19.4(a), Landlord shall use commercially reasonable efforts to keep confidential the reports, statements and information provided to Landlord pursuant to this Article. Notwithstanding the foregoing, Landlord may disclose such reports, statements and information (i) to its existing or potential lenders or purchasers of the Premises, (ii) to Landlord's and to said lenders' and purchasers' affiliates, directors, officers, employees, and third party advisors (including, without limitation, financial advisors, legal counsel and accountants), and (iii) as may be required by court order.

**ARTICLE 20**
**LICENSED FACILITY OPERATION; ACCESS TO BOOKS**
**AND RECORDS; MANAGEMENT**

**Section 20.1**  Compliance.  The parties agree that if this Lease is determined to be governed by §1861(v)(1)(i) of the Social Security Act (§952 of the Omnibus Reconciliation Act of 1980) and the regulations promulgated in implementation thereof at 42 C.F.R. Part 420, the parties each agree to make available to the Comptroller General of the United States, the Department of Health and Human Services ("**HHS**") and their duly authorized representatives, the books, documents and records of either of the parties and such other information as may be required by the Comptroller General or Secretary of HHS to verify the nature and extent of the costs of services provided by either of the parties.  If either of the parties carry out the duties of this Lease through a subcontract worth $10,000 or more over a twelve (12) month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General and their representatives to the related organization's books and records.

**Section 20.2**  Reserved.

**Section 20.3**  Facility Operations.  Tenant shall operate the Facilities consistent with its current operation. Landlord is merely the lessor of the real property which is the subject of this Lease and shall have no liability in connection with the operation of the Facilities or the provision of health care services from or at the Facilities.  Tenant shall responsible for (i) as the operator, licensee and provider of the Facilities, providing all health care services from or at the Facilities, independent and separate from Landlord; (ii) securing and maintaining in full force and effect all Health Care Licenses relating to such Facilities and services; (iii) compliance with all Requirements including without limitation all Requirements of Governmental Authorities and under Health Care Licenses, (iv) quality control of such Facilities and services, and (v) for all computer systems, software, record keeping, data bases and privacy requirements relating to the Facilities, all of which shall be provided at Tenant's own expense.

**Section 20.4**  Inspections and Audits. For purposes of satisfying the requirements of any Mortgage, or any refinancing, sale or appraisal process, Landlord shall have the right (but not the obligation) to conduct such inspections, audits, visitations and quality control reviews, of the Facilities and services provided by Tenant from or at the Facility as Landlord may desire, and for such purposes Tenant shall provide to Landlord and its representatives access to Tenant's books and records relating to such Facility and services during normal business hours upon reasonable, written notice.  No such inspection, audit, visitation or quality control review conducted by Landlord or its representatives or any report resulting therefrom shall modify or reduce or increase in any way Tenant's obligations under this Lease or as the parent of the exclusive operator, licensee and provider of the Facility and health care services from or at the Facility, as applicable.

**Section 20.5**  Relationship of Parties.  Landlord and Tenant shall be independent contractors and nothing in this Lease shall be construed as creating a partnership, joint venture,

-75-

employment, agency, license or franchise relationship. Tenant shall not have any authority to create any obligation binding upon Landlord.

**Section 20.6**   <u>Employees</u>.   All employees, contractors, consultants, professionals and providers relating to the Facilities and health care services provided from or at the Facilities shall be deemed to be employees or contractors of Tenant and not of Landlord.

**Section 20.7**   <u>License Requirements</u>.   Tenant shall provide, at its own expense all deposits, bonds, insurance, letters of credit, working capital, cash collateral, reserves, patient trust fund accounts and other financial requirements of Health Care Licenses to operate and provide health care services at the Facilities.

**Section 20.8**   <u>Recoupment Claims</u>. Tenant shall assume and shall have the exclusive responsibility for all Claims of overpayment or recoupment made by Third Party Payors, including without limitation, Medicaid and Medicare, relating to the provision of health care services from or at the Facilities, including both (i) those attributable to periods on or prior to the date of this Lease and (ii) those attributable to periods during the Term of this Lease (collectively, "**Recoupment Claims**").   Tenant shall continue to have such exclusive, responsibility for Recoupment Claims regardless of whether Tenant assumes and utilizes the Medicare/Medicaid provider numbers of the Facilities in existence prior to the date of this Lease or obtains new Medicare/Medicaid provider numbers for the Facilities.

**Section 20.9**   <u>Operations</u>.   Tenant shall cause operations at the Facilities to be conducted at all times, at a minimum, in a manner consistent with or better than Governmental Authority requirements, and, in connection therewith, Tenant shall:

(a)   maintain the standard of care for the residents or patients of the Facilities at all times at a level necessary to ensure a level of quality of care for the residents or patients of the Facilities in material compliance with Health Care Law;

(b)   maintain a standard of care in the storage, use, transportation and disposal of all medical equipment, medical supplies, medical products or gases, and medical waste, of any kind and in any form, that is in material compliance with all Applicable Laws;

(c)   operate the Facilities in a prudent manner in material compliance with Applicable Laws and cause all Health Care Licenses, reimbursement or care contracts, and any other agreements necessary for the certification, licensure, accreditation or operation of the Facilities as may be necessary for participation in each of the Third Party Payor reimbursement programs to remain in effect without reduction in the number of licensed beds or beds authorized for use in each of the Third Party Payor reimbursement programs;

(d)   not take or permit action which will result in a reduction, suspension, denial or elimination of reimbursement for services from, or material recoupment by, any Third Party Payor that would materially adversely affect Tenant;

-76-

(e)     not take any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor, or scope of the Health Care Licenses or applicable Third Party Payor reimbursement program participation;

(f)     not take any action that will (i) adversely affect Tenant's right to receive any Third Party Payor payments or reimbursements; (ii) materially reduce the Third Party Payor payments or reimbursements, or (iii) adversely affect the Health Care Licenses; and

(g)     maintain all deposits, including deposits relating to residents or residency agreements. If such deposits are in cash, Tenant shall deposit and hold such deposits in accordance with Applicable Law. Tenant shall cause any bond or other instrument which Tenant is permitted to hold in lieu of cash deposits under any Applicable Law or Governmental Authority requirements to be maintained in full force and effect and to comply, in all material respects, with any Applicable Law or Governmental Authority requirements. Tenant shall, upon request, provide Landlord with evidence reasonably satisfactory to Landlord of Tenant's material compliance with the forgoing.

**Section 20.10** <u>No Transfer of Health Care Licenses/Payor Agreements</u>. Tenant shall not assign, transfer, or pledge as collateral security any of its interest in any Health Care Licenses or Third Party Payor payment or reimbursement contracts (including rights to payment thereunder) pertaining to them or the Facilities, or assign, transfer, or remove or permit any other Person to assign, transfer, or remove any records pertaining to the Facilities, including, without limitation, patient records, medical and clinical records (except for removal of such patient records as directed by the patients owning such records or in accordance with Federal or State privacy laws, including HIPAA and the HITECH Act and the regulations promulgated thereunder, as amended), without Landlord's prior written consent, which consent may be granted or refused in Landlord's sole discretion; except that (i) the foregoing shall not apply to an assignment or pledge as collateral to the Working Capital Lender as a part of the Landlord Lien Collateral, subject to the terms of the Inter-Creditor Agreement and (ii) Tenant may, to the extent permitted by Applicable Law, store such records in a manner consistent with Tenant's standard policies and procedures. Tenant shall hold such Health Care Licenses free from restrictions or known conflicts that would materially impair the use or operation of the Facilities as intended, and are not provisional, probationary or restrictive in any way.

**Section 20.11** <u>Other Transactions</u>. Tenant shall not enter into any transaction other than in the ordinary course of its business and on fair and reasonable terms in material compliance with Applicable Laws and Governmental Authority requirements and, no less favorable to Tenant than those it would obtain in a comparable arms-length transaction with a person or entity not an Affiliate.

**Section 20.12** <u>Hill-Burton</u>. Tenant shall not participate in any federal, state or local program whereby any Governmental Authority or other Person may have the right to recover funds with respect to the Facility by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, <u>et seq</u>.).

**Section 20.13** <u>Compliance Evidence</u>. Tenant shall deliver to Landlord evidence of material compliance with any applicable post-transfer license requirements of Governmental Authorities.

**Section 20.14** *Intentionally omitted*.

**Section 20.15** <u>Tenant Representations and Warranties</u>. Tenant hereby represents, warrants and certifies to Landlord and Landlord's designee, as of the date hereof, as follows:

(a)     Tenant is the tenant under this Lease.

(b)     Tenant has accepted and is occupying or causing the occupancy of the entire Premises. All improvements to the Premises required by this Lease to be made by Landlord have been completed by Landlord in accordance with this Lease.

(c)     There are no defenses to or offsets against the enforcement of this Lease or any provision thereof against Tenant.

(d)     This Lease is in full force and effect without Default thereunder by Tenant or, to the best knowledge of Tenant, Landlord.

(e)     On the date of this Lease, there are no actions, whether voluntary or otherwise, pending against Tenant under the Bankruptcy Code.

(f)     All Health Care Licenses, required, necessary or desirable for the legal use, occupancy and operation of each of the Facilities has been obtained and are in full force and effect, including, without limitation, approved provider status in any Third Party Payor payment or reimbursement program license, or approval issued by the applicable Governmental Authority, as applicable for the requisite number of beds at such Facilities. Tenant will own and/or possess, and hold free from restrictions or conflicts with the rights of others all such Health Care Licenses, and to operate the Facilities in a manner such that such Health Care Licenses shall remain in force and effect.

(g)     The Health Care Licenses, may not be and have not been transferred to any location other than the respective Facility, have not been pledged as collateral security, and are held free from restrictions or known conflicts that would materially impair the use or operation of any Facility as intended, and are not provisional, probationary or restricted in any way.

(h)     Tenant has not taken or nor will it take any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor, or scope of the Health Care License or applicable Third Party Payor payment or reimbursement program participation.

(i)     Neither this Lease nor Tenant's performance hereunder will (i) adversely affect Tenant's right to receive Third Party Payor payments or reimbursements, (ii) materially

-78-

reduce Third-Party Payor payments or reimbursements; or (iii) adversely affect the Health Care Licenses.

(j)      Each Facility is duly licensed as required under Applicable Laws of the State in which such Facility is located. The licensed bed capacity of each Facility is as set forth on in the column named "*Licensed Beds*" Schedule 1. Neither Tenant nor any Facility has applied to reduce the number of licensed or certified beds of such Facility, to move or transfer the right to any and all of the licensed or certified beds of such Facility to any other location, or to amend or otherwise change such Facility's authorized bed capacity and/or the number of beds approved by the applicable Governmental Authority in the State where such Facility is located, and there are no proceedings or actions pending or, to Tenant's actual knowledge, contemplated to reduce the number of licensed or certified beds of such Facility.

(k)      To Tenant's actual knowledge, Tenant and the operation of the Facilities are in material compliance with all Applicable Laws, Health Care Licenses and requirements of Health Care Regulatory Agencies and other Governmental Authorities having jurisdiction over the operation of such Facilities, including, (i) staffing requirements, (ii) health and fire safety codes and standards, including quality and safety standards, (iii) accepted professional standards and principles that apply to professionals providing services in such Facility; (iv) federal, state or local laws, rules, regulations or published interpretations or policies relating to the prevention of fraud and abuse, (v) insurance, reimbursement and cost reporting requirements, (vi) government payment program requirements and disclosure of ownership and related information requirements; (vii) requirements of the applicable state department of health or equivalent and all other federal, state, or local governmental authorities, including without limitation those relating to such Facility's physical structure and environment, licensing, quality and adequacy of medical care, distribution or pharmaceuticals, rate setting, equipment, personnel, operating policies, additions to facilities and services and fee splitting, and any other applicable laws, regulations or agreements for reimbursement for the type of care or services provided with respect to such Facilities. Tenant will and will cause the operation of each Facility to be in material compliance with the foregoing throughout the Term of this Lease.

(l)      Tenant is in compliance with the conditions of participation in the Medicare and Medicaid Programs with respect to the Facility that currently participates in such programs, including the Medicare and Medicaid Patient and Program Protection Act of 1987, and has a current provider agreement under Title XVIII and/or XIX of the Social Security Act, which is in full force and effect. The Facilities did not have any deficiencies at level G or above on its most recent survey (standard or complaint), nor has the prior operator of the Facilities been cited with any substandard quality of care deficiencies (as that term is defined in Part 488 of 42 C.F.R) for the past two consecutive surveys. Neither the Facilities nor any other health care facility owned or operated by Tenant or Guarantor or, except has been disclosed in writing to Landlord, their respective Affiliates has been the subject of a "double G" or "immediate jeopardy" determination for the last three years.

(m)      No Facility has received a statement of charges or deficiencies and no penalty enforcement actions have been undertaken against any Facility, Tenant or any other operator, manager, officer or director by any governmental agency during the last three calendar

-79-

years that now has or hereafter will have a Material Adverse Effect on Tenant, and there have been no violations over the last three calendar years that resulted in the Facilities' operator or any of the Facilities' decertification for or termination of participation in any other Third Party Payor program.

(n)     To Tenant's actual knowledge, Tenant is not a target of, participant in, or subject to any action, proceeding, suit, audit, investigation or sanction by any Governmental Authority or any administrative or investigative body or entity or any other third party or any patient or resident (including, without limitation, whistleblower suits, or suits brought pursuant to federal or state False Claims Acts, and Medicaid/Medicare/State fraud/abuse laws) which may result, directly or indirectly, or with the passage of time, in the imposition of a fine, penalty, alternative, interim or final sanction, a lower rate certification, recoupment, recovery, suspension or discontinuance of all or part of any reimbursement from any Governmental Authority or Third Party Payor, a lower reimbursement rate for services rendered to eligible patients, or any other civil or criminal remedy, or which could reasonably be expected to have a Material Adverse Effect on Tenant or the operation of the Facilities, including such Facilities' ability to accept or retain residents, or which could result in the appointment of a receiver or manager, or in the modification, limitation, annulment, revocation, transfer, surrender, suspension or other impairment of a Health Care License, or affect Tenant or the Facilities' current participation in any Third Party Payor program, as applicable or any successor programs thereto, at current rate certification, nor has Tenant any such action, proceedings suit, investigation proceeding or audit been threatened in writing.

(o)     There is no pending or, to Tenant's actual knowledge, threatened, revocation, suspension, termination, probation, restriction, limitation, or non-renewal affecting Tenant or the Facilities or provider agreement with any Third Party Payor.

(p)     There are no agreements with residents of any Facility, or with any other persons or organizations, which deviate in any material adverse respect from, or which conflict with, any Applicable Laws.  Tenant has in place policies and procedures to maintain all patients records at the Facilities, including patient account records, in accordance with Applicable Laws and professional standards.

(q)     Other than the Medicare and Medicaid programs, Tenant is not a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity that may have the right to recover funds with respect to the Facilities by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).  Tenant has received no notice, and is not aware of any violation of applicable antitrust laws.

(r)     To the Tenant's actual knowledge, all Third Party Payor insurance cost reports and financial reports submitted by or on behalf of Tenant and the Facilities are and will continue to be materially accurate and complete and have not been and will not be misleading in any material respects.  There are no current, pending or outstanding, Third Party Payor programs reimbursement audits or appeals pending at any of the Facilities, there are no cost report years

-80-

that are subject to audits, no cost reports remain "open" or unsettled, and there are no current or pending Third Party Payor programs recoupment efforts at the Facilities.

(s)     Except as otherwise permitted in any receivable financing arrangement of Tenant, (i) Tenant's Third Party Payor Accounts Receivable are free and clear of Liens, (ii) Tenant has not pledged any of its receivables as collateral security for a loan or other indebtedness and (iii) Tenant has no material indebtedness other than the obligation to guaranty the repayment of the Working Capital Loan and unsecured amounts owed to trade vendors of the Facilities in the normal course of business.

(t)     Tenant is not a party to any collective bargaining agreement or other labor contract applicable to persons employed by it at the Facilities and there are no threatened or pending labor disputes at the Facilities.

(u)     Tenant has instituted, and the Facilities are operated in material compliance with a compliance plan which follows applicable guidelines established by Health Care Regulatory Agencies.

(v)     Tenant is in material compliance with the Healthcare Insurance Portability and Accountability Act of 1996, and the regulations promulgated thereunder.

(w)     The Facilities and the use thereof complies in all material respects with all Applicable Laws including, without limitation, local, state, and federal building codes, fire codes, health care, and other similar regulatory requirements and no waivers of such physical plant standards exist at any of the Facilities which would have a Material Adverse Effect on Tenant.

(x)     Any existing agreement relating to the management or operation of the Facilities s in full force and effect, is not in default by any party and is in compliance with all Health Care Laws.  If it is subsequently determined by the appropriate Health Care Regulatory Agency that one or more of said management agreements is not in compliance with all Health Care Laws, Tenant shall modify the non-complying management agreements to cause same to comply with all Health Care Laws.

(y)     Neither Tenant nor the Facilities has or will, other than in the normal course of business, change the terms of any of the Third Party Payor programs or its normal billing payment or reimbursement policies and related procedures, including the amount and timing of finance charges, fees and write-offs.

(z)     Tenant will cause to be delivered to Landlord, with a copy to any other individual or entity as Landlord may direct, a true, correct and complete Occupancy Report for each Facility.

**Section 20.16** Leasing "As-Is".  The parties acknowledge that Tenant has conducted all of its own due diligence, examination and inspection regarding the Facilities and the business of providing health care services from and at the Facilities and is entirely familiar with all business,

-81-

financial, liability, physical premises, operational and regulatory aspects, and every other matter or thing affecting or related to the health care business operated at the Facilities, and that Tenant is leasing the same in its "As Is" condition. Landlord has not made and does not make any representations or warranties whatsoever with respect to the health care business conducted at and from the Facilities or otherwise with respect to this Lease, express or implied, and Tenant is not relying on Landlord or its Affiliates in connection with any decision to enter into this Lease. Tenant assumes all risks resulting from any defects (patent or latent) in the Premises or from any failure of the same to comply with any Requirement or Applicable Law with respect to the Premises or the uses or purposes for which the same may be occupied.

**Section 20.17** Management Agreements.

(a) Throughout the Term, Tenant shall not enter into any Management Agreement without the prior written approval of Landlord, in each instance, which approval may not be unreasonably withheld, conditioned or delayed. Landlord hereby approves the form of the Management Agreement attached hereto as **Schedule H** as the form of Management Agreement that Tenant may utilize as of the Effective Date Tenant shall not, without the prior written consent of Landlord, which consent Landlord may not unreasonably withhold, condition or delay, agree to: (i) any change in the Manager under any Management Agreement; (ii) any material change in any Management Agreement; (iii) the termination of any Management Agreement; or (iv) the assignment of any Management Agreement by any Manager. Each Management Agreement shall provide that Landlord shall receive notice of any defaults thereunder and, at Landlord's option, an opportunity to cure any such defaults. If Landlord shall cure any of Tenant's defaults under any Management Agreement, the cost of any such cure shall be payable upon demand to Landlord by Tenant as Supplementary Rent. Any manager shall be reputable and have experience in managing facilities similar in size, scope, use and value as the Facilities or any one of them for which they are assigned management responsibilities.

(b) All management fees, payments in connection with any extension of credit and fees for services provided in connection with the operation of the Facilities, and all other payments and fees, payable by Tenant to any Manager, including a Manager that is an Affiliate of Tenant, shall be subordinated to the obligations of Tenant under this Lease. Tenant shall deliver to Landlord any reasonable instrument requested by Landlord and reasonably acceptable to Tenant to implement the intent of the foregoing provision.

**ARTICLE 21**
**MISCELLANEOUS PROVISIONS**

**Section 21.1** **Waiver of Jury Trial.** **IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM OF INJURY OR DAMAGE EXCLUDING ANY CLAIM FOR PERSONAL INJURY OR PROPERTY DAMAGE.**

**Section 21.2** Signs. Tenant may place one or more signs on the Premises to indicate the nature of the business of Tenant and such parties. Any sign shall be lawful under applicable sign codes and subdivision covenants. Landlord hereby approves the signage currently placed on the Premises.

**Section 21.3** Certain Definitions. (a) The term "Landlord" as used herein shall mean only the owner or the mortgagee in possession for the time being of the Premises, so that in the event of any sale, transfer or conveyance of the Premises Landlord shall be and hereby is entirely freed and relieved of all agreements, covenants and obligations of Landlord thereafter accruing hereunder and it shall be deemed and construed without further agreement between the parties or their successors in interest or between the parties and the purchaser, transferee or grantee at any such sale, transfer conveyance that such purchaser, transferee or grantee has assumed and agreed to carry out any and all agreements, covenants and obligations of Landlord hereunder.

(b) The term "Tenant" as used herein shall mean the tenant named herein, and from and after any valid and approved Transfer in whole of said Tenant's interest under this Lease pursuant to the provisions of Article 9, shall mean only the assignee or transferee thereof; but the foregoing shall not release the assignor or transferor from liability under this Lease.

(c) The words "enter", "re-enter", "entry" and "re-entry" as used in this Lease shall not be restricted to their technical legal meaning.

(d) The use herein of the neuter pronoun in any reference to Landlord or Tenant shall be deemed to include any individual Landlord or Tenant, and the use herein of the words "successor and assigns" or "successors or assigns" of Landlord or Tenant shall be deemed to include the heirs, executors, administrators, representatives and assigns of any individual Landlord or Tenant.

**Section 21.4** Headings. The headings herein are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope or intent of this Lease nor in any way affect this Lease.

**Section 21.5** [Reserved]

-83-

**Section 21.6** <u>Integration; Amendment</u>. (a) This Lease contains the entire agreement between the parties regarding the subject matter set forth herein and may not be extended (except as provided herein), renewed, restated, terminated or otherwise modified in any manner except by an instrument in writing executed by the party against whom enforcement of any such modification is sought and with the consent of any Mortgagee. All prior understandings and agreements between the parties and all prior working drafts of this Lease are merged in this Lease, which alone expresses the agreement of the parties. The parties agree that no inferences shall be drawn from matters deleted from any working drafts of this Lease.

(b) Tenant agrees that Tenant will not, without the prior written consent of Landlord, (i) amend, restate, supplement or modify this Lease, (ii) terminate, cancel or surrender the term of this Lease, or enter into any agreement with Landlord to do so, except as expressly permitted by the provisions of this Lease or (iii) pay any installment of Base Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease.

**Section 21.7** <u>Successors and Assigns</u>. The agreements, terms, covenants and conditions herein shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, personal representatives and, except as is otherwise provided herein, their permitted successors and permitted assigns.

**Section 21.8** <u>Notices</u>. Notice whenever provided for herein shall be in writing and shall be given either by personal delivery, overnight express mail or by certified or registered mail, return receipt requested, or in the case of notices specified in Section 5.4(a) by electronic mail, to Landlord at the address hereinabove set forth, and to Tenant at the address hereinabove set forth, or to such other Persons or at such other addresses as may be designated from time to time by written notice from either party to the other. Notices shall be deemed given (i) when delivered personally if delivered on a Business Day (or if the same is not a Business Day, then the next Business Day after delivery), (ii) three (3) Business Days after being deposited in the United States mail, registered or certified mail, postage prepaid, return receipt requested or (iii) if delivery is made by Federal Express or a similar, nationally recognized overnight courier service, then on the date of delivery (or if the same is not a Business Day, then the next Business Day after delivery), if properly sent and addressed in accordance with the terms of this <u>Section 21.8</u>.

**Section 21.9** <u>Construction of Lease</u>. (a) If any provision of this Lease shall be invalid or unenforceable, the remainder of the provisions of this Lease shall not be affected thereby and each and every provision of this Lease shall be enforceable to the fullest extent permitted by Applicable Law.

(b) The parties hereto intend that this Lease shall constitute a single, integrated and indivisible contract under Applicable Law, and therefore, that in any bankruptcy or insolvency proceeding commenced by or against Tenant, this Lease shall not be subject to assumption, assignment or rejection in parts, or with respect to a particular Facility, Buildings or parcels of land, but rather shall be subject to assumption, assignment or rejection, if at all, only in its entirety as a single contract.

12277199v9

**Section 21.10** <u>Brokers</u>. Landlord and Tenant each represent and warrant to the other party that such party has not dealt with any real estate broker in connection with this Lease and Landlord and Tenant agree to indemnify the other party and save the other party harmless from any and all claims for brokerage commissions by any other person, firm, corporation or other entity claiming through such party to have brought about this Lease transaction. The provisions of this <u>Section 21.10</u> shall survive the expiration or earlier termination of this Lease.

**Section 21.11** <u>Control of Facilities</u>. Tenant is and shall be in exclusive control and possession of the Premises, subject to patients, therapy and other service providers and beauticians and other de minimis users entering the Premises from time to time to obtain or provide services therein and Tenant shall operate the Facilities on the Premises at Tenant's sole and absolute discretion without control, interference or direction from Landlord or agents of Landlord (except as expressly set forth to the contrary in this Lease), and Landlord shall not, in any event whatsoever, be liable for any injury or damage to any property or to any person happening in, on or about the Premises, nor for any injury or damage to any property of Tenant, or of any other person or persons contained therein unless the same is caused by Landlord's gross negligence or willful misconduct. The provisions hereof, including without limitation <u>Article 17</u>, permitting Landlord to enter and inspect the Premises are made for the purpose of enabling Landlord to be informed as to whether Tenant is complying with the agreements, terms, covenants and conditions hereof, and if Landlord so desires, to do such acts as Tenant shall fail to do. Tenant agrees to look solely to Landlord's interest in its respective Premises for recovery of any judgment from such Landlord and in no event shall Tenant look to any other Landlord, nor shall any Landlord (or its partners, shareholders, members, managers, officers, directors or Affiliates) ever be personally liable for any such judgment. Tenant acknowledges and agrees that (a) the obligations of Landlord under this Lease shall not be joint and several, (b) the obligations of Landlord shall be limited to obligations pertaining to the Facility located on the Land owned by such Landlord (such Facility being referred to herein as the "Owned Land"), and (c) no Landlord shall have any obligation or liability whatsoever to Tenant with respect to matters relating to Facility other than its Owned Land.

**Section 21.12** <u>Confidentiality</u>. (a) Tenant agrees, and agrees to cause each of their Affiliates, (i) not to transmit or disclose provisions of this Lease to any Person (other than to Tenant's advisors and officers on a need-to-know basis or as otherwise may be required by law) without Landlord's prior written consent, (ii) to inform all Persons to whom provisions of this Lease are disclosed of the confidential nature of the Lease and to direct them not to disclose the same to any other Person and to direct each of them to adhere to the provisions of this Section. Tenant shall not, and shall not permit any of their Affiliates to, use Landlord's name (or the name of any of Landlord's Affiliates) in connection with any of its business operations, including without limitation, advertising, marketing or press releases or such other similar purposes, without Landlord's prior written consent. Nothing contained in this Lease is intended to permit or authorize Tenant or any of their Affiliates to contract on behalf of Landlord. Tenant hereby agrees that Landlord or any Affiliate of Landlord may (A) disclose a general description of transactions arising under this Lease for advertising, marketing or other similar purposes, (B) use Tenant's or Guarantor's names, logos or other indicia germane to such parties in connection with such advertising, marketing or other similar purposes and (C) disclose any and all information concerning the Lease, as well as any information regarding Tenant, the Guarantor

-85-

and their respective Affiliates, its operations, received by Landlord in connection with the Lease to its lenders or funding or financing sources or otherwise required by law.

(b)     Notwithstanding anything to the contrary contained in Section 21.12(a), Tenant may transmit or disclose this Lease or the provisions of this Lease to: (i) any of its Affiliates or any of its or their officers, employees, directors, shareholders, partners, members, principals, agents, lenders, investment bankers, consultant, attorneys, accountants and other professional advisors that agrees to comply with the provisions of this Section 21.12 or substantially equivalent provisions; (ii) any Governmental Authority having jurisdiction over it upon the request or demand of such Governmental Authority; (iii) any Person in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Applicable Law; (iv) in connection with any litigation or similar proceeding; (v) any Person if this Lease or the provisions of this Lease has been publicly disclosed other than in breach of this Section 21.12.

**Section 21.13** Construction.  The parties took equal part in drafting this Lease and no rule of construction that would cause any of the terms hereof to be construed against the drafter shall be applicable to the interpretation of this Lease.

**Section 21.14** Time is of Essence.  Time is strictly of the essence with respect to each and every term and provision of this Lease.

**Section 21.15** Force Majeure.  Except for the provisions of Article 7, the time within which either party hereto shall be required to perform any act under this Lease, other than the payment of money, shall be extended by a period of time equal to the number of days during which performance of such act is delayed by strikes, lockouts, acts of God, governmental restrictions, failure or inability to secure materials or labor by reason of priority or similar regulation or order of any governmental or regulatory body, enemy action, civil disturbance or any other cause beyond the reasonable control of either party hereto.

**Section 21.16** Rent Lien Waiver.  Tenant hereby waives its statutory lien against rent under Applicable Law.

**Section 21.17** True Lease.  Landlord and Tenant each waive any claim or defense based upon the characterization of this Lease as anything other than a true lease and irrevocably waive any claim or defense which asserts that the Lease is anything other than a true lease.  Landlord and Tenant covenant and agree that they will not assert that this Lease is anything but a true lease.  Landlord and Tenant each stipulate and agree not to challenge the validity, enforceability or characterization of the lease of the Premises as a true lease and further stipulate and agree that nothing contained in this Lease creates or is intended to create a joint venture, partnership (either de jure or de facto), equitable mortgage, trust, financing device or arrangement, security interest or the like.  Landlord or Tenant each shall support the intent of the parties that the lease of the Premises pursuant to this Lease is a true lease and does not create a joint venture, partnership (either de jure or de facto), equitable mortgage, trust, financing device or arrangement, security interest or the like, if, and to the extent that, any challenge occurs.

**Section 21.18** Rent Obligations Unconditional. Tenant acknowledges and agrees that Tenant's obligations to pay rent hereunder, and the rights of Landlord in and to such Rent, shall be absolute, unconditional and irrevocable. Except as expressly provided for in Section 8.2, Tenant shall not have any right to terminate this Lease or to be released, relieved, or discharged from any obligations or liabilities hereunder (including, without limitation, the payment of Rent) or entitled to any abatement, suspension, determent, reduction, setoff, counterclaim or defense for any reason whatsoever, including, without limitation, any of the following reasons:

(a) Any defect in, damage to, or destruction of, the Premises or any portion thereof, except as provided in Article 7 and otherwise expressly provided for in this Lease,

(b) Any condemnation, confiscation, requisition, or other taking or sale of the possession, use, occupancy, or title to the Premises or any portion thereof, except as provided in Article 8 and otherwise expressly provided for in this Lease;

(c) Any limitation, restriction, deprivation, or prevention of, or any interference with, the use, occupancy, or possession of the Premises or any portion thereof, except as provided in Article 7, Article 8 and otherwise expressly provided for in this Lease;

(d) Any set-off, abatement, counterclaim, suspension, recoupment, reduction, rescission, defense or other right or claim that Tenant may have against Landlord, any vendor or manufacturer of or contractor or subcontractor for the Premises or any part of any thereof, or any other person for any reason whatsoever;

(e) The inadequacy, incorrectness, or failure of the description of the Premises or any portion thereof;

(f) Any bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, or other proceeding affecting Landlord, any assignee of Landlord, or Tenant or any action with respect to this Lease which may be taken by any receiver, trustee, or liquidator (or other similar official), or by any court;

(g) Force Majeure;

(h) Any title defect, lien or matter affecting title to the Premises or eviction by paramount title or otherwise; or

(i) Any default by Landlord under this Lease or the impossibility or illegality of performance by Landlord, Tenant or both.

Tenant hereby waives, to the fullest extent permitted by Applicable Law, any and all rights that it may now have or that at any time hereafter may be conferred upon it, by Applicable Law or otherwise, to modify, terminate, cancel, quit or surrender this Lease or to effect or claim any diminution or reduction of Rent payable by Tenant hereunder, except in accordance with the express terms hereof. Tenant agrees that, if for any reason whatsoever this Lease shall be terminated in whole or in part by operation of law or otherwise (except as

12277199v9

expressly permitted under Section 8.2), then Tenant shall pay, to the maximum extent permitted by Applicable Law, to Landlord or any other person entitled thereto, an amount equal to each installment of Rent at the time such payment would have become due and payable in accordance with the terms hereof had this Lease not been terminated in whole or in part. Each payment of Rent made by Tenant hereunder shall be final and Tenant shall not seek or have any right to recover all or any part of such payment from Landlord or any Person for any reason whatsoever. It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, that the Rent or other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been abated, reduced or terminated pursuant to Section 8.2.

**Section 21.19** Officer's Certificate. On the execution of this Lease, Tenant has delivered an Officer's Certificate as to the corporate/LLC execution, delivery and authorization of this Lease, good standing of Tenant and incumbency of persons signing the Lease.

**Section 21.20** Governing Law/Consent to Jurisdiction/Venue. Irrespective of the place of execution and/or delivery of this Lease or the location of the Premises, this Lease shall be governed by and shall be construed in accordance with, the Applicable Laws of the State or States in which the Premises are located applicable to agreements entered into without regarding to conflicts of law principles. Landlord and Tenant hereby consent and submit to the exclusive jurisdiction of the state and Federal courts located in the state in which the Premises are located with respect to any claim or litigation arising hereunder or any alleged breach of the covenants or provisions contained herein, and acknowledge that proper venue in any matter so claimed or litigated shall be in the state and Federal courts located in which the Premises are located; provided, however, that (1) Landlord shall be permitted, in addition, if required by Applicable Law in the jurisdiction where the Premises are located, to bring any action against Tenant and/or to enforce this Lease in the jurisdiction where the Premises are located and (2) Tenant shall be permitted, in addition, if required by Applicable Law in the jurisdiction where the Premises are located to bring any action against Landlord and/or to enforce this Lease in the jurisdiction where the Premises are located.

**Section 21.21** Non-Liability for Withholding Consent. Tenant hereby waives any claim for damages against Landlord, any Superior Landlord and any Mortgagee for Landlord's, such Superior Landlord's or such Mortgagee's withholding, conditioning or delaying any consent or approval requested by Tenant. Neither Landlord, any Superior Landlord nor any Mortgagee shall have any liability to Tenant for damages for its refusal or failure to give any consent or approval. Tenant's sole remedy for Landlord's, such Superior Landlord's or such Mortgagee's withholding, conditioning or delaying consent or approval shall be to seek injunctive relief in accordance with the terms and conditions of this Lease.

**Section 21.22** Power of Attorney. Tenant grants to Landlord an irrevocable power of attorney coupled with an interest for the purpose of (a) exercising during the continuance of an Event of Default any and all rights and remedies available to Tenant under any Sublease, at law or in equity with respect to any such Sublease, any Subtenant or the Premises or Facility thereunder, (b) during the continuance of an Event of Default, executing any agreement,

-88-

document or instrument as required of Tenant under this Lease, and (c) during the continuance of an Event of Default, performing any of Tenant's other obligations under this Lease. To the extent not prohibited by Applicable Law, Tenant hereby ratifies all acts Landlord has lawfully done in the past or shall lawfully do or cause to be done in the future by virtue of such power of attorney.

**Section 21.23** <u>Counterparts</u>. This Lease may be executed in two or more counterparts (including by means of electronic signatures transmitted by email, facsimile or otherwise), each of which shall constitute an original, and all of which taken together shall constitute one instrument.

**Section 21.24** <u>Guaranty; Tangible Net Worth</u>.

(a) <u>Individual Guaranty</u>. As consideration, in part, for Landlord's willingness to execute this Lease, Landlord has required Tenant to cause Guarantor to deliver to Landlord the guaranty of this Lease in the form attached hereto as **Schedule F**.

(b) <u>Tangible Net Worth Requirement</u>. At all times during the Term, Tenant hereby covenants that the Tangible Net Worth of Tenant and (so long as the Guaranty is in effect) the Tangible Net Worth of Guarantor in the aggregate shall be at least Ten Million and No/Dollars ($10,000,000.00) (the "**Minimum Tangible Net Worth Requirement**"). The Minimum Tangible Net Worth Requirement shall be subject to adjustment as provided in <u>Section 6.13</u>. As used herein, the term "<u>Tangible Net Worth</u>" means the excess of total assets over total liabilities, [in each case as determined and approved by Landlord,] [**DRAFTING NOTE:** *the bracketed language remains open and subject to further negotiation and agreement by the parties*] in accordance with GAAP, excluding, however, from the determination of total assets (i) except as provided in this Section, all assets which would be classified as intangible assets under GAAP, including goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises; (ii) any deferred costs paid in advance; (iii) capital lease assets; or (iv) if any Guarantor is an individual, any assets owned (in whole or in part) by such individual's spouse. For purposes of calculating Tangible Net Worth, assets shall include cash deposits Guarantor pays to the Letter of Credit issuer as collateral for the obligations arising under the Letter of Credit. For purposes hereof, the value of depreciable assets shall be calculated as the fair market value of such assets. Notwithstanding the foregoing, and without violating the Minimum Tangible Net Worth requirement, [if (a) the Rent Coverage Ratio is less than 1.30:1.00 on two (2) consecutive Test Dates, and (b) Tenant demonstrates to the reasonable satisfaction of Landlord that the decline in Rent Coverage Ratio below 1.30:1.00 is due to Medicaid reimbursement delays (for services rendered and approved by those state agencies responsible for making the determination of payment) of more than 90 days, as evidenced by Tenant's Medicaid submissions,] [**DRAFTING NOTE:** *the preceding bracketed text remains open and subject to further negotiation and agreement by the parties*] then Guarantor or an Affiliate of Tenant may loan to Tenant on an unsecured basis up to an aggregate of Two Million and No/Dollars ($2,000,000.00) of Guarantor's Tangible Net Worth for Tenant's use to pay operating cash shortfalls; provided that Tenant repays to Guarantor any such loaned amounts with ninety (90) days from the date such funds are received by Tenant from Guarantor.

**Section 21.25** <u>Memorandum of Lease</u>.  At Tenant's request, the parties shall execute and record in the counties in which the Premises are located a memorandum of lease giving notice of certain non-monetary terms.

**ARTICLE 22**
**<u>RESERVED</u>**


**ARTICLE 23**
**<u>RESERVED</u>**


**ARTICLE 24**
**<u>RENEWAL</u>**

**Section 24.1**   <u>Option</u>. Provided no Event of Default has occurred which remains uncured either as of the date of Tenant's notice as set forth below or as of the first day of the applicable Extended Term (as hereinafter defined), Tenant shall have the right to extend the term of this Lease for two (2) successive periods of ten (10) years each ("**Extended Term(s)**") with respect to all (but not less than all) of the then current Premises, upon all of the terms and conditions of this Section.

**Section 24.2**   <u>Notice</u>.  Tenant must provide Landlord notice of its exercise of the option for the applicable Extended Term not less than twelve (12) full months prior, but not more than eighteen (18) months prior, to the expiration date of the Term or the first or second Extended Term, as the case may be.  Time is of the essence with respect to the foregoing.  Tenant may not exercise the option for the second Extended Term unless it exercised the option for, and occupied for the Premises for, the first Extended Term.

**Section 24.3**   <u>Market Rental Rate</u>. The Base Rent for the first Lease Year of each of the first and second Extended Term shall be at the greater of (i) the prevailing Market Rental Rate as of the first day of the applicable Extended Term and (ii) the Base Rent for the last Lease Year of then-current Term or Extended Term, as further escalated for the first Lease Year of the Extended Term as required by Section 2.1.  The Base Rent for each subsequent Lease Year of each of the first and second Extended Term shall increase by the lesser of (i) 2.5% or (ii) the annual increase in the Index, calculated by comparing the Index for the third (3rd) month preceding the first month of the new Lease Year as compared to the third (3rd) month preceding the first month of the prior Lease Year; except that such increase from one Lease Year to the next shall be no less than 2%).  As used herein, the term "***Market Rental Rate***" shall be defined as the then fair market rental value of the Premises determined in accordance with the provisions set forth below.  The Market Rental Rate of the Premises shall mean the base rental rate that would be agreed upon by Landlord and a comparable tenant at a comparable building, each of whom is willing, but neither of whom is compelled, to enter into a lease transaction.  The fair market rental value shall be projected into the commencement date of the applicable term and shall take into account all existing improvements and special uses or rights afforded to Tenant,

-90-

and also shall take into account the following factors, amongst others: (i) rental for comparable premises in comparable existing buildings (taking into consideration but not limited to annual escalations, quality, age, and location of applicable buildings and incentives then being offered for comparable premises); (ii) the length of the pertinent rental term; (iii) the creditworthiness of Tenant, (iv) the fair market rental value of the Leased Personal Property at the commencement of the first and second of the Extended Term in question and (v) the security Tenant provides during the Extended Term for the performance of its obligations hereunder. The fair market rental value of the Premises shall be determined in accordance with the Uniform Standards of Professional Appraisal Practice (including the Competency Provision) adopted by the Appraisal Institute using the Comparative Rental Analysis approach (and not the Cost Approach, Sales Comparison Approach or Income Capitalization Approach). All appraisal reports shall be written by the designated MAI appraiser and not by an associate.

**Section 24.4** Arbitration. If Tenant exercises its option for an Extended Term as provided above, Landlord and Tenant shall meet promptly and shall negotiate, in good faith, to reach agreement on the Market Rental Rate within fifteen (15) days following the Notice Date. If Landlord and Tenant are unable to reach agreement within such 15-day period, the Market Rental Rate shall be determined as follows:

(a) Appointment of Arbitrators. Within thirty (30) days after the end of said 15-day period, Landlord and Tenant shall mutually agree upon a real estate expert involved with the ownership, leasing or management of real estate and who has at least ten (10) years' experience, immediately prior to the date in question, evaluating Market Rental Rates for similar properties in comparable markets (the "**Expert**"). The Expert and the firm with whom he or she is employed shall have no current or, during the prior five (5) years, prior business relationship with a party or any of their affiliates. If the parties are unable to timely agree on the Expert, then Market Rental Rate shall be determined by a panel of three (3) Experts, each of whom shall meet the qualifications set forth above, and who shall be selected in accordance with the following procedure. Within ten (10) Business Days following the earlier of (i) a party's election to appoint a panel of Experts or (ii) the expiration of said 15-day period, each party shall deliver to the other written notice specifying the name and address of the person to act as the Expert on the party's behalf. Within ten (10) Business Days after the parties have appointed their respective Experts, the two Experts shall appoint a third Expert, who shall have the same qualifications as those required of the first two Experts. If the two Experts are unable to timely agree upon such appointment, then either party, on behalf of both, may require appointment of such a qualified person by the then president of the commercial real estate board for the county in which the Building is located. Each party shall pay the fees and expenses of its respective Expert and both shall equally share the fees and expenses of the third Expert. Attorney's fees and expenses of counsel for the respective parties shall be paid by the respective party engaging such counsel. Market Rental Rate shall be fixed in accordance with the following procedures. Within ten (10) Business Days following the appointment of the third Expert, each of the two Experts selected by the parties shall state, in writing, his or her determination of the Market Rental Rate supported by the reasons therefore. The third Expert shall have the right to consult experts and competent authorities for factual information or evidence pertaining to a determination of Market Rental Rate. The third Expert shall conduct investigations as he or she deems appropriate and shall, within thirty (30) days after being appointed, select which of the

-91-

two proposed determinations most closely approximates his or her determination of Market Rental Rate. The third Expert shall have no right to propose a middle ground or modification of either of the two proposed determinations. The determination he or she chooses as that most closely approximating his or her determination of the Market Rental Rate shall constitute the decision of the third Expert. The third Expert shall render the decision in writing with counterpart copies to each party. The third Expert shall have no power to add to or modify the provisions of this Lease. Promptly following receipt of the decision, the parties shall enter into an amendment to this Lease evidencing the extension of the Term for the applicable terms.

(b)     Final Determination. The determination of the Market Rental Rate as provided above shall be final, binding and conclusive on both Landlord and Tenant, shall be considered a final award pursuant to the rules of the American Arbitration Association and any applicable state or federal law and judgment may be had on the award in any court of competent jurisdiction.

(c)     Other Terms. All of the terms and conditions of the Lease shall remain the same and shall remain in full force and effect throughout the Extended Term(s), including the terms and conditions set forth in Article 25 relating to the Letter of Credit, except that (i) Base Rent shall be at the new rate determined as provided above, (ii) Tenant shall not be entitled to receive and Landlord shall have no obligation to pay any improvement or other allowance that is provided for in this Lease for the initial Term.

## ARTICLE 25
## LETTER OF CREDIT

**Section 25.1**   Deposit.   In lieu of a cash security deposit, Tenant has delivered to Landlord a letter of credit as security for the prompt, full and faithful performance by Tenant of each and every provision of the Lease and of all obligations of Tenant hereunder in the LC Amount (as defined below). The letter of credit shall be in the form described below and shall be delivered on the Commencement Date with the initial amount equal to the LC Amount (defined below).

**Section 25.2**   Letter of Credit Defined.   The term "**Letter of Credit**" as used herein shall mean an irrevocable, unconditional standby letter of credit substantially in the form attached hereto as the Schedule C and made a part hereof, with either an initial expiration date no earlier than ninety (90) days after the Expiration Date or an automatic renewal provision as described below, issued by a national banking association reasonably acceptable to Landlord, which Letter of Credit shall be payable to Landlord upon demand following the occurrence and during the continuance of an Event of Default hereunder, at a bank having offices for banking purposes in a location acceptable to Landlord in its reasonable discretion pursuant to presentation of an unconditional sight draft with a statement by Landlord that Landlord is entitled to draw thereunder pursuant to the terms of this Lease.

**Section 25.3**   LC Amount Defined.   The term "**LC Amount**" as used herein shall mean as of the Effective Date and until the expiration of the Term, an amount equal to the product

obtained by multiplying the then-applicable monthly Base Rent by ten (10).  The LC Amount shall be subject to change as provided in <u>Section 6.13</u>.

**Section 25.4**   <u>Renewal</u>.  Unless the stated expiration date of the Letter of Credit is at least ninety (90) days after the Expiration Date, the Letter of Credit shall be automatically renewed unless the issuing bank delivers to Landlord a notice of non-renewal no later than thirty (30) days prior to the expiration of the Letter of Credit.  In the event that the issuing bank has not timely renewed the Letter of Credit or issued a notice of non-renewal, the Letter of Credit shall provide that Landlord shall be entitled to draw the full amount of the Letter of Credit by sight draft and hold the same as a cash security deposit, subject to the same terms and conditions of this Article 26.

**Section 25.5**   <u>Landlord Rights</u>. If an Event of Default by Tenant then exists under the Lease, Landlord may use, apply or retain the whole or any part of the Letter of Credit which is necessary for the payment of: (i) any Rent or other sums of money which Tenant has not paid when due after any applicable notice and cure period stated in this Lease; (ii) any sum expended by Landlord on behalf of Tenant in accordance with the provisions of the Lease; or (iii) any sum which Landlord may expend or be required to expend by reason of any Event of Default under the Lease by Tenant, including, without limitation, any damage or deficiency in or from the reletting of the Premises as provided in the Lease.  The use, application or retention of the Letter of Credit, or any portion thereof, by Landlord shall not prevent Landlord from exercising any other right or remedy provided by the Lease or by law (it being intended that Landlord shall not first be required to proceed against the Letter of Credit) and shall not operate as a limitation on any recovery to which Landlord may otherwise be entitled.  Any portion of the cash proceeds of the Letter of Credit not so used or applied by Landlord in satisfaction of the obligations of Tenant as to which such Event of Default shall have occurred shall be deposited by Landlord and retained in a non-interest-bearing account and may be co-mingled with other funds of Landlord. If any portion of the Letter of Credit is used, applied or retained by Landlord for the purposes set forth above, Tenant agrees, within ten (10) days after the receipt of written demand therefor from Landlord, to either deposit cash security with Landlord equal to the amount so applied or retained or reinstate the aggregate amount of the Letter of Credit, as the case may be, in an amount sufficient to restore the then-current required LC Amount.

**Section 25.6**   <u>Return of Letter of Credit</u>. In the absence of evidence satisfactory to Landlord of any permitted assignment of the right to receive the Letter of Credit, Landlord may return the same to the original Tenant, regardless of one or more assignments of Tenant's interest in the Lease or the Letter of Credit.  In such event, upon the return of the Letter of Credit to the original Tenant, Landlord shall be completely relieved of liability under this Article or otherwise with respect to the Letter of Credit.

**Section 25.7**   <u>Landlord Transfer Rights</u>.  Tenant acknowledges that Landlord has the right to transfer its interest in the Premises and in the Lease, subject to the terms and conditions set forth in this Lease.  Tenant agrees that if such a transfer occurs, Landlord shall have the right to transfer or assign the Letter of Credit to the transferee.  Upon such transfer or assignment and delivery of the Letter of Credit to the transferee and such transferee's written assumption of responsibility for the return of the Letter of Credit to Tenant, Landlord shall thereby be released

-93-

by Tenant from all liability or obligation for the return of such Letter of Credit and Tenant shall look solely to such transferee for the return of the Letter of Credit.

## ARTICLE 26
## CAPITAL EXPENDITURE REQUIREMENT

**Section 26.1** <u>Reserve Deposit Requirement</u>.  Beginning on the Commencement Date and continuing thereafter during the Term, Tenant shall pay to Landlord for each Facility, as Supplemental Rent under this Lease, an amount (the "**CapEx Amount**") equal to the product obtained by multiplying the CapEx Factor (hereinafter defined) by the number of licensed beds within all of the Facility identified in the column named "***Licensed Beds***" shown on <u>Schedule 1</u>. The CapEx Factor shall initially equal $600.00 and, beginning on the first day of the second (2nd) Lease Year, shall annually increase by an amount equal to 2.0% of the amount for the preceding year (the "**CapEx Factor**"). Tenant shall pay to Landlord or, at Landlord's election, the Mortgagee, with each installment of Base Rent, one-twelfth (1/12) of the CapEx Amount.  The amounts so deposited in such reserve fund shall be the "**CapEx Reserve Funds**."

**Section 26.2** <u>Disbursements of CapEx Reserve Funds</u>:  Landlord shall make disbursements of the CapEx Reserve Funds as requested by Tenant, and approved by Landlord in its reasonable discretion, for Tenant to use in making capital repairs and capital improvements to the Facilities approved by Landlord in its reasonable discretion ("**CapEx Work**"). Disbursements shall be made no more frequently than once in any thirty (30) days period, and in an aggregate amount  no less than fifty thousand dollars ($50,000) (for CapEx Work for all of the Facilities) upon satisfaction of each of the following criteria: (a) Tenant shall submit a written request for payment to Landlord at least ten (10) days prior to the date on which Tenant requests such payment be made and specifying the repair and improvement costs to be paid; (b) Landlord shall have receive a certificate from an officer of Tenant stating that previous CapEx Work has been paid for in full with respect to previous CapEx Work that has been completed; (c) Landlord shall have received such other evidence as Landlord shall reasonably request demonstrating that the CapEx Work to be funded by the requested disbursement from the CapEx Account has been completed and paid for, or will be paid for upon such disbursement to Tenant; and (d) if required by Landlord, lien waivers and releases from all parties furnishing materials and/or services in connection with the requested payment. Landlord may require an inspection of the Premises at Landlord's expense prior to making any disbursement of the CapEx Reserve Funds in order to verify completion of replacements and repairs of items for which disbursement is sought.

**Section 26.3** <u>Conditions for Disbursement</u>.  Landlord shall have no obligation to disburse funds from CapEx Reserve Funds for payment of CapEx Work if (i) an Event of Default has occurred and is continuing, or (ii) there are insufficient CapEx Reserve Funds to pay the requested amount.

**Section 26.4** <u>End of Term; Event of Default</u>.  At the expiration or earlier termination of the Term, any CapEx Reserve Funds not previously disbursed to Tenant shall be the property of Landlord.  If this Lease shall be terminated by reason of any Event of Default, Landlord may, in

-94-

its sole discretion, apply all CapEx Reserve Funds held by Landlord on account of any and all sums due under this Lease.

**Section 26.5** <u>Terms of Holding</u>.  It is understood and agreed that (a) to the extent permitted by Applicable Law, CapEx Reserve Funds may be held by Landlord or its Affiliate or Mortgagee in a single bank account and commingled with other funds of Landlord or its Affiliate or Mortgagee, and (b) Landlord or Mortgagee, may, if Tenant fails to make any deposit required hereunder, use deposits made for any one item for the payment of the same or, upon any Event of Default, any other item of Rent.  Tenant acknowledges and agrees that no deficiency or lack of CapEx Reserve Funds shall relieve Tenant of its obligation to pay all deposits of CapEx Reserve Funds as required under this Lease.  Upon request by Tenant, Landlord shall provide to Tenant an accurate accounting of the CapEx Reserve Fund.

**Section 26.6** <u>Minimum Expenditure Requirement</u>.  During each Lease Year of the Term, Tenant shall spend on CapEx Work for each Facility an amount that is no less than the product obtained by multiplying the CapEx Factor by the number of licensed beds within that Facility as of the Effective Date as identified in the column named "***Licensed Beds***" on <u>Schedule 1</u> (the "**Expenditure Requirement**").  Tenant's compliance with this requirement shall be computed with respect to the Facility on an individual basis and shall not be based upon expenditures for two or more Facility on an aggregated basis.

**Section 26.7** <u>Security Interest; General</u>.

(a) <u>Security Interest</u>.  Although it is the intent of Landlord and Tenant that Tenant's payments to Landlord of CapEx Reserve Funds are Supplemental Rent and Rent under this Lease, if a court determines that, by operation of Applicable Law, such sums are not Supplemental Rent or Rent but instead are the property of Tenant, then to further protect Landlord's interest in said amounts, Tenant hereby grants to Landlord a first-priority security interest in the CapEx Reserve Funds and any and all monies now or hereinafter deposited therein as additional security for payment of Rent.  Until expended or applied in accordance with the terms of this Lease, the CapEx Reserve Funds shall serve as additional security for Tenant's obligations hereunder.  During the continuance of an Event of Default, Landlord may, in addition to all other remedies under this Lease, apply any of the CapEx Reserve Funds for the payment of Rent or other sums owing to Landlord under this Lease in its sole discretion.  The CapEx Reserve Funds shall not constitute trust funds.

(b) <u>General</u>.  Tenant shall not pledge, assign or grant a security interest in the CapEx Reserve Funds, or permit any lien or encumbrance to attach thereto or any levy to be made thereon by a party claiming through Tenant, except those naming Landlord as the secured party.  Should Landlord elect to hold the CapEx Reserve Funds in an interest-bearing account, all interest earned shall be added to the CapEx Reserve Funds and Tenant shall pay all taxes due in connection therewith.

[SIGNATURES FOLLOW]

**IN WITNESS WHEREOF**, the undersigned has executed this instrument the day and year first written above.

"**LANDLORD**"

GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC
GA HC REIT IV _____, LLC

Each of the above Landlords being a Delaware limited liability company

For each of the above Landlords,

By: GAHC4 Songbird SNF Portfolio, LLC, a Delaware limited liability company, the sole member and manager of each of the entities shown above

By: _____
Name: _____
Title: Authorized Signatory

-96-

**IN WITNESS WHEREOF,** the undersigned has executed this instrument the day and year first written above.

"**TENANT**"

**POP, LLC**
An Illinois limited liability company


By: _____
       Name: Mark B. Petersen
       Title: Manager

[ADD STATE-APPROPRIATE FORM OF NOTARY FOR TENANT SIGNATURE]

-97-

**SCHEDULE 1**

**PROPERTY**

**Facility Names and Addresses; Landlord; Tenant Licensed Beds**

| | Facility | Address | Landlord | Tenant | Number and Type of Licensed Beds |
|---|---|---|---|---|---|
| 1. | Sullivan Rehabilitation & Health Center ("Sullivan") | 11 Hawthorne Lane, Sullivan, IL 61951 | | | 123 SNF; 95 |
| 2. | Swansea Rehabilitation & Health Center ("Swansea") | 1405 North Second Street, Swansea, IL 62226 | | | 94 SNF; 84 |
| 3. | Eastview Terrace ("Eastview") | 100 Eastview Place, Sullivan, IL 61951 | | | 63 SNF; 57 |
| 4. | Arcola Health Care ("Arcola") | 422 E. Fourth South St., Arcola, IL 61910 | | | 50 SNF and 50 ICF; 95 |
| 5. | Shelbyville Rehabilitation & Health Center ("Shelbyville") | 2116 S. 3rd Street, Shelbyville, IL 62565 | | | 12 SNF and 69 ICF; 60 |
| 6. | Tuscola Health Care Center ("Tuscola") | 1203 Egyptian Trail, Tuscola, IL 61953 | | | 73 SNF; 57 |
| 7. | Effingham Rehabilitation & Health Center ("Effingham") | 1610 North Lakewood Drive, Effingham, IL 62401 | | | 62 SNF; 54 |
| 8. | Aledo Rehabilitation & Health Center ("Aledo") | 304 S. W. 12th Street, Aledo, IL 61231 | | | 80 SNF; 72 |
| 9. | Lebanon Care Center ("Lebanon") | 1201 North Alton, Lebanon, IL 62254 | | | 90 SNF; 90 |
| 10. | Tarkio Rehabilitation & Health Care ("Tarkio") | 300 Cedar Street, Tarkio, MO 64491 | | | 95 SNF; 54 |
| 11. | Robings Manor Nursing Home ("Robings") | 502 N. Main St., Brighton, IL 62012 | | | 32 SNF, 43 ICF and 8 IL; 75 |
| 12. | Rosiclare Rehab & Health Care Center | 55 Ferrell Rd., Rosiclare, IL 62982 | | | 62 SNF; 59 |

-98-

| | | | | |
|---|---|---|---|---|
| 13. | Courtyard Estates of Sullivan ("Courtyard") | 20 Courtyard Blvd, Sullivan, IL 61951 | | 50 SNF; 50 |
| 14. | Royal Oaks Care Center ("Royal Oaks") | 605 East Church St, Kewanee, IL 61443 | | 200 SNF; 186 |
| 15. | Twin Lakes Rehab & Health Center ("Twin Lakes") | 310 South Eads Ave, Paris, IL 61944 | | 62 SNF; 52 |
| 16. | Watseka Health Care ("Watseka") | 715 Raymond Rd, Watseka, IL 60970 | | 123 SNF; 95 |
| 17. | Collinsville Rehab & Health Center ("Collinsville") | 614 North Summit Ave, Collinsville, IL 62234 | | 98 SNF; 90 |
| 18. | Laharpe Davier Health Care ("Laharpe") | 101 North B St, La Harpe, IL 61450 | | 45 SNF; 45 |
| 19. | Shangri-La Rehab & Living ("Shangri-La") | 930 NE Duncan Rd, Blue Springs, MO 64014 | | 120 SNF; 101 |
| 20. | Westside Health Care ("Westside") | 601 North Columbia St, West Frankfort, IL 62896 | | 96 SNF; 73 |
| 21. | Havana Health Care ("Havana") | 609 North Harpham St, Havana, IL 62644 | | 20 SNF and 78 ICF; 82 |
| 22. | McLeansboro Rehab & Health Care ("McLeansboro") | 405 W Carpenter St, McLeansboro, IL 62859 | | 43 SNF; 41 |
| 23. | Vandalia Rehab & Health Care ("Vandalia") | 1500 W St Louis Ave, Vandalia, IL 62471 | | 57 SNF and 59 ICF; 89 |
| 24. | Farmer City Rehab & Health Center ("Farmer City") | 404 Brookview Dr, Farmer City, IL 61842 | | 56 SNF; 53 |

12277199v9

**SCHEDULE A-1**

Facility Name:

Facility Address:

Legal Description:

Permitted Exceptions:  The matters affecting title to the Premises which are in effect as of the Commencement Date, as follows:

**[DRAFTING NOTE: Schedules A-2 through A-__ to be added]**

**SCHEDULE B**

**RENT SCHEDULE**

The Schedule below is for Annual Base Rent.

| Lease Year | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Lease Year 1 | $6,869,000.00 | $572,416.67 |
| Lease Year 2 | $7,040,725.00 | $586,727.08 |
| Lease Year 3 | $7,216,743.13 | $601,395.26 |
| Lease Year 4 | $7,397,161.70 | $616,430.14 |
| Lease Year 5 | $7,582,090.75 | $631,840.90 |
| Lease Year 6 | $7,771,643.01 | $647,636.92 |
| Lease Year 7 | $7,965,934.09 | $663,827.84 |
| Lease Year 8 | $8,165,082.44 | $680,423.54 |
| Lease Year 9 | $8,369,209.50 | $697,434.13 |
| Lease Year 10 | $8,578,439.74 | $714,869.98 |
| Lease Year 11 | $8,792,900.73 | $732,741.73 |
| Lease Year 12 | $9,012,723.25 | $751,060.27 |
| Lease Year 13 | $9,238,041.33 | $769,836.78 |
| Lease Year 14 | $9,468,992.37 | $789,082.70 |
| Lease Year 15 | $9,705,717.18 | $808,809.77 |

**SCHEDULE C**

**<u>FORM OF LETTER OF CREDIT</u>**

**SCHEDULE D**

**DEFINITIONS**

"**Accounts Receivable(s)**" shall mean any accounts (including, without limitation, Health-Care-Insurance Receivables) relating to (a) any Provider Agreements relating to the Facilities, (b) agreements with or on behalf of patients ore residents of the Facilities, (c) any similar contracts relating to the Facility (or any proceeds thereof) and (d) other rights to receive payment of any kind of Tenant with respect to the Facilities and (e) any and all other rights to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including, without limitation, any Account).

"**Affiliate**" means, with respect to any Person, any other Person (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Person; (b) that directly or indirectly beneficially owns or holds ten percent (10%) or more of any class of capital stock or other ownership interests of such Person having ordinary voting power to elect a majority of the board of directors (or similar governing body) of such Person (the "**Voting Stock**"); or (c) that directly or indirectly beneficially owns or holds ten percent (10%) or more of the Voting Stock of the Person in question. As used in this definition, the term "**control**" means the possession, directly or indirectly, of the power to direct or cause direction of the management and policies of a Person, whether through the ownership of Voting Stock, by contract, or otherwise.

"**Alterations**" is defined in Section 5.4.

"**Applicable Law**" and "**Applicable Laws**" respectively mean any one or more of the applicable laws, including (without limitation) any: (a) law, statute, ordinance, rule, regulation, requirement or use or disposal classification or restriction, whether domestic or foreign, of a Governmental Authority, including, including, without limitation, each Environmental Law and Health Care Law; (b) order, injunction, writ, judgment, decree, ruling, interpretation, finding or other directive, whether domestic or foreign, of a Governmental Authority; (c) common law or other legal or quasi-legal precedent; (d) arbitrator's, mediator's or referee's decision, finding, award or recommendation; or (e) charter, rule, regulation or other organizational or governance document of any self-regulatory or governing body or organization.

"**Bankruptcy Code**" means the provisions of 11 U.S.C. Section 101 et seq., as amended from time to time, or any other present or future Applicable Law respecting bankruptcy, reorganization, insolvency, readjustment of debts, relief of debtors, dissolution or liquidation, and the rules and regulations promulgated thereunder, in each case as the same may have been and hereafter may be supplemented, modified, amended, restated or replaced from time to time.

"**Base Rent**" is defined in Article A, Section 3.

"**Building**" and "**Buildings**" respectively mean any one or more of the buildings and the other improvements now or hereafter erected on the Land, including, without limitation, the

HVAC, electrical, plumbing, mechanical and other systems therein, and the fixtures and equipment used or useful in connection with the operation, maintenance or repair thereof, as applicable to such buildings and improvements, respectively. Buildings exclude Tenant's Personal Property.

"**Business Day**" and "**Business Days**" shall mean, respectively, one or more day(s) which CitiBank, N.A., based in New York, New York, is open for the ordinary conduct of business.

"**Capital Lease**" shall mean, as to any Person, a lease of any interest in any kind of property or asset by that Person as lessee that is, should be or should have been recorded as a "capital lease" in accordance with GAAP.

"**Cash Equivalents**" shall mean, as to any Person, any and all of the following:

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Working Capital Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)     commercial paper issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's Investors Service, Inc. ("Moody's") or at least "A-1" (or the then equivalent grade) by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P"), in each case with maturities of not more than 180 days from the date of acquisition thereof; and

investments, classified in accordance with generally accepted accounting principles in the United States of America applied on a consistent basis as current assets of such Person, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition

"**Claims**" is defined in Section 11.3.

"**Code**" is The Internal Revenue Code of 1986, as amended.

"**Commencement Date**" is set forth in <u>Article A, Section 2(b)</u>.

"**Contracts**" shall mean all sale, service, performance, equipment or property lease contracts, agreements and grants and all other contracts, agreements or grants (in each case, whether written or oral, or third party or intercompany), between Tenant and any third party, and all assignments, amendments, restatements, supplements, extensions, renewals, replacements or modifications of any of the foregoing.

"**Convey**" or "**Conveyance**" is defined in <u>Section 22.1</u>.

"**Default**" means an Event of Default or the occurrence of an event or condition which with notice or lapse of time or both would become an Event of Default.

"**Default Rate**" means four percent (4%) over the greater of (i) the prime rate announced from time to time by Citibank, N.A. in New York, New York, as such prime reference rate may be adjusted and announced from time to time, or if unavailable, the parties shall use the prime reference rate of any national bank having an office in New York, New York selected by Landlord, or (ii) the Lease Rate; provided that in no event shall the Default Rate be greater than the applicable maximum lawful rate.

"**Ending Date**" is defined in <u>Section 8.2(a)</u>.

"**Environmental Law**" and "**Environmental Laws**" are defined in <u>Section 18.10</u>.

"**Equity Pledge**" is defined in <u>Section 9.1</u>.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, or any corresponding or succeeding provisions of Applicable Law, and the rules and regulations promulgated thereunder, in each <u>case</u> as the same may have been and hereafter may be supplemented, modified, amended, restated or replaced from time to time.

"**Event of Default**" is defined in <u>Section 12.1</u>.

==[DRAFTING NOTE: *compare definition with terms of ICA executed at closing, if any. Any changes to definition will be subject to mutual agreement of Landlord and Tenant*]==
"**Excluded Property**" shall mean, with respect to any Person, (a) any permit or license issued by a Governmental Authority to such Person or any agreement, contract or lease to which such Person is a party (A) that prohibits or requires the consent of any other Person (other than any of such Person's affiliates) which has not been obtained as a condition to the creation by such Person of a lien on any right, title or interest in such permit, lease, license, agreement or contract, (B) to the extent that any requirement of law applicable thereto prohibits the creation of a lien thereon, or (C) to the extent that a lien thereon would give another Person party thereto a legally enforceable right to terminate such permit, lease, license, agreement or contract (which right to terminate has not been waived by such other Person), but only, with respect to the prohibition in (A), (B), and (C), to the extent, and for as long as, such prohibition or right to terminate is not terminated or rendered unenforceable or otherwise deemed ineffective by the Uniform

A-105

Commercial Code or any other applicable requirement of law (including the Bankruptcy Code) or principles of equity; (b) any deposits, escrows or accounts solely maintained by such Person in accordance with applicable state or local laws or regulations to the extent such state or local laws prohibit such Person from pledging assigning or encumbering such deposit, escrow or account and (c) any equity interests in any other Person owned by such Person; provided, however, that (x) Excluded Property shall not include any Proceeds of any property described in clause (a), and (y) any such property that at any time ceases to satisfy the criteria for Excluded Property (whether as a result of such Person obtaining any necessary consent, any change in law, or otherwise), shall no longer be Excluded Property.

"**Expiration Date**" is defined in Article A, Section 2(c).

"**Extended Operation Period**" is defined in Section 16.4.

"**Facility**" and "**Facilities**" shall mean the, respectively, any one or more of the skilled nursing and/or assisted living facilities now or hereafter operated on the Land and from or at which health care services are provided.

"**Facility EBITDAR**" means, for any period, the sum without duplication of the following for the Facilities, on a consolidated basis: Net Income, plus, (a) Interest Expense, (b) taxes on income, whether paid, payable or accrued, (c) depreciation expense, (d) amortization expense, (e) the amount of rent payable by the Tenant pursuant to the Lease (which rent, in total, equals the amount of Rent payable under this Lease), all of the foregoing determined in accordance with GAAP and (f) non-cash related losses associated with adhering to FAS-144 (impairment of long-lived assets), minus (X) gains from any sale of assets, other than sales in the ordinary course of business and (Y) other extraordinary or non-recurring gains.

"**Force Majeure**" is defined in Section 21.15.

"**GAAP**" means generally accepted accounting principles, applied on a "consistent basis", as set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board and/or their respective successors and which are applicable in the circumstances as of the date in question.

"**Governmental Authority**" shall mean any governmental or quasi-governmental authority, including (without limitation) any nation, federal, state, territorial, county, municipal or other government or political) subdivision thereof, or governmental or quasi-governmental agency, board, authority, body, branch, bureau, commission, court, department or other instrumentality or political unit or subdivision, including, without limitation, any Health Care Regulatory Agency, or any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government, whether domestic or foreign, or any self-regulatory or governing body or organization.

"**Guarantor**" shall mean Mark B. Petersen.

A-106

"**Guaranty**" means that certain Guaranty dated as of the date hereof made by Guarantor in form and substance attached hereto as Schedule 2.

"**Hazardous Substance**" and "**Hazardous Substances**" are defined in Section 18.11.

"**Health Care Law**" and "**Health Care Laws**" mean, respectively, any one or more Applicable Law pertaining to or concerned with the establishment, construction, ownership, operation, maintenance, management or occupancy of the Facility or any part thereof.

"**Health Care Licenses**" shall mean any or all licenses, permits, accreditations, provider numbers, approvals, qualifications, certifications, certificates of need, and other authorizations granted by any Health Care Regulatory Agency or other Governmental Authority, accreditation organization or Third Party Payor relating to or affecting one or more of the Facilities, the establishment, construction, ownership, operation, maintenance, management, use, regulation, development, expansion or construction thereof, the provision of health care services thereon, and/or the reimbursement of healthcare costs relating thereto.

"**Health Care Regulatory Agency**" shall mean any or all agencies, boards, authorities, bodies, accreditation organizations and any Governmental Authority having jurisdiction over one or more of the Facilities, the ownership, operation, maintenance, management, use; regulation, development, expansion or construction thereof, the provision of health care services thereon, the reimbursement of health care costs relating thereto, or which grant, issue or regulate any Health Care Licenses.

"**Health Care Requirements**" shall mean, with respect to the Facilities, all Applicable Laws, in each case, pertaining to or concerned with the ownership, operation, use or occupancy any one or more of the Facilities or any part thereof and all permits, licenses and authorizations relating thereto, including, without limitation, all rules, orders, regulations and decrees of and agreements with Health Care Regulatory Agencies as pertaining to any one or more of the Facilities.

"**HHS**" is defined in Section 20.1.

"**Immaterial Use**" is defined in Section 18.1.

"**Impositions**" and "**Impositions**" are defined in Section 3.1.

"**Imposition Reserve Fund**" is defined in Section 3.5.

"**Improvements**" shall mean all buildings, facilities and other improvements located on the Land, including without limitation all fixtures, fittings and components thereof, such as any and all elevators, partitions, ducts, motors, compressors, and the heating, ventilating, air conditioning, plumbing, sprinkling, drainage, lighting, gas, electrical and all other systems located therein.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all items which, in accordance with GAAP, would be included in determining total liabilities as shown on the liability side of the balance sheet of such Person as of the date as of which Indebtedness is to be determined, including any lease which, in accordance with GAAP would constitute Indebtedness, (b) all indebtedness secured by any mortgage, pledge, security, Lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Person is subject, whether or not the indebtedness secured thereby shall have been assumed, (c) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock, equity or other ownership interest purchase, capital contribution or otherwise) or otherwise to become directly or indirectly liable.

"**Indemnified Party**" and "**Indemnified Parties**" are defined in Section 11.3.

"**Index**" shall mean the Consumer Price Index for All Urban Consumers, U.S. City Average published by the United States Department of Labor's Bureau of Labor Statistics. If the Bureau of Labor Statistics discontinues publication of the Index, publishes the Index less frequently or alters the Index in any material manner, then Landlord may adopt a substitute index or procedure which reasonably reflects and monitors consumer prices.

"**Initial Base Rent**" is defined in Article A, Section 3.

"**Intellectual Property**" shall mean all rights, priorities and privileges of Tenant relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, patents, trademarks, tradenames, any and all applications therefor and licenses relating thereto, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"**Inter-Creditor Agreement**" is defined in Section 12.15.

"**Interest Expense**" shall mean, for any Test Period, total interest expense (including attributable to Capital Leases in accordance with GAAP) with respect to all outstanding Indebtedness including capitalized interest but excluding commissions, discounts and other fees owed with respect to letters of credit and bankers' acceptance financing and net costs under any interest rate swap, cap or collar agreement or other similar agreement or arrangement designed to hedge the position with respect to interest rates.

"**Land**" means those certain plots, parcels and pieces of real property described on Schedule "A-1" through Schedule "A-24" attached hereto and incorporated herein by this reference.

"**Landlord Lien Collateral**" is defined in Section 12.15.

A-108

"**Landlord's Value Response Notice**" is defined in <u>Section 16.5.</u>

"**Lease Year**" is defined in <u>Section 2.1(b).</u>

"**Lease Rate**" shall mean the rate by which Base Rent increases hereunder on an annual basis.

"**Leased Personal Property**" shall mean all furniture, fixtures, equipment and machinery located at the Premises that is owned by Landlord and used in connection with the operation of the Facility including the items listed on <u>Schedule 11.9</u>.

"**Lien**" means any lien, mortgage, security interest, tax lien, pledge, charge, hypothecation, assignment, preference**,** priority, or other encumbrance of any kind or nature whatsoever (including, without limitation, any conditional sale or title retention agreement), whether arising by contract, operation of law, or otherwise.

"**Management Agreement**" is any agreement, whether written or oral, between Tenant or any Subtenant and any other Person pursuant to which Tenant or any Subtenant provides any payment, fee or other consideration to any other Person to operate or manage the Facility or to provide management, advisory or other services relating to the operation thereof.

"**Manager**" is any Person who has entered into a Management Agreement with Tenant, the Guarantor or their respective Affiliates.

"**Material Adverse Effect**"  means with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, a material adverse change in, or a Material Adverse Effect upon, any of the financial condition, operations, business or properties of Tenant which is reasonably likely to result in the inability of Tenant to timely satisfy its obligations under the Lease.

"**Mortgage**" means any mortgage, deed of trust or deed to secure debt creating a lien or encumbrance on the Premises or any part thereof or this Lease and Tenant's interest in the Premises or any part thereof, as the same may be amended, modified and/or restated from time to time.

"**Mortgage Loan**" means any loan that is secured by a Mortgage.

"**Mortgagee**" means any holder or beneficiary of a Mortgage, which may be an Affiliate of Landlord.

"**Net Income**" means, for any period, the net income (or loss) from whatever source, determined in conformity with GAAP. Net Income shall be adjusted as follows:  (a) with respect to management fees attributable to the Facilities, Net Income shall be increased by the management fees payable to pursuant to the Management Agreement and decreased by an imputed management fee of five percent (5%) of the net revenue of the Facility; and (b) with

A-109

respect to replacement costs, reduced by then-applicable CapEx Amount per licensed bed per annum at the Facility each Lease Year.

"**Non-Disturbance Agreement**" is defined in Section 10.1.

"**Occupancy Report**" shall mean a true, correct and complete schedule (provided in accordance with Health Care Requirements related to privacy) which accurately and completely sets forth with respect to any one or more of the Facility, as applicable, the occupancy status of patient beds at such Facility(ies), the average daily census and patient days categorized by the class of payment or reimbursement (i.e., by Third Party Payors).

"**Operator**" shall mean at any given time the entity (whether one or more) actually operating the Facility.

"**Other Property Rights**" shall mean all gores, strips, easements, licenses, rights tenements, hereditaments, liberties, powers, privileges and appurtenances relating to the Land and all of Landlord's right, title and interest in and to any adjacent or abutting lands lying in the beds of streets or roads, whether open, proposed or vacated.

"**Permits**" shall mean, as to any Person, any and all licenses, approvals, qualifications, variances, permissive uses, determinations of need, franchises, accreditations, certificates, certifications, consents, permits and other authorizations benefiting, relating to or affecting (i) any of the Premises and the ownership, construction, development, maintenance, management, repair, use, occupancy, possession or operation thereof, or (ii) the operation of any programs or services in connection with the Facilities and all renewals, replacements and substitutions therefor; in all cases including without limitation, those now or hereafter issued by or entered into with any Governmental Authority or Third Party Payor or maintained or used by such Person or entered into by such Person with any other Person, and including, without limitation, all Health Care Licenses and Provider Agreements.

"**Permitted Use**" is defined in Article A, Section 4.

"**Person**" means any individual, corporation, limited liability company, business trust, association, company, partnership, joint venture, Governmental Authority or other entity.

"**Personal Property Fair Market Value**" is defined in Section 16.5.

"**PLGL**" means Professional Liability and General Liability.

"**Premises**" means the Land and the Buildings now or hereafter covered by this Lease.

"**Projections**" means, as to any Person, such Person's, forecasted consolidated balance sheets, profit and loss statements, cash flow statements, capitalization statements, and capital and operating budgets, all materially consistent with such Person's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

A-110

"**Provider Agreements**" means all Third Party Payor provider agreements associated with the operation of any Facility,

"**Real Estate Taxes**" is defined in Section 3.1.

"**Recoupment Claims**" is defined in Section 20.8.

"**Remedial Work**" is defined in Section 18.7.

"**Rent**" is defined in Section 2.3.

"**Rent Coverage Ratio**" shall mean for any Test Period the ratio of (a) Facility EBITDAR for the Test Period to (b) the amount of Base Rent actually due and payable under this Lease during such Test Period.

"**Requirements**" is defined in Section 11.1.

"**Restoration**" is defined in Section 7.1.

"**Retainage**" is defined in Section 7.2.

"**Settlement Discussions**" is defined in Section 19.1(f).

"**Special Purpose Entity**" [**DRAFTING NOTE:** *definition to be modified to include terms required by HUD as of Effective Date*] is a corporation, limited liability company, or limited partnership which at all times while this Lease is in effect complies with the following:

(i)     Purpose. Such entity was organized solely for the purpose of owning, operating, financing and/or leasing the Premises (and no other property or facility) and any related Tenant's Personal Property for the Permitted Use.

(ii)     No Other Business. Such entity has not and will not engage in any business unrelated to owning, operating, financing or leasing such Premises and any related Tenant's Personal Property for the Permitted Use.

(iii)     No Other Assets. Such entity has not and will not have any assets other than those related to its owning, operating, financing or leasing such Premises and any related Tenant's Personal Property for the Permitted Use.

(iv)     No Other Indebtedness. Such entity has no indebtedness other than (a) obligations under this Lease, (b) liabilities in the ordinary course of business relating to its purpose as set forth in clause (i) above of this definition, (c) any Working Capital Loan, and (d) in connection with and to provide for the issuance of the Letter of Credit.

A-111

(v)     Misunderstandings, Such entity has not and will not fail to correct any known misunderstanding regarding the separate identity of such entity.

(vi)     Separate Accounts. Such entity has maintained and will maintain or will cause to be maintained its accounts, books and records separate from any other person or entity; provided, however, that Tenant's assets and operations may be included in a consolidated financial statement provided that appropriate notation shall be made on such consolidated financial statement to indicate that Tenant is its own separate entity.

(vii)     Commingling. Such entity has not and will not commingle its funds or assets with those of any other entity, and such entity has held and will hold its assets in its own name, provided that such entity shall be entitled to maintain its inter-company cash management arrangements.

(viii)     Own Name. Such entity has conducted and will conduct its business in its own name (formal or DBA).

(ix)     Separate Records. Such entity has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other person or entity; provided, however, that Tenant's assets and operations may be included in a consolidated financial statement, provided that appropriate notation shall be made on such consolidated financial statement to indicate that Tenant is its own separate entity.

(x)     Own Liabilities. Such entity has paid and will pay its own liabilities out of its own funds and assets to the extent possible; provided, however, that Tenant's entry into this Lease and payment and performance of its obligations hereunder and the performance or maintenance of its inter-company cash management arrangements, shall not be deemed a violation of this paragraph.

(xi)     Formalities. Such entity has observed and will observe all partnership, corporate or limited liability company formalities, as applicable.

(xii)     Guarantees. Except in connection with the Working Capital Loan and for ordinary course trade arrangements, such entity has not and will not assume or guarantee or become obligated for the debts of any other entity or hold out its credit as being available to satisfy the obligations of any other entity except for liabilities permitted by Landlord to be guaranteed and its obligations under this Lease.

(xiii)     Affiliate Securities. Such entity has not and will not acquire obligations or securities of its partners, members or shareholders.

(xiv)     Allocations. The administrators of such entity have allocated and will allocate fairly and reasonably any overhead for shared office space and uses, invoices and checks.

A-112

(xv)     Pledges. Except as otherwise permitted in this Agreement, such entity has not and will not pledge its assets for the benefit of any other person or entity other than the holder of the Working Capital Loan, or other than in connection with ordinary course trade arrangements or any loans consented to in writing by Landlord, which consent may be granted or withheld in Landlord's reasonable discretion.

(xvi)     Identification. Such entity will not hold itself out as liable for the debts of any other entity.

(xvii)     Loans. Such entity has not made and will not make loans to any person or entity, except pursuant to any cash management, joint administration arrangement or other inter-company arrangement

(xviii)  No Dissolution. Such entity has not and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale, transfer of membership interest, or amendment of its certificate of formation or operating agreement.

(xix)     Organizational Documents. (1) Its articles of organization, certificate of formation and/or operating agreement, as applicable, shall provide that the vote of a majority-in-interest of the remaining members is sufficient to continue the life of the limited liability company if a termination event occurs, such as a bankruptcy of any managing member, and (2) if the vote of a majority-in-interest of the remaining members is not obtained to continue the life of the limited liability company upon a termination event, its articles of organization, certificate of formation and/or operating agreement as applicable, provide that the limited liability company may not liquidate collateral without the consent of Landlord.

(xx)     Bankruptcy Filing. Such entity, without the unanimous consent of all of the members, shall not file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, dissolve, liquidate, consolidate, merge, or sell all or substantially all of its assets or any other entity in which it has a direct or indirect legal or beneficial ownership interest, engage in any other business activity, or amend its organizational documents.

(xxi)     Divisions. Such entity has not and will not identify its members, or any affiliates of either of them as a division or part of it.

(xxii)     Arm's-length Transactions. Such entity has not entered and will not enter into or be a party to, any transaction with its members or its affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are not less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party.

"**Sublease**" and "**Subleases**" are defined in Section 9.7.

A-113

"**Subsidiary**" means a Person of which an aggregate of more than fifty percent (50%) or more of the capital stock or other ownership interests thereof is owned of record or beneficially by such other Person, or by one or more Subsidiaries of such other Person, or by such other Person and one or more Subsidiaries of such Person, (a) if the holders of such capital stock or other ownership interests (i) are ordinarily, in the absence of contingencies, entitled to vote for the election of a majority of the directors (or other individuals performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency, or (ii) are entitled, as such holders, to vote for the election of a majority of the directors (or individuals performing similar functions) of such Person, whether or not the right so to vote exists by reason of the happening of a contingency, or (b) in the case of capital stock or other ownership interests which are not issued by a corporation, if such ownership interests constitute a majority voting interest.

"**Subtenant**" and "**Subtenants**" are defined in Section 9.4.

"**Superior Landlord**" means the landlord under a Superior Lease.

"**Superior Lease**" shall mean any lease now or hereafter in effect to which this Lease is subject and subordinate.

"**Supplementary Rent**" is defined in Section 2.2.

"**Tangible Net Worth**" is defined in Section 21.24(b).

"**Taking**" means a taking of the Premises (or any part thereof) or any damage to the Premises (or any part thereof) related to the exercise of the power of eminent domain and including a voluntary conveyance to any agency, authority, public utility, person, or corporate entity empowered to condemn property in lieu of court proceedings.

"**Tenant**" is defined in the introductory paragraph to this Lease.

"**Tenant's Personal Property**" shall mean the following (as each is defined herein or, if not defined herein, as defined in the Uniform Commercial Code):

(i)  all cash and Cash Equivalents;

(ii)  all Chattel Paper;

(iii)  all Commercial Tort Claims;

(iv)  all Contracts;

(v)  all Deposit Accounts;

(vi)  all Documents;

A-114

(vii)    all Equipment (other than Vehicles and title documents with respect to Vehicles)

(viii)    all General Intangibles;

(ix)    all Goods;

(x)    all Fixtures;

(xi)    all Instruments;

(xii)    all Intellectual Property;

(xiii)    all Inventory;

(xiv)    all Investment Property;

(xv)    all Letters of Credit and Letter-of-Credit Rights;

(xvi)    upon the making of a request by Secured Party pursuant to Section 3.3(iv) hereof, all Vehicles and title documents with respect to Vehicles;

(xvii)    all Supporting Obligations;

(xviii)    all other property not otherwise described above;

(xix)    all books and records pertaining to the Landlord Lien Collateral; and

all Proceeds and products of any and all of the foregoing, all substitutions and replacements for and all rents and profits of, each of the foregoing, all General Intangibles and indemnities relating to each of the foregoing, and all collateral security and guarantees given by any Person with respect to any of the foregoing

"**Term**" is defined in Article A, Section 2(a).

"**Termination Date**" is defined in Section 24.5.

"**Test Date**" shall mean the last day of each calendar quarter.

"**Test Period**" shall mean a period a Test Date and comprised of the twelve (12) most recent calendar months then ended (taken as one accounting period).

"**Third Party Payor**" shall mean Medicare, Medicaid, Tricare, Veteran's Administration, commercial and private insurers, managed care company, employee assistance programs, HMOs, preferred provider organizations and/or any other governmental, commercial, or other organization which maintains a healthcare reimbursement program or policy.

A-115

"**Threshold Amount**" is defined in Section 5.4(h).

"**Transfer**" is defined in Section 9.1.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as in effect in the State of Illinois/Missouri, and any successor statute, as in effect from time to time. Any term used in the Uniform Commercial Code and not otherwise defined in this Lease has the meaning given to the term in the UCC (except, that, terms used herein which are defined in the Uniform Commercial Code as in effect in the State of Illinois/Missouri on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Secured Party may otherwise determine).

"**Value Notice**" is defined in Section 16.5(a).

"**Vehicles**" shall mean all cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state.

"**Work**" is defined in Section 5.5.

"**Working Capital Lender**" individually or collectively (as the context requires) shall mean from time to time any working capital lender or cash flow of which Tenant or any Affiliate of Tenant is a borrower, where the collateral given therefore includes some or all of the Landlord Lien Collateral.

"**Working Capital Loan**" shall mean any borrowing or other means of financing or refinancing by Tenant or any Affiliate of Tenant from a Working Capital Lender, including (a) term loans for the purpose of financing Tenant's Personal Property in place as of the date of this Lease; (b) line of credit or similar loans for the purpose of financing ongoing business operations of Tenant; (c) loans for the purpose of financing the purchase of items that qualify as Tenant's Personal Property following the date of this Lease, provided, however such loans shall not exceed the fair market value of such Tenant's Personal Property; (d) loans for the purpose of financing Alterations to the Premises, provided that the lien of a Working Capital Loan for such purpose shall not attach to the Premises and (e) any other loans or financing arrangements.

"**Working Capital Collateral**" shall mean those assets described more fully on Schedule F, attached to this Lease

**SCHEDULE E**

**<u>FORM OF OPERATIONS TRANSFER AGREEMENT</u>**

A-117

**SCHEDULE F**

**FORM OF GUARANTY**

Landlord and Tenant agree that the form of Guaranty will provide for a $15 million cap as the maximum amount of Guarantor's guaranteed obligations.

Landlord and Tenant also agree that the Guaranty will terminate following the sustained increase in the Minimum Net Worth of Tenant above $10 million.

[**DRAFTING NOTE:** *Landlord and Tenant will negotiate the open issue of a reduction of Guarantor's maximum liability based upon sustained increases in the Minimum Net Worth of Tenant, but at amounts less than $10 million.*]

**SCHEDULE G**

**<u>ENVIRONMENTAL REPORTS</u>**

## SCHEDULE H

## APPROVED FORM OF MANAGEMENT AGREEMENT

## MANAGEMENT AGREEMENT

**THIS MANAGEMENT AGREEMENT (the "Agreement")** is made and entered effective as of xxx by and between **xxx** (the "Operator"), and **PETERSEN HEALTH CARE MANAGEMENT, LLC,** an Illinois limited liability company (the "Manager").

W I T N E S S E T H

**WHEREAS**, Operator is the Operator of the nursing home facilities listed in Exhibit A attached hereto and incorporated herein by reference (the "Facilities");

**WHEREAS**, Operator leases and occupies the Facilities pursuant to a Master Lease Agreement by and among Operator and _____ ("Owner") dated _____, 2018 (the "Master Lease"); and

**WHEREAS**, Operator and Manager desires to enter into this Agreement to engage Manager to manage the Facilities upon the terms and conditions contained herein.

**NOW, THEREFORE**, with the intent to be legally bound and in consideration of the mutual covenants and benefits contained herein, Operator and Manager hereby agree as follows:

## I. RETENTION OF MANAGER

**1.1** **Retention**. Subject to the terms and conditions hereinafter set forth, Operator retains and appoints Manager to manage the Facilities. Manager accepts such appointment and agrees that it will: (a) faithfully perform its duties and responsibilities as set forth in this Agreement; (b) use all reasonable efforts to supervise and direct the management of the Facilities in an efficient manner; and (c) consult with Operator and keep Operator advised of all major policy matters relating to the operation of the Facilities. Subject to the foregoing and to the other provisions of this Agreement, and absent specific direction from the Operator, Manager is solely responsible for decisions regarding the management of the Facilities, including the responsibility to determine all policies and actions affecting the appearance, maintenance, standards of operation, quality of service, and any other matter affecting the Facilities. Any contrary provision herein notwithstanding, by entering into this Agreement, Operator does not delegate to Manager any of the powers, duties and responsibilities vested in Operator by law or its organization documents. Operator shall be considered the official provider of record for Medicaid purposes and shall hold all authorizations and licenses necessary or incidental thereto with respect to the Facilities as and to the extent required under applicable law.

**1.2** **Relationship of Parties**. The relationship of Operator and Manager is that of an independent contractor. No provision contained herein shall be construed to create a partnership, joint venture, fiduciary or employment relationship.

**1.3** **Exclusion**. Neither Manager nor any of its owners, officers, directors, managers, or employees are excluded from participation in any federal health care programs, as defined under 42 U.S.C. 1320a-7b(f), or any form of state Medicaid program (each, an *"Exclusion"),* and to Manager's knowledge, there are no pending or threatened governmental investigations that may lead to such

12462499v3

Exclusion. Manager agrees to indemnify Operator and save it harmless from any penalty, loss, cost, or damage Operator may incur as a result of an Exclusion.

## II. **EFFECTIVE DATE**

**2.1** **Effective Date**. Manager shall assume the management of the Facilities pursuant to the terms and conditions of this Agreement effective as of xxx (the "Effective Date").

**2.2** **Term**. Unless earlier terminated, in accordance with the provisions of this Agreement, this agreement shall terminate on xxxx.

## III. **MANAGEMENT FEES**

**3.1** **Management Fee**.

**(a)** **Amount**. The compensation payable to Manager by Operator for the services to be rendered during the term of this Agreement shall never exceed an amount equal to six percent (6.0%) of the Adjusted Gross Revenues of the Facilities as hereinafter defined. The monthly management fee shall consist of a Fixed Fee and Percentage Fee, as those terms are defined below (the Fixed Fee and the Percentage Fee shall be referred to collectively as the "Management Fee"), which shall be calculated and paid by Operator as follows:

**1.** **Fixed Fee**. Manager shall be paid by Operator a monthly fixed fee for the Facilities (the "Fixed Fee"). The fixed fee schedule is attached as **Exhibit "A".** The fixed fee shall be subject to review on each annual anniversary of the Effective Date of this Agreement; plus

**2.** **Percentage Fee**. Manager shall be paid by Operator an additional amount (the "Percentage Fee"), which shall be calculated as follows: (a) six percent (6.0%) of the Adjusted Gross Revenues generated at the Facilities during the previous month; less (b) the Fixed Fee paid by such Facilities during the previous month; provided, however, that the Percentage Fee paid during any consecutive twelve (12) month period shall never exceed the Fixed Fee paid by such Facilities during that same consecutive twelve (12) month period; provided, further, that the total Fee paid hereunder shall never exceed the maximum limitations discussed in Section 3.1(a) above at any time during the term of this Agreement.

**(b)** **Adjusted Gross Revenues**. "Adjusted Gross Revenues" shall mean all revenues received or booked by reason of the operation of the Facilities, or any other use of the Facilities, including, without limitation, all patient or client revenues received for the use of or otherwise by reason of all rooms and beds provided, meals served, services performed or provided, space or Facilities subleased or goods sold at such Facilities, provided, however, that Adjusted Gross Revenues shall not include:

**1.** Revenue from professional fees or charges by physicians and unaffiliated providers of ancillary services which are separately billed and not included in comprehensive fees;

**2.** Non-operating revenues such as interest income, investor note payments or income from the sale of assets not sold in the ordinary course of business;

3. Contractual allowances for billings not paid by or received from the appropriate governmental agencies or third-party providers;

4. All proper patient billing credits and adjustments, including uncollectable accounts, according to generally accepted accounting principles relating to health care accounting and consistent with Section 4.9 below; and

5. Proceeds from the sale of any assets.

Adjusted Gross Revenues shall include the collection of any account that has been charged off and is later collected; provided, however, that a Management Fee may not be collected twice on any revenue.

(c) **Out of Pocket Expenses**. Operator shall reimburse Manager for all reasonable out-of-pocket expenses associated with any refinancing, business planning and construction and renovation projects incurred by Manager not in the ordinary course of business.

**3.2** **Payment Dates**. The Management Fee payable to Manager shall be due and payable on the first day of each month for the preceding calendar month. Manager is hereby authorized and directed to withdraw and pay the Manager for its services as provided for herein on the due dates thereof from the Operating Accounts (as hereinafter defined).

## IV. <u>MANAGEMENT OF FACILITIES</u>

**4.1** **General Management**. Manager shall manage the Facilities through the supervision of resident and patient care and shall perform all duties and functions necessary for the proper operation of the Facilities as required by law or government regulation and within the general policies, directives and guidelines approved by Operator. In accordance with the terms of this Agreement, Manager will perform all accounting, bookkeeping, and record keeping services, provide all financial reports and supervision of financial matters, arrange for the general maintenance and repair of the Facilities including planning and oversight of construction of additions to the Facilities, arrange for supplying of the Facilities, and supervise the training and employment of all personnel of the Facilities.

**4.2** **Standard of Care and Quality Control**. Manager shall manage the Facilities in accordance with all applicable industry and professional standards and with the objective of becoming the provider of choice with respect to quality of care in a prudent and cost-conscious manner. Manager shall establish a quality control care evaluation program for the Facilities to provide a thorough and complete measurement and assurance of quality health care and shall report to the Operator regarding such program. Manager shall immediately notify Operator in writing, and upon request, provide Operator with copies of all extraordinary inspection of care surveys, plans of corrections, notices of complaint violations, and any and all other documents relating to Medicaid or Medicare rates or certification, licenser issues or quality of care issues received by Manager.

**4.3** **Professional Staff Specialists**. As part of its duties and obligations hereunder, Manager shall, at its expense unless otherwise provided herein, make available to the Facilities for consultation and advice its staff of professional specialists as necessary to provide the services under this Agreement. Staff specialists will include persons skilled in accounting and internal auditing, forecasting and budgeting, human resources and risk management, marketing, inventory and purchasing systems, third-party reimbursement for applicable Medicare, Medicaid and insurance programs (exclusive of cost report preparation costs).

**4.4** **Licenses, Permits and Regulations**. As of the Effective Date, Operator represents that all licenses and permits for the Facilities (collectively, the "Licenses and Permits") are in good standing and that

the Manager has been informed of any notices of material default, charges, deficiencies, or revocation that are pending or threatened against the Facilities. Manager shall further:

(a)     Make all reasonable efforts to ensure that the Facilities and the operation thereof comply with all federal, state and local laws, regulations and ordinances applicable to the Facilities;

(b)     Promptly provide to Operator immediately after receipt by Manager, all notices, reports or correspondence from governmental agencies that assert any material deficiencies or charges against any Facilities or that otherwise relate to the suspension, revocation, or any other action adverse to any approval, authorization, certificate, determination, license or permit required or necessary to own or manage such Facilities and any plans of correction filed in response thereto, together with any notices threatening or imposing civil monetary penalties upon Operator or the Facilities; and

(c)     Apply for and obtain and maintain in the name of and at the expense of the Operator, all licenses and permits required in connection with the management and operation of the Facilities. Operator agrees to cooperate with Manager in applying for, obtaining and maintaining such licenses and permits.

**4.5     Insurance**. Manager shall apply for and obtain and maintain all necessary insurance coverage on behalf of Operator and at Operator's expense. The following insurance in such amounts and coverage as may be mutually agreed upon by the Operator and Manager or as may be required by any applicable loan documents and the Lease, whichever is greater:

(a)     Insurance on the Facilities (including the furnishings and equipment), exclusive of excavation, foundations and footings, against loss and damage by fire and lightning, with coverage extended to include, by means of an extended coverage endorsement to a fire insurance policy, loss or damage arising out of windstorm, hail, explosion (except boiler), riot, strikes, civil commotion, and sprinkler damage;

(b)     Insurance on the Facilities against loss or damage from explosion of boilers, heating apparatus, pressure vessels, and pressure pipes installed in the Facilities, without co-insurance clauses so long as available;

(c)     Comprehensive public liability, including automobile liability, products liability, medical malpractice and professional liability, and property damage insurance insuring Operator and Manager against loss or liability for damages or personal injury, death, or property damage arising or resulting from the management and operation of the Facilities;

(d)     Worker's compensation and other similar insurance as may be required by law or as may be required to insure Operator and Manager against loss for the payment of damages for such liabilities as may be imposed by law;

(e)     Unemployment compensation insurance through the appropriate State agency;

(f)     Business interruption insurance.

(g)     Such other insurance as may be required by law or prudent business management.

Manager shall submit to Operator for its approval a proposal setting forth the kinds and amounts of insurance which Manager intends to provide in connection with the operation of the Facilities (including,

without limitation, insurance of the kinds and in the respective amounts described in Paragraphs (a) through (g) above) and Operator shall be deemed to have approved such proposal unless Operator objects in writing within thirty (30) days of submission of the proposal by Manager. All insurance provided for under the foregoing provisions of this section shall be effected by policies issued by insurance companies of good reputation and sound and adequate financial responsibility, licensed, and qualified to do business in the appropriate jurisdiction. Any insurance of the character described in the foregoing provisions of this section may be effected by Manager by policies of blanket insurance which may cover other Facilities managed by Manager, the premium of which may be allocated on a pro rata basis among the various properties, including the Facilities, covered by said policies, and such allocated portion of said premium cost shall be borne by Operator. It is further understood and agreed that the policies of insurance provided for in this section may contain deductible provisions in such amounts as are maintained with respect to other Facilities managed by Manager and approved by Operator.

All of the policies of insurance described herein shall be carried in the names of Operator, Manager and any secured party under any security instrument from time to time outstanding affecting the Facilities. Any losses payable under such policies of insurance shall be payable to Operator, Manager and any secured party, as their respective interests may appear. Each of the policies of insurance referred to herein shall insure Operator and Manager, together with their respective directors, officers, agents, and employees. Manager shall secure certification of such insurance for the Facilities, shall maintain the original of all such policies at the office of the Manager, shall deliver duplicate policies to Operator and to any lienholder who requests a certificate, and shall procure endorsements thereto prohibiting any termination or cancellation thereof until the expiration of ten (10) days written notice of cancellation to all named insured parties, or such longer periods prescribed in the Operator's agreements with any lienholder.

Notwithstanding any provision of this Agreement to the contrary, all insurance carried by Manager shall satisfy the requirements and the insurance obligations of Operator arising under the Lease.

**4.6** **Purchase of Supplies, Equipment and Services**. Manager shall implement and maintain a complete system for the purchase of all items needed for the operation of the Facilities, including all supplies, equipment and services. Manager shall utilize its purchasing program and uniform systems of inventory control and strive to obtain the lowest cost for these items consistent with maintaining the operation of the Facilities in a first class manner and consistent with the directives of Operator. All purchases shall be made in the name of the Operator for the account of the Facilities. Manager may purchase any item or service from a company providing goods and services under a multi-Facilities contract which includes Operator's Facilities and those owned by any other party; provided, however, that: (a) the purchase price of such items are competitive to the prices of such items generally available in the market area of the Operator's Facilities; and (b) the execution of such agreement otherwise complies with all applicable state and federal laws governing such agreements.

**4.7** **Contracts and Other Services**. Manager shall, in the name of Operator and for the account of the Facilities, negotiate and execute such agreements and contracts which it may deem necessary or advisable for the operation of the Facilities, including but not limited to the furnishing of utilities, extermination and refuse removal, and other services provided to the Facilities by independent contractors. Manager shall obtain the prior written approval of Operator for any contract or agreement which has a term longer than the minimum term of this Agreement.

**4.8** **Capital Improvements, Repairs and Replacements**. Manager shall, in the name of Operator, subject to Operator's approval and for the account of the Facilities, negotiate and execute such agreements and contracts which it may deem advisable for the capital improvements to, or repairs of, or replacement of, the Facilities' physical property, plant and equipment in order to keep and maintain the Facilities in good working order and condition.

12462499v3

**4.9** **Rates and Collection**. Manager shall, in the name of Operator and subject to Operator's approval, set the rate of health care fees and charges to patients and residents, ancillary service fees, and all other costs and charges. Operator and Manager recognize and agree to maintain a level of rates and charges sufficient for the operation of the Facilities and to provide for the payment of all expenses and for the provision of all reserves as may be determined by Operator.

**4.10** **Legal Actions**. Manager may institute, in the name of Operator and subject to Operator's approval, any and all legal actions or proceedings to collect charges, rent, or other sums due the Facilities or to lawfully oust or dispossess tenants. Such approved actions shall be at the expense of Operator. In consultation with Operator, Manager may lawfully cancel, modify, or terminate any lease, license, or concession agreement for the breach thereof or default thereunder by the tenant, or concessionaire. Unless otherwise directed by Operator, and with the prior approval of Operator and at Operator's expense, Manager shall take appropriate steps to protect and/or litigate to final judgment in any appropriate court any violation, order, rule, or regulation affecting the Facilities. Any counsel to be engaged under this section shall be approved by Operator, which approval shall not be unreasonably withheld, and Manager shall promptly notify Operator of all legal actions immediately upon receipt.

**4.11** **Non-Competition/Non-Solicitation**. [Insert terms of Non-competition and Non-Solicitation from Lease.]

## V. PERSONNEL

**5.1** **Operator's Employees**. Manager shall hire, promote, discharge and supervise the work of the Facilities' administrator, assistant administrator, department heads and all operating and service employees performing services in and about the Facilities. Except as provided in Section 5.2 of this Article, the Facilities' administrator and all employees working under the administrator shall be employees of Operator on the Operator's payroll. Manager shall not be liable to such employees for their wages or compensation nor shall Manager be liable to Operator or to others for any act or omission on the part of such employees unless Manager has failed to use reasonable diligence in the hiring, discharge, and supervision thereof. Reasonable care shall be used in the selection of qualified, competent, and trustworthy employees.

**5.2** **Manager's Employees**. In the event that the Facilities is not able to hire the appropriate personnel to operate such Facilities, Manager may place at such Facilities an employee of Manager to fill the vacant position. During the first thirty (30) days of such replacement Operator shall pay to Manager the cost of such personnel, including all fringe benefits. After the first 30 days, Operator shall pay to Manager the sum of salary plus fringe benefits of the last incumbent in the vacant position being temporarily filled by Manager's employee. Any exception to these provisions must have the prior approval by Operator. The term "fringe benefits" as used herein shall include but not be limited to the employer's contribution of FICA, unemployment compensation, and other employment taxes, retirement plan contributions, worker's compensation, group life, accident, health insurance premiums, disability, retirement and other similar benefits. All such employees of Manager shall be covered by appropriate malpractice and/or errors and omissions insurance at Manager's expense.

**5.3** **Employee Benefits**. If in the reasonable opinion of Manager it is necessary or desirable at any time during the term of this Agreement to provide the employees of the Facilities with a pension or other employee retirement, disability or benefit plan similar to those now or hereafter applicable to employees of Manager's other managed Facilities, Manager shall recommend to Operator that it either: (a) elect to adopt such plan or plans, provided the provisions of such plan or plans permit such action and Operator is designated as an affiliated company by Manager; or (b) establish a similar independent plan or plans for the benefit of the employees of the Facilities. The establishment of such plan or plans or any fringe benefits shall be within the sole discretion of Operator and at Operator's sole cost and expense.

5.4 <u>**Labor Contracts**</u>. Manager will negotiate, in accordance with Operator's directives, with any labor union lawfully entitled to represent the employees of the Facilities, and may approve such agreements or contracts as it deems to be in the best interest of all parties. Nothing herein shall preclude Operator, at its expense, from exercising any right it may have to designate and authorize a representative, agent or attorneys, other than Manager, to perform the negotiations contemplated herein and approve and execute any agreement or contract arising therefrom.

5.5 <u>**Manuals**</u>. Manager shall prepare and maintain manuals at the Facilities for each department normally provided by Manager and any manuals required by any regulatory authorities, with Operator to be furnished with a copy of all such manuals upon request. Included in such manuals shall be instructions to the Operator's employees on the programs and procedures for marketing the Facilities in their respective communities.

5.6 <u>**Employee Handbook**</u>. Manager shall include in each employee handbook a section explaining in detail all employee benefits available to an employee, including without limitation, any medical insurance or reimbursement programs, tuition reimbursement, or any and all other benefits provided to employees. Manager shall designate at least one contact person in the employee manual whom employees may contact with questions or problems relating to any issues arising therein or under any other matters which may arise in the course of such employee's employment.

5.7 <u>**Corporate Compliance Plan**</u>. Manager shall maintain Operator's Corporate Compliance Plan. Manager shall be responsible for training Administrators and all other employees in Operator's Facilities and for periodic reinforcement training. Manager shall designate a Corporate Compliance Officer who is designated to receive reports and complaints, to keep records of such reports, to follow-up timely with corrective actions, and to keep Operator informed of all reports and corrective actions taken.

## VI. <u>FISCAL CONTROLS, PROCEDURES AND REPORTS</u>

6.1 <u>**Accounting Services**</u>. The accounting services to be performed or supervised by Manager in accordance with this Agreement shall include the following:

(a) Manager shall provide to Operator, within forty-five (45) days after the conclusion of each quarter, quarterly financial statements for the Facilities which shall contain current quarter and year-to-date actual balance sheets, income statements and capital budgets which shall be compared against the detailed budgets, and an aged accounts receivable and accounts payable summaries for the Facilities;

(b) The maintenance of all records for resident billing, billing for all accounts receivable and collection of same;

(c) The maintenance of all records for accounts payable and the payment of same;

(d) The maintenance of all payroll functions, including, but not limited to, the preparation of payroll checks, establishment of depository accounts for withholding taxes, the timely filing of payroll reports and returns, the timely payment of all such taxes on behalf of the Operator and the timely issuance of W-2 forms to all employees;

(e) The maintenance of a complete general ledger recording and summarizing the transactions of the Facilities. Manager shall prepare complete accounting journals and general ledgers with appropriate audit trails and shall retain all supporting documents in a manner efficient for retrieval;

(f)     Oversight of the preparation and timely, accurate filing of all reports, including without limitation, any Medicaid or Medicare cost reports, applicable sales, use or occupancy tax returns and any home office cost reports (if applicable), with the appropriate governmental reimbursement and licensing agencies or entity and any audited financial reports, with the cost of preparing and filing such reports to be paid by Operator.  All information necessary to prepare these reports shall be furnished by Manager to Operator in a timely fashion;

(g)     The timely preparation of such schedules as may be necessary to assist Operator's independent auditors in the performance of any audits of Operator, and to provide any and all other assistance to, and oversight of, Operator's auditors as may be reasonably requested;

(h)     Manager shall furnish Operator with any other reasonable reports that Manager has at its disposal as may be requested by Operator, at Manager's expense.

**6.2** **Books and Records**.  All books, records, reports, data files, and any other electronic medium for the storage of information relating to the Facilities, the management of the Facilities and the financial records relating thereto, and any and all other documents of any kind or nature, whether prepared by Manager for or in connection with the operation of the Facilities, shall be the property of the Operator; provided, however, that subject to Operator's prior written approval, Manager may make such copies thereof or extracts therefrom, at Manager's sole expense, for its own use. In addition, to the extent any records, reports and other documents of any kind or nature are electronically maintained by Manager, Operator is hereby granted by Manager the right to use Manager's software and hardware for a period of not less than ninety (90) days following termination of this Agreement to allow Operator to transfer such information maintained electronically into a usable format by Operator.

**6.3** **Retention of Records**.  It is hereby understood by both parties that:

(a)     Manager will maintain all records pertaining to the management of Operator's Facilities in accordance with all applicable federal, state and local laws and regulations.  Such records will be made available to appropriate governmental agencies and other third parties as provided by law.  Upon termination of this Agreement, Manager shall transfer all such records to Operator and will reasonably cooperate in any subsequent audit or review by any governmental agency or in any legal action resulting from an occurrence during the term of Manager's management of the Facilities; and

(b)     Until the expiration of four (4) years after the furnishing of any services pursuant to this Agreement, the parties to this Agreement will make available, upon written request of the Secretary of Health and Human Services, or the Comptroller General of the United States, of any of their fully authorized representatives, copies of this Agreement and any books, documents, records and other data of either party that are necessary to certify the nature and extent of costs incurred by either party for said services; and

(c)     Subject to the terms and conditions of this Agreement, if either party to this Agreement carries out any of its duties under this Agreement through a subcontract through a related organization involving a value or cost of $10,000.00 or more over a twelve (12) month period, each party will cause such subcontract to contain a clause to the effect that, until the expiration of four (4) years after the furnishing of any service, pursuant to said contract, the related organization will make available, upon written request of the Secretary of Health and Human Services, or the  Comptroller General of the United States, or any of their duly authorized representatives, copies of said contract and any books, documents, records, and other data of said related organization that are necessary to certify the nature and extent of costs incurred by either party for said services.

**6.5** **Cash Management**. Manager shall maintain individual bank accounts to be designated by Operator for the Facilities and Manager shall comply with Operator's policy for movement, segregation, sweeps or other aggregation of cash which shall be set forth in writing by Manager and approved by Operator, except for patient trust accounts which shall be maintained in a separate local account in accordance with any applicable state or federal regulations. Manager shall keep all patient billings current and shall pay all approved accounts payable on a timely basis. All accounts shall be in the name of Operator and all such accounts shall be referred to as the "Operating Accounts." As contemplated herein, Manager is hereby authorized to disburse and pay funds from the Operating Accounts in the name of or on behalf of Operator in such amounts and at such times as the same are required to be made (if funds are available) in connection with the management of the Facilities, including, but not limited to, the following:

(a)     The Operatorship, maintenance and management of the Facilities as set forth in this Agreement;

(b)     Payment of all real estate taxes, penalties, and interest for the Facilities;

(c)     Payment of any Management Fee to which Manager is entitled to receive pursuant to this Agreement; and

(d)     Payment of any non-budgeted expenditure in an amount and to the extent permitted by the Operator for the Facilities.

**6.6** **Operating Capital**. Operator shall provide Manager with such amount of operating capital as may be required from time to time for the operation of the Facilities on a sound financial basis. If additional capital is required, Manager shall notify Operator in writing and Operator shall provide Manager with such increase in capital within five (5) days thereafter. If Operator fails to provide such additional capital, Manager may, with the prior consent of Operator, provide the same as a loan to Operator that shall bear interest until repaid at rates currently charged by financial institutions for a similar borrowing.

**6.7** **Capital Improvements**. Operator shall provide Manager with such amount of funds as may be required from time to time to make all necessary capital improvements to the Facilities in order to maintain and continue the desired standards of operation of the Facilities as a nursing home. If additional capital improvement funds are required, Manager shall notify Operator in writing and Operator shall provide Manager with such increase in capital improvement funds within thirty (30) days thereafter. If Operator fails to provide such capital improvement funds, Manager may, with the prior consent of Operator, provide the same as a loan to Operator that shall bear interest until repaid at rates currently charged by financial institutions for a similar borrowing. **[AGG NTD: Should this be subject to an agreed-upon annual budget?]**

**6.8** **Rights of Inspection**. At any time during the term of this Agreement, Operator shall have the right to inspect all parts of the premises upon which the Facilities are located and shall have the right to inspect and audit, at reasonable times, all books and records pertaining thereto. Operator also has ready access to the Facilities to allow potential purchasers or lessors to view and inspect the Facilities.

## VII. TERMINATION

**7.1** **Termination For "Cause."** The following shall be deemed to be an event of material default under this Agreement:

(a)     Negligence, mismanagement, fraud, or willful misconduct by Manager in the performance of its duties hereunder;

(b)      A party's material breach of any term, provision, agreement, representation, warranty or covenant of this Agreement;

(c)      Receipt by Manager or Manager's employees of any undisclosed cash payments or other extraordinary consideration from a supplier resulting from the purchase by Operator's Facilities of any goods, equipment or services from such supplier;

(d)      If Petersen Health Care Management, LLC. is not the Manager;

(e)      Any substantial and material change in Manager's professional staff;

(f)      If either party shall voluntarily apply for, or consent to, the appointment of a receiver, trustee or liquidator of all or substantially all of its assets, file a voluntary petition in bankruptcy or admit in writing its inability to pay its debts as same become due, make a general assignment for the benefit of creditors or to avail itself of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating such party a bankrupt or insolvent, or appointing a receiver, trustee or liquidator for such party and such order, judgment or decree shall continue un-stayed and in effect for any period of ten (10) consecutive days; or

(g)      If the Facilities or a major portion thereof shall be damaged or destroyed by fire or other casualty and if the Operator fails to undertake to repair, restore or rebuild or replace any such damage or destruction within forty-five (45) days after such fire or other casualty, or shall fail to complete such work diligently once begun, then in case of either such event this Agreement may be terminated by Manager, but only upon thirty (30) days' written notice and only with respect to such Facilities.

In the event that a material default by Operator or Manager of the type specified above continues for a period of thirty (30) days after written notice from the non-defaulting party setting forth the specific event of material default, the non-defaulting party may, at its sole option, terminate this Agreement by giving the defaulting party written notice of the decision to terminate, which termination shall be effective immediately.

**7.2**      **Duties Upon Termination**.  In the event of termination of this Agreement:

(a)      Manager shall deliver to Operator, within forty five (45) business days of termination, all books, invoices, billing documents and such other records and documents or information with regard to the management and operation of the Facilities for which this Agreement is being terminated which are in the possession, custody or control of Manager, its officers, agents, servants or employees;

(b)      Manager shall deliver to Operator all deposits of patient trust funds received by Manager on behalf of and for the personal use of patients who reside at the Facilities for which the Agreement is being terminated, together with a list of all such patients and the amount to which each is entitled.  Manager does hereby indemnify Operator from any and all claims and losses arising out of any actions or omissions by Manager in connection with the handling of trust fund deposits during the term of this Agreement; and

(c)      Manager shall turn over to Operator possession of the Facilities for which this Agreement is being terminated on the date of the termination.

## VIII. <u>CONDEMNATION</u>

If the whole of the Facilities shall be taken or condemned in any eminent domain, condemnation, compulsory acquisition, or like proceeding by any competent authority for any public or quasi-public use or purpose or if such portion thereof shall be taking or condemned as to make it imprudent or unreasonable, in Manager's reasonable opinion, to use the remaining portion as a nursing home of the type and class immediately preceding such taken or condemnation, then the term of this Agreement shall cease and terminate on the date of which Operator shall be required to surrender possession of such Facilities. Manager shall continue to supervise and direct the management of such Facilities until such time as Operator shall be required to surrender possession of such Facilities as a consequence of such taking or condemnation. If only a part of the Facilities shall be taken or condemned and the taking or condemnation of such part does not make it unreasonable or imprudent, in Manager's reasonable opinion, to operate the remainder as a nursing home of the type and class immediately preceding such taking or condemnation, this Agreement shall not terminate.

## IX. <u>ARBITRATION</u>

If any controversy should arise between the parties in performance, interpretation, and application of this Agreement which involves accounting matters, either party may serve upon the other a written notice stating that such party desires to have the controversy reviewed by an arbitrator, who shall be a representative of a firm of certified public accountants with an expertise in accounting practices and procedures in the medical services industry. It the parties cannot agree within fifteen (15) days from the service of such notice upon the other party upon the selection of such arbitrator, he shall be selected or designated by the American Arbitration Association and the decision and award of the arbitrator so selected shall be binding upon the Operator and Manager. The arbitration will be held in Peoria, IL. As a condition precedent to the appointment of any arbitrator, both parties shall be required to make a good faith effort to resolve the controversy, which effort shall continue for a period of thirty (30) days prior to any demand for arbitration. The cost of any such arbitration shall be shared equally by the parties. Each party shall pay its own costs incurred as a result of its participation in any such arbitration. If the issue to be arbitrated is Manager's alleged breach of this Agreement and as a result thereof, Operator has the right to terminate this Agreement, Manager shall continue to manage the Facilities hereunder pending the outcome of such arbitration.

## X. <u>ASSIGNMENT</u>

**10.1** <u>Assignment by Manager</u>. Manager shall not have the right to assign this Agreement to another entity without obtaining the prior written approval of Operator.

**10.2** <u>Sale, Assignment, or Lease by Operator</u>. Any sale, lease or assignment with respect to Prairie Rose Health Care Center shall provide for an orderly management transition plan, the timing of which shall provide manager with a minimum of 180 days following the date of sale to ensure a smooth transition between managers (assuming a change in manager is contemplated).

## XI. <u>MISCELLANEOUS</u>

**11.1** <u>Notices</u>. All notices permitted or required hereunder shall be in writing and shall be deemed to have been duly given when delivered personally or when deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested, addressed to Operator or Manager, as the case may be, as follows:

12462499v3

**OPERATOR**:                    xxx

**MANAGER**:                    Petersen Health Care Management, LLC
                                830 W. Trailcreek Drive
                                Peoria, IL 61614
                                Attn: Mark B. Petersen

or to such other address and to the attention of such other persons or officers as either party may hereafter designate in writing by notice duly given.

**11.2    Indemnity**.  Subject to the provision hereof, each party hereto hereby respectively covenants and agrees to indemnify and hold harmless the other party from and against any damage, loss, cost or expense, including, but not limited to, any and all claims, demands, causes of action, court costs, fines, damages, judgments and reasonable attorney's fees (collectively, "Losses"), incurred by either such party in connection with any of the foregoing, as a result of the breach of any provision of this Agreement by such indemnifying party.  In addition, Manager hereby covenants and agrees to indemnify and hold harmless Operator from and against any Losses arising from or in connection with Manager's errors or omissions or willful misconduct in providing services hereunder.  The indemnified party will have the right, through counsel of its choice, to control any matter to the extent it could directly or indirectly affect said party financially.

**11.3    Complete Agreement**.  This Agreement contains the full and complete agreement between the parties hereto, and all prior negotiations and agreements pertaining to the subject matters hereof are merged into this Agreement.  This Agreement is one that cannot be modified or altered, irrespective of what might take place or occur, unless each of the parties hereto expressly agrees to such modification in writing.

**11.4    Severability**.  In the event any provisions hereof shall be held invalid by any court in any respect, such adjudication shall not invalidate or render ineffective the remaining provisions of this Agreement, which provisions shall remain in full force and effect as if this Agreement had been executed with the invalid portions thereof eliminated.  It is hereby declared the intention of the parties that they would have executed the remaining portions of this Agreement without including any such part, parts, or portions that may, for any reason, be hereafter declared invalid.

**11.5    Governing Law**.  This Agreement shall be governed by and shall be construed and interpreted in accordance with the laws of the State of Illinois.

**11.6    Warranty of Authority**.  The parties each warrant and represent that they have the full power and authority to execute this Agreement, that the agents, attorneys, officers, employees, directors or representatives who are executing this Agreement have been duly and lawfully authorized to do so by all requisite corporate action, that no promise, agreement, or obligation herein contained is constrained, limited, or prohibited under any law, statute, regulation, rule or rule of decision of the United States or any State, and that all acts, proceedings, and things necessary to enter into this Agreement, to perform the covenants and undertakings to be performed hereunder, and to bind them to the terms and provisions thereof, or proper in the premises thereof, have been done, taken, and performed.

**11.7    Amendments**.  From time to time, experience or business conditions may warrant that this Agreement be amended.  Upon mutual agreement of Operator and Manager, any such amendments shall be in writing, executed by both parties, and appended to this Agreement.

**11.8    HIPAA Compliance.**  The parties agree that the services provided under this Agreement will comply in all material respects with all federal and state-mandated regulations, rules, or orders

applicable to the services provided herein, including but not limited to regulations promulgated under Title II, Subtitle F of the Health Insurance Portability and Accountability Act (Public Law 104-91) ("<u>HIPAA</u>").  The parties shall contemporaneously herewith, execute a Business Associate Addendum sufficient to meet their respective obligations under HIPAA, in the form attached hereto as **<u>Exhibit B.</u>**

     **11.9**    **<u>Compliance with Master Lease.</u>**  Manager acknowledges that Manager has received a copy of the Master Lease and acknowledges that Operator occupies and operates the Facilities pursuant and subject to the terms and conditions thereof.  Notwithstanding anything to the contrary in this Agreement, the parties agree that Manager shall at all times conduct its performance under this Agreement in a manner that will cause Operator to comply with the terms and conditions of the Master Lease.  In the event of any conflict between the terms of this Agreement and the terms of the Master Lease with respect to the obligations of Operator and Manager thereunder or under this Agreement, the terms of the Master Lease shall control.

*[Signatures on next page.]*

**IN WITNESS WHEREOF**, the parties do hereby execute this Agreement effective as of the date and year written above.

**OPERATOR:**

By: _____
Mark B. Petersen
Its:    President

**MANAGER:**

**PETERSEN HEALTH CARE, MANAGEMENT, LLC,**
an Illinois limited liability company

By: _____
Mark B. Petersen
Its:    Manager

## EXHIBIT "A"

**FACILITIES AND FIXED FEE**

**Name of Facilities**                                                  **Monthly Fixed Fee**

**EXHIBIT B**

**ADDENDUM TO MANAGEMENT AGREEMENT**

This addendum ("Addendum") amends and is made part of the Management Agreement ("Agreement") by and between _____ ("Manager") and _____ ("Operator"). This Addendum shall become part of any modification or renewal of Agreement. Operator and Manager mutually agree to modify the Agreement to incorporate the terms of this Addendum to comply with the requirements of the implementing regulations at 45 Code of Federal Regulations ("C.F.R.") Parts 160-64 for the Administrative Simplification provisions of Title II, Subtitle F of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and the requirements of the Health Information Technology for Economic and Clinical Health Act, as incorporated in the American Recovery and Reinvestment Act of 2009 (the "HITECH Act"), that are applicable to business associates, along with any future guidance and/or regulations issued by the Department of Health and Human Services ("DHHS"). Operator and Manager agree to incorporate into this Addendum any regulations issued with respect to the HITECH Act that relate to the obligations of business associates. Manager recognizes and agrees that it is obligated by law to meet the applicable provisions of the HITECH Act.

**A.** **Privacy of Protected Health Information.**

**1.** **Permitted Uses and Disclosures.** Manager is permitted to use and disclose Protected Health Information ("PHI") that it creates or receives on Operator's behalf or receives from Operator (or another business associate of Operator) and to request PHI on Operator's behalf (collectively, "Operator's PHI") only as follows:

**a)** **Functions and Activities on Operator's Behalf.** To perform functions, activities, services, and operations on behalf of Operator, consistent with the Privacy Rule and the HITECH Act, as specified in the Agreement.

**b)** **Manager's Operations.** Manager may use the minimum necessary PHI it creates or receives for or from Operator for Manager's proper management and administration or to carry out Manager's legal responsibilities. Manager may disclose the minimum necessary of PHI for Manager's proper management and administration or to carry out Manager's legal responsibilities only if the disclosure is required by law, or Manager obtains reasonable assurances from the person or organization to whom the information is disclosed that it will remain confidential and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person or organization, and the person or organization notifies Manager (who will in turn promptly notify Operator) of any instances of which it is aware in which the confidentiality of the information has been breached.

**2.** **Minimum Necessary and Limited Data Set.** Manager's use, disclosure, or request of PHI shall utilize a Limited Data Set if practicable. Otherwise, Manager will, in its performance of the functions, activities, services, and operations, make reasonable efforts to use, to disclose, and to request of a Covered Entity only the minimum amount of Operator's PHI reasonably necessary to accomplish the intended purpose of the use, disclosure or request.

**3.** **Prohibition on Unauthorized Use or Disclosure.** MANAGER will neither use nor disclose Operator's PHI, except as permitted or required by this Addendum or in writing by Operator or as required by law. This Addendum does not authorize Manager to use or disclose Operator's PHI in a manner that will violate the 45 C.F.R. Part 164, Subpart E "Privacy of Individually Identifiable Health Information" ("Privacy Rule").

**4.** **Information Safeguards.**

**a)      Privacy of Operator's Protected Health Information.**  Manager will develop, implement, maintain, and use appropriate administrative, technical, and physical safeguards to protect the privacy of Operator's PHI.  The safeguards must reasonably protect Operator's PHI from any intentional or unintentional use or disclosure in violation of the Privacy Rule, 45 C.F.R. Part 164, Subpart E and this Addendum, and limit incidental uses or disclosures made pursuant to a use or disclosure otherwise permitted by this Addendum.

**b)      Security of Operator's Electronic Protected Health Information (ePHI)**.  Manager will develop, implement, maintain, and use administrative, technical, and physical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of ePHI that Manager creates, receives, maintains, or transmits on Operator's behalf as required by the Security Rule, 45 C.F.R. Part 164, Subpart C and as required by the HITECH Act.  Manager also shall develop and implement policies and procedures and meet the Security Rule documentation requirements as required by the HITECH Act.

**5.  Subcontractors and Agents.**  Manager will require any of its subcontractors and agents, to which Manager is permitted by this Addendum or in writing by Operator to disclose Operator's PHI, to provide reasonable assurance, evidenced by written contract, that such subcontractor or agent will comply with the same privacy and security obligations with respect to Operator's PHI that are applicable to Manager under this Addendum.

B.      **Compliance with Transaction Standards.**  If Manager conducts in whole or part electronic Transactions on behalf of Operator for which DHHS has established Standards, Manager will comply, and will require any subcontractor or agent it involves with the conduct of such Transactions to comply, with each applicable requirement of the Transaction Rule, 45 C.F.R. Part 162.

C.      **Individual Rights.**

**1.  Access.**  Manager will, within five (5) days following Operator's request, make available to Operator or, at Operator's direction, to an individual (or the individual's personal representative) for inspection and obtaining copies Operator's PHI about the individual that is in Manager's custody or control, so that Operator may meet its access obligations under 45 C.F.R. § 164.524 and, where applicable, the HITECH Act.  Manager shall make such information available in an electronic format where directed by Operator.

**2.  Amendment.**  Manager will, upon receipt of written notice from Operator, promptly amend or permit Operator access to amend any portion of Operator's PHI, so that Operator may meet its amendment obligations under 45 C.F.R. § 164.526.

**3.  Disclosure Accounting.**  So that Operator may meet its disclosure accounting obligations under 45 C.F.R. § 164.528:

**a)      Disclosures Subject to Accounting.**  Starting the effective date of the Agreement, or on such date as is otherwise required by law, Manager will record for each disclosure, not excepted from disclosure accounting under Addendum Section C.3(b) below, that Manager makes to Operator or a third party of PHI that Manager creates or receives for or from Operator, (i) the disclosure date; (ii) the name and (if known) address of the person or entity to whom Manager made the disclosure; (iii) a brief description of the PHI disclosed; and (iv) a brief statement of the purpose of the disclosure (items i-iv, collectively, the "disclosure information").  For repetitive disclosures Manager makes to the same person or entity (including Operator) for a single purpose, Manager may provide (x) the disclosure information for the first of these repetitive disclosures; (y) the

frequency, periodicity or number of these repetitive disclosures; and (z) the date of the last of these repetitive disclosures. Manager will make this disclosure information available to Operator in a time and manner designated by Operator.

**b)** **Disclosures Not Subject to Accounting.** Manager need not record disclosure information or otherwise account for disclosures of PHI that this Addendum or Operator in writing permits or requires (i) for the purpose of Operator's payment activities or health care operations, (ii) to the individual who is the subject of the PHI disclosed or to that individual's personal representative; (iii) pursuant to a HIPAA-compliant authorization that is signed by the individual who is the subject of Operator's PHI disclosed, or by that individual's personal representative; (iv) to persons involved in that individual's care or payment related to that individual's health care; (v) for notification for disaster relief purposes, (vi) for national security or intelligence purposes, (vii) to law enforcement officials or correctional institutions regarding inmates or other persons in lawful custody, (viii) in a limited data set; (ix) incident to a use or disclosure that Manager is otherwise permitted to make by this Addendum; and (x) otherwise excepted from disclosure accounting as specified in 45 C.F.R. § 164.528.

**c)** **Availability of Disclosure Information.** Unless otherwise provided under the HITECH Act, Manager will maintain the Disclosure Information for at least six (6) years following the date of the accountable disclosure to which the Disclosure Information relates, or for such time period as is otherwise required by law.

Manager will make the Disclosure Information available to Operator within ten (10) days following Operator's request for such Disclosure Information to comply with an individual's request for disclosure accounting.

In addition, where Manager is contacted directly by an individual based on information provided to the individual by Operator and where so required by the HITECH Act and/or any accompanying regulations, Manager shall make such Disclosure Information available directly to the individual.

**4.** **Restriction Agreements and Confidential Communications.** Manager will comply with any agreement that Operator makes that either (i) restricts use or disclosure of Operator's PHI pursuant to 45 C.F.R. § 164.522(a), or (ii) requires confidential communication about Operator's PHI pursuant to 45 C.F.R. § 164.522(b), provided that Operator notifies Manager in writing of the restriction or confidential communication obligations that Manager must follow.

**D.** **Privacy Obligation Breach and Security Incidents.**

**1.** **Reporting.**

**a)** **Privacy Breach.** Manager will report to Operator any use or disclosure of Operator's PHI not permitted by this Addendum or in writing by Operator. In addition, Manager will report, following discovery and without unreasonable delay, but in no event later than five (5) days following discovery, any "Breach" of "Unsecured PHI" as these terms are defined by the HITECH Act and any implementing regulations. Manager shall cooperate with Operator in investigating the Breach and in meeting Operator's obligations under the HITECH Act and any other security breach notification laws. Any such report shall include the identification (if known) of each individual whose Unsecured Protected Health Information has been, or is reasonably believed by Manager to have been, accessed, acquired, or disclosed during such Breach. Manager's report will at least:

i) Identify the nature of the non-permitted access, use or disclosure, including the

date of the Breach and the date of discovery of the Breach;

ii) Identify Operator's PHI accessed, used, or disclosed as part of the Breach (e.g., full name, social security number, date of birth, etc.);

iii) Identify who made the non-permitted access, use, or disclosure and who received the non-permitted disclosure;

iv) Identify what corrective action Manager took or will take to prevent further non-permitted access, uses, or disclosures;

v) Identify what Manager did or will do to mitigate any deleterious effect of the non-permitted access, use or disclosure; and

vi) Provide such other information, including a written report, as Operator may reasonably request.

b) **Security Incidents.** Manager will report to Operator any attempted or successful (i) unauthorized access, use, disclosure, modification, or destruction of Operator's ePHI or (ii) interference with Manager's system operations in Manager's information systems, of which Manager becomes aware that extend beyond routine, unsuccessful attempts. Routine, unsuccessful attempts include but are not limited to pings on Manager's firewall, port scans, attempts to log on to Manager's system to enter a database with an invalid password or username, denial-of-service attacks that do not result in a server being taken off-line and malware (e.g., worms, viruses). Manager shall promptly notify Operator Information Security Officer if Manager experiences Security Incidents that extend beyond these routine, unsuccessful attempts that could impact the confidentiality, integrity or availability of Operator's data. Manager will make this report upon Operator's request, except if any such security incident resulted in a disclosure of Operator's ePHI not permitted by this Addendum, Manager will make the report in accordance with Section D(1)(a) above. Examples of reportable security incidents include, but are not limited to:

i) The exposure of Manager's information systems to malicious code, such as a virus or worm, that places Operator data or systems at risk;

ii) Unauthorized access granted to or obtained by servers or workstations that contain Operator data;

iii) Manager becomes aware that Operator data is being used, copied, or destroyed inappropriately; and

iv) Manager experiences a "denial of service" attack or the compromise of a server or workstation containing Operator information that requires the server or workstation to be taken offline.

**2. Termination of Agreement.**

a) **Right to Terminate for Breach.** If Operator determines that Manager has breached any provision of this Addendum, Operator may terminate the Agreement in accordance with the provisions of Section 7.1(b) of the Agreement.

b) **Obligations upon Termination.**

i) **Return or Destruction of Operator's PHI as Feasible.** Upon termination, cancellation, expiration, or other conclusion of Agreement, Manager will if feasible return to Operator or destroy all PHI, in whatever form or medium

(including in any electronic medium under Manager's custody or control), that Manager created or received for or from Operator, including all copies of and any data or compilations derived from and allowing identification of any individual who is a subject of the PHI. Manager will complete such return or destruction as promptly as possible, but not later than thirty (30) days after the effective date of the termination, cancellation, expiration, or other conclusion of Agreement. Manager will identify any PHI that Manager created or received for or from Operator that cannot feasibly be returned to Operator or destroyed, and will limit its further use or disclosure of that PHI to those purposes that make return or destruction of that PHI infeasible. Within sixty (60) days after the effective date of the termination, cancellation, expiration, or other conclusion of Agreement, Manager will certify on oath in writing to Operator that such return or destruction has been completed, and will deliver to Operator the identification of any PHI for which return or destruction is infeasible and, for that PHI, will certify that it will only use or disclose such PHI for those purposes that make return or destruction infeasible.

ii) **Continuing Privacy and Security Obligation.** Manager's obligation to protect the privacy and safeguard the security of Operator's PHI as specified in this Addendum will be continuous and survive termination or other conclusion of the Agreement and this Addendum.

3. **Indemnity.** Manager will indemnify and hold harmless Operator and any Operator affiliate, officer, director, employee, or agent from and against any claim, cause of action, liability, damage, cost or expense, including attorneys' fees and court or proceeding costs, arising out of or in connection with any non-permitted use or disclosure of Operator's PHI or other breach of this Addendum by Manager or any subcontractor or agent under Manager's control.

E. **General Provisions.**

1. **Inspection of Internal Practices, Books, and Records.** Manager will make its internal practices, books, and records relating to its use and disclosure of Operator's PHI available to Operator and to DHHS to determine Operator's compliance with the Privacy Rule, 45 C.F.R. Part 164, Subpart E, and the Security Rule.

2. **Definitions.** The terms "Covered Entity," "Electronic Protected Health Information," "Protected Health Information," "Standard," "Trading Partner Agreement," and "Transaction" have the meanings set out in 45 C.F.R. § 160.103. The term "Standard Transaction" has the meaning set out in 45 C.F.R. § 162.103. The term "Required by Law" has the meaning set out in 45 C.F.R. § 164.103. The terms "Health Care Operations," "Payment," "Research," and "Treatment" have the meanings set out in 45 C.F.R. § 164.501. The term "Limited Data Set" has the meaning set out in 45 C.F.R. § 164.514(e). The term "use" means, with respect to Protected Health Information, utilization, employment, examination, analysis, or application within Manager. The terms "disclose" and "disclosure" mean, with respect to PHI, release, transfer, providing access to, or divulging to a person or entity not within Manager. For purposes of this Addendum, Operator's PHI encompasses Operator's Electronic PHI. Any other capitalized terms not identified here shall have the meaning as set forth in 45 C.F.R. Parts 160-64 for the Administrative Simplification provisions of Title II, Subtitle F of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), or in the Health Information Technology for Economic and Clinical Health Act, as incorporated in the American Recovery and Reinvestment Act of 2009 (the "HITECH Act")

3. **Amendment to Agreement.** Upon the compliance date of any final regulation or

amendment to final regulation promulgated by DHHS that affects Manager's use or disclosure of Operator's PHI or Standard Transactions, the Agreement and this Addendum will automatically amend such that the obligations imposed on Manager remain in compliance with the final regulation or amendment to final regulation.

**F. Conflicts.** The terms and conditions of this Addendum will override and control any conflicting term or condition of Agreement. All non-conflicting terms and conditions of Agreement remain in full force and effect.

*[Signatures on next page.]*

**IN WITNESS WHEREOF,** Operator and Manager execute this Addendum to be effective as of the effective date of the Agreement.

_____ **(Manager)**

By:_____

Print Name:_____

Title:_____

_____ **(Operator)**

By:_____

Print Name:_____
Title:_____

**SCHEDULE 19.3-A**

**FORM OF REPRESENTATION LETTER**

**ASB-CL-3.1: Management Representation Letter**

[Client's Letterhead]

[Date]

KMJ Corbin & Company LLP
555 Anton Blvd, Suite 1000
Costa Mesa, California 92626

We are providing this letter in connection with your audit of the balance sheet(s) of [Name of Client]  as of [Dates] , and the related statements of income, retained earnings, and cash flows for the [Periods]  then ended for the purpose of expressing an opinion as to whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of [Name of Client]  in conformity with U.S. generally accepted accounting principles. We confirm that we are responsible for the fair presentation in the financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles. We are also responsible for adopting sound accounting policies, establishing and maintaining internal control, and preventing and detecting fraud.

Certain representations in this letter are described as being limited to matters that are material. Items are considered material if they involve an omission or misstatement of accounting information that, in light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would be changed or influenced by the omission or misstatement. An omission or misstatement that is monetarily small in amount could be considered material as a result of qualitative factors.

We confirm, to the best of our knowledge and belief, as of [Date of Auditor's Report] , the following representations made to you during your audit.

1) The financial statements referred to above are fairly presented in conformity with U.S. generally accepted accounting principles.

2) We have made available to you all—

   a) Financial records and related data.

   b) Minutes of the meetings of stockholders, directors, and committees of directors, or summaries of actions of recent meetings for which minutes have not yet been prepared.

3) There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices.

4) There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

12462499v3

5) We believe that the effects of the uncorrected financial statement misstatements summarized in the attached schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

6) We acknowledge our responsibility for the design and implementation of programs and controls to prevent and detect fraud.

7) We have no knowledge of any fraud or suspected fraud affecting the company involving:

   a) Management,

   b) Employees who have significant roles in internal control, or

   c) Others where the fraud could have a material effect on the financial statements.

8) We have no knowledge of any allegations of fraud or suspected fraud affecting the company received in communications from employees, former employees, regulators, or others.

9) The company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

10) The following have been properly recorded or disclosed in the financial statements:

   a) Related party transactions and related accounts receivable or payable, including sales, purchases, loans, transfers, leasing arrangements, and guarantees.

   b) Guarantees, whether written or oral, under which the company is contingently liable.

11) There are no estimates that may be subject to a material change in the near term that have not been properly disclosed in the financial statements. We understand that *near term* means the period within one year of the date of the financial statements. In addition, we have no knowledge of concentrations existing at the date of the financial statements that make the company vulnerable to the risk of a near-term severe impact that have not been properly disclosed in the financial statements.

12) There are no:

   a) Violations or possible violations of laws or regulations whose effect should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

   b) Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with *FASB Accounting Standards Codification 450, Contingencies* (formerly *Statement of Financial Accounting Standards No. 5*).

   c) Other liabilities or gain or loss contingencies that are required to be accrued or disclosed by *FASB Accounting Standards Codification 450, Contingencies* (formerly *Statement of Financial Accounting Standards No. 5*).

13) The company has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral. [If the company has pledged assets, add "except as made known to you (optional—and disclosed in the notes to the financial statements)."]

14) We have complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance.

15) No events have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to, or disclosure in, the financial statements.

16) The responses set forth on the SAS 99 Questionnaire attached hereto as <u>Exhibit A</u> and made a part hereof have been provided by the management of [Name of Client] (the "Company").

Signature: [     ]
Title: [     ]

**SCHEDULE 19.3-B**

**FORM OF AUDIT LETTER**

**ASB-CL-2.1: Request for Legal Representation—
Lawyer Is Requested to Provide Information**

[Client's Letterhead]

[Date]

[Lawyer's Name and Address]

Our auditors, KMJ Corbin & Company LLP, are conducting an audit of our financial statements at [Date] and for the [Period] then ended. Please provide to them the information requested below involving matters with respect to which you have been engaged and to which you have devoted substantive attention on behalf of the Company in the form of legal consultation or representation.

Pending or Threatened Litigation, Claims, and Assessments (excluding unasserted claims and assessments)

Please prepare a description of all material litigation, claims, and assessments (excluding unasserted claims and assessments). Materiality for purposes of this letter includes items involving amounts exceeding $[    ] individually or in the aggregate. The description of each case should include:

1) the nature of the litigation,

2) the progress of the case to date,

3) how management is responding or intends to respond to the litigation, e.g., to contest the case vigorously or to seek an out-of-court settlement, and

4) an evaluation of the likelihood of an unfavorable outcome and an estimate, if one can be made, of the amount or range of potential loss.

Also, please identify any pending or threatened litigation, claims, and assessments with respect to which you have been engaged but as to which you have not yet devoted substantive attention.

Unasserted Claims and Assessments

We understand that whenever, in the course of performing legal services for us with respect to a matter recognized to involve an unasserted possible claim or assessment that may call for financial statement disclosure, you have formed a professional conclusion that we should disclose or consider disclosure concerning such possible claim or assessment, as a matter of professional responsibility to us, you will so advise us and will consult with us concerning the question of such disclosure and the applicable requirements of *FASB Accounting Standards Codification 450, Contingencies* (formerly *Statement of Financial Accounting Standards No. 5*) (excerpts of which can be found in the ABA's *Auditor's Letter Handbook*). Please specifically confirm to our auditors that our understanding is correct.

We have represented to our auditors that there are no unasserted possible claims or assessments that you have advised us are probable of assertion and must be disclosed in accordance with

C-145

*FASB Accounting Standards Codification 450, Contingencies* (formerly *Statement of Financial Accounting Standards No. 5*).

<u>Response</u>

Your response should include matters that existed as of [Date] , and during the period from that date to the effective date of your response. Please specify the effective date of your response if it is other than the date of reply.

Please specifically identify the nature of, and reasons for, any limitations on your response.

Our auditors would appreciate receiving your reply by [Date]  with a specified effective date as close as feasible to that date. You may also be requested to provide verbal updates to your written response at a later date. We appreciate your timely response to such requests.

<u>Other Matters</u>

Please also indicate the amount we were indebted to you for services and expenses (billed or unbilled) on [Date] .

Very truly yours,

[Officer's Signature and Title]

[Client's Name]